**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES OF AMERICA,**

    **Plaintiff,**

**v.**                                                              **Case No. 6:18-cr-223-Orl-37TBS**

**ROSE BETH LITZKY,**

    **Defendant.**

_____/

### SENTENCING MEMORANDUM FOR ROSE BETH LITZKY

[S]entencing serves the purposes of retribution, deterrence, incapacitation, and rehabilitation. Deterrence, incapacitation, and rehabilitation are prospective and societal—each looks forward and asks: What amount and kind of punishment will help make society safe? In contrast, retribution imposes punishment based upon moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community?[1]

Ms. Litzky, through her undersigned attorney, pursuant to 18 U.S.C. §§ 3551 and 3553,

requests a sentence of not a day higher than the mandatory minimum of fifteen years.

### ARGUMENT

In enacting the Sentencing Reform Act, Congress did "not favor[] one purpose of

sentencing over another," except that rehabilitation was not to be a reason to impose a sentence

of incarceration.[2] Rather, "each of the four stated purposes should be considered in imposing

sentence in a particular case," and "one purpose of sentencing may have more bearing on the

---

[1] *U.S. v. Cole*, 622 F. Supp. 2d 632, 637 (N.D. Ohio, December 11, 2008).

[2] *See* S. Rep. No. 98-225, at 67 (1983).

imposition of sentence in a particular case than another purpose has."[3]  In choosing what type

of sentence to impose, sentencing courts "must consider" all of the purposes and factors set

forth in 18 U.S.C. § 3553(a).[4]

Pursuant to the § 3553 factors, Ms. Litzky submits that a downward variance is

warranted for the following reasons: (1) her intellectual disability;[5] (2) her lack of prior

criminal history; and (3) her diminished capacity.

## I.    THE NATURE AND CIRCUMSTANCES OF THE OFFENSE AND THE HISTORY AND CHARACTERISTICS OF MS. LITZKY (18 U.S.C. § 3553(a)(a));

### A.  THE NATURE AND CIRCUMSTANCES OF THE OFFENSE

Ms. Litzky acknowledges that the nature of the offense is one of the most serious in the

federal system. However, the Court should consider the circumstances under which the offense

was committed as a mitigating factor, which were committed under the undue influence of the

co-defendant who took advantage of her intellectual disability, groomed her and manipulated

her. Prior to indictment, Ms. Litzky (along with her former attorney) met with the previously-

assigned federal prosecutor and agents and cooperated as best as she could regarding the co-

defendant's abuse. Ms. Litzky also met with federal agents on two other occasions (without

---

[3] *Id*. at 68.

[4] *Id*. at 119.

[5] Sometimes, the former, outdated term "mental retardation" is used in this memorandum to maintain continuity with the attributed source of information. The Fifth Edition of The American Psychiatric Association's *Diagnostic and Statistical Manual of Mental Disorders* ("DSM-5") has also replaced "mental retardation" with "intellectual disability." *See Exhibit E.*

the benefit of an attorney) and tried to help the investigation. After indictment, Ms. Litzky proceeded to trial and the more culpable co-defendant with overwhelming evidence of pedophilia and egregious conduct of sexual abuse throughout his many electronic devices received the benefit of a 5K for testifying and minimizing his conduct in Ms. Litzky's trial.

## B.  THE HISTORY AND CHARACTERISTICS OF MS. LITZKY

Indeed, it can now be reasonably argued that, in fashioning an appropriate sentence, courts are now required to consider, and factor in, a defendant's mental illness if they are to be faithful to § 3553(a).[6]

"[E]vidence about [a] defendant's background and character is relevant" to the sentencing decision, "because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to emotional and mental problems, may be less culpable than defendants who have no such excuse.[7]

The federal government vis-à-vis the Social Security Administration ("SSA") has paid for Ms. Litzky's livelihood since she was in elementary school, specifically September 1991, due to her intellectual disability. Now, the federal government vis-à-vis the Department of Justice wants Ms. Litzky to be imprisoned for life and wants the Court to disregard her intellectual disability. For the sake of brevity, the undersigned has included only a number of pages from the hundreds of pages of records dating back 28 years.  The undersigned has the records in their entirety (and provided them the government and to the United States Probation

---

[6] *U.S. v. Ferguson*, 942 F. Supp. 2d 1186, 1194 (M.D. Ala. 2013). The Supreme Court has used neuroscience in measuring criminal responsibility of juvenile offenders beginning in *Roper v. Simmons* (543 US 551 (2005)) and more recently in *Miller v. Alabama* (567 US 460 (2012)) signaling that neuroscience should help courts craft appropriate punishments for offenders.

[7] *Penry v. Lynaugh,* 492 U.S. 302, 319 (1989), *abrogated by Atkins v. Virginia*, 536 U.S. 304 (2002) (quoting *California v. Brown,* 479 U.S. 538, 545 (O'Connor, J., concurring)).

Office) and will be happy to make them available if the Court wishes to see them.  As seen below, her father Leonard Litzky has been her payee, managing her funds.



Her primary diagnosis from SSA has been intellectual disability and her secondary diagnosis has been speech and language delay.  From SSA's website: "Medical evidence is the cornerstone of the disability determination under both the title II and title XVI programs...By law, SSA needs specific medical evidence to establish that a claimant has an impairment."[8]

---

[8] https://www.ssa.gov/disability/professionals/bluebook/evidentiary.htm. Last accessed December 9, 2019.

SSA has required a medical professional to re-evaluate Ms. Litzky's disability throughout her life in order to continue receiving payments. However, as the APS noted, this is a chronic impairment. *Exhibit E.*

Intellectual disability is a devastating, lifelong handicap.  The American Psychiatric Association ("APS") defines intellectual disability as follows:

Intellectual disability involves impairments of general mental abilities that impact adaptive functioning in three domains, or areas. These domains determine how well an individual copes with everyday tasks:

The conceptual domain includes skills in language, reading, writing, math, reasoning, knowledge, and memory.

The social domain refers to empathy, social judgment, interpersonal communication skills, the ability to make and retain friendships, and similar capacities.

The practical domain centers on self-management in areas such as personal care, job responsibilities, money management, recreation, and organizing school and work tasks.

While intellectual disability does not have a specific age requirement, an individual's symptoms must begin during the developmental period and are diagnosed based on the severity of deficits in adaptive functioning. The disorder is considered chronic and often co-occurs with other mental conditions like depression, attention-deficit/hyperactivity disorder, and autism spectrum

disorder.

*See* Appendix, *Exhibit E* (Two-page publication from APS).

Intellectual disability has a profound effect on an individual's ability to understand and process information, engage in logical reasoning and, perhaps, most relevant to Ms. Litzky's case, often results in the individual following the lead of others:

> [C]linical definitions of mental retardation require not only sub-average intellectual functioning, but also significant limitations in adaptive skills such as communication, self-care, and self-direction that became manifest before age 18. Mentally retarded persons frequently know the difference between right and wrong and are competent to stand trial. Because of their impairments, however, by definition they have diminished capacities to understand and process information, to communicate, to abstract from mistakes and learn from experience, to engage in logical reasoning, to control impulses, and to understand the reactions of others.  There is no evidence that they are more likely to engage in criminal conduct than others, but there is abundant evidence that they often act on impulse rather than pursuant to a premeditated plan, and that *in group settings they are followers rather than leaders.*

*Atkins*, 536 U.S. at 318 (emphasis added). While the handicap does not excuse criminal conduct, it is usually seen as reducing the individual's culpability for that conduct. *See id.* ("*Their deficiencies do not warrant an exemption from criminal sanctions, but they do diminish their personal culpability*.")(emphasis added).

In the American Psychological Association's *Amici Curiae* brief filed in *Atkins* (*Amicus Br.)*, the Association referred to the susceptibility of the intellectually disabled to manipulation: "Moreover, people with mental retardation are often especially eager to please others, a

characteristic obviously susceptible to manipulation." *Amicus Br.* at 9.[9] The Association, too, drew an analogy to the susceptibility of children to "undue influence:"

> A comparison with children is useful here. Adults with mental retardation, of course, are *not* children. Nonetheless, with respect to personal culpability, adults with mental retardation and children share the critical characteristics of diminished capacity to understand the moral and factual consequences of their actions, to control their impulses, and to make independent decisions without undue influence by others.

*Id.* at 2 (emphasis in the original).  The Association also noted that those such as Ms. Litzky who fall in the subcategory of "mild" intellectual disability still suffer from significant deficits:

> Alternatively, people with mental retardation are sometimes sub-classified as having either "mild," "moderate," "severe," or "profound" mental retardation, depending on the degree of their intellectual and adaptive functioning. Note that the term "mild" mental retardation can be misleading, for even the highest functioning individuals with mental retardation must have substantial cognitive and behavioral disabilities before they can be diagnosed with retardation.

*Id.* at 6, n. 3. Overall, only one to three percent of the general population are considered to be intellectually disabled. *Id.* at 8 ("Although there is no precise census of the number of people with mental retardation, studies invariably put the number at less than 3% of the population, usually in the 1% to 3% range"). Given the effects of the disability, then, "impaired intellectual functioning is inherently mitigating." *Tennard v. Dretke*, 542 U.S. 274, 287 (2004).[10]

---

[9]The brief is available at the American Psychological Association's website: http://www.apa.org/about/offices/ogc/amicus/atkins.aspx. The brief is styled *McCarver v. North Carolina*, a companion case. *See Atkins v. Virginia*, 536 U.S. at 316, n. 21.

[10]In a survey of United States District Court Judges conducted in 2010, eighty percent of those surveyed thought "diminished capacity" was "ordinarily relevant to departure and/or variance consideration." United States Sentencing Commission, *Results of Survey of United States*

SSA determined 15 years ago that Ms. Litzky continued to meet the intellectually disabled listing. This 2004 investigation not only included talking to Ms. Litzky's longtime teacher from Wabasso School, Ms. Davis, Mr. Litzky, and school records, but also an independent evaluation.

Below is a summary of Ms. Davis's communication with SSA.

```
   Claimant:     ROSE LITZKY
   SSN:          ██████████
   ------------------------------------------------------------------------
   CONTACT WITH: PAT DAVIS-ESE TEACHER

   Telephone No.    Date: October 28, 2004
   ------------------------------------------------------------------------
   SUMMARY OF CONTACT:

   MS. DAVIS SAID CLMT HAS BEEN UNDER HER FOR 3 YEARS. CLMT IS UNDER EMH CLASSES FOR
   MENTALLY HANDICAPPED. CLMT IS 18 YEARS AND OVERWEIGHT. CLMT IS ACADEMICALLY BELOW
   AVERAGE AND NEEDS CONSTANT SUPERVISION AND SOMEBODY IS ASSIGNED TO HER ON A ONE ON
   ONE BASIS. CLMT HAS ATTITUDE AND EMOTIONAL PROBLEMS THAT AFFECTS HER WORK. CLMT IS
   ABLE TO START/FINISH THE WORK BUT NOT ON A TIMELY MANNER. CLMT HAS TO BE REMINDED
   AND GUIDED TO BE ABLE TO FINISH THE JOB. CLMT IS IN HER 12TH GRADE ESE BASIS AND
   ACTUAL 3RD/4TH GRADE LEVEL AT THIS POINT. CLMT DRESSES APPROPRIATELY FOR CLASS.
   CLMT DOES PARTICIPATE IN SCHOOL ACTIVITIES AND HAS PEER RELATIONSHIPS. CLMT WILL
   SOMETIMES REFUSE WHAT HER TEACHERS WANT HER TO DO, BUT WITH SOME COACHING AND
   CLARIFYING THE IMPORTANCE OF THE ASSIGNMENTS, CLMT WILL SOMEHOW DO IT. THE CLASS
   HAS A PROGRAM TO TRAIN STUDENTS WITH LEARNING DISABILITY TO FIND A JOB SUITED TO
   THEIR INTELLECTUAL LEVEL. MS. DAVIS SAID AFTER 3 YEARS, THERE WAS AN IMPROVEMENT
   ACADEMICALLY BUT SLOW AND IS STILL CONSIDERED MENTALLY DEFICIENT.
```

*District Judges January 2010 through March 2010,* Table 13. The survey is available at: http://www.ussc.gov/Research/Research_Projects/Surveys/20100608_Judge_Survey.pdf.

Form Approved
OMB No. 0960-0413

# PSYCHIATRIC REVIEW TECHNIQUE

Name  ROSE B LITZKY                                        SSN  ▮▮▮▮▮

NH (If different from above)                               SSN

I.    **MEDICAL SUMMARY**

    A.   Assessment is from: _____ to   PRESENT _____

    B.   Medical Disposition(s)

        1.  ☐  No Medically Determinable Impairment

        2.  ☐  Impairment(s) Not Severe

        3.  ☐  Impairment(s) Severe But Not Expected to Last 12 Months

        4.  ☒  Meets Listing ___1205 D___ (Cite Listing)

        5.  ☐  Equals Listing _____ (Cite Listing)

        6.  ☐  RFC Assessment Necessary

        7.  ☐  Coexisting Nonmental Impairment(s) that Requires Referral to Another Medical Specialty

        8.  ☐  Insufficient Evidence

    C.   Category(ies) Upon Which the Medical Disposition is Based:

        1.  ☒  12.02 Organic Mental Disorders

        2.  ☐  12.03 Schizophrenic, Paranoid and Other Psychotic Disorders

        3.  ☐  12.04 Affective Disorders

        4.  ☒  12.05 Mental Retardation

        5.  ☐  12.06 Anxiety-Related Disorders

        6.  ☐  12.07 Somatoform Disorders

        7.  ☐  12.08 Personality Disorders

        8.  ☐  12.09 Substance Addiction Disorders

        9.  ☐  12.10 Autism and Other Pervasive Developmental Disorders

☒  These findings complete the medical portion of the disability determination.

MC/PC's Signature  _~~Walter PhD~~_                          Date: 11/1/2004

MC/PC's Printed Name                                         Code:

Form SSA-2506-BK (6-2001) Destroy Prior Editions
EK (6-2001)

| II. | DOCUMENTATION OF FACTORS THAT EVIDENCE THE DISORDER |
|---|---|

**A.    12.02 Organic Mental Disorders**

☒   Psychological or behavioral abnormalities associated with a dysfunction of the brain…as evidenced by at least one of the following:

1.    ☐    Disorientation to time and place

2.    ☐    Memory Impairment

3.    ☐    Perceptual or thinking disturbances

4.    ☐    Change in personality

5.    ☐    Disturbance in mood

6.    ☐    Emotional lability and impairment in impulse control

7.    ☐    Loss of measured intellectual ability of at least 15 IQ points from premorbid levels or overall impairment index clearly within the severely impaired range on neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.

☒   A medically determinable impairment is present that does not precisely satisfy the diagnostic criteria above.

Disorder  PHONOLOGICAL D/O

Pertinent symptoms, signs, and laboratory findings that substantiate the presence of this impairment:

---

**D.    12.05 Mental Retardation**

☒   Significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22, with one of the following:

1.    ☐    Mental incapacity evidenced by dependence upon others for personal needs (e.g., toileting, eating, dressing, or bathing) and inability to follow instructions such that the use of standardized measures of intellectual functioning is precluded*

2.    ☐    A valid verbal, performance, or full scale IQ of 59 or less*

3.    ☐    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function *

4.    ☒    A valid verbal, performance, or full scale IQ of 60 through 70*

| IV. | CONSULTANT'S NOTES |
|---|---|

18YO  FEMALE.  CLMT HAS HX OF SPECIAL EDUCATION/ TMH, SPEECH/LANGUAGE IMPAIRED.  PAST TESTING HAS SHOWN IQ/ACHIEVEMENT SCORES IN THE IMPAIRED RANGE.  LANGUAGE SCORES HAVE ALSO BEEN CONSISTENTLY IN THE IMPAIRED RANGE.  NO MH TX.  PSYCH CE- 8/9/04-  MSE-  CAME WITH FATHER.  GROOMED.  COOPERATIVE.  DECREASED SPEECH.  MOOD WNL.  OX2 (PARTIAL TO PLACE).  FAIR ATTEN.  GOOD CONC.  DEFICIENT IMMEDIATE MEMORY.  GOOD RECENT, FAIR REMOTE MEMORY.  INDECISIVE.  NO SI/HI.  NO A/VH,D.  FAIR REASONING.  TESTING- WAIS3- VALID- V 63, P 67, FS 62.  WJR-  BR 57, BM 57, BWL 42.  DX-  MILD MR.  PHONOLOGICAL D/O.

ADL- TEACHER INDICATES CLMT IS IN EMH CLASS AND REQUIRES CONSTANT SUPERVISION.  SHE HAS AN ASSIGNED STAFF MEMBER FOR ONE-ON- ONE.  SHOWS ATTITUDE AND EMOTIONAL PROBLEMS THAT AFFECT HER WORK.  SHE CAN START AND FINISH BUT NOT TIMELY.  SHE MUST BE GUIDED, REMINDED TO COMPLETE TASKS.  WHILE IN THE 12th GRADE ESE, SHE WORKS ON  3rd- 4th GRADE LEVEL.  SHE PARTICIPATES IN ACTIVITIES AND HAS PEER FRIENDS.  WILL INITIALLY REFUSE TO DO AS ASKED BUT WILL EVENTUALLY COMPLY AFTER COACHING AND CLARIFICATION.

THIRD PARTY REPORTS-  CLMT GOES EVERY WHERE WITH FATHER AND CAN'T BE LEFT ALONE.  SHE NEEDS REMINDED TO GROOM.  NO MEAL PREP OR HHC.  LIKES TV AND PLAYING GAMES ON TV.  SOCIALIZES ON PHONE WITH FRIENDS FROM SCHOOL.  ATTEN SPAN IS 10-15 MINUTES.  DOES NOT FINISH TASKS.  CAN FOLLOW SPOKEN DIRECTIONS WHEN SHE WANTS TO DO SO.

OVERALL-  MEETS LISTING 1205 D.  CLMT HAS LONG HX OF SPECIAL CLASS PLACEMENT AND IQ/CHIEVEMENT/ LANGUAGE SCORES IN THE DEFICIENT RANGE.  TEACHER AND PARENT PROVIDED ADL INFORMATION THAT CONFIRMS SHE IS UNABLE TO INDEPENDENTLY INITIATE, SUSTAIN, COMPLETE TASKS IN SCHOOL SETTING OR IN THE HOME.  SHE HAS MINIMAL SOCIAL ACTIVITIES AND DOES NOT GO OUT ALONE.  THE CLMT APPEARS TO HAVE DEFICIENT IQ AND SIGNIFICANTLY IMPAIRED ADAPTIVE SKILLS.

Ms. Litzky was born in 1986 and the undersigned has reviewed records dating back to 1990. Some are included below.

```
           ASSOCIATION FOR THE HELP OF RETARDED CHILDREN

               OCCUPATIONAL THERAPY EVALUATION


  NAME:  ROSE LITZKY                    PROGRAM:  BRONX E.C.

  DOB:   ████████                       EVALUATOR:  KARYN RUGLAND HAYDOCK
                                                    MOT, OTR/L
  DOE:   3/7/90


  1:   IDENTIFYING DATA:

  Rose is a 3.9 year old girl.
  She appeared timid and withdrawn during classroom observation, but she
  was more outgoing during 1:1 evaluation.  She was also very distractible
  and used single words and gestures to communicate with therapist during
  the session.
```



THE
GREENWICH HOSPITAL
ASSOCIATION

PERRYRIDGE ROAD
GREENWICH, CONNECTICUT 06830-4697   TEL : 203 863-3000
FAX: 203 863-3427

L A N G U A G E   A N D   S P E E C H   E V A L U A T I O N

A U D I O L O G I C A L   E V A L U A T I O N

R E :   LITZKY, Rose
       2220 Wallace Avenue  #2D
       Bronx, New York   10467

DOB:   ███████                    Evaluation Dates: 2/15/90; 2/21/90
C.A.   3-8

Rose was seen at the Hearing, Speech and Language Center for an audiological
evaluation on 2/15/90 and a language and speech evaluation on 2/21/90.  At
age 3 years, 8 months, Rose has a reported productive vocabulary of two
words, ma for more and ba for ball.  Rose has attended special pre-school on
a daily basis since September, 1989.  Within this program, she receives speech
therapy three times per week.  No reports were available at the time of the
evaluation from this program.

# Rehabilitation
# Center OF FAIRFIELD COUNTY
## We Build the Total Person

The confidentially of this record is
required under CT ann Conn. statute.
This material shall not be transmitted to
anyone without prior written consent or
other authorization as provided in the
aforementioned statutes

Sally Gammon
President/CEO
Hee Jong Lee, M.D.
Medical Director

## SPEECH AND LANGUAGE EVALUATION

Name:  Rose Litzky                         Date of Evaluation:  5/13/91
Birthdate:  ▇▇▇▇▇                          Referred by:  Dr. Schutzengel
Parents:  Helen/Leonarad                   Examiner:  Joyce E. Johns, M.S.
Address:  106 Charron Street                          Speech-Language Pathologist
          Bridgeport, CT
Phone:  373-0099

Diagnosis:  Language Delay
Problem List:  Significant Receptive Language Delay
               Severe Expressive Language Delay
               Oral Motor Apraxia

Subjective:  Rose Litzky, a 4 year and 11 month old girl, was referred for a speech
and language evaluation at the Rehabilitation Center of Fairfield County by her
pediatrician, Dr. Schutzengel.  Rose was accompanied to the evaluation by her
father and her uncle.  Both men were present throughout the evaluation and served
as informants for the child case history form.

Rose's past medical history is insignificant.  She presently attends Skane School's
Special Education Pre-School, where she recieves speech therapy a few times a week.
According to Mr.  Litzky, Rose's only difficulty in school is that she has very few
words that she uses and it is hard for others to understand her.  In fact, Rose's
father and uncle report that Rose uses sounds and a few basic words in conjunction
with gestures to communicate.  Rose's hearing has been tested, and is reportedly
within normal limits.

CITY OF BRIDGEPORT

## DEPARTMENT OF PSYCHOLOGICAL SERVICES
### Report of Psychological Evaluation

SEP 8 1992

| | |
|---|---|
| NAME OF STUDENT | Rose Litkzy |
| SCHOOL | Skane |
| GRADE | Sp. Ed. Kindergarten |
| DATE OF BIRTH | 6-17-86 |
| C.A. | 5-10 |
| ADDRESS | 107 Charron Street |

DATE:   5-30-92

LDC:   E
STUDENT #:

ASSESSMENT INSTRUMENTS/TECHNIQUES:

COPY

| DATE: | TEST: | SCORES: |
|---|---|---|
| 4-21-92 | Informal Observations Techniques | |
| 4-30-92 | WPPSI-R | V= 57, P= 55, FS=52 |
| 4-20-92 | Classroom Vineland | Communication    63  5 |
| | | Daily Living     68  6 |
| | | Socialization    70  7 |
| | | Motor            84  12 |
| | | Composite        68  7 |
| 5-5-92 | PPVT-R | S.S.= 52 |
| | | A.E.= 3-0 |
| 5-5-92 | VMI | S.S.= 74, A.E.= 4-3 |

OTHER EVALS/REPORTS CONSIDERED FOR PURPOSES OF THIS ASSESSMENT (copies attached)

| DATE: | EVAL/REPORT: | ADMINISTRATOR |
|---|---|---|
| 4-92 | Brigance | Catie Esposito |

BRIEF BACKGROUND:   Rosie entered a Skane special education pre-school classroom after being seen in the Consultation Center in September of 1990.  At that time, speech and language was her most significant weakness with other skills measured at an approximate 1 year delay.  This past year Rose continued in the Special Education kindergarten at Skane.



COMMUNICATION EVALUATION REPORT

Name: Rose Litzky               Date of Evaluation: June 12, 1997
DOB: ███████                    Age at Evaluation:   10:11:25

Background Information

Rose was referred by the Office of Disability for speech and language
evaluation.  Her father stated that she is enrolled in Exceptional Student
Education classes at Rosewood Elementary School where she receives speech
and language therapy.



Suncoast Counseling & Assessment, Inc.
Center for Psychological and Forensic Services

**PSYCHOLOGICAL EVALUATION**

Theodore G. Williams, Ph.D.
Clinical Director

Steven Edney, Psy.D.
Director of Operations

Athena P. Scotes, LMHC
Director of Programs

Stuart Office- Main
207 SW 5th Street
Stuart, Florida 34994
Office: (561) 223-9988
Fax:(561) 223-9593
Email: suncoast@attglobal.net

Ft. Pierce Office
Sunrise Professional Plaza
2100 Sunrise Blvd.
Suite "D"
Fort Pierce, Florida 34950
Office: (800) 680-3016

| | |
|---|---|
| **Name:** | Rose B. Litzky |
| **Date of Birth:** | |
| **Social Security Number:** | ▮▮▮▮▮▮ |
| **Referral Source:** | Department of Labor and Employment Security Office of Disability Determinations |
| **Referring Examiner:** | C. Thomas |
| **Date of Evaluation:** | 01/16/02 |

**REASON FOR REFERRAL:**

The Department of Labor and Employment Security - Office of Disability Determinations, referred Rose for a psychological evaluation. This evaluation will be used as an aid in determining eligibility for disability benefits. The purpose of this evaluation, as well as the limits of confidentiality, were discussed with the claimant and her father, Mr. Lenny Litzky.

**METHOD OF EVALUATION:**

Learning Disabilities Evaluation:
    Wechsler Intelligence Scale for Children-Third Edition (WISC-III)
    Woodcock Johnson Tests of Achievement-Revised (WJ-R)
    Bender Visual Motor Gestalt Test (BVMGT)

A psychological evaluation from 1997 noted a Full-Scale IQ of 69, a Verbal IQ of 64, and a Performance IQ of 78. As her Full-Scale IQ fell on the cusp or Extremely Low to Borderline average and she was given a diagnosis of Borderline Intellectual Functioning. It was reported that the claimant had been physically abused by her mother which may be the cause of her learning deficits.

**LITZKY, ROSE/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**                                                      **Page 4**

**DIAGNOSTIC IMPRESSION**:

317                  Mild Mental Retardation

**CONCLUSION AND RECOMMENDATIONS:** .

Rose is an obese 15 year old Caucasian female whose father said has learning problems. A
previous psychological evaluation from 1997 diagnosed her with Borderline Intellectual
Functioning based on her WISC-III Full-Scale score on the  cusp of Extremely Low to
Borderline ranges and Borderline Performance IQ.

She was cooperative and exhibited good effort and motivation today.  Results of the WISC-III
revealed Extremely Low scores in all areas of evaluation.  Correspondingly, her WJ-R scores
were in the Extremely Low range, and her BVMGT scores noted an age equivalency of 8-0 to 8-
5 relative to her visual motor skills.


Joan H. Rodenhauser, Ph.D.                    Steven Edney, Psy. D.
Registered Mental Health Intern               Clinical Psychologist – Supervisor
Lic. #IMH-0001824                             Lic. PY-0005416


As this Court considers the appropriate sentence to impose, it is essential to emphasize

that Ms. Litzky has no prior criminal history and she presently struggles with a long-standing

intellectual disability and phonological disorder (which is documented and supported by a

plethora of medical, school, and social security records).

Ms. Litzky's intellectual disability justifies a below-guideline sentence either on the basis of a traditional guideline departure or as a variance.[11] Section 5K2.13 of the United States Sentencing Guidelines Manual provides for a downward departure in cases of diminished capacity. The provision provides that "[a] downward departure may be warranted if (1) the defendant committed the offense while suffering from a significantly reduced mental capacity; and (2) the significantly reduced mental capacity contributed substantially to the commission of the offense."

The application note goes on to state that:

'Significantly reduced mental capacity' means the defendant, although convicted, has a significantly impaired ability to (a) understand the wrongfulness of the behavior comprising the offense or to exercise the power of reason; or (b) control behavior that the defendant knows is wrongful.

While there seems to be little in the way of either published or unpublished decisions where the provision has been applied to the benefit of the defendant, courts have recognized that the provision is due careful consideration. *See United States v. Jones*, 42 Fed. Appx. 879, 981 (7th Cir. 2002); *United States v. Hogan*, 1995 WL 225710 (D.C. Cir. 1995)(unpublished).

Section 5K2.13 "comprehends both organic dysfunction and behavioral disturbances" so long as those conditions "impair the formation of reasoned judgments." *United States v. Cantu*, 12 F.3d 1506, 1513 (9th Cir. 1993) (finding PTSD, mood disorders, and schizophrenia qualify the defendant for a diminished-capacity departure to the extent they frustrate his ability to make reasoned decisions).

---

[11] *See United States v. Jordi*, 418 F.3d 1212, 1215 (11th Cir. 2005) ( "[T]he application of the guidelines is not complete until the departures, if any, that are warranted, are appropriately considered").

Ms. Litzky committed the offenses "while suffering from a significantly reduced mental capacity," and it seems obvious that her deficit contributed substantially to the commission of the offense in that she was far more likely than others to be manipulated or to follow the lead of other individuals such as the co-defendant. In the attached letters found in Appendix C, several members of the community from all walks of life (who do not know each other) mentioned Ms. Litzky's manipulation by the co-defendant. For example,

(1) Letter from Rosa Martin (C-1):

I cannot wrap my head around her being involved in this. I would not be surprised that she was manipulated by Roberto since she was easily manipulated by her father.

(2) Letter from Fernando Tiago (C-5):

I truly believe that she does not possess the ability and capability to conduct such horrendous undertakings on her own, without the guidance and probable enticement of someone else. Thus, it is with my humble opinion that leniency be granted for Rose, since it is not in her character to conduct herself in such a manner…I do not wish to minimize any wrong doing on her part. I would just like to highlight that I do not believe that Rose would be able to conduct these charged atrocities on her own.

(3) Letter from Shaun McFadden (C-6):

I really don't believe that Rose is capable of doing what she did on her own. She is very moldable to any strong mans will. I met Robert once and his tone with her and the girls was sharp, straight to the point, and demanding. She did as she was told. Now I don't know if it was fear or love, but she did everything he said or asked.

(4) Letter from Karen Burroughs (C-7):

In my first conversation with Rose I realized that she was a very vulnerable and victimized young woman facing a very serious situation. Since then, those first impressions have been validated by both her mentor and the Corrections Officer who oversees Rose's dorm. My concerns have motivated me to bring these observations to your attention for your consideration as you fulfill your responsibilities regarding her future…Comments from the Corrections Officer

who describes Rose as a "sweetheart:"…"I don't know what she has done, but
I would guess she was manipulated into it."

That same susceptibility to the influence of others surely impaired Ms. Litzky's ability
to "control behavior that" she knew was "wrongful."

## II.   THE NEED FOR THE SENTENCE IMPOSED (18 U.S.C. § 3553(a)(2))—

### A.  To Reflect the Seriousness of the Offense, to Promote Respect for the law, and to Provide Just Punishment for the Offense (18 U.S.C. § 3553(a)(2)(1));

Desert (blameworthiness) loses some bite because those with reduced ability to
reason, or to control their impulses, are less deserving of punishment than those
who act of viciousness or greed.[12]

First, the draconian term of imprisonment (life) as called for in the guidelines is not
necessary to reflect the seriousness of the offense, to promote respect for the law, or to provide
just punishment. Any prison sentence would be a particularly harsh punishment for Ms. Litzky
who has never had any contact with law enforcement or been incarcerated prior to the arrest in
this case.  Ms. Litzky's offense is undeniably serious, and should not be excused, but a 15-year
term of incarceration will provide more than adequate punishment.

In addition to imprisonment, Ms. Litzky will forever be required to register as a sex
offender, with the publication of that information to the community where she resides, as well
as to the entire world given the availability of the sex offense registration on the Internet.  Also,
Ms. Litzky will forever have convicted felon status and the consequent significant collateral
consequences. However, the biggest form of punishment was losing her kids. Ms. Litzky

---

[12] *Cantu,* 12 F.3d at 1516

voluntarily relinquished her parental rights of K.O. and E.L.[13] Losing them has been the source of immeasurable grief, regret, and remorse. In her unsent letter to the adoptive parents—in the spirit of restorative justice—Ms. Litzky states, "Thank you for giving my 2 girls a love and warm home. Im thankful for the help you are giving my girls Im so sorry for everything I feel very sad I wish I could have protect my babies good…" *See* Appendix, *Exhibit A*. The totality of that punishment is just, reflects the seriousness of Ms. Litzky's criminal conduct, and promotes respect for the law.

### B. To Afford Adequate Deterrence to Criminal Conduct (18 U.S.C. § 3553(a)(2)(B));

For many of the same aforementioned reasons, a prison term over the mandatory minimum of 15 years also is not necessary to "afford adequate deterrence to criminal conduct" as she has already suffered great loss and the man who groomed, manipulated, and abused her and her children is behind bars for 50 years.  Any need for general deterrence has also been satisfied by the government's decision to bring charges against the intellectually disabled mother of the two children whom the pedophilic, manipulative, sick father abused. To the extent that one believes in the ability of a sentence in a single criminal case to have a general deterrent effect, a felony conviction and sentence of 15 years in prison is more than adequate to deter others from committing this offense. Thus, to the extent it possibly can, the 15-year term of incarceration requested by Ms. Litzky will address the need for adequate deterrence called for in 18 U.S.C. § 3553(a)(2)(B).  However, because of Ms. Litzky's intellectual

---

[13] The girls have since been adopted into a seemingly loving, patient, resilient family who have remained involved in the prosecution of this case (as seen in the Victim Impact Statement) and who appear to have their best interests at heart.

disability, "Deterrence has less value ... because people with reduced capacities are less susceptible to a system of punishment and reward." *Cantu,* 12 F.3d at 1516.   In Mr. McFadden's letter to the Court he writes, "I do believe that her long incarceration would be lost on her because of her slow understanding and nature." *See* C-6.

### C. To Protect the Public from Further Crimes of Ms. Litzky (18 U.S.C. § 3553(a)(2)(C));

"The remaining rationale—incapacitation to protect the public safety—does not justify incarcerating mentally ill, intellectually disabled defendants unless they are violent." *Cantu,* 12 F.3d at 1516; USSG § 5K2.13.

Ms. Litzky's role in the offense resulted from extreme fear, duress, and diminished capacity. Her behavior during the relevant period is most consistent with that of a victim of abuse than a sexual predator. There was no intention or desire to abuse any minor.  There is simply no reason to believe that she would engage in any criminal activity in the future. Ms. Litzky's 15-year term of imprisonment, lack of criminal history, and her subsequent term of supervised release support the conclusion that—with the combination of familial support and societal support (as will be provided by the United States Probation Office)—she is unlikely to re-offend, and thus the public would be sufficiently protected.

### D. To Provide Ms. Litzky with Needed Educational or Vocational Training, Medical Care, or Other Correctional Treatment in the Most Effective Manner (18 U.S.C. § 3553(a)(2)(D))

Finally, a lengthy prison term is not necessary "to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553(a)(2)(D). Prior to her arrest in this case, as noted *infra,* Ms. Litzky had been receiving Social Security Disability payments from SSA. She is also

eligible to receive benefits from the Agency for Persons of Disabilities, which is an agency specifically tasked with helping Floridians who have developmental disabilities. Despite challenges, Ms. Litzky received a special diploma from Wabasso School and was able to attend culinary school.

## CONCLUSION

WHEREFORE, Ms. Rose Litzky respectfully submits that a sentence not a day higher than the mandatory minimum of fifteen years is more than sufficient, and in fact is greater than necessary, to comply with the statutory directives set forth in 18 U.S.C. § 3553(a).

Respectfully submitted,
DONNA LEE ELM
FEDERAL DEFENDER

*s/Karla M. Reyes*
Karla M. Reyes
Assistant Federal Defender
Florida Bar No.0072652
201 S. Orange Avenue, Suite 300
Orlando, FL 32801
Telephone: 407-648-6338
Fax: 407-648-6095
E-Mail: karla_reyes@fd.org
Attorney for Ms. Litzky

## CERTIFICATE OF SERVICE

I Hereby Certify that undersigned electronically filed the foregoing *Sentencing Memorandum for Rose Beth Litzky* with the Clerk of Court (CM/ECF) by using the CM/ECF system which will send a notice of electronic filing to the following: Karen Gable, Assistant United States Attorney, this the 9th day of December, 2019.

*s/Karla M. Reyes*
Karla M. Reyes
Attorney for Ms. Litzky