```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       ORLANDO DIVISION
                    CASE NUMBER 6:18-cr-223
 3
     . . . . . . . . . . . . . . . .
 4   UNITED STATES OF AMERICA,      :
                                    :
 5              Plaintiff,          :          Orlando, Florida
                                    :          December 16, 2019
 6              v.                  :          3:02 p.m.
                                    :
 7   ROSE BETH LITZKY,              :
                                    :
 8              Defendant.          :
     . . . . . . . . . . . . . . . .
 9

10      REDACTED TRANSCRIPT OF SENTENCING HEARING, VOLUME I
             BEFORE THE HONORABLE ROY B. DALTON, JR.
11                UNITED STATES DISTRICT JUDGE

12

13   APPEARANCES:

14

15   Counsel for Plaintiff:      Karen L. Gable

16

17   Counsel for Defendant:      Karla M. Reyes

18

19

20

21   Court Reporter:      Amie R. First, RDR, CRR, CRC, CPE
                          Federal Official Court Reporter
22                        401 West Central Boulevard, Suite 4600
                          Orlando, Florida  32801
23                        AmieFirst.CourtReporter@gmail.com

24   Proceedings recorded by Realtime Stenography.

25   Transcript produced by Computer-Aided Transcription.
```

```
 1                  P R O C E E D I N G S

 2                        * * * * *

 3           THE DEPUTY CLERK:  Case Number 6:18-cr-223, United

 4     States of America versus Rose Beth Litzky.

 5           Counsel, will you please state your appearance for

 6     the record.

 7           MS. GABLE:  Good afternoon, Your Honor.  Karen

 8     Gable on behalf of the United States.  I'm appearing with

 9     Task Force Agent Aja Stake from HSI.

10           THE COURT:  Good afternoon.

11           MS. GABLE:  Good afternoon.

12           MS. REYES:  Good afternoon, Your Honor.  Assistant

13     Federal Defender Karla Reyes on behalf of Ms. Litzky.

14           THE COURT:  Good afternoon, Ms. Reyes, Ms. Litzky.

15           Rose Beth Litzky, on July the 29th of 2019, a jury

16     found you guilty of count one of an Indictment that charged

17     you with engaging in a conspiracy to produce child

18     pornography, in violation of Title 18, United States Code,

19     Section 2251(a) and (e).

20           And count two of that same Indictment that charged

21     you with the production of child pornography, in violation

22     of Title 18, United States Code, Section 2251(a) and (e).

23           And count four of the Indictment that charged you

24     with possession of child pornography, in violation of Title

25     18, United States Code, Section 2252(a)(5)(B) and (b)(2).
```

1          The Court adjudged you guilty of those offenses,

2   and we're now here this afternoon for sentencing.

3          In just a minute I'm going to talk with the

4   lawyers.  I know we have a number of outstanding objections

5   to a number of the things that are contained in the

6   presentence report.

7          But I want to give you an overview, Ms. Litzky, of

8   how the proceeding will go forward.  And just after I take

9   care of the issues with respect to the presentence report

10  and hear from your lawyer concerning her objections to the

11  facts and the way the guidelines are calculated, I'm going

12  to give the Government an opportunity to address the issue

13  of sentencing as well as to present testimony from any

14  victims or others who have standing to be heard in

15  connection with the proceeding today.

16         Following that, I'll give Ms. Reyes an opportunity

17  to bring to my attention anything that she thinks might be

18  a mitigating factor in addition to what she's already

19  submitted for my consideration.

20         I just will note for the record, then, Ms. Reyes,

21  I have reviewed, with thanks, your sentencing memorandum,

22  as well as all the material that you submitted.

23         If there's anything else that you're aware of that

24  I should have reviewed, I hope you'll let me know; but I

25  think I've read everything that's been submitted for my

1    consideration.

2            And then last but not least, Ms. Litzky, if you

3    want to take advantage of it, I'll give you an opportunity

4    to address remarks to the Court directly before I proceed

5    with the imposition of sentence.

6            So, Ms. Reyes, let me invite you to the podium.

7            I guess as a starter, it would be helpful for you

8    to let me know if there are any of the objections that you

9    raised at the position of the parties meeting that have now

10   been resolved either by withdrawal or by consultation with

11   the Government.

12           MS. REYES:  Yes, Your Honor.

13           We spoke this morning, Ms. Gable and I.  And I

14   don't want to put words in her mouth, but I believe she's

15   withdrawing -- or she's agreeing to my objections regarding

16   the possession and the sexual act.

17           If she could -- we ask that you clarify as I don't

18   want to put words in her mouth.

19           THE COURT:  Okay.  Give me one minute.  Let me get

20   to -- let me get the PSR up.

21           All right.  I have the presentence report now to

22   the appropriate place beginning with count one in paragraph

23   45.

24           Which enhancement is the Government or

25   enhancements is the Government agreeing to withdraw?

1          MS. GABLE:  Your Honor, as to paragraph 57 of the

2     presentence report.

3          THE COURT:  Paragraph 57 is the 2G2.1(b)(2)(A),

4     two-level enhancement for the commission of the sexual act

5     or sexual contact.

6          MS. GABLE:  Yes, as it pertains to count two --

7          THE COURT:  Okay.

8          MS. GABLE:  -- of the Indictment.

9          I had a chance to review that image this morning,

10    and we do not believe that that should be scored.  In other

11    words, that is the image of E.L. lying on the futon.

12         THE COURT:  Yes, I remember the image.

13         MS. GABLE:  And there's no sexual act or sexual

14    contact within that image.

15         THE COURT:  All right.  And then was there

16    another?

17         MS. GABLE:  Yes.  And the other thing, for that

18    offense, the adjusted offense level then would be a 44.  So

19    that would be under paragraph 64.

20         THE COURT:  Yes.

21         MS. GABLE:  That would make that adjusted offense

22    level 44.

23         And then, Your Honor, as to paragraph 70 where the

24    defendant was scored for possessing more than 10 images but

25    fewer than 150 images of child pornography as it pertains

```
 1    to count four of the Indictment.
 2            Again, I believe that that image that she had, it
 3    was sort of one of these live iPhone photos.
 4            THE COURT:  Yes.
 5            MS. GABLE:  So we do not believe that that is
 6    scored properly and that she should receive an adjustment
 7    for that amount because there really is only one image.
 8    That was the possession count.
 9            THE COURT:  Okay.  So that would eliminate the
10    two-level enhancement in paragraph number 70?
11            MS. GABLE:  Correct.
12            And so under paragraph 74, then, the adjusted
13    offense level would be 31.
14            THE COURT:  All right.
15            MS. GABLE:  So then under paragraph 75 --
16            THE COURT:  So that's going to reduce the count
17    one adjusted offense level to 44?
18            MS. GABLE:  No.  The count one will be 46.
19            THE COURT:  Oh, I'm sorry, count two.
20            MS. GABLE:  Would be 42.
21            THE COURT:  42 or 44?
22            MS. GABLE:  44.  I'm sorry, Your Honor.
23            THE COURT:  Yes.  Thank you.
24            MS. GABLE:  Yes.
25            THE COURT:  I'm sorry.  I'm just trying to keep
```

```
 1   up.
 2             MS. GABLE:  Yeah.
 3             THE COURT:  So count one remains 46, count two
 4   becomes 44, and then count four becomes 31?
 5             MS. GABLE:  Correct.
 6             THE COURT:  Is that correct?
 7             MS. GABLE:  That is correct.
 8             And then the remaining scoring would remain the
 9   same.
10             THE COURT:  And I don't know if Probation is in
11   the loop here in terms of these agreements.
12             But how does that impact the overall offense level
13   after the grouping exercise?
14             PROBATION OFFICER:  Your Honor, it remains the
15   same.  Paragraph 78 will remain 48 after those adjustments.
16             THE COURT:  Okay.  Let me see if I'm -- so
17   paragraph 7, then, will remain at 48?
18             PROBATION OFFICER:  Yes, Your Honor.
19             THE COURT:  Do you agree with that, Ms. Reyes?
20             MS. REYES:  I believe so, Your Honor.
21             THE COURT:  Okay.
22             MS. REYES:  Guidelines will still remain life.
23             THE COURT:  All right.  So thank you for that.
24             Now, let me turn it over to you, Ms. Reyes, and
25   give you a chance to argue those that are still in dispute.
```

```
1              MS. GABLE:  Your Honor, one more.  I'm sorry.

2              THE COURT:  Oh, I'm sorry.  Thank you.

3              MS. GABLE:  While I still have the floor here.

4         We did have an objection and thought that she

5    should be scored for obstruction of justice.  I believe

6    that's a well-founded objection.

7              But we'll just -- in light of the guideline range,

8    we'll just take care of it when we do our sentencing

9    arguments.

10             THE COURT:  All right.

11             MS. GABLE:  In other words, we're going to

12   withdraw our objection.

13             THE COURT:  So you're withdrawing your objections

14   to her not being scored for obstruction of justice?

15             MS. GABLE:  Correct.

16             THE COURT:  Thank you.

17             Ms. Reyes.

18             MS. REYES:  Yes, Your Honor.

19             So based on the Government agreeing to paragraphs

20   10 and 17 in the final addendum, I believe my objections

21   for the remaining 1 through 18 have been outlined.  And I

22   have no further argument.

23             They're on page -- they start on page 28 of 55 of

24   the final addendum.

25             So I would ask the Court to require the Government
```

```
 1    to prove by a preponderance that these enhancements apply.
 2            THE COURT:  All right.  Let me take a look at
 3    these so I can make sure that we cover them all.
 4            The first one that I see is the Government's
 5    objection which is now withdrawn.
 6            The next would be your objection to the offense
 7    conduct in paragraphs 10 through 36.
 8            MS. REYES:  Yes, Your Honor.
 9            THE COURT:  You're objecting to that.
10            Do you want the Government to put on something
11    other than referencing the trial transcript or what do
12    you -- how would you like to proceed other than asking the
13    Government to be put to its proof?
14            MS. REYES:  Yes, Your Honor.
15            Obviously the Court also sat through the trial.
16    So I'm just maintaining these objections.  I understand the
17    Court heard testimony for two to three days.
18            THE COURT:  Okay.  Well, I'm trying to give you an
19    informed ruling on them.  So I don't have paragraphs 10
20    through 36 -- that's 26 paragraphs of the presentence
21    report.
22            MS. REYES:  Yes, Your Honor.
23            Notwithstanding the jury verdict, we maintain that
24    these -- the factual accuracy of these paragraphs were not
25    supported by the evidence.
```

1           THE COURT:  Okay.  Let me go back to 10 through 36

2     just so I make sure that I don't include something

3     inadvertently.

4           (Pause in proceedings.)

5           THE COURT:  So what I don't recall specifically,

6     even though I recall a number of the images, there are six

7     specific images that are referenced in paragraph number 13.

8           So I would need to -- you to let me know,

9     Ms. Gable and/or Ms. Reyes, whether or not there's a

10    dispute as to whether or not those images were introduced

11    into evidence.

12          The same would be true for paragraph number 14.

13    There are nine images in paragraph 14, five images in

14    paragraph 15, five images in paragraph 16, four images in

15    paragraph 17.

16          MS. REYES:  My recollection of the trial exhibits,

17    there were some of K.O. and E.L. that were found on

18    Mr. Oquendo's devices.  I can't tell the Court in these

19    paragraphs which ones were admitted in trial or not.

20          And at the position of the parties meeting,

21    because it was charged, because conspiracy was also one of

22    the charges, they believe that it was properly included in

23    this PSR.

24          THE COURT:  Do you want to be heard, Ms. Gable?

25          MS. GABLE:  Your Honor, I don't know whether all

1    of these images were introduced at the trial of the case.

2    I have not had access to the trial evidence, and I did not

3    try this case.

4          But these are the images that were described in

5    various documents, various reports.  Defense counsel

6    certainly had an opportunity to look at all of these

7    images.

8          I'm not prepared -- I don't have the images with

9    me.  If defense counsel -- if we need to do that, then I

10   would just have to ask for a short continuance, probably a

11   day so I can obtain all of these images for the Court to

12   look at.

13         THE COURT:  Do you want to identify for me,

14   Ms. Reyes, specifically those images that you think should

15   not be included in the record, or is it your position that

16   that's the Government's responsibility?

17         MS. REYES:  The latter, Your Honor.

18         THE COURT:  Do you have authority for the

19   proposition that the Government is required to prove the

20   facts that are contained in the PSR as opposed to you

21   raising objections to them?

22         I'm not talking now about the guideline

23   calculations or enhancements.  I have no quarrel with that.

24         But with respect to an objection that the facts

25   are somehow inaccurate or don't reflect what was -- what

1    happened at trial or that they ought not be otherwise

2    considered as relevant conduct, do you have any authority

3    for the proposition that the Government bears the burden of

4    establishing those facts as opposed to you raising them by

5    way of specific objection?

6              MS. REYES:  To the extent that they go to the

7    enhancements, I believe the case law is clear that the

8    preponderance is not a toothless standard.  But for the

9    proposition that the Court has asked me, I do not.

10             THE COURT:  Okay.  Well, right now we're talking

11   about -- we're not talking about enhancement.  Your

12   objection now is to the offense conduct that you don't want

13   to concede or you don't want to admit to for understandable

14   reasons.

15             My question to you is whether you have any

16   authority for the proposition that the Government has the

17   burden of establishing that these facts are correct as

18   opposed to you specifically objecting to these facts.  I

19   understand your general objection that you don't want to

20   agree to the facts.

21             But I'm not aware of the -- of any case law that

22   would impose a burden on the Government to demonstrate, for

23   instance, the flip side of that, that all of these facts

24   are correct absent some specific heads-up or notice that

25   there's an objection to some particular fact or aspect of

```
 1    the PSR as being inaccurate.

 2            And you have no authority to that?

 3            MS. REYES:  I don't.

 4            THE COURT:  I'm going to rule that the facts

 5    are -- that objection to the facts is incumbent upon you to

 6    point out where the facts are inaccurate.

 7            And in the absence of that, I'm going to overrule

 8    your objection.

 9            I'll note your general objection to the facts.

10    But having sat through the trial -- I've reviewed this

11    portion of the presentence report -- other than being able

12    to specifically recall each of the individual photographs

13    as being admitted into evidence, which in candor I cannot,

14    otherwise, I think the facts that are described in

15    paragraphs 2 through 36 are facts that were deduced at

16    trial by the United States.

17            And I'm going to overrule your objection.

18            What's next on your list?

19            MS. REYES:  The next one, Your Honor, follows.

20    It's number 2.  It's paragraph 23.  This is a specific

21    objection to characterizing her statement to law

22    enforcement.

23            Specifically, quote, Litzky stated Oquendo had

24    sent her a lot of nude photographs of their children in

25    text messages where she focused the camera on the
```

children's vaginas.  Litzky stated that she started seeing

these types of images of her children in or about 2015.

This was a subject of a motion to suppress her

statements because there were a lot of facts that were

included by the law enforcement here.

So I submitted that this statement attributed to

her was misconstrued, misstated, incorrect, in addition to

being biased because you have that law enforcement

narrative included in that paragraph.

So because the Court overruled the first objection

which included paragraph 23 --

THE COURT:  Right.

MS. REYES:  -- and that follows for my third

objection which refers to paragraph 25, paragraph 26, and

then 27 through 37.

THE COURT:  All right.  I didn't get to

paragraph 37, but I'll go back to that and look at it.

But I am going to overrule your objections to

paragraphs 10 through 36.  Because as I said, I think

they're supported by the trial testimony with the exception

of my not being able to identify specifically the

photographs that are referenced.

What's paragraph 37?  Just to keep me from

scrolling back to it if you have it handy there.

MS. REYES:  Your Honor, it says, quote, Based on

1    the preceding information, Litzky is responsible for

2    producing and distributing sexually explicit images of her

3    two minor daughters.  Furthermore, the defendant possessed

4    child pornography and engaged in a pattern of activity

5    involving the sexual abuse or exploitation of minors.

6            THE COURT:  So I'm going to overrule your

7    objection.

8            As it relates to Mr. Oquendo's testimony, which

9    comes up in a number of the paragraphs that you've

10   identified to, I'll just note for the record that I'm going

11   to -- Mr. Oquendo testified as he testified.  So the record

12   will reflect his testimony.

13           Whether that testimony is credible or entitled to

14   weight or entitled to consideration by the Court, I'm going

15   to take Mr. Oquendo's testimony in context recognizing that

16   he is a co-conspirator who's been convicted and sentenced.

17   And I'll give it whatever weight I think it deserves.

18           But in terms of the fact being reflected in the

19   presentence report, I think the Probation Office has

20   correctly described it and put it in the presentence

21   report.  That doesn't mean that it's unassailable in terms

22   of its accuracy or credibility.

23           So I'm going to overrule your objection now.

24           And now we're through paragraph 5 of the addendum

25   to the presentence report.

```
 1              MS. REYES:  Okay.

 2              THE COURT:  How about paragraph 6?

 3              MS. REYES:  Your Honor, if I may just really

 4    briefly, based on Ms. Gable's concession on those two

 5    enhancements, would the Court be inclined to have the

 6    probation officer strike the last sentence to that

 7    paragraph?

 8              THE COURT:  Let me go back to 37 and see what it

 9    is.  I know you read it to me, but I want to read it

10    myself.

11              That the defendant possessed child pornography and

12    engaged in a pattern of activity involving the sexual abuse

13    or exploitation of minors.

14              MS. REYES:  Yes, Your Honor.

15              THE COURT:  Do you want to be heard on that,

16    Ms. Gable?

17              MS. GABLE:  Yes, Your Honor.  I object to that.

18              As we get further on with the scoring, she

19    absolutely did engage in a pattern of activity involving

20    sexual exploitation of minors.

21              She was scored properly under the possession

22    count.  And she was scored properly as being a dangerous --

23    a repeating dangerous sex offender --

24              THE COURT:  I agree with the Government.

25              I'm going to overrule your objection and decline
```

```
 1    to strike that paragraph, that the presentence report be
 2    modified in that respect.
 3              Did we get to paragraph 6?
 4              MS. REYES:  Yes, Your Honor.
 5              The rest of the paragraphs deal with sentencing
 6    enhancements and the guidelines.
 7              THE COURT:  Okay.
 8              So paragraph 47 is commission of sexual act or
 9    sexual conduct.
10              Do you want to be heard on that, or does the
11    Government have any evidence on the enhancement in
12    paragraph number 47?
13              MS. GABLE:  Yes, Your Honor.
14              Under the applicable --
15              THE COURT:  Can you speak into the microphone?
16    I'm having a hard time hearing you.  Your paper is in front
17    of the mic.
18              MS. GABLE:  I'm sorry, Your Honor.
19              THE COURT:  I don't mind you doing it from there
20    if it's going to be relatively brief.
21              MS. GABLE:  Yes, no problem.
22              THE COURT:  But if it's going to be extended, if I
23    can get you to the podium.
24              MS. GABLE:  Sure.  Thank you.
25              Your Honor, pursuant to the guidelines, sexual
```

```
1    contact is defined by reference to 18 U.S.C. Section

2    2246(3).

3            Pursuant to that provision, sexual contact means

4    the intentional touching, either directly or indirectly

5    through the clothing, of the genitalia, groin, inner thigh,

6    of any person with an intent to arouse or gratify the

7    sexual desires of any person.

8            The trial testimony established both Mr. Oquendo's

9    testimony as well as the defendant's testimony that she

10   often posed the children and that she touched their vaginal

11   areas in order to spread their vaginal areas apart so that

12   Mr. Oquendo could get a better look at that.  So the trial

13   evidence clearly establishes that.

14           As to the conspiracy count which involved many

15   images over a long period of time that she engaged in

16   sexual contact with the children.

17           THE COURT:  Ms. Reyes, do you want to be heard any

18   further on paragraph 47?

19           MS. REYES:  No.  No, Your Honor.  My argument is

20   laid out by Probation in the addendum.

21           THE COURT:  The trial testimony supports the

22   enhancement.  I'm going to overrule the defense objection.

23           How about paragraph number 7 directed to

24   paragraph 48 in the presentence report?  That's the

25   enhancement 2G2.1(b)(3) for knowingly engaging in
```

1    distribution.

2          I'm going to overrule the objection because the

3    testimony of the -- the trial testimony supports that these

4    images were distributed to Mr. Oquendo by the defendant.

5          Do you want to make argument on paragraph

6    number 8, the 2G2.1(b)(4), that the images portray sadistic

7    or masochistic conduct or that it involves a toddler?

8          MS. REYES:  Nothing further than what's outlined

9    here.

10         THE COURT:  What is the objection?

11         MS. REYES:  That the facts do not support the

12   enhancement.

13         THE COURT:  That the image does not depict a

14   toddler?

15         MS. REYES:  Correct.

16         THE COURT:  What's your basis for making that

17   argument?  What's your basis for arguing that the

18   photograph does not depict a toddler?

19         MS. REYES:  Your Honor, it goes back to the

20   conspiracy and the lack of intent to produce child

21   pornography.

22         THE COURT:  Well, that doesn't have anything to do

23   with whether the image depicts a toddler.  I'm just trying

24   to determine if there's a good faith basis for the argument

25   that the image does not depict a toddler.

1            MS. REYES:  That the image does not depict a

2    toddler?

3            THE COURT:  Yes, ma'am.  That's what would trigger

4    the application of 2G2.1(b)(4) is if the image depicts a

5    toddler.

6            MS. REYES:  And I think that would go back to

7    whether or not she's guilty of the conspiracy.  So I would

8    like to maintain my objection to that, respectfully,

9    Your Honor.

10           THE COURT:  Okay.  I don't make the connection,

11   but I'll note your objection and overrule it.

12           What about paragraph number 9, the enhancement

13   under 2G2.1(b)(5), whether or not the defendant was a

14   parent, relative, or legal guardian?

15           Same argument?

16           MS. REYES:  Yes, Your Honor.

17           THE COURT:  Same ruling.  Objection is overruled.

18           Paragraph number 10, the enhancement under

19   2G2.1(b)(2)(A) with respect to whether or not the offense

20   involves the commission of a sexual act or sexual conduct.

21   I know that the Government has withdrawn that as it relates

22   to count two.

23           Do you have argument on paragraph 57?

24           MS. GABLE:  That is the --

25           THE COURT:  Is that one that the Government is

1    withdrawing?

2         MS. GABLE:  Correct, Your Honor.

3         THE COURT:  All right.  So I'll sustain that

4    objection.

5         How about paragraph number 11?  That's the

6    distribution in the PSR.

7         Same ruling.  The evidence, trial evidence, that

8    shows that defendant distributed the images to Mr. Oquendo.

9    So the enhancement is properly scored.

10        Paragraph number 12 of the addendum is related to

11   paragraph number 59.

12        Is that the same argument you made previously,

13   Ms. Reyes, with respect to the images depicting a toddler?

14        MS. REYES:  Yes, Your Honor.

15        THE COURT:  Okay.  Same ruling.  The objection is

16   overruled.

17        Paragraph number 13 of the addendum is directed to

18   paragraph 60 of the presentence report.  Again, the

19   defendant was a parent, relative, or legal guardian of the

20   minor.

21        So the two-level enhancement is properly scored

22   based on the trial testimony.  Objection is overruled.

23        Paragraph number 14 is directed at paragraph 67 of

24   the presentence report.  That's the enhancement under

25   2G2.2(b)(4)(B), the four-level increase because of the --

1          Let me look at that there.

2          Do you want to articulate your argument for me in

3     paragraph number 14 while I'm getting to the section of the

4     guidelines, Ms. Reyes?

5          MS. REYES:  The still image of E.L. laying on her

6     back on the futon is the subject of numerous objections,

7     factually and legally.  Based on our maintaining her

8     innocence, and for appellate review, because of my factual

9     objection, I would like to maintain, respectfully, my legal

10    objection to this enhancement.

11         THE COURT:  Okay.  Do you want to be heard,

12    Ms. Gable?

13         MS. GABLE:  No, Your Honor.

14         Actually, Your Honor, I'm sorry.  May I be heard?

15         THE COURT:  Yes.

16         MS. GABLE:  In what paragraph of the guidelines is

17    that, Your Honor?

18         THE COURT:  Paragraph number 67.

19         MS. GABLE:  The child E.L. was a toddler when she

20    was two when the image was produced.  The jury convicted on

21    that count.

22         THE COURT:  All right.  I'm going to overrule the

23    objection to paragraph number 67, the four-level

24    enhancement under 2G2.2(b)(4)(B) based on the trial

25    testimony and the images that were introduced into

```
1   evidence.
2           Paragraph number 15 of your addendum to the
3   presentence report is directed to paragraph number 68, and
4   that's the pattern of activity.
5           Is that the same argument you made previously?
6           MS. REYES:  Yes, Your Honor.
7           THE COURT:  Same ruling.  That objection is
8   overruled.
9           Paragraph number 16 which is directed to paragraph
10  number 69 for the two-level enhancement related to the use
11  of a computer.
12          Do you have any argument on that?
13          MS. REYES:  No additional argument, Your Honor.
14          THE COURT:  Okay.  I'm going to overrule your
15  objection and find that the two-level enhancement for the
16  use of a computer is properly applied.
17          As I've said many times, in a mine-run possession
18  case I don't usually enhance for two levels because I've
19  never seen a possession case that doesn't involve the use
20  of a computer.
21          But in this case it was not only the use of the
22  computing device to take the images but also the
23  distribution of the images.  So just for clarity sake in
24  terms of my position on it, it's not a mine-run possession
25  case to that extent.  So I think the two-level enhancement
```

1    is properly scored.

2            Paragraph 17 of your addendum to the presentence

3    report is directed to paragraph 70, and that's as to the

4    number of images.

5            Do you have any substantive argument other than

6    your argument with respect to the legal argument you made

7    previously in terms of the commission of the offense writ

8    large?

9            MS. REYES:  Yes, Your Honor.  This was one that

10   Ms. Gable agreed on.

11           THE COURT:  Okay.

12           MS. REYES:  So I would ask the Court to sustain

13   that.

14           THE COURT:  Okay.

15           So that would be -- I think we've already

16   addressed that.  That's in paragraph 70.  So the two-level

17   enhancement there the Government agrees is not properly

18   applied.

19           Correct, Ms. Gable?

20           MS. GABLE:  Yes, Your Honor.

21           THE COURT:  Okay.  So I'll sustain that objection.

22           And then paragraph 18 of the addendum is directed

23   to paragraph 79.  That's the enhancement under 4B1.5(b)(1)

24   for repeat and dangerous sex offender.

25           Do you want to make additional argument on that,

```
 1   Ms. Reyes?

 2          MS. REYES:  No, Your Honor.

 3          THE COURT:  Ms. Gable, do you want to be heard on

 4   that objection?

 5          MS. GABLE:  No, Your Honor.  Probation adequately

 6   addressed it.  Probation adequately addressed it in the

 7   presence report.

 8          THE COURT:  All right.  In light of the trial

 9   testimony, I think that objection is not well taken.  And

10   I'm going to overrule it and find that the enhancement

11   under 4B1.5 is properly scored.

12          Any additional objections to the presentence

13   report either in terms of the facts or the calculation of

14   the guidelines, Ms. Reyes?

15          MS. REYES:  No, Your Honor.

16          THE COURT:  And how about from the Government's

17   point of view, Ms. Gable?

18          MS. GABLE:  No, Your Honor.

19          THE COURT:  Let me just confirm again with

20   Probation and with the lawyers that my ruling on the

21   objections does not impact the offense level or the

22   guideline calculation that applies to Ms. Litzky, that

23   we're still operating under the guideline as calculated by

24   the Probation Office; is that correct?

25          PROBATION OFFICER:  There's no change, Your Honor.
```

```
1   The total offense level remains 43.

2          THE COURT:  Is that consistent with your

3   understanding, Ms. Gable?

4          MS. GABLE:  Correct, Your Honor.

5          THE COURT:  And with you, Ms. Reyes?

6          MS. REYES:  Yes, Your Honor.

7          THE COURT:  All right.  Having resolved, then, the

8   objections asserted by defense counsel and the stipulations

9   reached by the counsel for the defendant and counsel for

10  the Government and the Government's withdrawal of its

11  request for a two-level obstruction enhancement, I am going

12  to adopt the factual statements and guideline calculations

13  that are contained in the presentence report as my findings

14  of fact.

15         I determine that the advisory guidelines result in

16  a total offense level of 43, criminal history category of

17  I; guideline range of incarceration of 960 months;

18  supervised release ranging from 5 years to life;

19  restitution --

20         Is the Government seeking any restitution?  Are

21  there any victims of any of the photographs or images that

22  have requested restitution, Ms. Gable?

23         MS. GABLE:  No, Your Honor.

24         THE COURT:  All right.  And then a fine ranging

25  from $50,000 to $500,000; and a $300 special assessment.
```

```
 1              I just note for the record that some of the
 2    objections were sustained and others overruled.  But at the
 3    end of the day, the offense level 43, criminal history
 4    category of I was unchanged in light of the Court's
 5    disposition of those issues.
 6              So, Ms. Gable, are there any victims that want to
 7    address the Court prior to the imposition of sentence?
 8              MS. GABLE:  Yes, there are, Your Honor.
 9              The victims' adoptive parents would like to
10    address the Court.  Your Honor, they did prepare the victim
11    impact statement that was filed.
12              THE COURT:  I've read that.
13              MS. GABLE:  So they would like to address the
14    Court, Your Honor.
15              THE COURT:  All right.  I would like to invite
16    them to come forward then.
17              While they are on their way up, I just note for
18    the record if I didn't mention it already that in addition
19    to reviewing the presentence report, I reviewed the defense
20    sentencing memorandum as well as the victim impact
21    statements.
22              And I note there's a previously entered order of
23    forfeiture.
24              Good afternoon.  If you could let me have your
25    names, please, and then spell them for the court reporter.
```

```
 1              MS. WILSON:  Yes.  It's Wendy Wilson, W-E-N-D-Y,
 2    W-I-L-S-O-N.
 3              THE COURT:  Thank you.
 4              And you, sir?
 5              MR. WILSON:  Kevin Wilson, K-E-V-I-N, W-I-L-S-O-N.
 6              THE COURT:  Okay.  Thank you.
 7              I'm happy to hear from you, however you all want
 8    to share your time.
 9              MS. WILSON:  Dear Judge Dalton:
10              I am here today as K.O. and E.L.'s mother and
11    their advocate.  I am asking for your help.  I need you to
12    make sure that Rose will never be in a position to hurt my
13    girls or anyone else's children again.
14              Rose, you have forever negatively altered the
15    lives of your two biological children.
16              THE COURT:  So, Ms. Wilson, it would be helpful if
17    you'll address your remarks to me.
18              MS. WILSON:  I am not going to say ruined as I
19    believe with God's grace and our unconditional love and
20    support that one day they will be able to lead a productive
21    life.  However, they have a long journey ahead of them, and
22    the damage you caused them will forever be a part of their
23    lives.
24              By the time K.O. and E.L. came to live with us,
25    they had lived in six different homes.  Ours was the
```

1    seventh.  They were so uncontrollable and emotionally

2    unstable, and no one wanted to keep them.  And they were

3    passed around and tossed out like garbage.  They had no

4    sense of self-worth.

5         Upon living with us, they did not trust or love

6    anyone or themselves.  They were fearful of everyone and

7    everything.  They literally had no soul, just a dark lonely

8    existence.

9         They lacked the basic life skills.  They could not

10   even go to a restaurant as their behavior was so bad.  They

11   were truly out of control.  They hit, spit, bit, screamed,

12   and used the bathroom in their pants, and ran off, and were

13   uncontrollable due to all the sexual abuse, trauma, and

14   loss you, Rose, subjected them to for your personal gain.

15        Rose, you used these girls as your personal pawns

16   to get money and things you wanted.  You are one of the

17   most strategic and manipulative people I have ever

18   encountered.

19        You have stood behind the fallacy that you have a

20   speech impediment and a lower formal education; therefore,

21   you must have been manipulated to do these disgusting

22   things to your own children.

23        However, you are extremely bright.  And you are

24   willing to do whatever, no matter how heinous it is, to get

25   what you want.  Since you were caught, you have used this

1 as a defense when all along you are a master manipulator.

2   Rose, you are not the victim here.  K.O. and E.L.

3 are.

4   K.O. would repeatedly punch herself in the face

5 and cry that no one wanted or loved her.  E.L. would cry

6 out for hours without being able to communicate why.

7   The stress and pain you have caused them at times

8 have been unbearable for them to handle.  We went

9 through months of night terrors, uncontrollable crying,

10 overwhelming fear that would result in projectile vomiting.

11 And they would get so emotionally worked up they would

12 vomit everywhere.

13   █████ repeatedly ran from me --

14   THE COURT:  No first names.

15   MS. WILSON:  I'm sorry.  I'm sorry.

16   K.O. repeatedly ran from me, bit me, hit me, threw

17 up on me.  E.L. would get scared and would pee and poop in

18 her pants for reasons we did not understand and would cry

19 for hours.

20   Also, E.L. would hide food in her room as if she

21 were afraid she may not eat again.  She still struggles

22 with eating.  And if we were to let her, she would eat

23 nonstop.

24   Countless hours have been spent working with E.L.

25 to teach her what is appropriate behavior and appropriate

1    touch.  She would routinely put objects in her vagina and

2    touch herself and others inappropriately.  She had no idea

3    what good touch or bad touch as she on multiple occasions

4    would try to touch and kiss others inappropriately.

5         She often referred to Roberto touching her privacy

6    and hurting her butt, all which you allowed and coordinated

7    to get money and other things you wanted.

8         At bedtime she would lay down on the bed and

9    spread her legs open and brace herself waiting for someone

10   to victimize her.  It was almost mind-numbing for me to

11   watch this behavior as I could not and still cannot

12   understand what type of a monster would do this to a child,

13   much less their own child.

14        She has literally equated sexual abuse with love

15   and struggles to understand the difference.  She routinely

16   poses provocatively wanting her picture taken and asking

17   for someone to take her picture.  It is truly disgusting.

18        We continue to instill in E.L. what real love is

19   and that she does not have to be sexually abused, touched,

20   manipulated, or lied to to be loved.  We are teaching her

21   that love is kindness, respect, not touching

22   inappropriately, and not lying.

23        She continues to struggle and has the emotional

24   intelligence of a 3- to 4-year-old when she is 6.  She

25   routinely lies and manipulates to get what she wants.  She

1   struggles to make true emotional connections and most are

2   superficial to get what she wants at the moment.  You

3   ripped a part of her soul out that has yet to be restored.

4         K.O. came to us as a very angry, frightened little

5   girl that tried so hard to be tough to protect herself and

6   her little sister.  I cannot imagine the burden or stress

7   she must have felt trying to be strong to protect herself

8   and ███████ -- or E.L.

9         She, as E.L., struggles with night terrors and is

10  physically aggressive.  Once she began to feel safe, she

11  would occasionally tell me about how her dad would hurt her

12  butt and she didn't like it and she would cry.

13        She told me that you would make her -- you, Rose,

14  would make her lay on the bed naked.  What type of mother

15  does this?

16        One day me and the kids were talking to my

17  biological son.  And he asked K.O. why she lived with us.

18  She told us that her parents hurt her and her dad was in

19  jail.

20        My son asked, why don't you -- why didn't you just

21  run away if they hurt you?

22        ███████ told us that her dad would lock the bedroom

23  door, close the curtains, and make her get under the covers

24  so he could hurt her butt.  She just burst out crying and

25  told us that her mom said if she ever told anyone, he would

1    go to jail.

2            K.O. would also misbehave at bath time.  She later

3    opened up and told me that her dad would hurt her privacy

4    when he gave her a bath and she did not like taking a bath.

5            One day my biological son went into the bathroom

6    with my husband, and K.O. freaked out and became

7    hysterical.  She told me that my son could not go in there.

8    She said dads have big privacies and they hurt your butt.

9    She made me get him out.  It took quite a while to get her

10   calmed down.  And I tried to explain to her that my husband

11   would never hurt him and that we loved him.

12           She then asked me, Then why did my dad hurt us?

13   Did he not love us?

14           My heart broke.  I did not have an answer for her.

15   How could you tell a child that her parents were pure evil?

16           Over the months we had talked a lot about lying.

17   One day casually talking K.O. said, Mom, you know why we

18   lie?

19           I said, No.  Why?

20           She said, Because my real Mom and Dad taught us to

21   lie.

22           It was so sad to hear that coming from an innocent

23   child.

24           She kept asking, If lying is wrong, why would my

25   mom tell us to lie?

1      You could really see she was struggling with what

2 you had taught them versus what my husband and I were

3 trying to teach them.

4      K.O. continues to struggle with her anger and

5 listening skills.  She is very strong-willed.  However, I

6 am grateful that she is strong as I believe in my heart she

7 used her strength to survive her abuse.

8      K.O. has a lot of common sense and street smarts

9 well above her years.  However, she struggles academically

10 and has been in tutoring since she has lived with us for

11 two years.  Unfortunately, she never got a solid academic

12 foundation as she was bounced from home to home in addition

13 to the abuse and trauma you inflicted upon her.

14      This is just a small sampling of the things we

15 have been through with K.O. and E.L.  I can't even imagine

16 what they are actually going through in their own minds.

17      They want to know why.  Why did you do this to

18 them?  They often ask, Did my Mom and Dad even love us?

19 This is a routine question they ask.

20      They are older now, six and eight, and understand

21 what you did to them was not normal and it was wrong.  They

22 can't understand if you love them why you would have done

23 this to them.

24      In spite of all of the evil things you have done

25 to these precious girls, they will prevail.  With God's

```
 1   grace and my family's unconditional love, light will always
 2   prevail over darkness.
 3          They now have a forever family that loves them
 4   unconditionally, and they know it.  They are learning what
 5   it means to be truly loved.  My husband is showing them
 6   what it is like to have a real father and to feel the love
 7   and protection of a real father.
 8          I am showing them what it is like to have a real
 9   mother that loves them unconditionally and would never
10   allow anyone or anything to hurt them.  They are slowly
11   learning to love and to trust again, both of which have
12   been very hard.
13          You, Rose, are a true monster.  The pain and
14   suffering that K.O. and E.L. have gone through and continue
15   to go through no child should ever have to experience,
16   especially at the hands of their mother.
17          You should never be out of jail as you are a sick
18   predator that has violated the most natural law which is to
19   protect your children.  If released, I have no doubt that
20   you will victimize again.
21          Upon me reading the many pages from DCF, it is
22   reported from your own family that you have victimized in
23   the past prior to having your own children.  It is
24   documented that you videoed your niece's privacy before you
25   ever had your own children.
```

1          In addition, the F.B.I. has evidence where you and

2     Roberto were communicating about having another child you

3     can victimize, as K.O. and E.L. were getting too old.

4          You are truly evil.  And there is no

5     rehabilitation for this type of behavior.

6          Your Honor, I am asking today that you be my

7     girls' hero and to protect them and all other children from

8     Rose's evilness and give her the maximum sentence

9     allowable.  I'm asking that you not go light on her.

10    Without your help, she will do this again.

11         Rose, before you go to prison for the heinous

12    crimes against your children, I want to know that you will

13    never ever be in a position to hurt them again.

14         Thank you.

15         THE COURT:  Thank you, Ms. Wilson.

16         Any additional victim statements, Ms. Gable?

17         MS. GABLE:  No, Your Honor.

18         THE COURT:  Would the Government like to be heard

19    as to an appropriate disposition?

20         MS. GABLE:  We would, Your Honor.

21         Your Honor, on behalf of the United States, I am

22    requesting the Court to sentence this defendant to a

23    guideline sentence, to the maximum sentence, which is

24    960 months or 80 years in prison.

25         This sentence, Your Honor, it reflects the

1    seriousness of the offense and will promote respect for the

2    law.  It will satisfy the need for deterrence.  It will be

3    just punishment for the crimes that this defendant has

4    committed.  And it will protect the community and the

5    victims of the offense from further crimes of Ms. Litzky.

6         This crime, Your Honor, is so serious that she

7    committed.  She scored out as a 53 under the guidelines.

8    That is how serious of an offense this is.  Few offenses,

9    Your Honor, under the Code, under the guidelines receive a

10   score of 53.

11        She was 10 above the maximum that the guidelines

12   go to for sentencing purposes, which is a 43.  And,

13   therefore, her sentence became a 43, which is life.  She

14   cannot be sentenced to life.  There is not a statutory

15   maximum to allow imprisonment for life.

16        So, therefore, the Court can aggregate the

17   statutory maximums to reach that and to sentence her to

18   960 months or 80 years.

19        She victimized her own children, children that she

20   was given the opportunity in life to protect, to nurture,

21   and to love.  And instead of doing that, Your Honor, she

22   used them as sex objects.

23        And by her own testimony, she produced images of

24   those children for her co-conspirator Oquendo in order to

25   make him happy, to please him, to sexually gratify him, and

1    yes, for money.

2          He testified under oath that she would hold out

3    the prospect of giving him pictures if he gave her money,

4    whether it was child support or money for something else.

5          The conduct is just so egregious and so

6    outrageous.  For 10 months she had those children to

7    herself.  He was in Virginia.  And during that period of

8    time, she could have protected those children.  She could

9    have kept them safe.

10          But instead, she harmed them.  She made them lay

11    on the bed naked.  She posed them.  She contorted their

12    legs to expose their naked vaginas.

13          I looked at some of those images over the weekend.

14    Those children were in obvious distress when she was

15    contorting their bodies, making them pose naked for Oquendo

16    when he was several states away in Virginia.

17          She touched their vaginas in a sexual way in order

18    to expose them further and to even more humiliate them so

19    that Oquendo could see and get a better view of their

20    vaginal areas.

21          She harmed them, Your Honor.  For 10 months she

22    was the one.  She was the one who was harming those

23    children.  And she could have protected them, and she

24    didn't.  And her conduct, it has severe and long and

25    everlasting effects on those children.

 1           The greatest challenge for the Government in these

 2      cases, Your Honor, is to -- regarding the children, to be

 3      able to articulate to the Court the harm that they are

 4      suffering.  It's very difficult for the Government to do

 5      that given the nature of the victims.

 6           In this case, the children's adoptive parents did

 7      such a great job of describing for the Court the harm and

 8      pain and suffering and trauma that Ms. Litzky caused to her

 9      own children and the effects that it's having on them as

10      they go through their lives.  And those effects will be

11      with them forever.

12           She took hundreds of photos of those children.

13      That evidence is uncontroverted.  And in some of those

14      images, she is smiling as she poses those children naked

15      for Oquendo.

16           She, unsolicited, produced images for him.  Many

17      of those, in the chats that I reviewed over the weekend,

18      showed that he never asked her, even when he didn't ask her

19      for pictures, she offered the children up.

20           She taught him how to use ooVoo.  She downloaded

21      that application on his phone so that he would be able to

22      continue to sexually exploit and abuse those children, and

23      her too, when he was several states away in Virginia.

24           So, Your Honor, the seriousness of this offense

25      weighs so heavily in the sentencing determination, and the

1     impact on these victims weighs so heavily.

2          But in addition, Your Honor, her personal

3     characteristics are mitigators in this case.  She does have

4     a speech impediment.  She does have a low IQ.  But those

5     things do not excuse or justify her behavior in this case.

6          She tried to use a narrative throughout this

7     entire case, through the trial and even at sentencing, that

8     somehow she is the victim here.  She has tried to pitch a

9     narrative that Oquendo beat her and that he coerced her

10    into doing this.

11         But the evidence absolutely shows otherwise.  And

12    the evidence shows that those statements by her and that

13    narrative that she's pitching is just another way for her

14    to manipulate the situation.

15         All of the evidence at trial -- I read through all

16    of these transcripts over the weekend.  I looked at the

17    chats, the texts.  There is not one shred of evidence that

18    Oquendo threatened her or abused her.

19         I also reviewed her transcripts.  And, in fact, in

20    her very first interview with the agents on September

21    15th, 2016, which is a trial exhibit in this case, the

22    agents asked her, Did he ever physically hurt you?

23         And she said, No.

24         The agents asked her did he verbally abuse her?

25         And she said, No.

1          Later on, as she began to realize that she was

2     facing some serious penalties here, she began to say

3     otherwise.  But there is no evidence at all that that

4     happened.

5          And, in fact, Your Honor, yes, I know that she

6     filed a protective order.  But I reviewed that too, that

7     injunction that was filed.  And nothing in there says that

8     he was abusing her or hitting her or doing any of that.

9     The only act that was mentioned in that injunction was that

10    she saw him pull the child's hair.

11         And the injunction that she filed, which was

12    before he moved to Virginia, never once did she state that

13    she was sexually abusing these children or that Oquendo was

14    sexually abusing these children.

15         So, Your Honor, this narrative that she has been

16    trying to pitch throughout this entire case that she was

17    coerced and that she was manipulated and that she was

18    physically abused into doing these things to her own

19    children is not borne out by the evidence.  The only

20    evidence we have of that is her own self-serving

21    statements.

22         And I would note for the record that she has been

23    interviewed by many different doctors in this case, mostly

24    at her request.  And her narrative and descriptions of the

25    abuse by Oquendo, it starts out light; and by the time that

1   we have Dr. Rapa's report that was filed with this Court

2   for sentencing purposes, oh, my gosh, he was -- I mean, the

3   narrative is just, just so much more embellished and so

4   much more than it was at the very beginning of this case.

5          So, Your Honor, that narrative that she's pitched,

6   that is an aggravator in this case.  Because what all that

7   boils down to is that she has not accepted responsibility

8   for any of her actions.  She has come up with excuses and

9   justifications, but she has not accepted responsibility.

10         And if she has not accepted responsibility for her

11  actions and the awful things that she did to her children

12  and the everlasting harm that they will suffer, then how

13  could she ever be rehabilitated?

14         Accepting responsibility and acknowledging the

15  wrongs is the first step towards that path.  And she is not

16  there.  Instead, she continues to excuse and justify but

17  never once saying, yes, I did this, I accept responsibility

18  for what I have done to my own children.

19         She has repeatedly lied throughout these

20  proceedings, Your Honor.  She initially lied to the agents

21  during both interviews.

22         Initially, she told the agents that she had never

23  taken any sexually abusive pictures of her children.  Then

24  she said maybe one or two.

25         She didn't admit to the ooVoo chats until the very

```
 1    end of the second interview with the agents.  She admitted
 2    that she took the picture of E.L. that's charged in count
 3    two.  Then she said she didn't.
 4          And then at trial she lied about that image of
 5    E.L., which is the image of the child lying on her back
 6    with the keys.  And she said that she did not take that
 7    picture.  She testified under oath that she did not do it.
 8    And she tried to blame the other victim and said that it
 9    was the other victim that got her phone and took that
10    picture and sent it to the defendant.
11          And the jury didn't believe her.  They convicted
12    her on that offense.  And, of course, the evidence shows
13    that she is the one who took it.  So she lied about that.
14          She lied under oath about not knowing that he was
15    sexually interested in children when she admitted to the
16    agents and it's borne out by some of the text
17    communications that when he sent her images of child
18    pornography, cartoon images of child pornography, she
19    responded by saying something to the effect of "you
20    horndog."
21          So she knew what was going on.  Yet she took the
22    stand, raised her right hand, took the oath and said that
23    she did not know that he was sexually interested in the
24    children and that he was masturbating to those images.
25          As you heard from the Wilsons, she taught her
```

1    children to lie.  That's borne out by not only evidence but

2    also by what the Wilsons say.

3            So all of these things are mitigating, Your Honor.

4    And again, they just all go to the central point that this

5    defendant has not accepted responsibility, that she is

6    manipulative, that she lied, and that she's trying to pitch

7    a false narrative in order to excuse and justify her

8    conduct.

9            The Defendant Oquendo, he did get 50 years.  The

10   Court sentenced him to 50 years.  But he's not similarly

11   situated to this defendant at all.  He pled guilty to two

12   counts of production.  He accepted responsibility for his

13   conduct.

14           He was facing a statutory maximum term of

15   imprisonment of 60 years, not 80 years like the defendant.

16   He cooperated.  He testified.  And pursuant to the plea

17   agreement, the Government asked the Court to recognize the

18   assistance he provided in the case.  So he is not similarly

19   situated to this defendant.  So a term of 80 years is

20   justified in this case for her.

21           Most importantly, Your Honor, she is not the

22   victim in this case.  Despite her narrative to the

23   contrary, she is not a victim in this case.  This case is

24   not about her.  This case is not about abuse that she may

25   have suffered as a child.  It's not about her intellectual

1    functioning.

2         This case is about what she did to her children,

3    about the life sentence that she has condemned them to, a

4    life of pain, of suffering, difficulty trusting and loving

5    other individuals; a life of having to be taught how to act

6    appropriately in public.

7         The pain that they endured, not only at the hands

8    of Oquendo and her hands, but being shuffled around to so

9    many different foster homes because it's really difficult

10   when children are sexualized and acting out for foster

11   parents to take those children on because of the problems

12   that they present in the household and the problems that

13   they present to other children.

14        The Wilsons, they're saints.  These children are

15   so lucky that they found the Wilsons, that the Wilsons have

16   taken them on to raise them in a loving household.  Thank

17   goodness for that.  But they still have so many issues that

18   they face in their life.  But she has condemned them to a

19   life sentence of pain and suffering.

20        And so a just sentence in this case, Your Honor,

21   is a sentence of 80 years, and we ask the Court to sentence

22   her to that.

23        THE COURT:  Thank you, Ms. Gable.

24        Ms. Reyes, would you like to be heard in

25   mitigation?

```
 1              MS. REYES:  I have one witness, Your Honor.

 2              THE COURT:  Yes.

 3              MS. REYES:  Ms. Patricia Davis.

 4              THE COURT:  Would you come on forward, Ms. Davis.

 5         Do you want to do this by question-and-answer, or

 6    is she going to make a statement?

 7              MS. REYES:  Question-and-answer, Your Honor.

 8              THE COURT:  Okay.  Come all the way down into the

 9    well of the courtroom, please.  Come past the podium.  And

10    then my courtroom deputy will place you under oath.

11              THE DEPUTY CLERK:  That's fine right there, ma'am.

12    If you'll please raise your right hand.

13         Do you solemnly swear or affirm that all the

14    testimony you're about to give in the case now before the

15    Court will be the truth, the whole truth, and nothing but

16    the truth?

17              THE WITNESS:  I do.

18              (Witness sworn.)

19              THE DEPUTY CLERK:  Thank you, ma'am.

20         If you'll have a seat in the witness stand to your

21    right.

22         And, ma'am, once seated, if you'll adjust that

23    microphone so you're speaking directly into it.

24         And then state your name and spell your name for

25    the record.
```

```
 1              THE WITNESS:  My name is Patricia Davis.

 2              THE DEPUTY CLERK:  Spell your name for the record.

 3              THE WITNESS:  Patricia, P-A-T-R-I-C-I-A.  Davis,

 4  D-A-V-I-S.

 5              THE DEPUTY CLERK:  Thank you.

 6              THE COURT:  You may inquire, Ms. Reyes.
```

**DIRECT EXAMINATION**

```
 8  BY MS. REYES:

 9  Q    Ma'am, how do you know Ms. Litzky?

10  A    I was Rose's teacher for eight years at the Wabasso

11  School.

12  Q    Okay.  What -- where did you get your bachelor's

13  degree?

14  A    My bachelor's degree is from Boston University.

15  Q    And what did you get your degree in?

16  A    My degree is in special education and elementary

17  education with a minor in science.

18  Q    Okay.  Do you also have a master's degree in special

19  education?

20  A    I have a master's degree from Long Island University.

21  Q    And have you been board certified in special

22  education?

23  A    There's a national board certifying agency for

24  teachers, and I have that certification as well as special

25  education.
```

```
1    Q    Was that a stringent program?

2    A    It's very stringent, and it's looked upon very highly

3    throughout the professional world.

4    Q    I understand you retired in June of 2012.

5    A    Yes, ma'am.

6    Q    Okay.  And how long were you with the Indian River

7    County school district?

8    A    I taught in Indian River for 17 years.

9    Q    And in 17 years were you working in one particular

10   school?

11   A    I was at the Wabasso School.

12   Q    Okay.  Can you explain to the Court what Wabasso

13   School is?

14   A    The Wabasso School is the central school for the

15   Indian River County school district.  Central meaning that

16   it's specifically for special needs children ages 3 to 21,

17   and it's for students who cannot be well educated within

18   the mainstream.

19   Q    Prior to that, did you work at another school

20   district?

21   A    I worked for 19 years at the Oceanside school district

22   in Long Island and two years at the Valley Central school

23   district in New York, upstate New York.

24   Q    In your 19 years with Oceanside school district, were

25   you their first special education teacher that they ever
```

1    had?

2    A    I was the first one in the building, yes.  And also in

3    upstate New York.

4    Q    Did you also serve as department chair for the special

5    education department?

6    A    Yes, ma'am.  Eventually the department grew to be

7    about six people, and I was in charge.

8    Q    Prior to Oceanside, where did you teach?

9    A    I taught at the Valley Central school district.  And

10   that's up in Montgomery, New York.

11   Q    And were you also a special ed teacher there?

12   A    I was a special ed teacher there at Valley Central

13   High School.  And, again, I was the first one.

14   Q    So in total, how many years of educating special needs

15   kids do you have?

16   A    Thirty-eight.

17   Q    Are you -- even though you're retired, are you

18   currently working?

19   A    Yes, ma'am.  I decided I needed something to keep me

20   busy, so I went back to work.  And I am now an education

21   person at the Okeechobee Correctional Institution for the

22   Department of Corrections.

23   Q    And are you also in an educational role there?

24   A    I am.  Right now I am a teacher in a classroom

25   situation.  And they've asked me to become education

1    supervisor.

2    Q     Okay.  So when you say that you were Ms. Litzky's

3    teacher for eight years, do students at that school

4    typically have one class that they stay in?

5    A     Not always.  But it just so happened that we had

6    decided to split the classes up.  And I opted to teach the

7    female students, and one of my colleagues was teaching the

8    males.

9    Q     Okay.  And when you first met Rose, do you remember

10   how old she was or what grade she was in in mainstream

11   school?

12   A     She was about 13.  And she was just coming into

13   school, into our building from one of the other school

14   district -- one of the other schools where she was not able

15   to do as well as we expected her to do.

16         So this was eighth grade.

17   Q     And can you tell the Court a little bit about her as a

18   student in the eighth grade?

19   A     When she first came in, of course, she was very quiet

20   and kind of reticent and very shy.  Once she became

21   adjusted to the school and once she became adjusted to the

22   classroom and understood the rules and the regulations and

23   what would be expected of her, she was a very good student

24   with us.

25   Q     Would you say that compared to the other kids, she was

```
 1    an asset to the room?
 2    A    She was an asset to the room.  In comparison with some
 3    of the other students, again, in the entire building, the
 4    -- she was one of the higher-functioning students because
 5    she could read at a third-grade level and she could do math
 6    at about a third-grade level as well.
 7    Q    Did your program have work experience components?
 8    A    Yes.  Once the students turned the age of 18, they
 9    went out at various job sites that had been developed with
10    an assistant as the job coach.  And they would travel by
11    school bus to the job sites for part of the day and learn
12    how to do prevocational, vocational skills in an on-the-job
13    setting.
14    Q    Was this a part-time program?
15    A    It was just in the mornings, yes, ma'am.
16    Q    Okay.
17    A    And then they would come back in the afternoons for
18    their academics.
19    Q    And were those always supervised?
20    A    They were always supervised.  They went with --
21    initially, if a child was being placed on a job site, they
22    would go one-on-one with an assistant so that the child
23    could successfully learn what would be expected at the job
24    site.  And then they would go in groups of two or three
25    with an assistant always available.
```

1    Q    Okay.

2         And if a job couldn't be completed, what was the

3    assistant's responsibility?

4    A    Because we had several job sites, the way we were able

5    to develop them is by guaranteeing that whatever was being

6    assigned would be completed.  Hopefully by the students.

7    If not, then definitely by the assistant.

8    Q    Okay.  Do you remember what Ms. Litzky's job

9    assignments were?

10   A    Rose went to the Disney Vero Beach Resort, and she

11   worked in the kitchen area.  And she learned prep work.

12   She learned about the dishwasher, how to clean dishes, load

13   them into the dishwasher, remove them, stack them up

14   accordingly.

15        They learned table-setting.  Just about anything as

16   preparatory work for a restaurant.

17   Q    As her teacher for eight years, did you ever have

18   interactions with her father?

19   A    Yes, on various occasions.

20   Q    And what was your opinion of him?

21   A    Mr. Litzky was very concerned and tried to be

22   involved, but he was of limited ability.  He often tried --

23   he had to keep getting jobs and trying to work and often

24   lost his jobs because of his commitments to the girls.

25   Q    Would you say that he was overwhelmed as a single

1    father to three girls?

2    A    Yes, definitely.  He would often call us asking for

3    some help.

4    Q    And did you visit Ms. Litzky at her house?

5    A    I have been several times to a couple of their

6    different homes to visit with them.

7         And that's not unusual.  I went to visit many of my

8    students in their homes.

9    Q    As her teacher, were you also contacted by the Social

10   Security Administration regarding any disabilities?

11   A    Yes.  Once a student -- especially at the Wabasso

12   School, once a student turned 18, SSI would come into play

13   and they would tender the questionnaires to the teachers

14   asking for information and documentation of disability

15   throughout the school career.

16   Q    Okay.  Have you kept most of your yearbooks from

17   Wabasso School?

18   A    Yes.

19   Q    Okay.

20   A    Yes, I do.

21   Q    And did you provide me with one or two of them?

22   A    Yes.

23         MS. REYES:  Okay.  Your Honor, I provided copies

24   to the Government.

25         I would seek to introduce what's been marked as

```
 1    Defendant's Exhibit 1.
 2            THE COURT:  Defense 1 will be received.
 3            (Defendant's Exhibit 1 was received
 4             in evidence.)
 5    BY MS. REYES:
 6    Q    Do you know, other than her disabilities, why she
 7    actually came to Wabasso in the eighth grade, why she
 8    didn't just stay in normal classes?
 9    A    Apparently there had been a situation at her previous
10    school and -- or outside of school where she had been
11    subject to a gang rape situation.  And in order for her to
12    remain safe, her father sought out the Wabasso School.
13    Q    Okay.  How long did you -- you said you were her
14    teacher for eight years.
15    A    Yes, ma'am.
16    Q    So when was the last time that you taught Ms. Litzky?
17    A    Rose graduated in June of --
18    Q    Was she 21 when she graduated?
19    A    Yes, she was.  She was aging out of the program.
20         The Wabasso School could keep students up to age 21.
21    Depending upon when their birthday fell during the school
22    year, they could even finish more of the year or have to
23    leave at that point.
24    Q    So because her birthday is in June --
25    A    She was able to finish the extended school year until
```

```
 1  June 30.
 2  Q    Okay.  And did you guys offer extended school years
 3  throughout her years at Wabasso?
 4  A    Yes.
 5  Q    And did she --
 6  A    She participated in them, yes.
 7  Q    What else do you believe the Court should know about
 8  Ms. Litzky?
 9  A    Well, I think it's very important to note that Rose
10  has been labeled as, using the old terms, trainably
11  mentally retarded.  The new jargon now is intellectual
12  impaired.  And that's for anyone whose IQ falls below 85.
13  But the old terminology really helps you to understand what
14  the capabilities of that particular person are.
15       She was never a leader.  She was always a follower and
16  always desperate for belonging and wanting to be -- wanting
17  to be cared for and loved.
18       She would express that, you know, wanting a boyfriend,
19  wanting that kind of -- somebody to take care of her.  So
20  that was something that we had to deal with.
21  Q    Her most recent IQ tests from earlier this year, 2019,
22  put her at a 69.
23       Does that surprise you?
24  A    No, it doesn't.  Actually, I would have expected to
25  see it possibly be lower.
```

1    Q    Okay.  When we first met early October you said,

2    quote, She had no nurture and nature did not give her a

3    full hand.

4         What did you mean by that?

5    A    Unfortunately, Rose is trainably mentally handicapped.

6    She is intellectually impaired.  She does have a speech

7    impairment.  And she is not as intelligible as you would

8    like her to be, especially if she's speaking quickly.

9         But nature is one part.  The most important part is

10   the nurture.  She was not raised in a situation that was

11   very positive for her.  Her mother was not there.  Her dad

12   was limited at best with what he was able to do.  And I

13   believe that she just did whatever she could to survive as

14   well as she could.

15   Q    Did you ever meet any of her sisters?

16   A    Very briefly.  Very briefly.

17   Q    And what was your interaction with them?

18   A    Not good.  Usually if they knew I was coming, they

19   would disappear.  They would not want to be held

20   accountable for anything.

21   Q    Was it your impression that they had a close

22   relationship with Ms. Litzky?

23   A    No, I do not believe that at all.  In fact, if

24   anything, I think Rose was probably victimized by them and

25   made to be a scapegoat.

```
 1              MS. REYES:  Nothing further, Your Honor.

 2              THE COURT:  Ms. Gable, do you have any questions?

 3              MS. GABLE:  I don't, Your Honor.

 4              THE COURT:  Thank you.

 5         Thank you, ma'am.  You can step down.

 6         Do you have any other witnesses or statements to

 7   present other than argument, Ms. Reyes?

 8              MS. REYES:  Just argument, Your Honor.

 9              THE COURT:  Okay.

10              MS. REYES:  Your Honor, I would like to

11   acknowledge family members and friends who are present

12   here.

13         We have Juelie Perry.  She's the owner -- and

14   she's also an educator for many, many years.  She teaches

15   and she's an owner of the TLC Preschool at Sebastian.  And

16   she drove here for Ms. Litzky.

17         Karen Burroughs is -- she works out at the Orange

18   County Jail, and she's a part of Inside Out Jail Ministry.

19         Jason Dansbury is her boyfriend.  He's also

20   present.

21         Pat Davis who Your Honor heard from.

22         Joel Ganza is a family friend.

23         And Helen Hitchcock, her mother, is also present.

24              THE COURT:  Thank you all for being here.  I'm

25   sure Ms. Litzky appreciates your presence.  And I do as
```

1  well.  So thank you for taking the time out of your busy

2  days to be here.

3        MS. REYES:  Your Honor, what we know from dozens

4  of records is that she was traumatized from the neglect and

5  physical abuse of her mother.  And her father did the best

6  that he could to raise three daughters, but he was not the

7  parent that he should have been to Ms. Litzky.

8        This was corroborated by a letter that we received

9  from Rosa Martin who served as sort of a surrogate mother

10  to Ms. Litzky.  She took Mr. Litzky in and his three

11  daughters in when they moved from upstate Connecticut.  And

12  she was the one who actually attended school conferences

13  throughout the years with the kids.

14        We know that the older sister Frances also became

15  the matriarch of the family.  And we know that she hated

16  Rose, she bullied Rose, and she excluded Rose.  The younger

17  sister Stacy followed the older sister's lead.

18        So Rose being the middle child, who began speaking

19  at the age of 7, was overweight with a severe speech

20  impediment and intellectual disability.  She was unloved

21  and unsupported at home.  And at school she was excluded

22  from the other kids because of her intellectual disability.

23        Then on May 23rd, 1999, she was traumatized by

24  strangers.  The boys took Rose's clothes off.  They tied

25  her down to the bed inside of one of the kid's houses.  And

```
 1    the rape kit that was done three days later still had blood

 2    on it.

 3            The State of Florida paid for her to go to therapy

 4    after this violent incident through the State of Florida's

 5    victim's compensation fund.

 6            The co-defendant met Ms. Litzky when she was 17,

 7    and he began grooming her.  She was clearly emotionally

 8    attached and dependent on him when they actually met in

 9    real life.

10            He also traumatized her.  She was raped by him,

11    pimped out to his friends, physically and verbally abused

12    by him.  And the child victims in this case, and Rose, were

13    victimized by him.

14            So we know that the great task of a child is to

15    attach to its mother.  Without attachment they never learn

16    to trust within themselves or to trust the world around

17    them.

18            This concept of attachment is the fundamental bond

19    between parents and infants that is essential to survival

20    and development.  And we see this concept of attachment in

21    animals too.  Animals who lose their mother will try to

22    find another mother.  They will try to look for another

23    mother to feed them.

24            So evidence of the impact of parental attachment

25    on early to middle childhood development is indisputable
```

1   and immense.  And attachment has been shown to influence

2   every aspect of early children development from

3   neurocognitive development to sociobehavioral competence.

4          The critical periods of attachment are in early

5   childhood.  The human attachment period for females is to

6   the age of 14, males until the age of 34.

7          And this failure to form secure attachments early

8   in life do have a negative impact on behavior in later

9   childhood and throughout life.  Obviously the attachments

10  made in early life can affect future relationships.

11         The social sciences is abundant that childhood

12  trauma affects and stunts the ability of the brain to

13  repair itself.  And chronic stress affects the body and

14  literally changes the structure of the brain.

15         So it's our position today as it's been throughout

16  this case that Ms. Litzky suffers from intellectual

17  disability.  She is definitely not a master manipulator.

18         And I'm not going to read from my memorandum too

19  much, but I think it's important from the Atkins Supreme

20  Court case -- it's on page 6 of my memorandum.

21         And it says, quote, Because of their impairments,

22  by definition they have diminished capacities to understand

23  and process information, to communicate, to abstract from

24  mistakes and learn from experience, to engage in logical

25  reasoning, to control impulses, and to understand the

1    reaction of others.

2            The American Psychological Association's brief in

3    Atkins said that, quote, People with mental retardation are

4    often especially eager to please others, a characteristic

5    obviously susceptible to manipulation.

6            In Dr. Rapa's evaluation of Ms. Litzky, on page 9

7    of 12, which is part of the addendum in this case -- I

8    believe it's docket entry 216-1.

9            She wrote, quote, In cases such as Ms. Litzky,

10   it's important to look at the role that childhood trauma,

11   brain development, intimate partner violence, and

12   developmental cognitive disabilities played in allowing

13   Ms. Litzky to be manipulated by her partner and ultimately

14   cooperate with him in the crime.

15           I know the Court has read this so I won't read all

16   of it too much.  But on page 10 of 12 of her evaluation,

17   she wrote, quote, In this case Ms. Litzky participated in

18   criminal actions against her children and failed to protect

19   them.  These are the facts of the case.  Underlying these

20   facts, though, is the reality of Ms. Litzky's low IQ, early

21   childhood abuse, gang rape as a preteen, and her

22   exploitation by a pedophile who also physically battered

23   her when she did not obey him.  He is older than Ms.

24   Litzky, likely more intelligent than Ms. Litzky, and is

25   violent.

1          Based on these factors, there is reason to believe

2     that he met Ms. Litzky online, groomed her to have

3     children, and then coerced her to give pictures of the

4     children for him to use for his own sexual gratification.

5          I want to respond just briefly, if I may, to a few

6     comments by Ms. Gable.

7          The forensic evidence in this case -- I've been

8     the attorney assigned since it was indicted.  And I have

9     been to the Brevard County Sheriff's Office on countless

10    occasions because Mr. Oquendo had so many electronic

11    devices.

12         The videos and the images will never leave my

13    memory.  In ten years I've never been emotionally affected

14    at looking at videos and pictures to the extent that I was

15    in this case.

16         But for her to say that the kids were in obvious

17    distress -- the kids at such a young age are so innocent.

18    They didn't understand what was going on.

19         And in numerous of the videos that Mr. Oquendo

20    produced, he is engaging them.  And they think that this is

21    funny.  And I did not see the obvious distress because of

22    their innocence.

23         The bulk of the conspiracy were photos that were

24    found on his devices that he screenshoted and he took.

25         So other than Ms. Litzky's statement, which I

```
 1    still believe was a false confession, it's my position that
 2    she did not take, quote, hundreds of photographs, like
 3    Ms. Gable stated.
 4          Those photos were the ones that were found on his
 5    devices, that he screenshoted from conversations that they
 6    had.
 7          Ms. Gable mentioned that Ms. Litzky was smiling in
 8    some of those photos.  And to try to use that against
 9    Ms. Litzky to show her being a monster shows a profound
10    ignorance of intellectual disability because she is very
11    childlike due to that intellectual disability.
12          The image of E.L. that is the source of the
13    possession count, the production count, I've seen it.  It
14    was not focused on her vagina.
15          And in looking at all of the evidence on his
16    devices, he likes little kid's genitalia to be the focus.
17    You almost cannot see the kids.
18          So this was not a preferred photograph.  And the
19    forensic evidence showed that not only was there no
20    evidence of deletion on her phone but there was no evidence
21    that she actually ever sent this to Mr. Oquendo despite his
22    testimony to the contrary.
23          What you saw in most of Ms. Gable's argument, from
24    what I understood, was a lot of victim blaming, the
25    injunction that was filed and denied ultimately in the
```

 1    case.

 2            We heard unrebutted testimony from Ms. Davis and

 3    all of the records that in the 12th grade she was

 4    operating at a third-to-fourth grade reading and math

 5    level.

 6            So the injunction not including violence on his

 7    part to her, the narrative that she was, quote, physically

 8    abused, underscores why the Me Too Movement is alive and

 9    well.

10            One of the Court's many factors under 3553 is

11    disparity.  It's a large task to go through all of the

12    production cases nationwide which is what one of the

13    factors refers to.  But I thought it would be interesting

14    to look at this Court's CP production since the very

15    beginning.

16            And based on my research, the Court has 17 child

17    pornography production cases, 14 of which have been

18    sentenced.  Of those 14, three of them were mothers.  Two

19    of them -- actually, all three of them received the benefit

20    of a 5K.

21            Sarah Adleta, she received 54 years and the

22    Government filed a 5K in that case.

23            And Lauren Diaz received 25 years from the Court.

24            Sarah Ritchie was the most recent one from October

25    of this year.  And that one caught my attention not because

1   she received 15 years, which is not -- which is a

2   significant sentence.  But what struck me about her case

3   was that Ms. Gable wrote a sentencing memorandum in this

4   case, and they rarely do that in child pornography cases.

5          But in her memorandum to this Court she said that

6   unlike most sexual offenders, Ms. Ritchie is intelligent

7   and a college-educated woman who worked as a sixth grade

8   teacher for close to 10 years.

9          What makes her different from Ms. Litzky is that

10   she exploited a 1-year-old child in her custody.  She

11   engaged in sexual acts with this 1-year-old child.

12          So in looking at disparity, I would ask the Court

13   to place heavy emphasis on the fact that Ms. Litzky has

14   been receiving Social Security disability for her

15   intellectual disability since 1991.

16          Her father has been the payee managing her funds

17   for as long as I can remember, as long as I could look back

18   at all the Social Security records.

19          I would ask the Court to consider her lack of

20   criminal history, just like the other defendants that have

21   been in front of the Court.

22          And finally, as addressed in my memorandum, I

23   would ask the Court to find that an intellectual disability

24   justifies either a traditional guideline departure or a

25   variance.  And I wrote it down in my memorandum.

 1          But the application note applicable to death, to

 2    that downward departure states, quote, Significantly

 3    reduced mental capacity means that the defendant, although

 4    convicted, has a significantly impaired ability to

 5    understand the wrongfulness of the behavior comprising the

 6    offense or to exercise the power of reason or to control

 7    behavior that the defendant knows is wrongful.

 8          It seems obvious that her deficit contributed

 9    substantially to the commission of these offenses.

10          In the letters that we provided to the Court,

11    people who do not know each other mention the same thing,

12    which was Ms. Litzky's manipulation by the co-defendant.

13    And they're in my memorandum, Your Honor.

14          But I believe that the same susceptibility to the

15    co-defendant's undue influence obviously impaired her

16    ability to control the behavior that she knew was wrongful.

17          Based on all of the goals of sentencings, I

18    believe this Court can accomplish those with a 15-year

19    sentence.

20          My understanding from conversations with

21    colleagues is that once released from her term of

22    imprisonment, she will still be able to receive Social

23    Security benefits.  Vocational Rehabilitation will also be

24    an office that would be tasked with helping her in addition

25    to the Agency for Persons with Disabilities.

 1              I've talked to my client, Your Honor, and I have

 2     confirmed that she does not wish to address the Court.

 3              Nothing further.

 4              THE COURT:  Thank you, Ms. Reyes.

 5              So, Ms. Litzky, I need to ask you directly, make

 6     sure that you understand you have a right to make what's

 7     called an allocution or a statement to the Court.  Your

 8     lawyer has indicated to me that you do not wish to do that.

 9     I just need you to confirm for me that that's the case.

10              THE DEFENDANT:  Yes.

11              THE COURT:  Yes?  All right.

12              I'm going to take some time to digest the

13     information that I've absorbed today.  So I'm going to

14     continue the sentencing to be renoticed at a later date.

15              I want to just make a couple of notes for the

16     record while folks are here.

17              With respect to -- I've had many more of these

18     cases than I would like to have, that's for sure.

19              With respect to the Defendant Ritchie, Ms. Ritchie

20     reported, self-reported the abuse and turned both herself

21     and her abusing husband in to federal authorities,

22     cooperated with the Government, and acknowledged her

23     responsibility.

24              Ms. Sarah Adleta, from many years ago, also

25     testified against her Army husband during -- for acts

1    committed while he was deployed.  She was facing a 60-year

2    mandatory minimum term -- I'm sorry, not mandatory.  I

3    meant a 60-year maximum and received a 54-year sentence in

4    exchange for a 5K by the Government and actually testifying

5    in the proceedings against her husband, Mr. Adleta.

6          So I don't have perfect recall of all of these,

7    but unfortunately they stand out in my mind.

8          So I'm going to adjourn the proceedings and take

9    these matters under advisement.

10          I will give notice to you all as to when I'm

11   prepared to reconvene.  I have a lot of information to

12   absorb and assimilate.  So I'm going to take some time to

13   do that.  And I appreciate the presentation by the

14   Government and the defense.

15          And we'll be in recess pending further order.

16          (Proceedings adjourned at 4:36 p.m.)

17                      * * * * *

1                      C E R T I F I C A T E

2

3          I certify that the foregoing is a correct

4    transcript from the record of proceedings in the

5    above-entitled matter.

6

7    February 17, 2020

8

9        s\  Amie R. First
     _____
     Amie R. First, RDR, CRR, CRC, CPE
10   Federal Official Court Reporter
     United States District Court
11   Middle District of Florida

12

13                     C E R T I F I C A T E

14

15         I certify that the foregoing is a correct copy of

16   the transcript originally filed with the Clerk of Court on

17   February 18, 2020, and incorporating redactions of personal

18   identifiers approved by Judge Roy B. Dalton, Jr., in

19   accordance with Judicial Conference policy.

20         Redacted characters appear as a black box in the

21   transcript.

22

23   s\Amie R. First, RDR, CRR, CRC, CPE

24

25