1

<pre>
 1                    UNITED STATES DISTRICT COURT
                      MIDDLE DISTRICT OF FLORIDA
 2                         ORLANDO DIVISION

 3    - - - - - - - - - - - - - - -X
                                    :
 4     UNITED STATES OF AMERICA,    :
                                    :
 5                                  :   Case No.:
                 Plaintiff,         :   6:18-cr-00223-RBD-EJK-2
 6                                  :
       vs.                          :
 7                                  :   Orlando, Florida
                                    :   July 25, 2019
 8     ROSE BETH LITZKY,            :   9:04 a.m.
                                    :
 9                                  :
                 Defendant.         :
10                                  :
                                    :
11    - - - - - - - - - - - - - - -X

12         TRANSCRIPT OF JURY TRIAL PROCEEDINGS, VOLUME III,
             BEFORE THE HONORABLE ROY B. DALTON, JR.
13                 UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16    Counsel for Plaintiff:        Ilianys Rivera Miranda

17    Counsel for Defendant:        Karla Mariel Reyes

18

19

20   Proceedings recorded by mechanical stenography.
     Transcript produced by computer-aided transcription.
21

22   Court Reporter:   Heather Jewett, RPR, FCRR
                       Federal Official Court Reporter
23                     401 West Central Boulevard, Suite 4600
                       Orlando, Florida 32801
24                     e-mail: heatherjewett.focr@gmail.com

25
</pre>

*2*

1
                    T A B L E   O F   C O N T E N T S

2                          July 25, 2019

3   PROCEEDINGS                                              Page

4    JUROR EXCUSED                                            102

5    RULE 29 MOTION
          Argument by Ms. Reyes                               229
6          Argument by Ms. Rivera                              232

7    SCHEDULING AND ARGUMENT RE: SPECIFIC INTENT              235

8
    WITNESSES
9
    For the Government:
10
     AJA STAKE
11        Cross-Examination by Ms. Reyes                        4
          Redirect Examination by Ms. Rivera                   75
12
     FRANCIS DUFRESNE
13        Direct Examination by Ms. Rivera                     83
          Cross-Examination by Ms. Reyes                      120
14        Redirect Examination by Ms. Rivera                  138

15   ROBERTO OQUENDO
          Direct Examination by Ms. Rivera                    141
16        Cross-Examination by Ms. Reyes                      191
          Redirect Examination by Ms. Rivera                  220
17        Proffered Direct Examination  by Ms. Reyes          225

18


19
    EXHIBITS
20
    For the Government:
21
     Number 14      Text Messages (Bates 0776-0778)          111
22   Number 15      Extraction Report (Bates 0643-0672)       98
     Number 17      Text Messages (Bates 0779-0791)          112
23   Number 18      Text Messages (Bates 0792-0797)          113
     Number 19      Text Messages (Bates 0798-0799)          114

24

25

*3*

P R O C E E D I N G S

1
2        (Call to order of the court at 9:04 a.m.)
3            THE COURT:  Good morning, all.  We're back on the
4    record.  United States v. Litzky, 18-cr-223.  Court notes all
5    counsel are present and the witness is back in the witness
6    box.
7            Our jurors all ready to go?
8            THE COURT SECURITY OFFICER:  Yes, Your Honor.
9            THE COURT:  Counsel, for planning purposes, I'm
10   going to break for lunch today at 11:45 because I need to go
11   to the bar luncheon, so a little bit early lunch break.  So
12   it'll probably be 11:45 to 1:15 is my guess.
13           Let's bring the jurors in, please.
14           THE COURT SECURITY OFFICER:  Yes.
15       (Jury in at 9:05 a.m.)
16           THE COURT:  Good morning, ladies and gentlemen.
17   Welcome back.  Hope you-all had a pleasant evening and that
18   the traffic wasn't too horrific this morning.  I'm spoiled.  I
19   don't have to get on Interstate-4 from where I start.  So -- I
20   probably shouldn't tell you that, but it's true.
21           But, anyway, thank you for being back in a timely
22   fashion.  And, if you'll recall, when we adjourned yesterday,
23   we were in the midst of the cross-examination of the agent,
24   and we're going to resume where we left off last evening.  So,
25   Ms. Reyes, if you're ready, you may inquire.

*Testimony of Aja Stake*                                                         **4**

1                          AJA STAKE,

2    having previously been duly sworn, testified as follows:

3                        CROSS-EXAMINATION

4    BY MS. REYES:

5    Q     Agent Stake, did you abide by the Court's prior

6    admonition not to discuss your testimony with any lawyers?

7    A     Yes, ma'am.

8    Q     We left off on whether or not federal cases have more

9    resources available to you to investigate versus state cases,

10   and your answer was no?

11   A     Correct.

12   Q     Okay.  So as a federal agent in September of 2016, you

13   had the ability to subpoena for records?

14   A     Yes, ma'am.

15   Q     And that is called -- in legalese it's called a "subpoena

16   duces tecum"?

17   A     Yes, ma'am.

18   Q     And you have that power without involving the courts;

19   right?

20   A     The subpoena has to be approved through the courts.

21   Q     Okay.  But if you ask for it, you're going to get a

22   subpoena duces tecum?

23   A     Yes, ma'am.

24   Q     Okay.  So as part of your investigation in this case, you

25   subpoenaed -- or you issued a subpoena duces tecum to Google?

*Testimony of Aja Stake*                                                      **5**

1    A    Yes, ma'am.

2    Q    And that was specifically for the e-mail

3    robertloverose8186@gmail?

4    A    Yes, ma'am.

5    Q    And you asked them for a period from December 1, 2015,

6    through September 15th of 2016?

7    A    Yes, ma'am.

8    Q    And what was the purpose of that?

9    A    To obtain the subscriber information.

10   Q    And were you successful?

11   A    Yes, ma'am.

12   Q    Did you also try to get e-mails?

13   A    No, ma'am.  That would require a search warrant.

14   Q    Okay.  As part of the search warrant that you did

15   September 15th of 2016 for nine of his devices, did you

16   believe that that would warrant another search warrant for

17   Gmail?

18   A    I did not get a search warrant for the Gmail, no, ma'am.

19   Q    Okay.  Why is that?

20   A    I just did not get a search warrant for the Gmail.

21   Q    Okay.  Did your investigation reveal that their

22   communications consisted of e-mails?

23   A    Yes, ma'am.

24   Q    Okay.  But you just decided not to get the e-mails?

25   A    Correct.

*Testimony of Aja Stake*                                                      **6**

1   Q    Okay.  And that was -- the subpoena duces tecum for

2   Google was June 19th of 2017?

3   A    I'd have to refer to the subpoena just to verify that.

4   Yes, ma'am.

5   Q    Okay.  I asked you yesterday if you had requested school

6   records, and you said no.

7   A    Correct.  And I would like to correct that answer.

8   Q    Yeah.  So overnight have you had a chance to reconsider

9   your answer?

10  A    I thought about it last night, yes, ma'am.

11  Q    Okay.  And have you actually had a chance to look at the

12  memorandum that you submitted to the Indian River County --

13  Indian River School District?

14  A    I did not review anything because I didn't know if I was

15  permitted to do that.  I just remembered that I had actually

16  requested those, and I had forgotten -- honestly had forgotten

17  that I had done that.

18  Q    And that was because it was over two years ago?

19  A    Yes, ma'am.

20  Q    Specifically, it was August 1st of 2017?

21  A    If that's what the document says.  I would have to look

22  at it to verify that.

23  Q    Okay.  Why were school records a part of your

24  investigation in this case?

25  A    I requested the school records around the time frame to

*Testimony of Aja Stake*                                            7

1    assist Ms. Rivera.

2    Q    Whose school records did you request?

3    A    Ms. Litzky.

4    Q    Okay.  And did you know why Ms. Rivera wanted those

5    records?

6              MS. RIVERA:  Objection, Your Honor, as to

7    speculation and relevance.

8              THE COURT:  If you know, you can answer.  Otherwise,

9    the objection's sustained.  You can ask her whether or not she

10   knows and, if so, how she knows.

11   BY MS. REYES:

12   Q    The question was did you --

13             THE COURT:  Do you know?

14             THE WITNESS:  No, I don't know why exactly.

15   BY MS. REYES:

16   Q    Okay.  On the evening of September 15, 2016, prior to you

17   interviewing her with Agent Spadafora, Agent Young had

18   previously interviewed her a couple hours before; correct?

19   A    Correct.

20   Q    So when you interviewed her September 15th, that was the

21   second time that she spoke to law enforcement in one day?

22   A    Yes, ma'am.

23   Q    And on the evening of September 15, 2016, she gave you

24   her phone number?

25   A    Yes, ma'am.

*Testimony of Aja Stake*                                                      8

1    Q    And that was almost at the beginning of your interview?

2    A    Yes, ma'am.

3    Q    And later on, maybe an hour after you were done, you

4    seized her phone?

5    A    Yes, ma'am.

6    Q    And then September 22nd of 2016, you tried to get it --

7    or you got a search warrant for her phone?

8    A    There was a search warrant obtained.  I don't know the

9    specific date that it was approved or signed.

10   Q    Okay.

11   A    I'd have to look at it.

12   Q    But she gave you permission to go through her phone?

13   A    Yes.

14   Q    Okay.  So the search warrant was just to keep things

15   clean; right?

16   A    I -- yes, ma'am.

17   Q    Okay.  Because with her consent, you were allowed to go

18   through her phone?

19   A    I was.

20   Q    And your -- Agent Dufresne was -- the forensic examiner

21   in your office, was also allowed to go through her phone with

22   her permission?

23   A    Yes, ma'am.

24   Q    Okay.  When you had her phone and her phone number, did

25   you know who her phone provider was?

*Testimony of Aja Stake*                                                        9

1    A    At that time I don't believe I knew exactly who it was.

2    Q    Okay.  Did you ask?

3    A    I don't recall in the interview if I asked her the

4    specific provider, but I don't believe I did.

5    Q    Okay.  In your investigation, did you ever subpoena for

6    the phone records?

7    A    No, ma'am.

8    Q    And why is that?

9    A    I just did not subpoena the phone records.

10   Q    Did you think the phone records would be evidence in this

11   case?

12   A    I had the evidence in the forensic examination of the

13   phone.  I didn't subpoena the phone records.

14   Q    Okay.  So the forensic examination does not include call

15   logs?

16   A    It does include call logs.

17   Q    Okay.  So if Agent Dufresne testifies that his forensic

18   examination does not include call logs, would that surprise

19   you?

20   A    You would have to ask Agent Dufresne what the specific

21   call log content was in that forensic examination.  I couldn't

22   tell you right offhand without looking at the forensic

23   examination.

24   Q    Okay.  My question is -- I will ask Agent Dufresne.

25   A    Okay.

*Testimony of Aja Stake*                                                  **10**

1   Q    Okay?  But my question to you is did you -- would it

2   surprise you to learn that the call logs are not a part of

3   the -- his forensic examination in this case?

4   A    It wouldn't surprise me.  If they're deleted, it may not

5   pull the call log.

6   Q    If the call log is deleted?

7   A    Yes, ma'am.

8   Q    Okay.

9   Q    That's your understanding of how this technology works?

10  A    You'd have to verify all that through Agent Dufresne.

11  Q    Okay.  If you don't know, you can tell the members of the

12  jury you don't know.

13  A    Okay.  Thank you.

14  Q    In your interview on September 15, 2016, as well as

15  February of 2017, you expressed doubt about whether or not she

16  took the photo on July 2, 2016?

17  A    I addressed inconsistencies in her statements is what I

18  did.

19  Q    And you also expressed doubt?

20  A    That -- I expressed doubt in regards to the

21  inconsistencies.  Yes, ma'am.

22  Q    Okay.  Did you ever submit the phone for fingerprints?

23  A    No, ma'am.

24  Q    Okay.  And to this day you have it in evidence?

25  A    Yes, ma'am.

*Testimony of Aja Stake*                                              **11**

1   Q    So your doubts in regards to who could have used her

2   phone would have been alleviated had you sent it off for

3   fingerprints; correct?

4             MS. RIVERA:  Objection, Your Honor.  That's a

5   mischaracterization of the witness testimony.

6             THE COURT:  Objection's sustained.  You can

7   rephrase.

8             MS. REYES:  Your Honor, I'd like to proffer that

9   later.

10            THE COURT:  What?

11            MS. REYES:  The question and answer.

12            THE COURT:  Yes, ma'am.

13  BY MS. REYES:

14  Q    Other than a forensic examination of her phone, you -- as

15  part of your investigation, you did not request anything else

16  from the phone?

17  A    No, ma'am.

18  Q    Okay.  And Agent Dufresne has a lot of capabilities as a

19  forensic examiner?

20  A    Yes, ma'am.

21  Q    Would that be fair?

22  A    Yes, ma'am.  That's fair.

23  Q    And would it be fair to say that his power or his ability

24  is only limited by what you ask him to do?

25  A    You're going to have to rephrase that.  I don't

*Testimony of Aja Stake*                                              **12**

1    understand what you're looking for in that question.

2    Q    Sure.  Because he's not the case agent, he doesn't have

3    any discretion as to what he's going to pull from the phone;

4    correct?

5    A    He pulls what he can forensically.

6    Q    Okay.  He pulls what you ask him to pull; correct?

7    A    No, ma'am.  He pulls a forensic examination of the phone.

8    Q    Did you ask him to conduct a forensic examination of

9    Mr. Oquendo's computer media?

10   A    Yes, ma'am.

11   Q    Okay.  And that included nine different devices?

12   A    I believe the total was around there, around nine.  Yes,

13   ma'am.

14   Q    Okay.  It included several phones?

15   A    Yes, ma'am.

16   Q    And it included a couple of laptops?

17   A    Yes, ma'am.

18   Q    And a thumb drive?

19   A    Yes, ma'am.

20   Q    Okay.  And Agent Dufresne -- he conducted his forensic

21   examination and completed it by January 9th of 2017?

22            MS. RIVERA:  Objection, Your Honor.  If she knows.

23            THE COURT:  All the questions are if she knows, so

24   objection's overruled.

25            THE WITNESS:  I don't know.

*Testimony of Aja Stake*                                          **13**

 1          THE COURT:  If you don't know, you'll say you don't
 2   know.
 3          THE WITNESS:  Yes, sir.  I don't know.
 4   BY MS. REYES:
 5   Q    Okay.  In preparing for trial, did you look at any
 6   documents?
 7   A    I did.
 8   Q    Okay.  But you didn't look at Agent Dufresne's report?
 9   A    No, ma'am.
10   Q    Did you ever ask him for a forensic examination of
11   Ms. Litzky's phone?
12   A    Yes, ma'am.
13   Q    And what was your understanding -- what did you ask him
14   to do?
15   A    A forensic examination of Ms. Litzky's cell phone.
16   Q    And what is your understanding of a forensic examination
17   of Ms. Litzky's phone?
18   A    The extraction of the information off of Ms. Litzky's
19   phone.
20   Q    Did you ask him to issue a report based on his extraction
21   of her phone?
22   A    I didn't specifically ask him.  He has his own jobs and
23   duties in regards to that.
24   Q    Would he issue a report of an extraction if you didn't
25   ask for it?

*Testimony of Aja Stake*                                         14

1   A    I don't tell him what to do.  He has his own process that

2   he has to do in regards to that.

3   Q    So is your answer --

4   A    I don't know.

5   Q    Okay.  But, to your understanding, he did issue a report

6   of his extraction on -- on the codefendant's --

7   A    I just said I don't know.  I don't know.

8   Q    Okay.  Would anything refresh your memory as to that

9   issue?

10  A    If there was a report that was submitted to you from him,

11  then I could review that and see if it was a report that he

12  issued, but I don't know that off- -- I didn't review that.

13  Q    As the case agent in this case, would your 19-page report

14  perhaps refresh your memory?

15  A    I can look at the report if you would like me to.

16  Q    Only if it will refresh your memory.

17  A    I don't -- I never saw a report from Agent Dufresne, so I

18  can't confirm whether or not he wrote a report or not.

19  Q    On Ms. Litzky's phone specifically?

20  A    Yes, ma'am.

21  Q    Okay.  Do you think coming to a federal jury trial -- do

22  you think it would be important to have a report of

23  Ms. Litzky's phone?

24          MS. RIVERA:  Objection, Your Honor.  Argumentative.

25          THE COURT:  Sustained.

*Testimony of Aja Stake*                                                   **15**

1    BY MS. REYES:

2    Q    Government 12-A that we showed the jury yesterday -- they

3    were images and two-second movies from her phone from July 2,

4    2016?

5    A    Yes, ma'am.

6    Q    Okay.  And -- and that was something that Agent Dufresne

7    completed for trial?

8    A    Yes, ma'am.

9    Q    And that was at the request of defense counsel?

10   A    I don't know whose request that was.

11   Q    You never requested it; correct?

12   A    I never requested the actual video and picture?

13   Q    You never requested the information from Ms. Litzky's

14   phone.

15           MS. RIVERA:  Objection, Your Honor.  That's a

16   mischaracterization of the witness testimony.

17           THE COURT:  Well, objection's overruled.  You can

18   answer the question if you understand it.

19           THE WITNESS:  Can you repeat the question, please.

20   BY MS. REYES:

21   Q    Sure.  You never asked Agent Dufresne for a report of

22   what came from Ms. Litzky's phone?

23   A    A written report?  Is that what you're asking?

24   Q    Sure.

25   A    I never asked him for his -- I never observed a written

*Testimony of Aja Stake*                                               16

1   report completed by Agent Dufresne.

2   Q    Okay.  Do you remember asking him for a report of her

3   phone?

4   A    No, ma'am.

5   Q    Okay.  So 12-A -- Government 12-A was something that you

6   never requested of him; correct?

7   A    I never requested that of him.

8   Q    Okay.  But he prepared it for this trial?

9   A    Yes, ma'am.

10  Q    During the interview on February 2017, you or

11  Agent Spadafora asked Ms. Litzky if she would agree to a

12  polygraph regarding the codefendant's abuse?

13  A    No, ma'am.  That was on September 5, 2016.  That was not

14  the February date.

15  Q    Okay.  So your testimony is that you asked for a

16  polygraph on September 15th of 2016?

17  A    That was the date that the polygraph -- yes, ma'am.  That

18  interview.

19  Q    Okay.  Was that because you didn't believe her abuse?

20  A    I didn't ask her that question.  Agent Spadafora asked

21  her that question.

22  Q    Okay.  You guys were both interviewing her; correct?

23  A    Correct.

24  Q    Okay.  Did you ask -- did you or Spadafora ask for a

25  polygraph because you didn't believe her allegations of abuse?

*Testimony of Aja Stake*                                            17

1   A    We asked her if she'd be willing to take a polygraph.

2   Q    Right.  My question is did you ask her because you did

3   not believe her allegations of abuse?

4   A    I believe that there was inconsistencies in her

5   allegations.

6   Q    And in September of 2016 through February of 2017, did

7   you ever ask her to do a polygraph examination?

8   A    No, ma'am.

9   Q    And your office specifically allows you to ask suspects

10  to do polygraph examinations?

11       MS. RIVERA:  Objection, Your Honor, as to relevance

12  of the polygraph.

13       THE COURT:  Objection's overruled.

14       THE WITNESS:  I'm sorry.  Can you repeat the

15  question.

16  BY MS. REYES:

17  Q    Sure.  Your office, Brevard County Sheriff's Office --

18  they specifically allow you to ask suspects to conduct

19  polygraph examinations?

20  A    Correct.

21  Q    They're -- they're not meant to be a substitute for a

22  complete and thorough investigation?

23  A    Correct.

24  Q    But they are -- they're to be used as a supplement;

25  correct?

*Testimony of Aja Stake*                                                18

1    A    Correct.

2    Q    Prior to September 15th of 2016, had you ever asked a

3    suspect to agree to a polygraph?

4              MS. RIVERA:  Objection, Your Honor.  Relevance.

5              THE COURT:  Sustained.

6    BY MS. REYES:

7    Q    Did she agree to a polygraph?

8    A    She said she would take one.

9    Q    Okay.  Until this day, July 25, 2019, you've never

10   requested her to -- to do one; correct?

11   A    No, ma'am.

12   Q    Let's talk about your interview on September 15, 2016.

13   She told you that she had moved into her current residence in

14   April; correct?

15   A    Correct.

16   Q    Did your investigation reveal that that was a false

17   statement?

18   A    We had some questions in regards to when -- the specific

19   date of when she had moved in.

20   Q    Did your investigation reveal that that was a false

21   statement?

22   A    I don't know exactly the date range that we had come up

23   with -- that we were able to figure out in regards to -- they

24   had moved to so many different locations.

25   Q    She referred to the codefendant as her fiancé?

*Testimony of Aja Stake*                                                    **19**

1    A    Yes, ma'am.

2    Q    Did your investigation reveal that that was a false

3    statement?

4    A    She considered her -- him her fiancé, so I don't see

5    how -- just because it's not an official proposal doesn't

6    necessarily mean that someone doesn't consider somebody their

7    fiancé.

8    Q    Sure.  Legally speaking --

9    A    There's nothing legal in regards to a fiancé status,

10   though.

11   Q    Okay.  Traditionally speaking, did your investigation

12   reveal that that was a false statement?

13           MS. RIVERA:  Objection, Your Honor.  It's been asked

14   and answered and, otherwise, relevance.

15           THE COURT:  Objection's overruled.

16           THE WITNESS:  I don't -- I didn't ask anyone if they

17   ever were officially proposed to in regards to this case.

18   BY MS. REYES:

19   Q    Did you ask the codefendant if they were engaged to be

20   married?

21   A    No.

22   Q    Okay.  She -- she told you that she had been talking with

23   the codefendant; correct?

24   A    Correct.

25   Q    And you interpreted that to mean dating; correct?

*Testimony of Aja Stake*                                               **20**

1   A    She clarified that for me.  She said that they were not

2   dating.  They were talking.

3   Q    Okay.  Do you understand my question?

4   A    If you would like to repeat the question.

5   Q    Did you understand the question?

6   A    I answered your question.

7   Q    Okay.  You didn't.  So --

8              MS. RIVERA:  Objection, Your Honor --

9              THE COURT:  That's enough of this back-and-forth.

10  Let's have questions and answers.

11  BY MS. REYES:

12  Q    Okay.  You asked her how long they had been together;

13  correct?

14  A    Correct.

15  Q    And she said, "We were talking long before we were

16  dating"?

17  A    Correct.

18  Q    And you told her, "You were dating before that?"

19  A    I did say that, yes.

20  Q    And she said yes; right?

21  A    She said they were -- they were talking.  That's what she

22  clarified, that they were talking.

23  Q    Okay.  Do you have Government's Exhibit 6 in front of

24  you?  If you could refer to page 3, Bates 675.

25             MS. REYES:  Your Honor, I have copies for the

*Testimony of Aja Stake*                                          **21**

1    jury -- can I provide them? -- of Government's 6 and 8.

2           THE COURT:  Is there some reason you can't display

3    it on the ELMO?

4           MS. REYES:  No, Your Honor.  I would just like to

5    provide them to the jury as well.

6           THE COURT:  I think it would be more efficient if we

7    do it on the ELMO.  So let's see if we can do that.  If not,

8    I'll allow you to distribute paper copies.

9           MS. REYES:  Okay.  Your Honor, I wasn't prepared to

10   use the ELMO.

11          THE COURT:  Okay.  Let me see the lawyers briefly at

12   sidebar.

13       (Sidebar on the record.)

14          THE COURT:  So what are you doing?  What's the --

15   what's the point of the paper copy as opposed to doing them

16   electronically?

17          MS. REYES:  I'm just conducting my

18   cross-examination, Your Honor.  I'm not doing anything.  I

19   don't know what the Court is asking me.

20          THE COURT:  Well, ordinarily, we use the electronic

21   tools to display the evidence.

22          MS. REYES:  Right.

23          THE COURT:  If there's some reason that we can't do

24   that, I'll certainly accommodate you, and we can do it the

25   old-fashioned way.

1          MS. RIVERA:  Okay.

2          THE COURT:  I was brought up in the old-fashioned

3    way, so it doesn't cause me any difficulties, but what I'm

4    concerned about is that we're getting into some sort of

5    theatrical display, and I'm not going to go there.

6          MS. REYES:  Okay.  Well, I regret that the Court

7    feels that way, but I have some electronic media that I can

8    use in my cross, but I was also intending for the jury to have

9    one hard copy to follow along.

10         MS. RIVERA:  Your Honor, if I may suggest,

11   Michele Valente's here from our office.  These documents are

12   Bates-stamped.  She can call the Bates number, and she can

13   publish it for everyone.

14         THE COURT:  I'm not going to unnecessarily limit

15   Ms. Reyes's ability to cross the way she wants to do it.  I

16   just want to make sure that we're not going into the area of

17   theater here as opposed to some sort of strategic

18   cross-examination.  I don't want to try the case for you, nor

19   do I want to second-guess the way you're trying it.  You're a

20   very competent lawyer.  I have complete confidence in you.  If

21   there's nothing to this process, I'll take your word for it,

22   and we'll do it that way.

23         MS. REYES:  I -- I don't want the Court to think I'm

24   being theatrical, so I'll use the electronic media.

25         THE COURT:  Do it however you want to do it.  The

*Testimony of Aja Stake*                                          **23**

1   reason I'm asking you is because it's out of the ordinary.

2   It's unusual.  And so I'm going to credit the fact that it's

3   unusual, but that's the way you want to do it.  So --

4        (End of sidebar.)

5             THE COURT:  All right.  Mr. Countryman, could you

6   help Ms. Reyes and distribute those --

7             MS. REYES:  Your Honor, I'm not going to.  Thank

8   you.

9   BY MS. REYES:

10  Q    Okay.  If we could turn to Bates 675 of Government

11  Exhibit 6.  Do you have it in front of you?

12  A    Yes, ma'am.

13  Q    Okay.  So she -- you asked her -- so we were on line 21.

14  A    Okay.

15  Q    She said, "Me and him was talking long before that."

16       And you said, "You were dating long before that?"

17  A    Yes, ma'am.

18  Q    And she says, "Yeah"?

19  A    Yes, ma'am.

20  Q    Right?  So she's agreeing with you?

21  A    Yes, ma'am.  Although, when you see 24,

22  Q    But, Agent Stake, hold on.  Even though her answer was

23  that "We were talking long before that," you changed the

24  question immediately after her answer, and you said, "You were

25  dating long before that"?

*Testimony of Aja Stake*                                                    **24**

1    A    Yes, ma'am, and she corrected me.

2    Q    So at this point you hear her fine; correct?

3    A    Yes, ma'am.

4    Q    Because when you don't hear her, you ask her to repeat

5    herself; correct?

6    A    Correct.

7    Q    Okay.  So when she said "talking," there was nothing in

8    your head to indicate that she meant dating; correct?

9    A    She corrected me after I said that, ma'am.

10   Q    Do you understand my question?

11   A    You can ask the question again.

12   Q    So then you said -- after she agreed with you on line 24,

13   you said, "Okay.  So how old were you when you started dating

14   him"; right?

15   A    Yes, ma'am.

16   Q    So you're still using the word that you want to use in

17   this interview; correct?

18   A    That's the word I used.

19   Q    Okay.  And then she said on line 25, "I wasn't dating

20   him.  I was talking to him."

21   A    Correct.

22   Q    Okay.  So would you characterize that as -- as just a

23   simple mistake on your part to put words in her mouth?

24   A    She corrected me.  I misstated it, and she corrected me.

25   Q    Would you consider that a simple mistake on your part to

*Testimony of Aja Stake*                                        **25**

1    put words in her mouth?

2          MS. RIVERA:  Objection, Your Honor.  Asked and

3    answered.

4          THE COURT:  It wasn't answered.  Objection's

5    overruled.

6          THE WITNESS:  I wasn't intending to put words in her

7    mouth.

8    BY MS. REYES:

9    Q    Okay.  But you did; right?

10   A    No, ma'am.  She corrected me.

11   Q    Before she corrected you, you put words in her mouth;

12   correct?

13   A    I said the word "dating" as opposed to "talking," yes,

14   ma'am.

15   Q    Okay.  Did your investigation reveal that -- when she

16   indicated they were ten years apart, did your investigation

17   reveal that that was a false statement?

18   A    It was inaccurate.  Yes, ma'am.

19   Q    Because, really, they were approximately five years

20   apart; correct?

21   A    Yes, but if you look at the content of that, she also

22   provided years to oppose that ten years that she had said in

23   that statement as well.

24   Q    The question was they were really five years apart?

25   A    Yes, ma'am, but if you look at the years she provided me,

**Testimony of Aja Stake**                                          **26**

1   that was more consistent than her actually stating that it was

2   ten years.

3   Q    Okay.  So the answer is yes, your investigation revealed

4   that that was a false statement?

5   A    I wouldn't say in the totality of it.  It's not an

6   intentional false statement.  It was a matter of years.

7   Q    That's not the question.

8   A    Okay.  Well, I'm -- that's my answer to the question,

9   ma'am, is that based on the totality of that entire statement,

10  I wouldn't say that that was an intentional false statement

11  that she provided me.

12  Q    Okay.  The question is not intentional.  The question was

13  not based on the totality of the circumstances.

14  A    Okay.  That's my perception of that statement, ma'am.

15  Q    Okay.  So when they -- when she said ten years, you

16  thought that was a correct statement?

17  A    Based off of the ages she provided me in inclusion with

18  that, yes, ma'am.

19  Q    Okay.  Did your investigation reveal any other false

20  statements from September 15th of 2016?

21  A    In regards to what specifically?

22  Q    The investigation of the case.

23  A    I would request that you be more specific in regards to

24  what specifically was false.

25  Q    Answer the question.

*Testimony of Aja Stake*                                                    **27**

1        MS. RIVERA:  Objection, Your Honor.  The question is
2   vague.
3        THE COURT:  Objection's sustained.  The
4   objection's -- the question's argumentative.  The comment is
5   argumentative.  The question was not argumentative.  The
6   comment was.  So no comments.  New question or the same one
7   again if you want to pursue it.  You're welcome to pursue it.
8   BY MS. REYES:
9   Q   In your three-year investigation of this case, have you
10  gone back to her statement on 9/15/16 and determined if there
11  were any other falsehoods in that statement?
12  A   Yes, ma'am.
13  Q   Okay.  Did you find any other falsehoods?
14  A   Yes, ma'am.
15  Q   What?
16  A   Her initial denials, and there's a lot of inconsistencies
17  throughout her -- both of her statements.
18  Q   Okay.  So based on all of the inconsistencies throughout
19  her statements, how can you determine what was true and what
20  was false?
21  A   The totality of all the circumstances, ma'am.
22  Q   Okay.  Meaning what?
23  A   The forensic evidence, her statements, and the evidence
24  that we had in regards to -- included with the forensic
25  evidence in regards to the chats and the ooVoo.  Everything.

*Testimony of Aja Stake*                                              28

1    Q    Okay.

2    A    This is a pretty extensive case.

3    Q    Okay.  So you're saying that the forensic evidence

4    matches up to her statements and corroborates them?

5    A    Not completely, no.

6    Q    Okay.  The forensic evidence in this case reveals that

7    she did not send the picture on July 2, 2016; correct?

8    A    You'd have to -- I don't have a specific sent -- data in

9    regards to that.  That would have to be addressed through

10   Agent Dufresne.

11   Q    Is the answer that you don't know?

12   A    I don't know.

13   Q    Okay.  So we're here today for a federal criminal jury

14   trial, and you do not know if she sent the, quote/unquote,

15   "pornographic production" on July 2, 2016?

16   A    I know that that image was produced on her device and she

17   said that she was the one that produced it.

18   Q    Okay.  Do you understand my question?

19   A    I don't know the information in regards to that image or

20   that video being sent.  It was produced.

21   Q    You have no evidence that it was ever sent; correct?

22   A    I don't personally have evidence that it was sent.

23   Q    Okay.  And you're the case agent in this case; correct?

24   A    Yes, ma'am.

25   Q    Okay.  So if anybody is going to know the answer to that

**Testimony of Aja Stake**                                        **29**

1    question, it's going to be you; correct?

2    A    Correct.

3    Q    Okay.  Not Agent Dufresne; right?

4    A    Correct.

5    Q    Yesterday you testified that Ms. Litzky never reported

6    abuse to you; correct?

7    A    Yesterday I testified that she never reported that she

8    was hit by him.

9    Q    Okay.

10   A    That's what I testified to.

11   Q    Okay.  Perhaps -- okay.  So if you could -- if we could

12   turn to Government Exhibit 6, page 696.  Starting at line 20,

13   you asked her, "So you -- and why would -- I don't understand.

14   You wouldn't ask him any more questions on that -- than that.

15   Is it just that -- is he physically abusive to you?"  You

16   asked her that; right?

17   A    Yes, ma'am.

18   Q    Okay.  And she answered, "To me, uh, some- -- somewhat";

19   right?

20   A    Correct.

21   Q    Would you consider that abuse?

22   A    No, ma'am.  I asked her to clarify in the very next

23   sentence.

24   Q    Okay.  So that statement -- you asked her, "Is he

25   physically abusive to you?" and she says, "Somewhat."

*Testimony of Aja Stake*                                                     **30**

1   A    Yes, ma'am.

2   Q    That statement, you do not consider that a report of

3   abuse?

4   A    Not automatically, no, ma'am.

5   Q    Okay.  So let's go on.  The next question was "Somewhat?"

6   on line 24.  "What do you mean by 'Somewhat'?"  That was your

7   question; right?

8   A    Yes, ma'am.

9   Q    To clarify?

10  A    Yes, ma'am.

11  Q    Because you had been trained in conducting domestic

12  violence investigations; right?

13  A    Yes, ma'am.

14  Q    Okay.  So her answer was "Um, every time he drinks and

15  when I get in a fight, he comes to my face," and that's

16  line 25; correct?

17  A    Yes, ma'am.

18  Q    And then she says -- on line 1 of Bate 697, she says,

19  "And then, like, he comes to smack me in my eye"; right?

20  A    Yes, ma'am.

21  Q    She said that?

22  A    Yes, ma'am.

23  Q    Okay.  So she -- she goes on, and you ask her, "Does he

24  smack you?"  Right?

25  A    Yes, ma'am.

**Testimony of Aja Stake**                                                  **31**

1    Q    And she says no?

2    A    Correct.

3    Q    Right?

4         But just before that, she told you, "And he smacks me in

5    my eye"?

6    A    No, ma'am.  I don't believe that that is the proper

7    context.

8    Q    Okay.  The line right before that -- okay? -- when she

9    says that he did not smack her on line 3 of Bates 697, when

10   you asked her, "Does he smack you?" and she says, "No" --

11   A    Correct.

12   Q    -- the line right before that says "Every time he drinks

13   and when I get in a fight, he comes to my face, and then he

14   likes to smack me in my eye."

15   A    No, that's not what it says.

16   Q    Okay.  Can we highlight line 1.  That same day you asked

17   her if -- if the codefendant had asked her to send him sexual

18   images of their own children?

19   A    What part of the transcript are we referring to now?  I

20   was still on that same page.

21   Q    Don't worry about it right now.

22   A    Okay.

23   Q    So on September 15, 2016, did you ask her if he asked her

24   to send sexual images of the children?

25   A    Yes, ma'am.

1   Q    Okay.  And do you remember what she said?

2   A    I would like to refer to the transcript to give a proper

3   answer to that.

4            MS. REYES:  Okay.  If we can pull up Government

5   Exhibit 6, Bates 705, line 5.

6   BY MS. REYES:

7   Q    Is your memory refreshed?

8   A    Yes.

9   Q    Okay.  So she told you that she -- that he did ask her to

10  send those images; correct?

11  A    Yes.

12  Q    And you asked her, "Did you do it?"

13  A    "Did you do it?"  Yes.

14  Q    And she said no?

15  A    Correct.

16  Q    Okay.  And once she said no, you pressed on; correct?

17  A    Correct.

18  Q    Okay.  Because you weren't satisfied with her answer?

19  A    I was further questioning the answer, yes.

20  Q    Okay.  And you were further questioning it because you

21  weren't satisfied with it?

22  A    I was completing the interview, ma'am, and getting all

23  the information, so I asked her to verify -- just to verify.

24  Q    Okay.  And that is when we get into this conversation

25  about having a picture with the girls taking a bath with the

*Testimony of Aja Stake*                                                      33

1    dog; correct?

2    A    Correct.

3    Q    And that dog reference concerned you?

4    A    The dog concerned me?

5    Q    That dog reference concerned you?

6    A    I don't understand what you're asking.

7    Q    Okay.  Based on your investigation, did you get a chance

8    to look at this actual picture of the girls with the dog in

9    the shower?

10   A    Yes, I did.

11   Q    Okay.  And they -- there's no focus of the vaginal area

12   in that photo; correct?

13   A    Their vaginas are exposed in the photo.

14   Q    There is not a focus in that photo of their vaginal area;

15   correct?

16   A    There's not a direct focus, but their vaginas are exposed

17   in that photo.

18   Q    Right.  So you automatically -- by this point, had you

19   seen the photo?

20   A    No.

21   Q    Okay.  So you're thinking that it's contraband; correct?

22   A    That specific photo?

23   Q    Yes.

24   A    Not necessarily.  I mean, we didn't have the specific

25   photo or the details of the photo.

*Testimony of Aja Stake*                                          **34**

1    Q    Okay.  And you told her that she sent it to him in order

2    for him to send money; correct?  That was your question --

3    A    Yes, ma'am.

4    Q    -- to her?

5         So the money aspect of this investigation, -- you were

6    the first one to come up with that; correct?

7    A    I -- I don't know if I was the first one to come up with

8    that.

9    Q    Okay.  Is it your understanding that Ms. Litzky came up

10   with the motive for sending the photos first?

11   A    I believe she's the first one that mentioned the money.

12   Q    Okay.  And has your investigation revealed that he was

13   actually on child support?

14   A    Yes, ma'am.

15   Q    And he wasn't paying child support?

16   A    Correct.

17   Q    Okay.  Yesterday you testified that there was nothing to

18   indicate that she was not of a clear mind that day?

19   A    Correct.

20   Q    What did you mean by that, a clear mind?

21   A    I believe that her responses to the questions were -- she

22   didn't act as if she didn't know what we were talking about or

23   what the investigation was involved about.

24   Q    So you believed that a clear mind just means that she

25   understood the conversation?

*Testimony of Aja Stake*                                                    35

1    A    Correct.

2    Q    Okay.  Are you a psychologist?

3    A    No, ma'am.

4    Q    Okay.  Have you been trained in talking to people with

5    speech impediments?

6    A    Not specifically trained on that, no, ma'am.

7    Q    Have you been trained on dealing with people with

8    invisible disabilities?

9    A    Clarify what you mean in regards to "invisible

10   disabilities."

11   Q    A disability that you can't see.

12   A    Not specifically.

13   Q    Okay.  Would you consider intellectual disability to be

14   an invisible disability?

15        MS. RIVERA:  Objection, Your Honor.  She's not an

16   expert on that field.

17        THE COURT:  Objection's overruled.  She asked

18   whether you would consider it that.

19        THE WITNESS:  I don't know if -- it's not seen as

20   if -- invisibly seen when I first see you and not have any

21   interaction with you.  I would say that I don't know, I mean,

22   disabilities in that regards, but I don't know that if you

23   have interaction with somebody, then you're -- you know, you

24   should be able to see some aspects of different disabilities.

25   BY MS. REYES:

*Testimony of Aja Stake*                                         36

1    Q    Okay.

2    A    But for me to be able to specifically label what they

3    would be, I wouldn't be able to do that.

4    Q    Okay.  Have you been trained in identifying suspects with

5    autism spectrum disorder?

6    A    I have been to a class in regards to autism, yes, ma'am.

7    Q    And would you consider autism to be an invisible

8    disability?

9            MS. RIVERA:  Objection, Your Honor.  That's way

10   beyond the scope of the direct examination.

11           THE COURT:  Objection's overruled.

12           THE WITNESS:  I believe that autism is a wide

13   spectrum, and there's all different levels of it, so I

14   don't -- necessarily would -- could say that it's invisible.

15   BY MS. REYES:

16   Q    And you have been trained on how to talk to people that

17   have those developmental disabilities?

18   A    Not specifically trained on talking to them.  It was just

19   an overall training in regards to that.

20   Q    Does the Brevard County Sheriff's Office have a specific

21   policy on talking to suspects with developmental disabilities?

22   A    I know that there is a portion of one of our policies

23   that refer to autism.  I don't know the exact details of that

24   policy.

25   Q    Okay.  But you've been trained on your policies; correct?

*Testimony of Aja Stake*                                              37

1   A    Yes, ma'am.

2   Q    And as an agent with the SORT unit, do you have to keep

3   updated on what your office policies are?

4   A    Yes, ma'am.

5   Q    Okay.  So if you could turn to the pink binder.

6   A    Pink binder.  Yes, ma'am.  I can close this; right?

7   We're done with this right now?

8   Q    Just -- you might as well leave it open.

9   A    Okay.

10  Q    If you could turn to 8-2, page 4 of 8.

11  A    Yes, ma'am.

12  Q    If you could just take a look at that policy,

13  specifically (m), as in "Mary," (3).  Let me know when you're

14  done reading it.

15  A    Yes, ma'am.

16  Q    Your -- your agency specifically requires you to follow

17  certain procedures when a suspect is on the autism or autism

18  spectrum disorder; correct?

19          MS. RIVERA:  Objection, Your Honor.  Relevance to

20  this particular defendant.

21          THE COURT:  Overruled.

22          THE WITNESS:  Yes, it has specific policies.

23  BY MS. REYES:

24  Q    Okay.  If you could turn to 8-3, page 2 of 4,

25  paragraph 5, and let me know when you've had a chance to read

1    it.  5A2.

2    A    Just 5A2?

3    Q    Read the whole thing.

4    A    Okay.

5    Q    The policy refers to not just autism but a

6    development- -- a related developmental disability; correct?

7    A    Yes, ma'am.

8    Q    And that policy requires you to make a good faith effort

9    to have someone present with them at all times when you're

10   questioning them; correct?

11   A    Correct.

12   Q    And you're aware of that policy?

13   A    Yes, ma'am.

14   Q    Okay.  And as it stands today, are you familiar with

15   Homeland Security having a guide to dealing with people who

16   have disabilities?

17   A    I am not aware of that, no, ma'am.

18   Q    So in your yearlong task force officer duty with Homeland

19   Security, you've never been trained on how to deal with

20   individuals with disabilities?

21   A    Not through Homeland Security, no, ma'am.

22   Q    Okay.  Do you ever receive training by the federal agency

23   that you work for?

24   A    Occasionally we do get some trainings.  We do the -- the

25   initial task force officer training.

*Testimony of Aja Stake*                                          39

1   Q    Okay.  So if you could turn to Exhibit 7 in the pink

2   binder.

3   A    Okay.

4   Q    And just take a look at it, and let me know if you've

5   ever seen this.

6   A    It doesn't look familiar to me.

7   Q    Okay.  And turn to page 4, see if any of that looks

8   familiar to you.

9   A    Okay.  No, ma'am.

10       MS. REYES:  Can we bring up Government Exhibit 12,

11   the photo, and leave it up.

12       Your Honor, I'm requesting that the Government's

13   professional dealing with the computer show Government

14   Exhibit 12, and they're indicating they don't have the disc,

15   so if we can retrieve the disc from the clerk.

16       THE COURT:  Yes, ma'am.  Absolutely.

17       MS. REYES:  Ms. Valente, if you could pause it or

18   somehow leave it on the screen.  Thank you.

19   BY MS. REYES:

20   Q    Agent Stake, you testified that this photo taken on

21   July 2nd was focused on EL's vaginal area?

22   A    Yes, ma'am.

23   Q    Okay.  And you still stand by that assertion?

24   A    Yes, ma'am.

25   Q    Can you see it clearly in front of you?

*Testimony of Aja Stake*                                              **40**

1  A    Yes, ma'am.

2  Q    Okay.  And with it in front of you, you can still tell

3  the members of the jury that it's focused on her vaginal area?

4  A    Yes, ma'am.  The direction of the focus of that picture

5  is her vaginal area.

6  Q    Okay.  Your testimony was that it -- her legs were spread

7  apart?

8  A    Yes, ma'am.

9  Q    Okay.  In looking at that, you can still testify that

10  that is so?

11  A    Yes, ma'am.

12        MS. REYES:  Okay.  We can take that down.

13  BY MS. REYES:

14  Q    When you talked to her in February of 2017, you had the

15  benefit of having looked at this photo; correct?

16  A    Yes, ma'am.

17  Q    Okay.  So even though you did not have the benefit of the

18  ooVoo chats, you did, in fact, have this photo?

19  A    Yes, ma'am.

20  Q    Okay.  And did you have the benefit of looking at all of

21  the photos that were taken on July 2, 2016?

22  A    Yes, ma'am.

23  Q    Okay.  But that was the one that you picked out; correct?

24  A    Yes, ma'am.

25  Q    Okay.  And did you bring it with you in February to her

*Testimony of Aja Stake*                                               41

1    house?

2    A    Yes, ma'am.

3    Q    Okay.  And what else -- what other photos did you bring

4    with you?

5    A    Also the other photo that was the one that was described

6    over her shoulder, the one of -- holding EL and spreading her

7    legs apart in that picture.

8    Q    Okay.  So by February you had the benefit of having all

9    of the codefendant's images from his devices; correct?

10   A    No, ma'am.

11   Q    Okay.  What -- what did you have?

12   A    I had that picture that I just described to you and

13   multiple other pictures that were Mr. Oquendo's pictures.

14   Q    Okay.  But you didn't have all of them?

15   A    No.

16   Q    Okay.  So when did you get all of his photos?

17   A    I don't know the exact date of that.  I don't know when

18   the -- all of that -- including the ooVoos?  Is that what

19   you're asking?

20   Q    No.  I'm asking about the pictures from his devices.

21   A    I don't know what the final completion date was of all of

22   those devices.

23   A    So if Agent Dufresne completed a report in January of

24   2017, you wouldn't have had it by January 2017?

25   A    I don't know, ma'am.  I don't know what -- when the

*Testimony of Aja Stake*                                                42

1   completion of all those devices was done.

2   Q    Okay.  So in February you went to her house with those

3   two photographs?

4   A    Yes, ma'am.

5   Q    Okay.  And by the time that you talked to her, you knew

6   that the photo of her holding EL was not taken on her phone;

7   correct?

8   A    Correct.

9   Q    So you lied to her; correct?

10  A    I misspoke to her.  That wasn't an image that was

11  actually found on her phone.

12  Q    Okay.  And your investigation has revealed that she never

13  took that photo; correct?

14  A    No, ma'am.

15  Q    No, she did not take the photo?

16  A    No.  She did take the photo.

17  Q    Okay.  So do you understand -- do you know how ooVoo

18  works?

19  A    Yes, ma'am.  I know the basics of ooVoo.

20  Q    Okay.  And that photo of her holding EL over her

21  shoulder -- that was -- that was a photo from ooVoo; correct?

22          MS. RIVERA:  Objection, Your Honor.

23  Mischaracterization of the witness testimony.

24          THE COURT:  Objection's overruled.

25  BY MS. REYES:

*Testimony of Aja Stake*                                                    43

1    Q    That was a photo taken from ooVoo; correct?

2    A    ooVoo is not indicated on that photo.

3    Q    Okay.  Do you understand my question?

4    A    Ma'am, I don't -- I don't have any evidence to support

5    that that was actually taken on ooVoo.

6    Q    Are you aware that the codefendant took many screenshots

7    from the ooVoo chats?

8    A    Yes, ma'am.

9    Q    Okay.  And are you aware that if someone takes a

10   screenshot, the other person does not know?

11   A    Not necessarily.

12   Q    Okay.  So the other person may or may not know that

13   they've taken a screenshot?

14   A    Correct.

15   Q    A person can take a screenshot surreptitiously; correct?

16   A    Correct.

17   Q    And the conversations that they had through several

18   months -- those were live conversations; correct?

19   A    They were chat conversations.

20   Q    Okay.  They were video chat conversations; right?

21   A    Yes, ma'am.

22   Q    Okay.  And does your -- did your investigation reveal

23   that this app also has messaging capabilities?

24   A    It has a chat feature on it.

25   Q    Okay.

**Testimony of Aja Stake**                                              **44**

1    A    Yes, ma'am.

2    Q    So a person can text with another person through this

3    app?

4    A    Yes, ma'am.

5    Q    And they can talk on the phone with the other person?

6    A    I am not aware if it has an actual, like, just telephone

7    ability.

8    Q    Okay.  But they can also video?

9    A    Yes, ma'am.

10   Q    Okay.  When did you -- I know you didn't have it for the

11   February 2017 date, but when did you become aware of the ooVoo

12   chats?

13   A    I don't know the specific date I was aware of the ooVoo

14   chats.

15   Q    Would anything refresh your memory as to that issue?

16   A    I don't have the specific date of that.  No, ma'am.

17   Q    Okay.  Do you believe that those ooVoo chats are a pretty

18   important piece of evidence in this case?

19   A    Yes, ma'am.

20   Q    And you were aware of this -- would you -- you say you

21   don't know the date?

22   A    Correct.

23   Q    Could you give the members of the jury an approximation?

24   A    It was following that interview of February of 2017.

25   Q    Okay.  Could you tell the members of the jury if -- if it

1    was in 2017?

2    A    I don't want to misstate.  I don't know exactly when

3    those ooVoo chats were located --

4    Q    Okay.

5    A    -- and images.  I don't have a specific date, and I don't

6    want to misstate it.

7    Q    Right.  So when you just said "shortly after," you didn't

8    know --

9    A    No.  I said it was for sure after that date, February.

10   Q    Okay.  Did you ever try to subpoena the records from

11   ooVoo?

12   A    No, ma'am.

13   Q    And that would have been kind of important; right?

14   A    I did not subpoena the records from ooVoo.

15   Q    Do you understand my question?

16   A    I'm just saying I did not --

17   Q    Right.

18   A    -- subpoena the records from ooVoo.

19   Q    Right.  Do you think that would have been important

20   information?

21   A    I don't know what their retention is in regards to that

22   type of information.

23   Q    And you don't know because you didn't bother; right?

24   A    I did not do it, no, ma'am.

25   Q    So you want to offer these chats that were taken that

1    were extracted from Mr. Oquendo's phone; correct?

2    A    Correct.

3    Q    Your investigation revealed at least 100 screenshots of

4    these conversations?

5    A    Yes, ma'am.

6    Q    Okay.  And by the time that you -- by February of 2017,

7    did you know that the codefendant was a collector of child

8    pornography?

9    A    Absolutely.

10   Q    Okay.  And he had -- he had thousands of images of nude

11   children; correct?

12   A    Yes.

13   Q    Images including his children?

14   A    Yes, ma'am.

15   Q    But including other children?

16   A    Yes, ma'am.

17   Q    And you had the benefit of knowing his Internet search

18   history?

19   A    Yes, ma'am.

20   Q    And he would specifically search for "little toddlers";

21   right?

22   A    Yes, ma'am.

23   Q    And you had the benefit of knowing that he actually

24   committed sexual crimes against his children?

25   A    Yes, ma'am.

*Testimony of Aja Stake*                                                47

1    Q    Okay.  When you showed her -- when you showed her the

2    photo on February of 2017 of her with EL over her shoulder,

3    what was her reaction?

4    A    She initially said that she didn't take that photo.

5    Q    Okay.  You can -- you can close the pink binder.

6    A    Okay.

7    Q    When you're talking to her about these two photos, did

8    you specify what photo you're referring to?

9    A    Yes, ma'am.

10   Q    Okay.  So there's no confusion between you,

11   Agent Spadafora, and Ms. Litzky on what photo you're talking

12   about?

13   A    No, ma'am.

14   Q    Okay.  But you began that interview by telling her that

15   you specifically wanted to talk about the photos that were in

16   her phone; correct?

17   A    Correct.

18   Q    Okay.  And you asked her that at the very beginning of --

19   almost at the very beginning of the interview?

20   A    Yes, ma'am.

21   Q    Okay.  But you -- you ended up asking her questions about

22   a photo that was from another phone; correct?

23   A    Correct.

24   Q    Okay.  So were you trying to elicit a false confession?

25   A    No, ma'am.

*Testimony of Aja Stake*                                              **48**

1    Q    And she told you throughout the interview in February

2    that she didn't send the photos; correct?

3    A    Correct.

4    Q    She said it over and over?

5    A    Correct.

6          MS. REYES:  Mr. Countryman, if we can switch over to

7    the defense.

8          If we could play 7:46, Bate 741, through 7:43.

9    (Exhibit published.)

10   BY MS. REYES:

11   Q    In this part of the conversation, you can turn to

12   Government Exhibit 8, page -- Bate 741, line 18.  During this

13   part of the conversation, you are showing her a photograph;

14   correct?

15   A    Yes, ma'am.

16   Q    What photograph are you showing her in this portion of

17   the conversation?

18   A    The one that we looked at, the 12 photo.

19   Q    Okay.  And she -- and you asked her, "And that was taken

20   here at this house?" and she just said, "Yes"; correct?

21   A    Yes, ma'am.

22   Q    So we're going to continue playing this audio, but would

23   you agree that during this portion of your interview, that

24   she's still trying to identify the picture?

25   A    She identified the picture.

*Testimony of Aja Stake*                                              **49**

1   Q    Okay.  So you would not agree that during this portion

2   she's looking at the photo and she -- she appears to still be

3   trying to identify it?  You would not agree with that?

4   A    I mean, she looked at it, and she identified it pretty

5   quickly.

6   Q    Okay.  So let's hear how pretty quickly she identified

7   it.

8        (Exhibit published.)

9   BY MS. REYES:

10  Q    Okay.  So in this conversation -- you can turn to

11  Bate 742.  We can start at 11 -- line 11.  You're questioning

12  her:  "Like, how do you know you left your phone that day?"

13  Correct?

14  A    Correct.

15  Q    And you -- you tell her at line 15, "Did I tell you what

16  the day was?"  Correct?

17  A    Correct.

18  Q    All right.  So this photo --

19       THE COURT:  Can I interrupt you for just a second?

20  Do you want to be back on the -- do you want the transcript

21  displayed again?

22       MS. REYES:  No, Your Honor.

23       THE COURT:  Okay.  I'm sorry for the interruption.

24  BY MS. REYES:

25  Q    You told her, "Did I tell you what the day was?"

*Testimony of Aja Stake*                                                    **50**

1    A    Yes, ma'am.

2    Q    And this photo that you showed her you know was taken

3    July 2nd of 2016; right?

4    A    Correct.

5    Q    And after you show her the photo, she -- she tells you

6    that she recognized it; right?

7    A    Yes, ma'am.

8    Q    But you don't believe her?

9    A    I questioned her further in regards to it.

10   Q    Okay.  And you questioned her further because you didn't

11   believe her?

12   A    I didn't believe that she knew the specific date because

13   I hadn't provided it to her yet.

14         MS. REYES:  Okay.  If we could play starting at

15   Bate 743, 10:57.

16   BY MS. REYES:

17   Q    Okay.  Before we play that, she tells you she didn't take

18   the photo; correct?

19   A    Correct.

20   Q    And then Agent Spadafora says, "Did your dad take the

21   photo?"

22   A    Correct.

23   Q    "Did your mom take the photo?"

24   A    Correct.

25   Q    Did your investigation reveal that during that period of

**Testimony of Aja Stake**                                                      **51**

1    time they were living in a duplex?

2    A    I don't know that specific information.

3    Q    Okay.  So you don't know what the living situation was on

4    July 2nd of 2016?

5    A    It was my understanding they were living on Burn Drive.

6    Q    Okay.  And you don't know what type of residence Burn

7    Drive is?

8    A    It's not a duplex.

9    Q    Okay.  Did your investigation reveal whether her mother

10   was living next to her?

11   A    It was my understanding that the mother was living with

12   them.

13   Q    Okay.  And was it your understanding that the father was

14   living with them at that time?

15   A    Yes, ma'am.

16   Q    And was it your understanding that the codefendant at the

17   time was living with her?

18   A    Off and on.

19   Q    Okay.  So -- so she denies it.  She says, no, her father

20   didn't take it.  No, her mother didn't take it.  You still

21   don't believe her; correct?

22   A    Correct.

23   Q    But she's telling you that she didn't take it?

24   A    Correct.

25            MS. REYES:  Okay.  So if we could play the audio at

*Testimony of Aja Stake*                                                    **52**

1    10:57, Government Exhibit 7, Bate 743.

2         (Exhibit published.)

3    BY MS. REYES:

4    Q    Did you ever ask the codefendant if he took that photo?

5    A    No, ma'am.

6    Q    He -- he waived his right to *Miranda* on September 15th of

7    2016; correct?

8    A    Correct.

9    Q    So when you get this information from Ms. Litzky February

10   of 2017, you don't go back out and ask the codefendant if he

11   took that photo?

12   A    No, ma'am.

13   Q    Okay.  You don't think that would have been important?

14   A    I didn't go back and ask him.  He was in custody.

15   Q    Right.  You can go to the jail -- right? -- to interview

16   people?

17   A    Correct.

18   Q    So you didn't think it was important to go ask him if he

19   took that photo?

20   A    I did not go back and ask him.  I'm not going to say

21   whether I believed it was important or not.  I'm saying I did

22   not go back and ask him.

23   Q    Okay.  Well, the question is if you thought it was

24   important, and I need an answer.

25   A    Ultimately, Ms. Litzky admitted that she was the one that

**Testimony of Aja Stake**                                                    **53**

1    took that photo.

2    Q    I understand.  The question is did you think it would be

3    important to go back after she tells you, "He always uses my

4    phone" -- do you think it would have been important to go back

5    and ask him if he took that photo on July 2nd?

6    A    I didn't -- after the conclusion of that interview, I

7    didn't find that important at the time.

8    Q    Okay.  Ms. Litzky in February continues to tell you that

9    she's scared of the codefendant?

10   A    Correct.

11   Q    And you continue to dismiss her reports; correct?

12   A    No, ma'am.  I didn't dismiss them.  I asked her why she

13   was scared.

14   Q    Okay.  And would you say that Agent Spadafora dismissed

15   her reports?

16   A    I don't believe the reports were dismissed.  We wanted

17   explanation on why she was scared.

18   Q    Okay.  And the reason that you want an explanation is so

19   that you understand the nature of these threats; correct?

20   A    Correct.

21   Q    But when she's trying to explain it to you, you're

22   actually not giving her a chance to even finish her sentence;

23   correct?

24   A    She explained it to us.

25   Q    Okay.  The question is when she's trying to explain it to

1    you, you're not even letting her finish her sentence; correct?

2    A    I don't believe that's correct.  We let her finish.

3    Q    Okay.

4    A    We did question her on it.

5          MS. REYES:  Okay.  If we can -- Mr. Countryman, if

6    we can switch back to the Government.

7          Ms. Valente, if you can please play -- or display

8    Government Exhibit 8, Bate 750, line 17 -- starting at

9    line 17.

10   BY MS. REYES:

11   Q    So on February 2017, Ms. Litzky is continuing to tell you

12   that he -- that she was afraid of the codefendant; correct?

13   A    Correct.

14   Q    Okay.  Looking at this transcript -- we're not going to

15   play the audio, but looking at this transcript, would you say

16   that you're letting her finish sentences here?

17   A    I think the audio's a better description of actual

18   conversation.

19   Q    Okay.  That's not my question.  My question is looking at

20   this transcript, would you agree that you are not letting her

21   answer the question?

22   A    One could look at this and think that I was not letting

23   her answer the question, but we were asking questions, and if

24   you look at the entire audio -- if you listen to the entire

25   audio, I believe that's a better representation of it.

*Testimony of Aja Stake*                                              **55**

1    Q    Okay.  You asked her on line 23 --

2              MS. REYES:  If we can highlight that one.

3    BY MS. REYES:

4    Q    You asked her, "What did you mean -- what do you mean

5    threatened you?"  Right?

6    A    Correct.

7    Q    And she begins to ask -- she begins to answer you;

8    correct?

9    A    Correct.

10   Q    But Agent Spadafora says -- before she's allowed to

11   finish her answer, he says, "By not giving you the money that

12   he was going to give you?"

13   A    Correct.

14   Q    And if we could turn to Bate 751, lines 1 through 23, she

15   says, "He threatened me"; correct?

16   A    Correct.

17   Q    And now Agent Spadafora is asking her, "How did he

18   threaten you?"  Right?

19   A    Correct.

20   Q    And she starts to say, "He said he was going to have big

21   boys"; right?

22   A    Correct.

23   Q    And she's interrupted; right?

24   A    Correct.

25   Q    And Agent Spadafora speaks over her when she tries to

*Testimony of Aja Stake*                                                          **56**

1   explain?

2   A    Agent Spadafora speaks next, yes.

3   Q    Yes.  And she -- he speaks over her because she wasn't

4   allowed to finish her sentence; correct?

5   A    There was interruptions within that -- that interview.

6   Q    Okay.  On line 8 Agent Spadafora asks her, "Did you ever

7   call law enforcement?"  Right?

8   A    Correct.

9   Q    And she appears to have said, "hmm"; right?  H-m-m.  We

10  don't know.

11  A    You can hear it in the audio.

12  Q    What can we hear in the audio?

13  A    You can play the audio, and that would give you a better

14  representation of what the "hmm" was, but she would often make

15  those type noises in between conversations.

16  Q    Okay.  And then Agent Spadafora just continues asking her

17  about their divorce?

18  A    Correct.

19  Q    Okay.  So she never got to finish her explanation about

20  the big boys; correct?

21  A    Later on in the conversation, I believe she elaborated

22  more on that.

23  Q    Okay.  Where in the conversation did she elaborate on the

24  big boys?

25  A    Can I look through it?

*Testimony of Aja Stake*                                          57

1    Q    Absolutely.  Take all the time in the world.

2         For the sake of time, you can turn to Bate 768 and 769.

3    A    Okay.  Thank you.

4         MS. REYES:  If we could please turn to page --

5    Bate 768, lines 11 through 25.

6    BY MS. REYES:

7    Q    Was this the time that she was allowed to explain the

8    boys?

9    A    That's the part where she had said more about the boys,

10   yes, ma'am.

11   Q    Okay.  But my question was was this the point of the

12   conversation where she was allowed to explain the boys, or was

13   there another part that I missed?

14   A    This is the part.

15   Q    Okay.  So here is Agent Spadafora speaking over her?  Is

16   she being allowed to finish what she's saying?

17   A    She -- she is talking -- I -- I can't tell from the

18   transcript, I mean, specifically speaking over her.  I don't

19   think that's fair without actually listening to it.

20   Q    Okay.  In reading the transcript, is she being allowed to

21   finish her explanation of the boys?

22   A    She -- she does say in that line she's -- that he said,

23   "I'm going to come and send my boys to --" and then she

24   hesitates -- "to call my dad, and I, like --"

25        I mean, it doesn't look like in the transcript she

*Testimony of Aja Stake*                                              **58**

1    finishes that sentence, no, ma'am.

2    Q    Okay.  So if we could turn to the next page, Bate 769,

3    starting at -- the entire page.

4         MS. REYES:  If we could zoom in a little bit.

5    BY MS. REYES:

6    Q    So is this where she's allowed to finish her explanation

7    about the boys?

8    A    She was asked, in regards to the boys, "Did he ever send

9    the boys?"  We asked her that.

10   Q    Did she ever get a chance to explain what she meant by

11   "the boys"?

12   A    That was the amount of detail we got in regards to that.

13   Q    Okay.  So the answer is no?

14   A    I don't know what else she would have said in regards to

15   it.

16   Q    And you don't know because you didn't let her finish;

17   right?

18   A    It could be perceived that way.

19   Q    Would you -- would it be fair to say that you were

20   putting words in her mouth in February of 2017 during that

21   interview?

22   A    I don't feel I was putting words in her mouth, no, ma'am.

23   Q    Okay.  If we could turn to Bate 761, lines 6 through 14.

24   She tells you -- take a look in front of you or on your

25   screen.  She's telling you when she found out about his

1    sexual -- or the answer -- the question is interest.  So she's

2    trying to tell you when she learned about his interest in

3    children; correct?

4    A    Correct.

5    Q    Okay.  And she starts to answer you; correct?

6    A    Correct.

7    Q    But you do not allow her to finish; correct?

8    A    What line are you referring that I didn't allow her to

9    finish?

10   Q    11 and 12.

11          MS. REYES:  If we could highlight 11 and 12 and 13.

12   BY MS. REYES:

13   Q    It's on your screen.  It might be easier to look.

14   A    No.  It's fine.  I can see it.  Thanks.

15   Q    So the question is -- do you need me to repeat it?

16   A    I believe I allowed her to finish.  She said she found

17   out six months ago when they moved in.

18   Q    Okay.

19   A    And I said it was before that.

20   Q    Okay.  Usually, when a sentence is completed, the

21   transcript will show a period; right?

22   A    Not always.

23   Q    Okay.  So I guess we're going to try to cue up the audio

24   for this one -- okay? -- because you're saying you let her

25   finish.

*Testimony of Aja Stake*                                                    **60**

1    A    You can cue up the audio, yes, ma'am.

2    Q    That wasn't my question.  My question is you're saying

3    that you let her finish?

4    A    I believe I let her finish.

5    Q    Do you know if you let her finish?

6    A    I don't know.  Let's listen to the audio.

7    Q    Okay.  That's okay.  The answer is you don't know?

8    A    Okay.

9    Q    I'm asking you.

10   A    I don't know.

11   Q    Okay.  And you tell her while she's trying to answer, "It

12   was before that, Rose"; right?

13   A    Correct.

14   Q    So she's answering a question, and you're telling her the

15   answer; correct?

16   A    Yes, ma'am.

17   Q    And she denies it; right?

18   A    Correct.

19   Q    You asked her if the codefendant ever asked her to do

20   anything to the kids?

21   A    I asked her if he ever -- yes, ma'am.

22   Q    Okay.  And why would you ask that?

23   A    It was a question in regards to the total investigation,

24   what he asked her to do.

25   Q    And you asked because it's important to see what her

*Testimony of Aja Stake*                                                        **61**

1    motivation was behind the photos; right?

2    A    Correct.

3    Q    She told you that he never asked her -- right? -- to do

4    anything to the kids?

5    A    He never asked her to do anything sexually with the kids?

6    Q    Yes.

7    A    That was the statement.

8    Q    Yes.  She told you no; correct?

9    A    Correct.

10   Q    Okay.  You testified regarding there being 500 photos

11   that she took of the kids?

12   A    That's what she said, yes, ma'am.

13   Q    Okay.  And did your investigation reveal where these

14   photos are?

15   A    We do not -- we did not recover 500 images, no, or

16   videos.

17   Q    From her?

18   A    No.  She said she deleted them all after she did it.

19   Q    Okay.  And she also told you that she would give him a

20   lot of her old phones; correct?

21   A    Correct.

22   Q    Did your -- did you ask Agent Dufresne to specifically

23   look for deleted images on Roberto Oquendo's phone?

24   A    Yes, ma'am.

25   Q    Okay.  Because the software that the Brevard County

1   Sheriff's Office uses, if you know, can allow to -- the

2   forensic examiner to determine whether there's deleted images;

3   correct?

4   A    Correct.

5   Q    Okay.  So is it your testimony that you asked

6   Agent Dufresne to look for deleted images from the

7   codefendant's devices?

8   A    Yes, ma'am.

9   Q    Okay.  And what was the result of that?

10  A    I don't have the specific results of numbers of deleted

11  images that were recovered off of all those devices.

12  Q    Would that be evidence in this case?

13  A    Yes, ma'am.

14  Q    Do you believe it would be important evidence?

15  A    We have all of the forensic reports.  That could be

16  reviewed.

17  Q    Okay.  My question is about the deleted images --

18  A    Yes, ma'am.

19  Q    -- the 500 deleted images that Ms. Litzky said she took.

20  A    Correct.

21  Q    Okay.  My question is do you believe a report on the

22  deleted images would be important?

23  A    We don't always get deleted images.

24  Q    But your testimony is --

25  A    It is important, yes, ma'am.

*Testimony of Aja Stake*                                                    63

1   Q    Okay.  And your testimony is that you specifically asked

2   him for this; correct?

3   A    Yes, ma'am.

4   Q    Okay.  So if she says that he doesn't have that

5   information, what's the reason for that?

6   A    You'd have to ask Agent Dufresne in regards to that.

7   Q    Okay.  In preparing for this federal criminal jury trial,

8   did you ask him if he, in fact, extracted deleted images from

9   the codefendant's devices?

10  A    I do not know the amount of deleted images that were

11  extracted from all of those devices.

12  Q    Okay.  Did you ask him for deleted images from

13  Ms. Litzky's iPhone?

14  A    Yes, ma'am.

15  Q    Okay.  So if he says that he never extracted for deleted

16  images, you don't know why he would do that?

17  A    The ex- -- I don't know what the process of the

18  extraction is in regards to that.  It extracts everything.  So

19  it should include the deleted images if they were able to

20  extract that information, but, again, that process has to be

21  addressed through Agent Dufresne.

22  Q    Sure.  But that was something that you got her to admit

23  to on -- September and in February; right?

24  A    Correct.

25  Q    This number of 500 photos; correct?

*Testimony of Aja Stake*                                                    **64**

1    A    The number 500 was on -- February, yes, ma'am.

2    Q    Okay.  Did it ever come up in September of 2016 --

3    A    The --

4    Q    -- the number of images?

5    A    The number of images did, yes, ma'am, but not 500.

6    Q    Okay.  So in February of 2017, she says, "Hey, I deleted

7    500 photos."  Did you follow up with Agent Dufresne to see,

8    "Hey, can we find these deleted images?"

9    A    Agent Dufresne went through all the forensics in regards

10   to trying to locate the deleted files, yes, ma'am.

11   Q    Okay.  After the February --

12   A    I don't know the specific date.

13   Q    Okay.  Because that was my question.

14   A    I don't know.

15   Q    The day of -- the day of February 2017, she tells you

16   that she's been threatened, and you tell her that you didn't

17   see any threats in any of the text messages; correct?

18   A    Correct.

19   Q    By this point you did not have ooVoo; correct?

20   A    Correct.

21   Q    So what text messages did you review in telling her that

22   you didn't see any threats anywhere?

23   A    The SMS messages.

24   Q    From what device?

25   A    I went through her device and numerous of his device.

*Testimony of Aja Stake*                                                    65

1    Q    Okay.

2    A    So I couldn't -- I went through numerous text messages.

3    They had hundreds of text messages.

4    Q    Actually, thousands?

5    A    Probably closer to thousands, yes, ma'am.

6    Q    And did you ever print them in chronological order and

7    read them

8    A    I did not print them out in chronological order, no,

9    ma'am.  I reviewed them through the extraction reports.

10   Q    Okay.  And the extraction reports are not in

11   chronological order; correct?

12   A    I wouldn't say that that's correct, no, ma'am.

13   Q    Okay.  But in getting ten devices, the text messages from

14   one device might overlap with the text messages from another

15   device; correct?

16   A    As far as dates and times?  If it was captured on a SD

17   card or -- of that sort, then I imagine that they could

18   overlap.

19   Q    Okay.  So as part of your investigation, did you read a

20   chronological order of their text messages throughout all of

21   their devices?

22   A    I read through the text messages of the devices that we

23   obtained, yes, ma'am.  I did -- I wouldn't say that I printed

24   out a chronological order, no, but I went through the text

25   messages, yes, ma'am.

1        THE COURT:  I'm going to interrupt you here,

2  Ms. Reyes, and let the jury take our morning break.

3        So, ladies and gentlemen, let's take a 15-minute

4  break, and so we'll come back at 10:50 and resume with the

5  cross-examination.

6        (Jury out at 10:36 a.m.)

7        THE COURT:  Can I see the lawyers for just a second

8  over here at sidebar?

9        Agent, could you step down.  I want to talk to the

10  lawyers and make sure it's outside of your earshot.

11        (Sidebar on the record.)

12        THE COURT:  So I have a worry that I want to share

13  with you-all and see if you have some input into it.  Some of

14  the -- my worry is this:  The issue of -- I'll call it

15  "duress" has been sprinkled into the cross-examination.  It

16  appears in some of the transcripts of the interviews.  And

17  duress is not a defense.  Justification is not a defense.  At

18  least there's not been any showing that the elements of the

19  affirmative defense -- that is, no availability, no other

20  recourse, no other options -- nor do I think -- and I don't

21  mean to speak for you, but nor do I think the defense could

22  make that showing.

23        And so what I'm concerned about is I'm concerned

24  about whether or not that information is potentially going to

25  be confusing to the jury.  The Government hasn't objected to

1    any of it.  So far be it from me to try the case for you, but

2    I'm concerned about the possibility of confusion, and I'm

3    thinking about whether or not a limiting instruction of some

4    sort would be appropriate.  I guess what I'm conflicted about

5    and the reason I want to get some input from you-all is

6    whether or not that information may go to the question of the

7    truthfulness or voluntariness of the confession, which I think

8    it could conceivably think it could be relevant to.

9            So I don't expect you to answer that question right

10   at this moment, but I just want to tell you that I'm concerned

11   about it and would like to get the benefit of your thinking on

12   it.

13           I do have at least one case -- I got a bunch of

14   them, but there's a case -- this is a case that's as close as

15   I've been able to find.  It's not a -- it's not a CP

16   production case.  It's a -- it's actually a forfeiture case.

17   But the Eleventh Circuit addresses the issue of duress or

18   justification, and I found a number of others.  But what I'd

19   like for you-all to do maybe when you have the opportunity

20   tonight, perhaps, is to take a look at that and let me get the

21   benefit of your thinking on it.

22           MS. RIVERA:  Part of the reason why I haven't

23   objected to it is the evidence did come in.  The statement is

24   in evidence.  However -- and she might want to argue that it

25   goes to the voluntariness of the -- the context of all of it,

1   you know, to address the voluntariness and the truthfulness of

2   her statements, but I am concerned about the confusion that

3   this may cause the jury as to the defense of duress, and --

4   and I believe it was one of the jury instructions that was

5   proposed by the defendant in this case.

6           THE COURT:  Well, I don't mean to cut you off, but

7   we don't have the time for a robust conversation about it

8   here, but I just wanted to express my concern about it.  I am

9   thinking up here how to best deal with it, if at all.  As I

10  said, I don't do the lawyering, but it is my responsibility to

11  make sure the jury is accurately instructed on the issues and

12  that they don't get confused, if I can avoid that.

13          So I just wanted you to know that I was thinking

14  about it.  I have some concerns about it.  I haven't resolved

15  what, if anything, I'm going to do about it.  You-all, I would

16  appreciate it if you would do some research over the evening

17  tonight.  There's -- there are many other cases that --

18  there's not anything directly on point.

19          MS. RIVERA:  So then, when the defense is finished

20  with Agent Stake, this is something that's going to take some

21  time.  The Court wouldn't be instructing the jury after she

22  testifies but later in the case if -- if that's going to be

23  the case?

24          THE COURT:  Yeah.  I'm a fairly long way away from

25  the jury instructions.  So --

*Testimony of Aja Stake*                                             **69**

1        MS. RIVERA:  I thought maybe the Court was

2    considering a limiting instruction after she testifies, but

3    that's not --

4        THE COURT:  Well, I'm not going to give them a

5    limiting instruction until, A, I know what I'm going to say

6    and, B, that I'm confident that it's correct and give you-all

7    an opportunity to give me your views on it.  So --

8        MS. REYES:  Your Honor, if I may.

9        THE COURT:  Yes.

10       MS. REYES:  I do not believe that I have the

11   evidence to support a duress affirmative defense.  I included

12   it in the -- I included it as part of the jury instructions

13   just so that there were no surprises during our charge

14   conference, but I think this dovetails a little bit.  I don't

15   know if you want to talk about it right now, but I think it

16   dovetails a little bit in the court finding that CP

17   production, Count 2, is not a specific intent crime.

18       THE COURT:  Right.

19       MS. REYES:  So that really piqued my interest, and I

20   did some research on it.  I respectfully disagree, but I

21   believe the Court is correct.  But as it relates to conspiracy

22   by the Government adding "willfully" in the language, they

23   made it a specific intent crime.

24           And I have an Eleventh Circuit case that I wanted to

25   brief, like, in a pleading, but I have a copy of it that I can

*Testimony of Aja Stake*                                          70

1    give you and the Government.  The defendant's name is Cohen,

2    and it is an Eleventh Circuit case.  And it stands for the

3    proposition that by the Government adding the "willfully"

4    language, they made it a specific intent crime.

5            So to make it less confusing, I can specify that my

6    questions relate to conspiracy and not the production or the

7    possession counts, but I think that her state of mind is

8    important for the conspiracy if not for the production.

9            THE COURT:  I'll read your case and see where we go

10   from there.  Like I said, it's not something I think we can

11   resolve at a ten-minute sidebar, but I just wanted to put you

12   on notice that I have these concerns, and at some point,

13   before we get to jury deliberations and instructions, I'm

14   going to sort out in my own mind what I think is the proper

15   way to approach it.  I'd like to do that with your input,

16   obviously, but I'll ultimately make a decision as to how I

17   think it should best be handled, and then you-all will be

18   given an opportunity to voice your either agreement or

19   objection to the way I decide ultimately to handle it.  The

20   reason I bring it up now is because I am soliciting your

21   input.

22           MS. RIVERA:  Thank you, Your Honor.  And this is

23   another matter.  I'm probably going to get shut down

24   immediately.  But we have another trial starting on Monday,

25   and we may go over; right?

1          How many -- I don't know how many witnesses you
2     intend to call.
3          MS. REYES:  I have six, Your Honor.
4          MS. RIVERA:  And I have concern also that my trial
5     preparation time for that other case has not been sufficient
6     in the last couple of days, and we start on Monday,
7     Your Honor.
8          THE COURT:  I don't have any -- I don't have any
9     flexibility, so that's -- I appreciate the fact that you're
10    overworked and you've got a lot to do.  So am I.  But
11    that's -- that's the nature of the beast.  So I'm not going to
12    address next week's problems until let's solve this week's
13    problems.
14         MS. RIVERA:  Yes.  Yes, Your Honor.
15         MS. REYES:  And before I forget, Your Honor, I
16    returned Mr. Oquendo's psychological evaluation to Ms. Rivera
17    yesterday afternoon.
18         MS. RIVERA:  Yes.
19         THE COURT:  Okay.  Great.  Thank you.
20         Let me give you-all a few extra minutes since we
21    only have five left.  So let's come back at 11:00, and I'll
22    let the jurors know so you-all get a chance to have a break.
23        (End of sidebar.)
24         THE COURT:  Will you let the jurors know we'll be a
25    little bit longer.  We're not going to get back until 11:00.

*Testimony of Aja Stake*                                                72

1    I used up all of our time doing this.  So tell them we'll have

2    a few more minutes.

3         (Recess at 10:46 a.m. until 10:59 a.m.)

4         THE COURT:  Back on the record in United States

5    v. Litzky, 18-cr-223.

6         Counsel, let me see you again for just a minute

7    before our jurors come back in.

8         (Sidebar on the record.)

9         THE COURT:  So I know that it was innocent enough,

10   but it's the second time in the course of this proceeding that

11   the Government has expressed an interest in the continuance of

12   United States v. Edwards, 19-cr-47.  When you ex parte the

13   Court, you violate the Constitutional rights --

14        MS. RIVERA:  Oh, my God.  I'm so sorry.

15        THE COURT:  -- and it's not appropriate, and I just

16   want to -- I'm confident it was innocent enough, but I would

17   be remiss if I didn't point it out on the record since we did

18   have a conversation about it.

19        MS. RIVERA:  Yes.

20        THE COURT:  And so just kind of advise the

21   Government that if you want to move for a continuance in

22   another matter, you file a motion and make an appropriate

23   request.

24        MS. RIVERA:  Yes, Your Honor.  And I can disclose to

25   opposing counsel that I've made these comments on the record

*Testimony of Aja Stake*                                                  73

1    in this case.

2            THE COURT:  That would be wise.

3            MS. RIVERA:  Yes.

4            THE COURT:  All right.  Thank you.

5        (End of sidebar.)

6            THE COURT:  All right.  Let's bring our jury back,

7    please.  Thank you.

8            Just a reminder, Ms. Reyes -- I don't know where

9    we'll be -- or Ms. Rivera, but I'm going to break for lunch at

10   11:45.

11       (Jury in at 11:01 a.m.)

12           THE COURT:  Welcome back, ladies and gentlemen.

13   Sorry for the delay.  I had something I needed to address with

14   the lawyers, so I took the opportunity to do it while you were

15   out.  So we'll resume with the cross-examination of the agent.

16           You may inquire, Ms. Reyes.

17   BY MS. REYES:

18   Q    Do you have any information as part of your investigation

19   in this case as to whether or not Ms. Litzky knew that the

20   codefendant was sexually molesting the girls?

21   A    She was aware of his sexual interest in children.  As far

22   as specific information that she knew he was molesting the

23   girls -- excuse me.  Sorry -- I don't have specific

24   information that she knew he was molesting the girls.

25   Q    The photo -- the Government Exhibit Photo 9 -- Exhibit 9

**Testimony of Aja Stake**                                           74

1    of the girls, was that taken August 12th of 2016, the first

2    day of school for them?

3    A    On or about that date, yes, ma'am.

4    Q    And August 9th, did your investigation reveal that

5    Ms. Litzky was trying to get the codefendant to babysit the

6    girls so that she could go school shopping?

7    A    Yes, ma'am.  On or about that date.

8    Q    And did your investigation reveal that he actually showed

9    up?

10   A    Yes, ma'am.

11   Q    And did your investigation reveal that he sexually abused

12   the girls that day?

13   A    Yes, ma'am.

14   Q    While Ms. Litzky was out of the house?

15   A    Yes, ma'am.

16   Q    Going back to these 500 images, just for the jury, we

17   don't know what they actually consist of; correct?

18   A    No, ma'am.

19   Q    We don't know if they were 500 photos of nude children?

20   A    I don't have the specific of those 500 images, no, ma'am.

21   Q    And you don't know if they were sexual in nature?

22   A    No, ma'am.  I don't have those images.

23   Q    In your experience with domestic violence victims or

24   domestic violence investigations, would it be fair to say that

25   victims protect their abusers?

*Testimony of Aja Stake*                                                    75

1    A    Yes, ma'am.

2    Q    Would it be fair to say that victims deny their abuse?

3         MS. RIVERA:  Objection, Your Honor, as to the line

4    of questioning regarding --

5         THE COURT:  Sustained.

6         MS. REYES:  May I have a brief moment, Your Honor?

7         THE COURT:  Yes.

8         MS. REYES:  Nothing further, Your Honor.

9         THE COURT:  Redirect examination, Ms. Rivera.

10                      REDIRECT EXAMINATION

11   BY MS. RIVERA:

12   Q    Regarding the images that the defendant described sending

13   to Oquendo at some point in the interview, how did she

14   describe them as to what types of images she was taking when

15   she finally admitted that she was taking those images?

16   A    Nude images and images focused on their vagina for the

17   purpose of his sexual gratification.

18   Q    Now, did you in your review of the text messages -- you

19   said there were hundreds, possibly thousands of messages

20   exchanged between the defendant and Mr. Oquendo.  Did you see

21   any text messages of Oquendo threatening to send the boys to

22   do any harm to this defendant?

23   A    No, ma'am.

24   Q    Did you see any messages of him threatening her to obtain

25   or acquire these type of images from the defendant, the images

*Testimony of Aja Stake*                                               **76**

1    that we've been referring here, sexual images?

2    A    No, ma'am.

3    Q    What -- in terms of the relationship, what you saw, what

4    you gleaned from these text message communications, what was

5    the nature of the relationship between the defendant and

6    Mr. Oquendo?

7    A    It was a relationship that was -- I would say a normal

8    relationship.  They'd say, "I love you," and that type of --

9    there wasn't anything in regards to threats.  I would say it's

10   a typical boyfriend-girlfriend relationship, but a lot of it

11   was focused on the children.

12   Q    Would you say, based on your review of those messages,

13   that the defendant was pursuing Oquendo?

14   A    Yes.

15   Q    For what purpose based on those text messages?

16            MS. REYES:  Objection to speculation.

17            THE COURT:  Sustained.

18   BY MS. RIVERA:

19   Q    In the text messages between -- that you reviewed between

20   the defendant and Mr. Oquendo, what did it appear to be the

21   purpose of those communications based on your review --

22            MS. REYES:  Objection, Your Honor.  Speculation.

23            THE COURT:  Sustained.

24   BY MS. RIVERA:

25   Q    Regarding Exhibit 7 for the defense for identification --

*Testimony of Aja Stake*                                          77

1    it hasn't been admitted -- Tab No. 7, back in September of

2    2016, when you were conducting this investigation, were you a

3    part of the Homeland Security Investigations?

4    A    No, not at that time.  I was part of the FBI Innocent

5    Images Unit.

6    Q    So regarding this guide as to interacting with people who

7    have disabilities, this would not have been part of any

8    training that you would have received back in September of

9    2016?

10   A    No, ma'am.

11   Q    And if you can review the second page here of this

12   document, Tab No. 7.  Does this pertain at all to criminal

13   investigations?

14   A    It doesn't appear to be.

15   Q    Sorry?

16   A    It doesn't appear to be.

17   Q    What does this guide appear to be about?

18   A    The nondiscrimination and employment of people with

19   disabilities.

20   Q    Now, I know you're not -- you're not an expert in mental

21   health issues, but based on your interactions with the

22   defendant multiple times during this investigation, did you

23   assess any type of intellectual type of disability or issue?

24   A    No.  As far as I knew, she just had a speech impediment.

25   Q    Now, as far as your review of the evidence in this case,

*Testimony of Aja Stake*                                                    78

1   did you receive any evidence that the defendant is in the

2   autism spectrum disorder?

3   A    Not that I'm aware of.

4   Q    Is there any one piece of document in this case from all

5   the evidence you've had in your control, possession, reviewed

6   that says that this defendant suffers of any type of autism

7   spectrum disorder?

8   A    No, ma'am.

9   Q    Did the defendant reveal during any of her interviews or

10  interactions with law enforcement that she suffers any

11  condition in the autism spectrum disorder?

12  A    No, ma'am.

13  Q    Did she tell you during any of the interactions with you

14  that she was intellectually disabled?

15  A    No, ma'am.

16  Q    As to the iPhone that you -- that you seized in this

17  case, who did you seize that iPhone from?

18  A    Directly from Ms. Litzky.

19  Q    Based on your review -- and as far as what the --

20  Agent Dufresne's work in this case, you said -- in order to

21  search that iPhone, what process do you obtain?

22  A    I obtained a state search warrant.

23  Q    And in that state search warrant, would that define the

24  scope of the search?

25  A    Yes, ma'am.

*Testimony of Aja Stake*                                              79

1   Q    And would that apply -- who does that apply to, the scope

2   of the search?  Who was authorized to perform the search of

3   this iPhone?

4   A    An agent with the Brevard County Sheriff's Office or any

5   other dual sworn designated person.

6   Q    So would you say, then, that you and Agent Dufresne were

7   bound by the terms of the search warrant obtained in this

8   case?

9   A    Yes, ma'am.

10  Q    Do you know, based on your interview with the defendant,

11  whether that iPhone was password protected?

12  A    Yes, ma'am.

13  Q    And during your interview with the defendant, did she

14  provide you that password?

15  A    Yes, ma'am.

16  Q    Based on your -- turning over these items of computer

17  media to Agent Dufresne, are you aware whether, in the process

18  of analyzing those items of computer media, Agent Dufresne

19  generated extraction reports?

20  A    Yes, ma'am.

21  Q    And do you know what is an extraction report?

22  A    It is the data that is retrieved off of those devices.

23  Q    So, basically, copies of all the information on the

24  phone?

25  A    Yes, ma'am.

*Testimony of Aja Stake*                                            **80**

1  Q    And did you have an opportunity in your evaluation of

2  this case to go over each one of those extraction reports?

3  A    Yes, ma'am.

4  Q    Based on your review of all of that evidence, did you

5  find any evidence corroborating of any type of threats of --

6  or physical abuse to the defendant if she didn't turn over

7  sexual images of the children?

8  A    No, ma'am.

9  Q    That -- that image that the defense referred to regarding

10 the defendant holding EL over her shoulder, based on your

11 review of the evidence in this case, where was -- do you know

12 where that image was found?

13 A    That image was found on the LG.

14 Q    Do you know where the ooVoo images were found in this

15 case?

16 A    They were found on the Moto phone.

17 Q    These are two separate devices?

18 A    Yes, ma'am.

19 Q    Now, based on the defendant's ultimate admissions in this

20 case, the two images that had been referred to during the

21 interview -- those two ultimately indicated that she sent them

22 to Oquendo?

23 A    Yes, ma'am.

24 Q    So as far as the forensic evidence that you reviewed, did

25 you find any of those images -- well, one image you already

*Testimony of Aja Stake* 81

1  said that was found on his phone --

2          MS. REYES:  Objection to leading and --

3          THE COURT:  Sustained.

4          MS. REYES:  -- improper rebuttal.

5          MS. RIVERA:  I'm sorry, Your Honor.

6          THE COURT:  Ask direct questions.

7          MS. RIVERA:  Yes.

8  BY MS. RIVERA:

9  Q    So the image of EL, the one in particular that you

10 describe that she's on a bed -- was that image found on any of

11 Oquendo's devices, if -- if you know?

12 A    I don't know.

13         MS. RIVERA:  Okay.  I have no further questions,

14 Your Honor.

15         THE COURT:  Okay.  Thank you.

16         MS. RIVERA:  Oh, I'm sorry.  I do have a couple of

17 additional questions.

18 BY MS. RIVERA:

19 Q    At the beginning of -- it was yesterday you mentioned

20 that you are the case agent and not Agent Spadafora.  How --

21 what was Agent Spadafora's role in this case?

22 A    He just assisted with the interviews.

23 Q    And was anyone else assigned as a co-case agent at any

24 point?

25 A    Agent Raymundo is the co-case agent.

*Testimony of Aja Stake*                                                      82

1    Q    And how were you -- how did you become the case agent in

2    this case?

3    A    Ultimately, it was supposed to go to Cindy Young, and due

4    to the extensive nature of it, I assumed the case.

5             MS. RIVERA:  I have no further questions,

6    Your Honor.

7             THE COURT:  Okay.  Thank you, Agent.  You may step

8    down.

9             Call your next witness.

10            MS. RIVERA:  Your Honor, the Government calls Agent

11   Francis Dufresne.

12            THE COURT:  Ladies and gentlemen, while

13   Agent Dufresne is coming in, just to let you know, I have a

14   meeting I have to take care of over the lunch hour.  So we're

15   going to break a little bit earlier than usual.  We're going

16   to break at 11:45, probably take a lunch break until 1:15 so I

17   can get that work done, and then come back.  So it's an extra

18   15 minutes, so enjoy it.  I just want to give you a heads-up.

19            Agent Dufresne, if you'll come all the way down to

20   the front of the courtroom, please.  My courtroom deputy

21   standing here to my right will place you under oath and give

22   you some seating instructions.

23            MR. DUFRESNE:  Yes, Your Honor.

24            THE COURTROOM DEPUTY:  Raise your right hand.

25            ///

*Testimony of Francis Dufresne*                                    **83**

1                          FRANCIS DUFRESNE

2    was called as a witness on behalf of the Government and,

3    having been duly sworn, testified as follows:

4               THE WITNESS:  I do.

5               THE COURTROOM DEPUTY:  Thank you, sir.  You can have

6    a seat in the witness stand to your right.

7               THE WITNESS:  Yes, sir.

8               THE COURTROOM DEPUTY:  Agent, once seated, if you'll

9    adjust that microphone in front of you so you're speaking

10   directly into it, and then state your name and spell your name

11   for the record.

12              THE WITNESS:  Francis Dufresne, F-r-a-n-c-i-s

13   D-u-f-r-e-s-n-e.

14              THE COURTROOM DEPUTY:  Thank you.

15              MS. RIVERA:  May it please the Court.

16              THE COURT:  You may inquire.

17                       DIRECT EXAMINATION

18   BY MS. RIVERA:

19   Q    Sir, where do you work?

20   A    Brevard County Sheriff's Office.

21   Q    In what capacity?

22   A    As an agent.

23   Q    Are you a digital forensic examiner?

24   A    Yes, I am.

25   Q    And what is your current unit of assignment?

*Testimony of Francis Dufresne*                                                      84

1    A    Digital forensics unit.

2    Q    For how long have you worked with the Brevard County

3    Sheriff's Office?

4    A    Twenty-three years.

5    Q    And as a digital forensic examiner?

6    A    For 15 years.

7    Q    In what other capacities have you worked for the Brevard

8    County Sheriff's Office?

9    A    I was a patrol deputy.  I was a domestic violence

10   investigator.  I was assigned to the community policing unit.

11   I was a field training officer.  I was assigned to our general

12   crimes unit and then, finally, digital forensics.

13   Q    As of September of 2016, were you working as a digital

14   forensic examiner?

15   A    Yes, I was.

16   Q    What is digital media?

17   A    Digital media is, like, a computer or a cell phone.  It's

18   a way to store your data electronically.

19   Q    And what are your duties as a digital forensic examiner?

20   A    Assist in retrieving evidence from digital devices, such

21   as a computer or a cell phone, a camera, and provide that

22   information to investigators and also provide information for

23   court proceedings.

24   Q    And can you please tell the members of the jury what is

25   your background and education.

1    A    I have a master's degree in information technology

2    management, a bachelor's degree in information technology.

3    I've been to the Homeland Security Investigations' Cyber

4    Crimes Center and been trained through them and certified to

5    do computer forensics through them.  I've been to the Defense

6    Cyber Crime Center and certified to do forensics through them,

7    through the United States Secret Service.  I've also had

8    training in EnCase, FTK, which are tools I use to assist me in

9    my investigations, as well as Cellebrite for mobile

10   investigations.

11   Q    And we'll get -- talk about those.  Have you provided

12   training in the area of digital forensics as well?

13   A    I have coworkers in the office that are newer to digital

14   forensic investigations, and I assist them as well as agents

15   from other agencies.

16   Q    Were you trained in the use of particular computer

17   software, then?

18   A    Yes, I was.

19   Q    And what is digital extraction software?

20   A    Some of it is used to actually make a copy of a hard

21   drive, such as AccessData FTK Imager.  Some of it helps me

22   then process that image or put it in human readable format,

23   and then it allows me to prepare a report.

24   Q    And have you been certified in the use of digital

25   extraction software?

*Testimony of Francis Dufresne*                                      **86**

1   A    Yes.

2   Q    Which software?

3   A    AccessData's FTK, Forensic Toolkit; Guidance Software's

4   EnCase; and Cellebrite.

5   Q    Why were you training those in particular?

6   A    That's what everybody in the industry is using, and

7   they've been tested and validated and provide the results told

8   to us by the manufacturer.

9   Q    So what -- you mentioned FTK.  What is FTK used for?

10  A    Forensic Toolkit helps me process images of computers,

11  hard drives, and puts it in human readable format and allows

12  me to create reports.

13  Q    And what is EnCase?

14  A    EnCase is another tool similar to FTK for computers and

15  allows me to process data, puts it into human readable format,

16  and allows me to complete reports.

17  Q    And what about Cellebrite?  What is Cellebrite?

18  A    Cellebrite is for mobile devices, such as cell phones.

19  It extracts the data from a phone, puts it in a human readable

20  format, and then provides an extraction report.

21  Q    Are you certified to conduct forensic examinations of

22  computers and cell phones?

23  A    Yes.

24  Q    What organization certified are you?

25  A    The Homeland Security Investigations Cyber Crime Center,

*Testimony of Francis Dufresne*                                          87

1   the Defense Cyber Crime Center, and also MFI, Mobile

2   Forensics, Inc., for cell phone examinations.

3   Q    Are smartphones essentially computers?

4   A    Yes, they are.

5   Q    Why so?

6   A    They have an operating system like a computer, can store

7   data, such as images and pictures and e-mails, like a

8   computer.

9   Q    Now, have you ever testified as an expert witness?

10  A    Yes, I have.

11  Q    And have you ever testified in federal court regarding

12  digital forensic examinations?

13  A    Yes, I have.

14  Q    About how many items of digital media have you examined

15  in your career?

16  A    Hundreds.

17        MS. RIVERA:  Your Honor, we're moving to qualify

18  Agent Francis Dufresne as an expert in the field of digital

19  forensic examination.

20        THE COURT:  Do you wish to voir dire the witness?

21        MS. REYES:  No, Your Honor.

22        THE COURT:  All right.  Ladies and gentlemen, the

23  witness has been offered as an expert witness in the area of

24  digital forensic examination.  What that means is that he's

25  going to be permitted to offer opinion testimony within the

*Testimony of Francis Dufresne*                                    88

1    area of his expertise.  You should give that testimony the

2    same assessment that you would in regards to its credibility

3    as you would any other witness.  It just allows him to offer

4    opinions as opposed to statements of fact, which would

5    ordinarily be received from a routine witness.

6              So your request is granted, and the witness will be

7    permitted to testify with respect to his opinions in the area

8    of digital forensics.

9              MS. RIVERA:  Thank you, Your Honor.

10   BY MS. RIVERA:

11   Q    Sir, on or about September 15, 2016, were you involved in

12   a child exploitation investigation?

13   A    Yes.

14   Q    What was your role in that investigation?

15   A    To extract data from two laptop computers and

16   approximately seven cell phones.

17   Q    So what items of computer media did you actually extract

18   data from, if you would describe them?

19   A    I extracted data from two laptops.  One is a Gateway

20   laptop.  One is an HP laptop.  There were several Motorola

21   cell phones, an iPhone, a couple ZTE cell phones.

22             MS. RIVERA:  Your Honor, if I may retrieve some of

23   the physical evidence?

24             THE COURT:  Yes, you may.

25             MS. RIVERA:  May I approach the witness, Your Honor?

*Testimony of Francis Dufresne*                                    **89**

1       THE COURT:  You may.

2       MS. RIVERA:  I'm handing the witness what has been

3  marked as Government Exhibits 3, 4, and 10.

4  BY MS. RIVERA:

5  Q    Sir, do you recognize those exhibits?

6  A    May I examine them?

7  Q    Yes.  Go ahead.

8  A    Yes, I do.

9  Q    Okay.  Are -- how are these exhibits pertinent to this

10  case?  Were these part of the exhibits you analyzed?

11  A    Yes, they are.

12  Q    And can you please -- as far as describing them for the

13  record, what is Exhibit No. 3?

14  A    Exhibit No. 3 is an LG cell phone.

15  Q    Is it the LG H634 cell phone?

16  A    Yes, it is.

17  Q    And what is Exhibit No. 4?  What is that?

18  A    That is a Moto G XT1031 cell phone.

19  Q    As to these two devices, who did you receive those

20  devices from?  How were they acquired for examination?

21  A    Agent Troy Deavers.

22  Q    Okay.  And regarding Exhibit No. 10 -- what is it?

23  A    It's an Apple iPhone.

24  Q    And who provided that iPhone to you for forensic

25  analysis?

*Testimony of Francis Dufresne*                                            **90**

1    A    Agent Aja Stake.

2    Q    Okay.  Now, under what authority did you perform these

3    forensic examinations?

4    A    Pursuant to a search warrant.

5    Q    And what was the scope of the search, if you recall?

6    A    To look for images and videos of child pornography.

7    Q    Now, some of these items -- can you tell the members of

8    the jury what is the difference in terms of what is -- between

9    iPhone and some of the other devices that we have here.

10   A    So iPhone is a proprietary operating system for a phone

11   or for an iPad from Apple, very closed loop, not a lot of

12   flexibility on what you can do with it, how you can customize

13   it, very hard to recover deleted data from.  An Android cell

14   phone is made by Google, the operating system.  It works

15   similar to an iPhone, but it's more open source and allows a

16   lot more customizability, and you can sometimes recover data

17   easier, deleted data especially, from Android phones.

18   Q    And so as to the items of computer media, the cell phones

19   that you analyzed that were retrieved from or associated with

20   Roberto Oquendo, were those iPhones or -- or Android devices?

21   A    Android.

22   Q    And you mentioned that you analyzed certain computer

23   media.  How was the process of examination of that computer

24   media?

25   A    I made a copy of the hard drive and then processed using

*Testimony of Francis Dufresne*                                             **91**

1    EnCase, which is one of the software suites I use, and found

2    images.

3    Q    Okay.  Now, in -- in the process of examining these

4    computer devices using EnCase, is any of the content modified?

5    A    No.  When I make a copy of the hard drive, it's write

6    blocked, so it makes a bit-for-bit copy, and then the software

7    itself doesn't allow me to write to even the copy that I have.

8    Q    Now, as to the forensic analysis of the cell phones in

9    this case, how did you go about that forensic analysis?

10   A    Some of the cell phones, I utilized Cellebrite, and some

11   of them I had to actually do what's called a "chip-off

12   procedure."

13   Q    What is a chip-off procedure?

14   A    For various reasons -- not having a pass code, not

15   supported by Cellebrite -- some of the older Android devices,

16   I can remove the memory chip that contains the data from the

17   cell phone and read that memory chip, make a copy of the hard

18   drive, and then read it in Cellebrite software and produce a

19   human readable report.

20   Q    And in performing these forensic extractions of data from

21   a cell phone in the way that you have described here, is there

22   any way that you could have modified or altered the content of

23   the original item?

24   A    No.

25   Q    How so?

*Testimony of Francis Dufresne*                                     **92**

1   A    When I make -- especially for a chip-off, when I make a

2   copy of the hard drive or even the laptop computers, there's a

3   hash value associated with that copy.

4   Q    How is that relevant?  What is a hash value?

5   A    So hash value is a mathematical algorithm or,

6   essentially, a digital fingerprint of that hard drive, and

7   after my examination, I make sure that the hash value has not

8   changed.

9   Q    Is this the same -- do you also obtain a hash value when

10  you perform a forensic extraction of the cell phones?

11  A    Cellebrite does it per category.  It doesn't do an

12  overall.

13  Q    Okay.  Were you able to validate that as to each one of

14  these items of cell phones and computers that you actually

15  obtained accurate images of the original devices?

16  A    Yes.

17  Q    In terms of the devices that you received as associated

18  with Mr. Roberto Oquendo, did you find any items of

19  interest -- images, videos of interest to this case?

20          MS. REYES:  Objection to beyond the scope of his

21  expertise.

22          THE COURT:  Objection's overruled.

23          THE WITNESS:  Yes, I did.

24  BY MS. RIVERA:

25  Q    And what were the nature of those images or videos?

*Testimony of Francis Dufresne*                                    93

1    A    They were prepubescent children engaged in sexual

2    activity or a lewd display of the genitalia or taken for the

3    purpose of somebody's sexual gratification.

4              MS. REYES:  Objection, Your Honor, as to ultimate

5    issue.

6              THE COURT:  I'm going to overrule the objection.

7              So, ladies and gentlemen, the witness is testifying

8    with respect to his assessment or his view of what was there.

9    You'll make your own determination as to what, if anything, is

10   depicted in the photographs.

11             You may proceed.

12   BY MS. RIVERA:

13   Q    Now, as to the defendant's iPhone, did you find any

14   images or videos of interest to this case?

15   A    Yes.

16   Q    What did you find?

17   A    I found an image and a live picture from an iPhone of a

18   prepubescent female laying on a bed with the legs spread with

19   the focus on the vaginal area.

20   Q    And when you say -- what was the term you used?  A

21   live --

22   A    Live video or live picture.

23   Q    Live picture.  What is -- what is a live picture?

24   A    Apple has a live picture, which, when you try to take a

25   picture with your iPhone, it captures a picture but also a

*Testimony of Francis Dufresne*                                    **94**

1    three-second video, a little before and a little after, to try

2    to help you be able to get your perfect picture.

3    Q    And so when you do your forensic extraction of images and

4    videos, how do those live pictures -- how do those look in

5    your extraction report?

6    A    Oftentimes, they come up as movies.

7    Q    Now, in addition to that -- to the image that you

8    described as having been retrieved from the defendant's cell

9    phone, did you retrieve any other images or photos of children

10   in the nude?

11   A    Yes.

12   Q    And was that evidence provided to the case agent,

13   Aja Stake?

14   A    Yes.

15   Q    Now, did you find in your forensic analysis of the

16   defendant's iPhone and the other computer devices in this case

17   any text messages or chats between the defendant and anybody

18   else?

19   A    Yes.

20   Q    What did you find?

21   A    I found text messages between Ms. Litzky and Mr. Oquendo,

22   and I found chats between Ms. Litzky and Mr. Oquendo.

23   Q    As to the nature of the chats, in what type of

24   application were those chats found?

25   A    ooVoo.

*Testimony of Francis Dufresne*                                      **95**

1    Q    Okay.  And what is ooVoo?

2    A    ooVoo is a video chat service.

3    Q    And does this also -- this application, does it provide

4    for messaging as well?

5    A    Yes.

6    Q    And do you know if -- if that service requires the use of

7    the Internet?

8    A    Yes, it does.

9    Q    Are the Internet cell phones facilities of interstate

10   commerce?

11   A    Yes, they are.

12   Q    Where were these ooVoo chats found?

13   A    On the Motorola G XT1031 cell phone.

14   Q    And which one of those items would that be that are in

15   front of you?

16   A    That would be Government Exhibit 4.

17   Q    Now, as to this Motorola G XT1031, did you find any

18   evidence of user attribution?

19   A    Yes, I did.

20   Q    What evidence of user -- first of all, what is evidence

21   of user attribution?

22   A    User attribution either lets me know who's using or who

23   owns the device I'm examining.

24   Q    And what evidence of user attribution did you find?

25   A    The user info for that phone was Roberto Oquendo with

*Testimony of Francis Dufresne*                                    **96**

1   Mr. Oquendo's picture, as well as there was a Yahoo user

2   account with the username oquendo.roberto.

3   Q    Now, as it pertains to those chats -- and -- and you

4   indicated that they were associated with the defendant

5   Oquendo.  How do you assess that in this case?  How do you

6   come to that conclusion?

7   A    Under a different phone, there was an ooVoo account with

8   the username robby007001, which is one of the usernames in the

9   ooVoo chats I found.

10  Q    And what was the other username in the ooVoo chats that

11  you found?

12  A    Babyrose1113.

13  Q    And what other evidence in this case do you have linking

14  the defendant to the use of that username?

15  A    Under the iPhone, when I examined it, I found a Kik

16  account with the username babyrose1113.

17  Q    And as to the text messages that you identified as being

18  between Oquendo and the defendant, do you have, as far as your

19  evaluation, the defendant's cell phone number?

20  A    Yes.

21  Q    Do you know what that is?

22  A    Ms. Litzky's phone number was (772) 571-3769.

23  Q    And is that the way that you identify her text messages,

24  by her phone number?

25  A    That, and her name was right beside it, Rose Litzky.

*Testimony of Francis Dufresne*                                         97

1    Q     Can you turn to the Government binder, please, and it
2    would be Government Exhibit No. 15 for identification.  Do you
3    recognize that?
4    A     Yes, I do.
5    Q     And how do you recognize it?
6    A     That's my -- a part of my extraction report, and that's
7    the ooVoo messages that were extracted.
8    Q     Were these -- how were these messages extracted?
9    A     Through the Cellebrite report.
10   Q     Okay.  And had these messages -- were they -- had they
11   been deleted at any point?
12   A     Yes, they had.
13   Q     And how come you were able to extract information that
14   had been deleted?
15   A     In some cases stuff that's marked for deleted is not
16   deleted right away.  It's stored in a database, and until the
17   operating system tells that database to essentially flush or
18   remove all that deleted items, it's still there and available
19   for recovery.
20   Q     Now, were you able to extract any images associated with
21   these chats, in particular Exhibit 15 for identification?
22   A     No.
23   Q     Do you know whether there were reference to images in
24   these chats?
25   A     Yes.

1          MS. RIVERA:  Now, Your Honor, we would like to move

2    Government Exhibit 15 for identification -- that it be

3    admitted into evidence.

4          THE COURT:  Any objection?

5          MS. REYES:  No, Your Honor.

6          THE COURT:  Government's  15 will be received

7    without objection.  You may publish.

8       (Government's Exhibit No. 15 was admitted into

9    evidence.)

10          MS. RIVERA:  Thank you, Your Honor.

11          Now, if we may publish Government Exhibit 15.  It

12    would be Bates 643.  Actually, the top, please.

13    BY MS. RIVERA:

14    Q    Agent Dufresne, what are we looking at here?

15    A    Those are the participants of the chats with their ooVoo

16    usernames.

17    Q    And -- and regarding your testimony as to these

18    particular participants, what was the evidence you said in

19    reference to who these speakers were?

20    A    Mr. Oquendo's ooVoo username was robby007001, and for

21    Ms. Litzky, a Kik messenger account had the same babyrose1113

22    username.

23          THE COURT:  Is this a good stopping point for you,

24    Ms. Rivera?

25          MS. RIVERA:  Yes, Your Honor.

*Testimony of Francis Dufresne*                                      **99**

1        THE COURT:  Let's take our lunch break now, ladies

2   and gentlemen, and we're going to be in recess, as I said, a

3   little bit longer today.  We're going to resume at 1:15.

4   Remember, this is not the time to discuss the case amongst

5   yourselves or with anyone else.  See you back here at 1:15.

6        (Jury out at 11:42 a.m.)

7        THE COURT:  Mr. Dufresne, just a reminder, it's not

8   appropriate to discuss the substance of your testimony while

9   you're in the midst of it.

10        THE WITNESS:  Yes, Your Honor.

11        THE COURT:  So you're free to go to lunch and do

12   whatever you'd like to do, and we'll see you back here and

13   ready to resume the witness stand at 1:15.

14        THE WITNESS:  Thank you, Your Honor.

15        THE COURT:  We'll be in recess.

16        (Recess at 11:43 a.m. until 1:17 p.m.)

17        THE COURT:  We're back on the record in

18   United States v. Litzky, 6:18-cr-223.  All counsel are

19   present, and Mr. Dufresne is back on the witness stand.

20        I got a message over lunch that one of our jurors,

21   Mr. Tejeiro, is having some medical problems, apparently went

22   to the emergency room last night, and I guess they wanted to

23   admit him, but he felt like he was better.  He's having some

24   high blood pressure problems.  He's feeling ill now.  I'm

25   going to bring him in, talk to him, and see what the situation

*Testimony of Francis Dufresne*                                    **100**

1   is before we get underway.

2         So would you ask Mr. Tejeiro if he can step into the

3   courtroom.

4      (Mr. Tejeiro entered.)

5         THE COURT:  That's fine right there, Mr. Tejeiro.

6         JUROR:  Okay.

7         THE COURT:  So I got a message over lunch,

8   Mr. Tejeiro, that you're not feeling well.  Apparently, you

9   had some issues that took you to the hospital last night.  Did

10  I get that right?

11        JUROR:  Yes, Your Honor.

12        THE COURT:  How are you feeling now?

13        JUROR:  I mean, I have high blood pressure, and I've

14  been feeling some of the symptoms that might be associated

15  with circulatory problems.

16        THE COURT:  Okay.

17        JUROR:  And -- however, I felt -- last night I felt

18  better, and I want to fulfill my duty.  I can't hide the fact

19  that I still feel not normal.

20        THE COURT:  Okay.  Well, I don't want -- we don't

21  want to compromise your health in any way, Mr. Tejeiro, so

22  what I'm going to do is get some input from the lawyers, but

23  if you'll just step out for just a minute, I think we'll

24  probably excuse you from service and let you get back to the

25  doctor and get yourself checked out.

*Testimony of Francis Dufresne*                                    *101*

1          JUROR:  Yes, sir.  Thank you very much, and I

2    apologize to the parties and to you.

3          THE COURT:  Well, you can't control that at all, but

4    let me just ask you one last thing for the record:  In light

5    of your concerns about your health, do you think it would

6    probably interfere with your -- potentially interfere with

7    your ability to give the case your undivided attention?

8          JUROR:  I think it would.

9          THE COURT:  Okay.  All right.  Thank you, sir.

10          All right.  Ms. Williams, if you would just have

11    Mr. Tejeiro stand by for just a second while I visit with the

12    lawyers.

13          Thank you, sir.  I hope you feel better.

14          JUROR:  Thank you.

15      (Mr. Tejeiro exited.)

16          THE COURT:  I'm going to excuse Mr. Tejeiro in light

17    of his medical situation, but I want to give the lawyers an

18    opportunity to lodge an objection if they object.

19          What says the Government?

20          MS. RIVERA:  No objection, Your Honor.

21          THE COURT:  What says the defense, Ms. Reyes?

22          MS. REYES:  I mean, I think it's a bit late to ask

23    me that, Your Honor, but I do object.

24          THE COURT:  Why is it late?

25          MS. REYES:  Because you've already told him that

*Testimony of Francis Dufresne*                              **102**

1    you're going to excuse him.

2          THE COURT:  I haven't done anything.

3          MS. REYES:  I think he told us that he managed it.

4    I mean, the question that Your Honor posed was are you going

5    to be able to pay attention, and he said he's going to be

6    thinking about it.  So I think at that point that rises to a

7    cause, but, initially, he -- he said he managed it.

8          THE COURT:  Okay.  So do you want to object?

9          MS. REYES:  Yes, Your Honor.

10          THE COURT:  Okay.  Your objection is noted.

11          Would you excuse Mr. Tejeiro.

12          THE COURT SECURITY OFFICER:  Yes, Your Honor.

13          THE COURT:  And bring the rest of our jurors back

14    in.

15          I'll tell you what.  Mr. Countryman, why don't you

16    help our jurors get back in, and, Ms. Williams, if you'll help

17    Mr. Tejeiro leave the building.  He'll need to go out the back

18    way.

19          THE COURTROOM DEPUTY:  Yes, Your Honor.

20          MS. RIVERA:  Your Honor, after this witness, I

21    intend to call Mr. Roberto Oquendo to the witness stand, and

22    he would be our last witness.

23          THE COURT:  Okay.

24          MS. RIVERA:  And we would like to raise an objection

25    as to some of the evidence that the defense intends to present

*Testimony of Francis Dufresne*                                            **103**

 1   with that witness.

 2           THE COURT:  We'll find the time to do that.

 3       (Jury in at 1:22 p.m.)

 4           THE COURT:  Welcome back, ladies and gentlemen.  We

 5   were in the midst of Mr. Dufresne's testimony.  You-all can be

 6   seated.  We're going to pick up where we left off.

 7           Ms. Rivera, you may inquire.

 8           MS. RIVERA:  Thank you, Your Honor.

 9   BY MS. RIVERA:

10   Q    Agent Dufresne, I would like to show you what has been

11   marked as Government Exhibit 16 and 16-A.  Your Honor, may I

12   approach?

13           THE COURT:  Yes.

14   BY MS. RIVERA:

15   Q    What is Government's Exhibits 16 and 16-A?  What are

16   they?

17   A    16 is marked as trial exhibit ooVoo images regarding

18   Count 1, and 16-A is marked as ooVoo images regarding Count 1

19   to be published.

20   Q    Do you recognize your initials on these items of

21   evidence?

22   A    Yes, I do.

23   Q    Were you involved in obtaining the extraction of those

24   images?

25   A    Yes, I was.

1    Q    Where were those images extracted from?  Which device?

2    A    The Moto G XT1031.

3    Q    Now, do you know where was that item -- the Moto G XT

4    manufactured?

5    A    China.

6    Q    And in addition to that, based on your forensic review of

7    that evidence as well as the chats, were you able to determine

8    location as to where -- where was that device on or about the

9    times charged in the indictment in 2014?

10   A    Yes.

11   Q    So where was the device located between -- between

12   August 2014 and January of 2015?

13   A    Virginia.

14   Q    How do you determine that?

15   A    Under the device locations, there's GPS coordinates, and

16   when you plug the GPS coordinates into a Web browser, it gives

17   you the location.

18   Q    Past January 2015, were you able to find any other

19   evidence in the phone, in the Moto G XT, as to location

20   information on the device?

21   A    Yes.

22   Q    And what did that information reveal?

23   A    That Mr. Oquendo was there until March 27th of 2015.

24   Q    And when you say "there," where are you referring to?

25   A    Virginia.

*Testimony of Francis Dufresne*                                    *105*

1    Q    As to the chats, the ooVoo chats, Government Exhibit 15,

2    were you able to associate any of the dates on those chats

3    with dates in which there were images of child pornog- -- or

4    not --

5              MS. RIVERA:  Let me take that back, Your Honor.

6    Strike that question.

7              THE COURT:  Yes, ma'am.

8    BY MS. RIVERA:

9    Q    In terms of the ooVoo chats, were you able to obtain any

10   evidence of images of the children being exposed in the nude

11   on or about any particular dates in those communications?

12   A    Yes.

13   Q    Which dates?

14   A    October 28th, October 29th, November 1st, November 2nd,

15   and December 28th.

16   Q    Of which year?

17   A    2014.

18   Q    So what does that -- what does that mean to you in terms

19   of the evidence in the case?  And you've indicated a number of

20   dates.

21   A    Yes.  So those -- there were --

22             MS. REYES:  Objection to relevance.  Vague.

23             THE COURT:  Sustained on the vagueness grounds.  You

24   can rephrase.

25   BY MS. RIVERA:

*Testimony of Francis Dufresne*                                    **106**

1    Q    Can you explain what those dates are linked to?

2    A    Those dates are from pictures, and there's also ooVoo

3    chat messages that have occurred on those same dates.

4    Q    And beyond those dates, are there any dates in January or

5    February or March of 2015 associated with images of -- of the

6    children exposed in the nude?

7    A    Yes.

8    Q    Which months or dates?

9    A    January and February of 2015.

10   Q    As to the defendant's iPhone, if you know, where was that

11   iPhone assembled?

12   A    China.

13   Q    So it is your testimony today that there are images

14   associated with the dates of those chats?

15         THE COURT:  Don't restate the witness's testimony.

16   Ask questions, if you would, Ms. Rivera.

17         MS. RIVERA:  I'm sorry, Your Honor?

18         THE COURT:  Don't regurgitate the witness's prior

19   testimony.  Simply ask direct questions.

20   BY MS. RIVERA:

21   Q    So there are images, then, associated with the dates of

22   the chats?

23   A    Yes.

24         MS. RIVERA:  Now, as to Government Exhibit 13,

25   Your Honor, may I approach the witness?

1            THE COURT:  Yes.

2    BY MS. RIVERA:

3    Q    Do you recognize it?

4    A    Yes, I do.

5    Q    What is this?

6    A    This is a trial exhibit image acquired from LG H634 cell

7    phone.

8    Q    Do you know what image this referred to?

9    A    Yes, I do.

10   Q    What image is it?

11   A    It's an image of an adult female holding a prepubescent

12   female over her shoulder, exposing her vaginal area.

13   Q    Now, that image -- where was that image retrieved from?

14   A    Mr. Oquendo's LG H634 cell phone.

15   Q    Now, as far as how that image ended up being on that

16   item, do you have any information on how that image was

17   acquired by Mr. Oquendo?

18   A    No, I do not.

19   Q    What was the creation date on that image?

20   A    January 14, 2016.

21           MS. RIVERA:  And now, Your Honor, if I may approach

22   the witness again.

23           THE COURT:  Yes.

24           MS. RIVERA:  Showing him Exhibit 12 and 12-A.

25   BY MS. RIVERA:

*Testimony of Francis Dufresne*                                                108

1   Q    Do you recognize it?

2   A    Yes, I do.

3   Q    How do you recognize it?

4   A    It has my initials on the disc.

5   Q    What is it?

6   A    Trial exhibit image and video regarding Counts 2 and 4.

7   Q    Do you know what is contained therein?

8   A    Yes.

9   Q    And what is -- what is in this item in particular?  What

10  does the image depict?

11  A    A prepubescent female with her vaginal area exposed.

12  Q    Okay.  So you're referring to which exhibit in

13  particular?

14  A    Number 12.

15  Q    Okay.  And what was the creation date on this image

16  and -- and the video included there?

17  A    July 2, 2016.

18  Q    And the video that we're referring to -- is that one of

19  the live-action type of images that you've mentioned in this

20  case that you acquired?

21  A    Yes.

22  Q    And do you -- were you able to acquire, based on your

23  examination, any information as to where that image was

24  produced?

25  A    No -- oh, I take that back.  Yes.

1   Q    How so?  How did you determine --

2   A    So there was GPS coordinates located in the picture, and

3   when you plug that in, it comes back to 932 Burn Drive.

4   Q    And based on the evidence in this case, who resided at

5   the time at 932 Burn Drive Northeast?

6   A    Ms. Litzky.

7   Q    And what is Government Exhibit 12-A?

8   A    iPhone images and videos.

9   Q    Does this also pertain to the defendant's phone?

10  A    Yes, it does.

11  Q    And what -- did you actually save those images to this

12  particular exhibit?

13  A    Yes, I did.

14  Q    Okay.  What are -- those images depict?

15  A    Different things: kids in the pool, dog, a picture of

16  some legs.

17  Q    Okay.  Are there also nude images of EL contained

18  therein?

19  A    Yes.

20        MS. RIVERA:  If I may have a moment, Your Honor?

21        THE COURT:  Yes.

22  BY MS. RIVERA:

23  Q    So as to the image in Exhibit 12 depicting EL, where was

24  that image found -- image/video?

25  A    In Ms. Litzky's iPhone.

*Testimony of Francis Dufresne*                                    **110**

1    Q    Sir, regarding your extraction reports in this case,

2    other than the chats, were you able to acquire any other type

3    of evidence in addition to images?

4    A    Chats, SMS, images, and videos.

5    Q    What is SMS?

6    A    SMS stands for short message system.  That's a -- just a

7    regular text message.

8    Q    Now, did you have an opportunity to review those text

9    messages in preparation for trial?

10   A    Yes.

11   Q    If you can go to your binder --

12           MS. RIVERA:  Actually, instead, I'll approach,

13   Your Honor.  This may be faster.  I'm approaching the witness

14   with Government Exhibits 14, 17, 18, and 19 for

15   identification.

16   BY MS. RIVERA:

17   Q    Please examine those items.  Starting with Government

18   Exhibit 14 for identification, do you recognize it?

19   A    Yes, I do.

20   Q    How do you recognize it?

21   A    This has my initials on it, plus also the summary page

22   has my name on it.

23   Q    Okay.  Are these some of the -- what is it?  What is the

24   content of it without going into the particular messages?

25   A    Text messages.

*Testimony of Francis Dufresne*                                     *111*

1   Q    Between which parties?

2   A    Between Mr. Oquendo and Ms. Litzky.

3             MS. RIVERA:  Your Honor, if I may now move

4   Government Exhibit 14 for identification, that it be admitted

5   in evidence.

6             THE COURT:  Any objection to 14?

7             MS. REYES:  Yes, Your Honor, based on the rule of

8   completeness.

9             THE COURT:  Are there other portions that you'd like

10  to have published?

11            MS. REYES:  Yes, Your Honor.

12            THE COURT:  Okay.  Do you have those?

13            MS. REYES:  I don't have them ready as exhibits.

14            THE COURT:  Okay.  I'm going to permit this, but

15  I'll give you, certainly, the opportunity to supplement the

16  exhibit with any other portion that you think ought to be

17  considered by the Court and the jury in interest of

18  completeness.  But I'm going to admit the Government's 14 and

19  give you the opportunity to supplement it as you see fit.

20            MS. REYES:  Yes, Your Honor.

21        (Government's Exhibit No. 14 was admitted into

22  evidence.)

23  BY MS. RIVERA:

24  Q    Okay.  Now, going into Government Exhibit 17, do you

25  recognize it?

*Testimony of Francis Dufresne*                                    *112*

1    A    Yes, I do.

2    Q    How do you recognize it?

3    A    It has my initials on it, and also it has my name on the

4    summary part.

5    Q    What is Government Exhibit 17?

6    A    It is text messages also from Ms. Litzky and Mr. Oquendo.

7              MS. RIVERA:  Your Honor, we're offering Government

8    Exhibit 17 for identification, that it be admitted in

9    evidence.

10             THE COURT:  Any objection to 17?

11             MS. REYES:  Same objection, Your Honor.

12             THE COURT:  Same ruling.  I'll give you the same

13   consideration with respect to supplementing 17.  If you have

14   additional portions of that exhibit that you think need to be

15   considered in the interest of completeness, I'll give you the

16   opportunity to provide those.

17             MS. REYES:  Yes, Your Honor.

18             THE COURT:  Seventeen will be admitted subject to

19   that.

20        (Government's Exhibit No. 17 was admitted into

21   evidence.)

22   BY MS. RIVERA:

23   Q    And, actually, going back to Exhibit 14, I'm not sure if

24   you identified for the record those messages were retrieved

25   from which item?

*Testimony of Francis Dufresne*                                      113

1    A    The Moto G XT1031.

2    Q    Okay.  And as to Exhibit 17, where were those messages

3    retrieved from?

4    A    The ZTE Z988.

5    Q    Now, going on to Exhibit 18 for identification, do you

6    recognize it?

7    A    Yes, I do.

8    Q    How do you recognize it?

9    A    It has my initials on it and also has my name on the

10   summary part.

11   Q    What is Government Exhibit 18?

12   A    More text messages from Ms. Litzky and Mr. Oquendo.

13        MS. RIVERA:  Your Honor, we're offering Government

14   Exhibit 18 for identification into evidence.

15        THE COURT:  Any objection to 18?

16        MS. REYES:  Yes, Your Honor.  Same objection.

17        THE COURT:  Then I'll give you the same ruling with

18   respect to 18.  Otherwise, it'll be admitted.

19     (Government's Exhibit No. 18 was admitted into

20   evidence.)

21   BY MS. RIVERA:

22   Q    Now, as to which item did you retrieve these messages

23   from?

24   A    The LG H634.

25   Q    Okay.  And now moving on to Government Exhibit 19, do you

1   recognize it?

2   A    Yes, I do.

3   Q    How do you recognize it?

4   A    It has my initials on it, and the summary portion has my

5   name on it.

6   Q    Now, what are these?

7   A    Text messages between Ms. Litzky and Mr. Oquendo.

8        MS. RIVERA:  Your Honor, we're offering --

9   BY MS. RIVERA:

10  Q    As to which item?  I'm sorry.  As to which item?

11  A    Ms. Litzky's iPhone.

12       MS. RIVERA:  We are offering Government Exhibit 19

13  for identification, that it be admitted into evidence.

14       THE COURT:  Do you have the same issues with 19,

15  Ms. Reyes?

16       MS. REYES:  Yes, Your Honor.

17       THE COURT:  Same ruling, then.  I'll admit 19

18  subject to Defense being given the opportunity to supplement

19  it.

20       (Government's Exhibit No. 19 was admitted into

21  evidence.)

22  BY MS. RIVERA:

23  Q    Sir, is it correct to state that these are not all of the

24  text messages?

25  A    Correct.

*Testimony of Francis Dufresne*                                        **115**

1   Q    Based on your review of that evidence, were there text

2   messages with other parties other dates not involved in this

3   case?

4   A    Yes.

5   Q    Now, all of these items except for the iPhone are

6   associated with Mr. Roberto Oquendo; is that correct?

7   A    Correct.

8   Q    As to the extraction of images from Ms. Litzky's phone,

9   did you attempt to extract any type -- deleted images?

10  A    Yes.

11  Q    And how did you do that?

12  A    I used a different tool to try to extract deleted data

13  from an iPhone.

14  Q    What tool do you use?

15  A    I'm on a nondisclosure agreement for that tool.

16  Q    Okay.  Good.  Thank you.

17       And is it fair to say that you try different tools in

18  order to be able to try to extract deleted images from her

19  iPhone?

20  A    Yes.

21  Q    And were you -- were you able to extract any deleted

22  images from her phone, things that were carved out?

23  A    Images, no.

24  Q    Okay.  And as it pertains to this case, were you able to

25  extract any other type of deleted items from her iPhone?

*Testimony of Francis Dufresne*                                             *116*

1   A    Some text messages, yes.

2   Q    Okay.  Now, as to Mr. Oquendo's cell phones, were you

3   able to extract images or videos depicting children in the

4   nude from deleted space or unallocated space?

5   A    Yes.

6   Q    And maybe for the record we should clarify.  What is

7   unallocated space?

8   A    When you delete something, that's where the file resides

9   until it's completely removed.

10  Q    So in his case you were able to extract some of the --

11  some of these deleted images?

12  A    Yes.

13  Q    And so what was the difference in terms of procedure, or

14  what made the difference in terms of being able to extract

15  images from one type of device versus the other?

16  A    At the time the Android operating system was much easier

17  to recover deleted data from and to get a physical image from,

18  and a physical image is a complete copy of the actual hard

19  drive used to store your images, your videos, your text

20  messages, and that allowed me to carve for data easier.

21  Q    Why is it not as straightforward to carve for data from

22  an iPhone?

23  A    iPhone encrypts everything.  They have software

24  encryption as well as hardware encryption.  The two are tied

25  together, so if one piece is removed, you'll never break the

1  encryption on the other piece.

2  Q    Now, as to the images associated with this defendant in

3  particular, where were these images retrieved from?  The

4  images of the children exposed in the nude associated with

5  this particular defendant, where were they retrieved from?

6  Which item?

7  A    The iPhone.

8  Q    And which other item?

9  A    The Moto G XT1031 and the LG H634.

10  Q    As to the other images of children being exposed in the

11  nude that you found in Oquendo's cell phone, would you be able

12  to tell as to anything else outside of the ones you just

13  mentioned whether they were produced or sent by this

14  defendant?

15  A    No.

16  Q    Why not?

17  A    That information just didn't exist.

18          MS. RIVERA:  If I may have a moment, Your Honor?

19          THE COURT:  Yes.

20  BY MS. RIVERA:

21  Q    Did you -- regarding your forensic analysis of the

22  defendant's cell phone, did you create -- did you produce an

23  extraction report?

24  A    Yes.

25  Q    Okay.  What is an extraction report?

*Testimony of Francis Dufresne*                                    **118**

1  A    An extraction report is when I extract the data and then

2  have Cellebrite put it a human readable format.  I then create

3  a report which contains your text messages, your videos, your

4  pictures, if it was able to get e-mails, puts that all in a

5  report that I provide to the case agent to review.

6  Q    And by the case agent, you mean Agent Aja Stake?

7  A    In this case, yes.

8  Q    Aside from the extraction report that was generated in

9  connection with that iPhone, did you create any other type of

10 summary report regarding your forensic analysis of the iPhone?

11 A    No.

12 Q    Is it a practice or policy that you have to create a

13 summary report of your findings every time that you analyze an

14 item of computer media?

15 A    No.

16 Q    And why is it that in this case, if there's a reason you

17 didn't create a separate summary report?

18 A    This was just a straightforward extraction case at the

19 time.

20         MS. RIVERA:  Okay.  If I may have a moment,

21 Your Honor?

22         THE COURT:  Yes.

23         MS. RIVERA:  I have no further questions,

24 Your Honor.

25         THE COURT:  Thank you.

*Testimony of Francis Dufresne*                                    119

1                 Cross-examination.

2                 MS. REYES:  Your Honor, I move for Jencks.

3                 THE COURT:  The Government's ordered to comply,

4    Jencks material, with respect to this witness, Mr. Dufresne,

5    if not previously delivered to defense counsel.

6                 MS. RIVERA:  Yes, Your Honor.  I believe he may have

7    some notes with him that -- in addition to what was already

8    provided, Your Honor.

9                 THE COURT:  Okay.  We're going to take a five-minute

10   recess, ladies and gentlemen.  I need to talk with the lawyers

11   just quickly.  I'll be right back with you.

12        (Jury out at 1:45 p.m.)

13                THE COURT:  Ms. Rivera, if you'll give Ms. Reyes

14   whatever it is that hasn't been previously produced.

15                Ms. Reyes, let Mr. Countryman know when you're ready

16   to proceed.

17                MS. REYES:  Yes, Your Honor.

18        (Recess at 1:46 p.m. until 1:50 p.m.)

19                THE COURT:  All right.  Back on the record in

20   18-cr-223, United States v. Litzky.

21                Ms. Reyes, have you received the Government's Jencks

22   disclosure with respect to Mr. Dufresne?

23                MS. REYES:  Yes, Your Honor.

24                THE COURT:  Have you had adequate time to review it?

25                MS. REYES:  Yes, Your Honor.

*Testimony of Francis Dufresne*                                    **120**

1        THE COURT:  All right.  Let's bring our jury back,

2    please.

3        All counsel are present, the defendant is present,

4    and Mr. Dufresne is back on the witness stand.

5    (Jury in at 1:51 p.m.)

6        THE COURT:  Thank you, ladies and gentlemen.

7    Welcome back.

8        Ms. Reyes, you may inquire.

9        MS. REYES:  Thank you, Your Honor.

10                       CROSS-EXAMINATION

11   BY MS. REYES:

12   Q    I've been mispronouncing your last name for over half a

13   year.  I apologize.

14   A    That's all right.

15   Q    Prior to your service with the Brevard County Sheriff's

16   Office, do you have any prior law enforcement?

17   A    I worked for Melbourne Village Police Department.

18   Q    Okay.  And how long did you do that?

19   A    Six months.

20   Q    Approximately how many child pornography cases have you

21   investigated specifically in your 15 years as a digital

22   forensic examiner?

23   A    At least a hundred.

24   Q    And do you commonly work with the federal task officers?

25   A    Yes.

*Testimony of Francis Dufresne*                                        *121*

1  Q    Okay.  But you also work with the state detectives?

2  A    Yes.

3  Q    Okay.  Have you -- even though you work for a law

4  enforcement agency, have you ever done any work for a defense

5  attorney?

6  A    No, I have not.

7  Q    Okay.  You testified as an expert how many times in

8  federal court?

9  A    I've testified -- this is the third trial in federal

10  court.

11  Q    Okay.  And how many times have you testified as an expert

12  in state court?

13  A    Three or four.

14  Q    Is it correct that in your 15 years you have looked at

15  thousands of items of digital media?

16  A    Yes.

17  Q    And in this case specifically, you examined two laptop

18  computers?

19  A    Yes.

20  Q    And seven cell phones?

21  A    Approximately seven cell phones.

22  Q    Did you have occasion to examine a thumb drive?

23  A    Yes, I did.

24  Q    And did that produce any images of -- any nude images of

25  children?

*Testimony of Francis Dufresne*                                          **122**

1    A    I do not believe so, no.

2    Q    Okay.  Would anything refresh your memory as to that

3    issue?

4    A    If I looked at Mr. Oquendo's report.

5    Q    Okay.  What do you -- do you mean when you say

6    "Mr. Oquendo's report"?

7    A    There's a different report for him.

8    Q    Okay.  And that was what you completed on January 9th of

9    2017?

10   A    I don't remember when I completed it, but, yes, that

11   would be it.

12   Q    Okay.  Was -- would you consider that a summary report

13   that you did for his devices?

14   A    Yes.

15   Q    And can you explain to the members of the jury exactly

16   what a summary report is.

17   A    That just described the items that were given to me to be

18   examined.  In the case of a computer, I tell how I had made a

19   copy of the hard drive, and then I detail processing it,

20   breakdown, files such as users, who's using the computer, how

21   many times people have logged in, and then I go into

22   discussing if there was evidence found or not; if there is,

23   how many images or videos and the file paths.

24   Q    And because you're sworn law enforcement, you're able to

25   make your own decisions as to what constitutes evidence?

*Testimony of Francis Dufresne*                                    **123**

1   A    Not sure I follow you.

2   Q    Okay.  Do you take your guidance from the case agent?

3   A    Yes.

4   Q    Will they tell you what they need?

5   A    They will brief me on the case.

6   Q    And the scope of your examination -- is that limited or

7   expanded by whatever they -- they ask of you?

8   A    Depends on what kind of court order there is or consent.

9   Q    Okay.  So let's talk about that a little bit.  Your

10  authority was pursuant to a search warrant?

11  A    Yes.

12  Q    As it related to the codefendant's nine devices and

13  Ms. Litzky's one device?

14  A    Yes.

15  Q    And is it your understanding that there were two separate

16  search warrants on two different dates?

17  A    Yes.

18  Q    Okay.  Did -- did you learn or do you know that

19  Ms. Litzky actually consented to a search of her phone?

20  A    I don't know if I was told that or not.

21  Q    Okay.  If a suspect gives consent to search their

22  property, will that broaden your authority?

23  A    Again, it depends on the case, the type of case, and the

24  case agent.

25  Q    Did the case agent inform you that Ms. Litzky gave

*Testimony of Francis Dufresne*                                    **124**

1   consent?

2   A    I don't recall.

3   Q    Okay.  In front of you is a binder.  If you could turn to

4   Government Exhibit 11.  Is this something that you would

5   consider consent?

6   A    No.

7   Q    Okay.  What would you look for in determining whether a

8   suspect gave consent?

9        MS. RIVERA:  Objection, Your Honor.  Outside the

10  scope.

11       THE COURT:  Objection's overruled.

12       THE WITNESS:  So either a consent form or recorded

13  or verbal consent.

14  BY MS. REYES:

15  Q    Okay.  You -- you didn't have the benefit of her recorded

16  consent in this case?

17  A    Not to my knowledge, no.

18  Q    Okay.  So when you say that your examination was limited

19  by the scope of the search warrant, what was the scope of the

20  search warrant?

21  A    It comes down to images, videos, text messages, chats,

22  historical data to include GPS locations, e-mails.

23  Q    What is historical data?

24  A    Any -- usually deals with GPS data, location data.

25  Q    Okay.  So is that the same thing?

*Testimony of Francis Dufresne*                                      **125**

1   A    Pretty much, yes.

2   Q    Okay.  Would it give you access to a call log?

3   A    Yes.

4   Q    And the search warrant -- I mean, the search warrant?

5   A    Yes.

6   Q    Okay.  So in this case were you able to retrieve a call

7   log for Ms. Litzky's phone?

8   A    Yes.

9   Q    And where has that been made available to the defense?

10  A    In the several reviews that were done leading up to this

11  case for preparation for trial, your expert actually looked at

12  the extraction report, and that was in that extraction report.

13  Q    Okay.  You were explaining a little bit about how iPhones

14  have this unique proprietary information that makes it hard to

15  recover deleted data.

16  A    Yes.

17  Q    Is it possible to recover deleted data from an iPhone?

18  A    Yes.

19  Q    And did your examination reveal whether or not there was

20  any type of encryption software on this phone?

21  A    iPhones come with built-in encryption.

22  Q    Okay.  Is that something that you're able to overcome as

23  a forensic examiner?

24  A    In most cases, no.

25  Q    What about in this case?

*Testimony of Francis Dufresne*                                    **126**

1    A    In this case, no.

2    Q    So what specifically do you believe was encrypted on this

3    phone?

4    A    Everything on the phone is encrypted.

5    Q    What didn't you have access to because of the encryption?

6    A    You're not able to get a full physical, which is a

7    complete image of the hard drive from the start to the finish.

8    Q    Okay.  So let's actually talk about that, skipping ahead

9    a little bit, but can you explain to the members of the jury

10   the difference between a logical and a physical extraction?

11   A    Sure.  A logical is if you pull your phone out of your

12   pocket right now and we're looking at it.  That's pretty much

13   a logical.  What you're seeing on there is what you get.  A

14   physical is when you get an entire copy of the hard drive and

15   you're able to better carve for deleted data.

16   Q    And for Ms. Litzky's iPhone, what were you able -- which

17   type of extraction were you able to do?

18   A    It was called an advanced logical.

19   Q    And pardon my ignorance, but is that a partial physical?

20   A    No, it is not a partial physical.  It is -- Cellebrite

21   terms it "advanced logical," but it's pretty much just a

22   logical extraction.

23   Q    Okay.  So with a logical extraction, what are your

24   limitations?

25   A    Carving for deleted data.

*Testimony of Francis Dufresne*                                    *127*

1    Q    Is that the only limitation?

2    A    You won't get some of the file system files.

3    Q    Okay.  Were you asked to do a summary report on the

4    codefendant's devices?

5    A    Yes.

6    Q    Okay.  But you weren't able to do one for Ms. Litzky's

7    phone?

8    A    No.

9    Q    How do you decide what you're -- when you're going to do

10   a summary report or not?

11   A    If it's just a straight-up extraction, as in this case, a

12   lot of times back then we didn't do any kind of report other

13   than the extraction report.

14   Q    What do you mean when you say "straight-up extraction"?

15   A    Just me extracting the data, creating a report, and then

16   passing it off to the case agent to review.

17   Q    And would you consider your examination of the

18   codefendant's devices to be a straight-up extraction report?

19   A    No.

20   Q    What was that?

21   A    That was more of a summary because I had to do chip-offs

22   to bypass pass codes, and then I had the computers.

23   Q    Okay.  I don't want to misquote you, but did you say that

24   you were asked to look for images of prepubescent children

25   engaged in sexual acts for the purpose of lewd exhibition?

*Testimony of Francis Dufresne*                                        **128**

1    A    Or lewd exhibition of genitalia.

2    Q    Okay.  So you were asked to look for -- say it again.

3    I'm sorry.

4    A    Prepubescent children engaged in sexual activity or lewd

5    and lascivious display of the genitalia.

6    Q    Are you an expert in child pornography?

7             MS. RIVERA:  Objection, Your Honor.

8             THE COURT:  Objection's overruled.

9             THE WITNESS:  I have testified in state court as an

10   expert in child pornography.

11   BY MS. REYES:

12   Q    Okay.  How many times?

13   A    Once that I know of.

14   Q    And is -- do you just tell the members of the jury what

15   child pornography is?

16            MS. RIVERA:  Objection, Your Honor.

17            THE COURT:  The basis of your objection?

18            MS. RIVERA:  Beyond the scope and relevance.

19            THE COURT:  Objection's overruled.

20            THE WITNESS:  Could you reask that question, please.

21   BY MS. REYES:

22   Q    Sure.  As an expert in child pornography, do you just

23   tell the members of the jury what it means?

24   A    Usually, I explain what it means, and then we show images

25   and videos.

*Testimony of Francis Dufresne*                                    **129**

1    Q    Okay.  When -- if you remember, when did you find the

2    ooVoo chats in this case?

3    A    It was later in the review, right before you and I met

4    for one of our reviews.

5    Q    So before March 1st of 2019?

6    A    It was this year.  I don't remember.

7    Q    What -- how did you come upon that?

8    A    I clicked on chats in the extraction report and saw ooVoo

9    and then clicked on the ooVoo chats and saw the chats.

10   Q    So it was something that you already had in your

11   possession.  You just were looking around for stuff.  Would

12   that be fair?

13   A    Yes.

14   Q    Okay.  And those ooVoo chats were found, you said, on the

15   LG phone?

16   A    Moto G.

17   Q    Moto G.  Okay.  Do you remember if it was the TD-03?

18   A    Yes.

19   Q    Okay.  So that is the basis of Exhibit 14 that's in front

20   of you.  For TD-13 -- and if you need to look at the notes

21   that you prepared in preparation for trial, that might help.

22   But for Exhibit 14, you identified five images that

23   corresponded with the ooVoo chats?

24        MS. RIVERA:  Your Honor, the misstatement as to the

25   exhibit number, objection on that basis.

1      THE COURT:  I'll give you an opportunity to correct

2   it.  I don't know if it's wrong or not, but you can take a

3   look and see if it is.

4      MS. REYES:  Sure.

5   BY MS. REYES:

6   Q    For TD-03 you testified that the text messages are not --

7   do not include all of their conversations; correct?

8   A    Correct.

9   Q    If you remember, the TD-03 had 1,996 SMS messages;

10  correct?

11  A    I don't know the exact number.

12  Q    Okay.  So when you have this vast number of text

13  messages, with your software you're actually able to

14  categorize it by sender and receiver to make it actually

15  pretty easy to make an excerpt for the jury; right?

16  A    Yes.

17  Q    Okay.  So for -- let's look at Exhibit 14.  This stems

18  from what we have here in this exhibit, is October 15th of

19  2014, and then it goes through June 3rd of 2010.

20  A    Yes.

21  Q    You were able to locate images that corresponded to

22  October 28th of 2014?

23  A    Yes.

24  Q    October 29th of 2014?

25  A    Yes.

*Testimony of Francis Dufresne*                                    **131**

1    Q     November 1st of 2014?

2    A     Yes.

3    Q     November 2nd of 2014?

4    A     Yes.

5    Q     And, finally, December 28th of 2014?

6    A     Yes.

7    Q     Okay.  And these text messages show some text messages

8    from October 15th of 2014?

9    A     Yes.

10   Q     Going to Exhibit 17, to your knowledge, did this device

11   have 2,359 SMS messages?

12   A     I don't recall.

13   Q     Do you recall the date span on this device?

14   A     Without looking at that, no.

15   Q     Okay.  So is it on the front page?

16   A     In this case, no, it's not.

17   Q     Okay.  If you don't know, it's okay, but do you believe

18   the dates could be August 10th of 2016 through September 14th

19   of 2016?

20   A     I don't recall.

21   Q     Looking at Exhibit 18, just to keep it in order, do you

22   recall if there were 1,348 SMS messages on this device?

23   A     No, I don't.

24   Q     But this is the device where Ms. Litzky is seen holding

25   EL?

*Testimony of Francis Dufresne*                                    **132**

1    A    Yes.

2             MS. REYES:  Ms. Valente, if we could please show

3    Government Exhibit 13.

4             Your Honor, may I approach --

5             THE COURT:  Yes.

6             MS. REYES:  -- to retrieve an exhibit?

7             THE COURT:  You may.

8             MS. RIVERA:  Your Honor, I believe the witness may

9    have it there on the witness stand.

10            THE COURT:  Would you --

11            MS. REYES:  May I approach the witness, Your Honor?

12            THE WITNESS:  Which exhibit are you looking for?

13            MS. REYES:  Thirteen.

14            THE WITNESS:  Yes.

15   BY MS. REYES:

16   Q    While that's being brought up, did your investigation or

17   your examination reveal the dates on this device?

18   A    I'm sure it did.

19   Q    Okay.  Would December 24th of 2015 through August 9th of

20   2016 sound accurate?

21   A    I don't remember.

22   Q    Okay.  If we could pause it.  Are you able to determine

23   whether or not this was an image that was taken from the ooVoo

24   app?

25   A    No.

*Testimony of Francis Dufresne*                                    133

1    Q     Why is that?

2    A     There's no information about it that says it was taken

3    from the ooVoo app.

4               MS. REYES:   Okay.   We can take it down.

5    BY MS. REYES:

6    Q     What information would be on it to determine whether it

7    was from the ooVoo app?

8    A     Sometimes, based on the file path, it might say -- the

9    name of it might be ooVoo.   There was other stuff that had

10   that name in this case.   And if it was under the chat -- the

11   ooVoo chats and actually able to be recovered in there, yes.

12   Q     Okay.   But you testified that your examination revealed

13   the date that it was taken was January of 2016?

14   A     Yes.

15   Q     Okay.   Do you remember the date?

16   A     14th.

17   Q     Okay.   Were you able to correspond that picture with any

18   written communication?

19   A     I did not check.

20   Q     Okay.   Were you asked to check?

21   A     No.

22   Q     Okay.   If you were asked, would you have done it?

23   A     Yes.

24   Q     Turning to Exhibit 19, this is Ms. Litzky's phone?

25   A     Yes.

*Testimony of Francis Dufresne*                                134

1    Q    Did your examination reveal that there were 3,604 SMS

2    messages?

3    A    There was a lot.  I don't remember the exact number.

4    Q    Okay.  Do you remember the time or -- the time period on

5    this phone?

6    A    No, I don't.

7    Q    So what we have from the Government in this exhibit, if

8    you could turn to it, is a conversation that occurred on

9    August 24th of 2016.

10   A    Yes.

11   Q    And just -- I asked you for Exhibit 14, but I want to be

12   clear.  For 17, 18, and 19, you have the ability with all of

13   your tools, confidential or otherwise, to simply sort and get

14   very easily the chart between the sender and the receiver?

15   A    Back when this report was created, no.  Now, yes, they've

16   updated their software.

17   Q    So on -- when did you create this report?

18   A    July of 2018.

19   Q    Okay.  And we're in July of 2019?

20   A    Yes.

21   Q    Okay.  So before trial, before this federal criminal jury

22   trial, you could have done it very easily; correct?

23   A    Not easily, but I could have done it.

24   Q    Okay.  Your instruction was specifically to look for,

25   quote, "child pornography"?

*Testimony of Francis Dufresne*                                         **135**

1    A    Yes.

2    Q    Would you consider that a targeted examination?

3    A    No.

4    Q    If we could turn to Government Exhibit 15.  What device

5    was this taken from?

6    A    TD-03.

7    Q    Were you able to find in TD-03 any deleted images?

8    A    I don't recall.

9    Q    Do you recall being able to extract deleted images from

10   any of the Androids?

11   A    I know there were some recovered.  I don't know which

12   phones.

13   Q    Okay.  Do you know if any of the images recovered were

14   images of nude children?

15   A    I believe so, yes.

16   Q    Were those -- was that made -- did you make Aja Stake

17   aware of that?

18   A    The phones, I did the extraction reports, and I provide

19   them to her for analysis.

20   Q    Okay.  So in your analysis -- in your forensic report,

21   would you have told her that you found nude images of children

22   in the deleted images?

23   A    I would not have told her that.  I would have handed her

24   the report for analysis.

25   Q    Okay.  So would she have been able to -- as a non-digital

*Testimony of Francis Dufresne*                                            *136*

1  forensic examiner, would she have been able to read the report

2  and determine that?

3  A    Yes.

4  Q    Okay.  I know you don't remember the devices, but do you

5  remember how many devices you were able to recover deleted

6  images from?

7  A    No, I don't.

8  Q    And I think you've already answered this, but did you

9  find -- were you able to retrieve deleted images from

10  Ms. Litzky's iPhone?

11  A    No.

12  Q    What text messages were deleted from Ms. Litzky's phone?

13  A    I don't know the content of them.  I know there was some.

14  Q    Do you know the date range?

15  A    I don't.

16  Q    Would anything refresh your memory as to that?

17  A    If we looked at the extraction report for the iPhone.

18  Q    And where is that?

19  A    It's on the thumb drive that's provided here for your

20  use.

21  Q    Okay.  So we can ask Mr. Connor?

22  A    Yes.

23  Q    Okay.  You checked for chats, SMS, and what else?  There

24  was a third thing that you testified.

25  A    Images, videos, device locations.

*Testimony of Francis Dufresne*                                    *137*

1   Q    Did your investigation reveal -- I'm sorry -- your

2   examination reveal whether Ms. Litzky or the codefendant had a

3   Facebook account?

4   A    I remember seeing a Facebook.  I don't know whose

5   Facebook account it was.

6   Q    Okay.  And you actually wrote notes regarding the

7   Facebook account?

8   A    I would have to look at my notes to refresh my memory.

9   Q    They should be in front of you.

10  A    Yep.

11       Yes.

12  Q    And how would you be involved in the extraction of

13  Facebook messages?

14  A    When you extract media from the phone in advanced

15  logical, that's one of the categories under chats that it

16  pulls.

17  Q    Okay.  And did you do that for Ms. Litzky's phone?

18  A    Yes.

19  Q    And did you find messages from her and Mr. Oquendo?

20  A    I didn't read the Facebook stuff.

21  Q    Okay.  Were you asked to?

22  A    No.

23            MS. REYES:  May I have a brief moment, Your Honor?

24            THE COURT:  Yes.

25  BY MS. REYES:

*Testimony of Francis Dufresne*                                      **138**

1   Q    Sir, what -- how many deleted images did you find?

2   A    I don't know.

3   Q    Okay.  Would anything refresh your memory as to that

4   issue?

5   A    We would have to look at each extraction report to find

6   out exactly how many.

7   Q    Okay.  What did you look at to prepare for your testimony

8   today?

9   A    I looked at device locations.  I looked at

10  user-attributable information.  I looked at dates -- the dates

11  for the ooVoo images.  I looked at some text messages, not a

12  lot.  I looked at some images, again, not all of the images,

13  phone numbers.  I think that's about it.

14  Q    Did you find any encryption software, or do Androids

15  already come with encryption software?

16  A    I don't believe they did in 2016.  I don't believe they

17  came with it.

18  Q    Do you remember seeing any?

19  A    I do not.

20          MS. REYES:  Okay.  Nothing further, Your Honor.

21          THE COURT:  Thank you.

22          Any redirect?

23          MS. RIVERA:  Yes, Your Honor.

24                    REDIRECT EXAMINATION

25  BY MS. RIVERA:

*Testimony of Francis Dufresne*                                    139

1  Q    Do you know whether anyone in this case tried to obtain

2  the ooVoo chats through the ooVoo company?

3  A    Yes.

4  Q    Do you know if that company is still in existence?

5  A    It is not.

6  Q    Do you know when it ceased to exist?

7  A    November of 2017.

8  Q    In this case were you instructed not to give an opinion

9  as to what constitutes child pornography?

10 A    Yes.

11 Q    Do you know why?

12 A    No.

13         MS. RIVERA:  No further questions, Your Honor.

14         THE COURT:  Thank you.

15         May this witness be excused?

16         MS. RIVERA:  Yes, Your Honor.

17         MS. REYES:  Yes, Your Honor.

18         THE COURT:  Thank you, Mr. Dufresne.  You are

19 excused.  If you're here under subpoena, you're released from

20 it.  You can go on about your business.

21         THE WITNESS:  Thank you, Your Honor.

22         THE COURT:  You're welcome.

23         Call your next witness.

24         MS. RIVERA:  The Government calls Roberto Oquendo.

25         THE COURT:  Ms. Rivera, do you want to retrieve some

1    of these exhibits up here that --

2            MS. RIVERA:  Yes, Your Honor.

3            THE COURT:  -- may not be pertinent for this

4    witness?  At least, they may be, I guess.  They may not be.

5    I'm not sure what's over there, but if you want to clear off

6    the exhibit box over here.

7            MS. RIVERA:  Should I leave the binder, Your Honor?

8            THE COURT:  Whatever you think you need, you're

9    welcome to leave.  I just wanted to tidy it up a little bit.

10           MS. RIVERA:  Okay.

11           THE COURT:  If you have exhibits that have already

12   been admitted into evidence, you might want to put those on

13   the clerk's table so we don't get them shuffled up.

14           Mr. Oquendo, if you'll come up to that chair and

15   stand behind it, raise your right hand.  My courtroom deputy

16   is going to place you under oath.

17                       ROBERTO OQUENDO

18   was called as a witness on behalf of the Government and,

19   having been duly sworn, testified as follows:

20           THE WITNESS:  Yes.

21           THE COURTROOM DEPUTY:  Thank you, sir.  You can have

22   a seat in the witness stand.

23           MS. RIVERA:  Your Honor, if I may have a moment?

24           THE COURT:  Yes.

25           THE COURTROOM DEPUTY:  And, sir, once seated, if

*Testimony of Roberto Oquendo*                                    *141*

1    you'll adjust that microphone in front of you so you're

2    speaking directly into it and then state your name and spell

3    your name for the record.

4              THE WITNESS:  My name is Roberto Oquendo.  My name

5    is spelled R-o-b-e-r-t-o O-q-u-e-n-d-o.

6              THE COURTROOM DEPUTY:  Thank you.

7              THE WITNESS:  You're welcome.

8              THE COURT:  When you're ready, you may proceed,

9    Ms. Rivera.

10             MS. RIVERA:  Thank you.

11                       DIRECT EXAMINATION

12   BY MS. RIVERA:

13   Q    Sir, how old are you?

14   A    I am 37 years old.

15   Q    What is your highest level of education?

16   A    I graduate ninth grade.  I went through tenth grade, and

17   I dropped out.  I never graduated tenth.

18   Q    Are you currently in pretrial detention?

19   A    Yes.

20   Q    Why?

21   A    I was arrested in 2016 on a traffic stop, and upon

22   further investigation, they found child pornography on my

23   devices.

24   Q    And in connection with that arrest and finding child

25   pornography on your devices, did you -- were you charged

1  federally?

2  A    The state charged me, but it wasn't federal at the time.

3  Q    Okay.  And were you eventually charged with federal

4  charges?

5  A    Yes.

6  Q    Okay.  What happened with your case?

7  A    You mean the state?

8  Q    No.  Federal.

9  A    Federal?

10  Q    Uh-huh.

11  A    They picked me up from Brevard County Jail Complex.  They

12  were holding me.

13  Q    Did you plead guilty in connection with this?

14  A    Yes, I have.

15  Q    What did you plead guilty to?

16  A    I pled guilty to conspiracy to produce child pornography

17  and production of child pornography.

18  Q    Have you been sentenced in your case?

19  A    No, I haven't.

20  Q    Has anyone made any promises to you in exchange for your

21  testimony?

22  A    No, not at all.

23  Q    If -- my question was -- and I just want to make sure I

24  state it clearly for the record -- has anyone made any

25  promises to you in exchange for your testimony here in court

1   today?

2   A    No, there's no promises been made.

3   Q    And do you understand that you are under oath?

4   A    I understand.

5   Q    Do you understand what may happen if you lie under oath?

6   A    Perjury.

7   Q    So when you said you pled guilty to conspiracy to produce

8   child pornography, did those crimes involve real victims?

9   A    Yes.  They involved my children.

10  Q    And for purposes of the proceedings here in court, can

11  you just use their initials?

12  A    Yes, ma'am.

13  Q    And who is the mother of your children?

14  A    The mother is Rose Litzky.

15  Q    Do you see Rose Litzky here in court today?

16  A    Yes.  Right there.  Left-hand corner.

17  Q    Can you please, then, identify her by where she's seated

18  and what she's wearing today.

19  A    The black glasses, black sweater, and a white T-shirt --

20  top.

21          MS. RIVERA:  Your Honor, may the record reflect the

22  witness has identified the defendant?

23          THE COURT:  Yes, it will.

24  BY MS. RIVERA:

25  Q    When did you first meet the defendant?

*Testimony of Roberto Oquendo*                                          **144**

1   A    On a dating website.  She was 16, and I was 25.  We never

2   really met in person until years later.

3   Q    So do you recall what was the dating website?

4   A    Mbuzzy.com.

5   Q    How would you spell that?

6   A    M-b-u-z-z-y, I believe.

7   Q    And did you immediately start dating, or was it more like

8   you were just chatting?

9   A    We were chatting for -- for years on and off.  Again, I

10  met her at -- when she turned 25.  I was 30.

11  Q    So would you say, then, that you're about five years

12  older than her?

13  A    Yes.

14  Q    And where did you eventually meet in person?

15  A    I ended up moving up towards Vero Beach, Florida, and

16  it's not like I was trying to move closer to her.  I didn't

17  even know where she lived.  I just ended up living the next

18  city over from where she was, and I invited her over one day

19  when I found out.  We were talking.

20  Q    So did you -- you, in fact, met her in person where

21  exactly?

22  A    I was living in Vero Beach.  I invited her over.  She was

23  living in Sebastian, Florida.

24  Q    So what happened once you met in person?

25  A    She came over to my house.  We watched movies, and we had

1    oral -- intercourse.

2    Q    And what do you mean by "intercourse"?  Sexual

3    intercourse?

4    A    Yes, yes.

5    Q    Was that soon after you met?

6    A    Yes.

7    Q    And so as a result of -- of how you interacted with each

8    other, did you start dating --

9    A    Yes.

10   Q    -- at any point?

11   A    Yes, we did.

12   Q    Okay.  How soon thereafter?

13   A    Right after.  Two weeks after that -- five days, she came

14   over.  Two weeks after that, I moved out and moved in with her

15   father and her.

16   Q    When you say, "Five days, she came over," are you

17   referring to any particular events in connection with the

18   defendant?  What happened in those five dates that you said

19   that she came over?

20   A    She came over for five nights straight, and we had sex

21   those time, and I knew I got her pregnant on purpose.

22   Q    What do you mean that you got her pregnant on purpose?

23   A    She was asking me to impregnate her all the time.

24   Q    I'm sorry.  If you could speak just a little bit louder.

25   A    A little bit louder.  I know.  Okay.

1   Q    So you said she was asking you to get her pregnant?

2   A    She -- she was wanting a child, yes.  She wanted me to

3   conceive her.

4   Q    Okay.  Now, did she, in fact, get pregnant --

5   A    Yes.

6   Q    -- soon thereafter?

7   A    Yes, she did.

8   Q    So you indicated that you moved in together.  When did

9   you start residing together approximately year-wise that you

10  recall?

11  A    Around Christmastime, December of -- ███ was born in

12  ███, so probably 2010.

13  Q    So if we can not use their names, just --

14  A    I'm sorry.

15  Q    -- call her KO.

16      And so you said KO was born, then, when?

17  A    She was born ████████████.

18  Q    And after -- when KO was born, were you residing together

19  or not?

20  A    Yes.

21  Q    How would you describe your relationship with the

22  defendant at the time that KO was born?

23  A    It was -- it was okay in the beginning.  I'd help her

24  with the baby and whatnot.

25  Q    I'm sorry?

*Testimony of Roberto Oquendo*                                    **147**

1    A    I would help her take care of the child at her house.

2    Q    Now, what was -- did you both have any particular roles

3    assigned in terms of caregiving to the children in your homes?

4    A    No.  Just learning.  It was the first child, pretty much

5    learning from each other because we'd never done it before.

6    Q    Now, as -- when did you -- are you aware the defendant

7    has a speech impediment?

8    A    Yes.

9    Q    When did you become aware of that?

10   A    As soon as she came over the first day, I noticed, but,

11   like, I did understand her somewhat.

12   Q    Other than the defendant's speech impediment, was the

13   defendant interacting normally with you?

14   A    Yes.

15   Q    Okay.  Now, after KO was born, how soon thereafter was

16   K- -- EL born?

17   A    EL was born ███████████.

18   Q    And was there any point after the children were born that

19   you started performing sexual acts on your children?

20   A    My oldest was around -- a little over one, like one and a

21   half -- one and a month or so.  That's when I started taking

22   pictures and whatnot.

23   Q    And was there any point that you started performing

24   sexual acts on EL?

25   A    Yes.

1    Q    When did that happen?

2    A    Around the same age as KO.

3    Q    And what would that be?

4    A    Around one.

5    Q    What types of sexual acts did you perform on the

6    children?

7    A    Licking around their genital area.  Licking around their

8    genital area.

9    Q    And was there -- were there occasions where you placed

10   your penis against their vaginal area?

11   A    Yes.  Yes, there was, but there was no penetration.

12   Q    So did you ever take any images or videos depicting you

13   performing sexual acts on your children?

14   A    Yes, I did.

15   Q    And what type of device did you use to produce those

16   images or videos?

17   A    My cell phone.  Camera on my cell phone.

18   Q    Did the defendant ever see you engage in those acts?

19   A    Yes.  She did with ██████ once.

20   Q    How -- what did she actually observe?

21   A    Me licking on the genital area.

22   Q    And what was the defendant's reaction to that?

23   A    To -- nothing.  She turned around and walked away.

24   Q    And how old would you say was EL at the time when that

25   happened?

*Testimony of Roberto Oquendo*                                          **149**

1    A    Around one.  One, two -- one, two months, around that

2    area.

3    Q    Did the defendant ever see you taking pictures,

4    photographs of the children exposing their vaginal area?

5    A    Yes, yes.

6    Q    What types of photographs did she observe you take?

7    A    Nude photographs.

8    Q    And what was her reaction to you taking these images,

9    these photographs?

10   A    I don't know how to explain that.  What do you mean?

11   Q    How did she react when she saw you taking pictures or

12   images of her?

13   A    Normal.

14   Q    I'm sorry?

15   A    Normal.

16   Q    What is normal to you in this context?

17   A    Like, as if nothing was wrong.

18   Q    Did she question you about it? confront you about it?

19   A    No.

20   Q    Was -- for how long were you residing together?  After

21   you moved in, you said it was approximately December of 2010.

22   At what point did you move out of the residence, if that ever

23   happened?

24   A    I was in and out of the home for years.  I heard the

25   father had a problem with money, obviously, and he didn't want

*Testimony of Roberto Oquendo*                                    **150**

1   me in the house.  He'd get mad and kick me out of the house

2   several times and then beg me to come back after a certain

3   period of time.

4   Q    Who begged you to come back to the house?

5   A    Sometimes her father did, and Rose.

6   Q    Now, when you said for a period of years you were in and

7   out of the house, that span of time, did that cover up until

8   the time of your arrest?

9   A    Yes.

10  Q    And when were you arrested?

11  A    September 15th, I believe, 2016.

12  Q    When was the first time, if you recall, that you moved

13  out of the house?  How old was EL?

14  A    I know she was -- EL?  No, she wasn't walking.  She

15  was -- she was barely -- I know KO was -- just started to

16  walk.  I think it was nine months that she started to walk.

17  Q    After you moved out of the residence --

18  A    I had gotten an apartment around that time.

19  Q    After you moved out of the residence, did you keep in

20  touch with the defendant?

21  A    Oh, yes.

22  Q    How would you communicate with the defendant?

23  A    Via cell phone text message, sometimes phone calls.

24  Q    And you say sometimes phone calls.  Typically, how would

25  you communicate with the defendant?

*Testimony of Roberto Oquendo*                                            *151*

1    A    Text message mostly.

2    Q    Is there a reason why not phone calls as opposed to text

3    messaging?

4    A    Well, one reason, her speech impediment; and, two, I

5    don't really like talking on the phone.

6    Q    So would she prefer to text you as opposed to talk to you

7    on the phone?

8    A    Yes.

9    Q    And as it pertains to this case, what types of messages

10   did you exchange with the defendant over time?

11        MS. REYES:  Objection to vague.

12        THE COURT:  Sustained.

13   BY MS. RIVERA:

14   Q    Did there ever come a point when you and the defendant

15   started exchanging images of children in the nude?

16   A    Yes.  Of -- only of my children.  No one else's.  She

17   didn't exchange anyone else's.  It was only my children.

18   Q    Are you saying that the defendant didn't send you

19   images -- sexual images of other children --

20   A    No.

21   Q    -- only her children?

22   A    That's what I'm saying, yes.

23   Q    And do you know approximately when did that start?  How

24   old were the children?

25   A    They were still young, around the same age I was

*Testimony of Roberto Oquendo*                                    **152**

1    explaining before.

2    Q    Around what age?

3    A    Around one.

4    Q    Who was around one year old?

5    A    ▓▓▓▓ began -- she was around one.  KO.  I'm sorry.  I

6    keep forgetting.  And ▓▓▓▓ soon after.

7    Q    So around the time that KO was one years old, one years

8    of age, the defendant started exchanging nude images of her

9    children with you.  Is that what you're saying?

10   A    Yes.  It's only because I wasn't living in the house.

11   Q    Why do you say that?

12   A    Because I wasn't around.

13   Q    And why would she send you nude images of her children --

14   A    Sometimes I would ask her to do so.

15   Q    I'm sorry?

16   A    I would ask her to do so sometimes.

17   Q    Now, those times when you asked her to send you -- what

18   types of images were you asking for?

19   A    Nudes.  Nude -- nude images.

20   Q    Were there times when she just volunteered to send you an

21   image without you requesting it?

22   A    Sometimes, yes.

23   Q    Now, did you ever threaten her into sending you an image?

24   A    No.

25   Q    Did you ever threaten to harm her physically or

*Testimony of Roberto Oquendo*                                     153

1  emotionally --

2  A    No.

3  Q    -- in exchange for an image, a nude image of your

4  children?

5  A    No.

6  Q    Did you ever threaten to hurt the children if she sent

7  you a -- if she didn't send you a nude image of the children?

8  A    No.  She never -- I never did that.

9  Q    I'm sorry?

10 A    I never would hurt the children like that.

11 Q    But you committed sexual acts on them.

12 A    Well, yeah, but I'm saying physically harm.

13 Q    But they were physically hurt in this case.  Wouldn't you

14 say so?

15 A    I would say so.

16 Q    Were -- I'm going to draw your attention to June of 2014.

17 Did there come a time when you relocated to Virginia?

18 A    Yes.

19 Q    Why did you relocate to Virginia?

20 A    I had lost my job, and I was having trouble finding

21 another.  And that's when I decided to go up north for a

22 little while.

23 Q    And where did you reside once you relocated to Virginia?

24 A    Salem, Virginia.  I was living with Rose Litzky's mother.

25 Q    Who coordinated, if anyone, for you to reside with the

*Testimony of Roberto Oquendo*                                              *154*

1   defendant's mother in Virginia?

2   A    I believe I spoke to her about it, her mom, and Rose had

3   told her -- I talked to them about it, and Rose got me a

4   ticket -- a bus ticket to go up there.

5   Q    And once -- for how long were you residing in Virginia?

6   A    For ten months.

7   Q    So that would be between --

8   A    June 2014 through March 2014 -- '15.

9   Q    And while you were residing in Virginia, how did you stay

10  in touch with the defendant?

11  A    Again, text messaging and an ooVoo video chat line.

12  Q    And how -- how did that come about?  What is ooVoo?

13  A    ooVoo is a video chat line that's an app that you

14  download onto your cell phone.  It requires Wi-Fi.  See, I was

15  having trouble with my cell phone signal-wise because it was

16  from Florida, and I was in Salem, Virginia.  Of course, you're

17  surrounded by mountains, so their towers are different.  The

18  phone itself needed to be another type of cell phone.  It's

19  something to do with the towers.

20  Q    And while you were in Virginia, where was the defendant?

21  A    She was -- she resided with her father in Sebastian.

22  Q    Is that in Florida?

23  A    Yes.  Florida, yes.

24  Q    And who recommended, if anyone, this ooVoo application

25  for you to be able to communicate with --

*Testimony of Roberto Oquendo*                                    *155*

1    A    Like I said, we were having trouble with my cell phone

2    reception, and I mentioned it to her several times, and she --

3    she found this app for me, and she told me how to download it.

4    Q    How did you download it?

5    A    Google Play, I believe it was.  You look it up on there

6    and just download an app.  Simple.

7    Q    How often would you chat with the defendant during the

8    time that you were there in --

9    A    Mostly every day.

10   Q    Sorry?

11   A    Mostly every day.

12   Q    And when you chat -- when you engaged in chats with the

13   defendant, were these, like, live chats?  Were they, like,

14   text messaging?  What was it?

15   A    They were both at the same time.

16   Q    And what were the types of communications that you

17   exchanged with the defendant over ooVoo?

18   A    Sometimes it would just be me and her, and sometimes it

19   would be with children too.

20   Q    And so what was the defendant using this application for

21   as it pertains to her children?

22   A    First off, communication.  The second thing, as I said, I

23   was having trouble with my cell phones.  And, also, the

24   children were also nude at the time sometimes.

25   Q    You said the children were nude?

*Testimony of Roberto Oquendo*                                    *156*

1   A     Yeah.  They were nude sometimes, yes.

2   Q     So how were they nude?  How was -- how was -- how were

3   you viewing the children nude through this ooVoo application?

4   A     Sometimes during the bath or on bed.  It's just --

5   Q     What was -- and as you were looking at the children nude,

6   was there any area of their body that was the focus of -- of

7   these transmissions?

8   A     Sometimes it would be the genital area, yes.

9   Q     Would it be specifically the vaginal area --

10  A     Yes.

11  Q     -- of the children?

12  A     Yes.

13  Q     In any of these communications, do you or the defendant

14  instruct the children on what to do or how to --

15  A     Yes.

16  Q     -- pose?

17  A     Sometimes I have; sometimes she did.

18          THE COURT:  Mr. Oquendo, wait until Ms. Rivera

19  finishes her question, if you would, before you answer.  If

20  you both talk at the same time, the court reporter can't take

21  it down.

22          THE WITNESS:  Okay.

23  BY MS. RIVERA:

24  Q     What would you tell the children to do through this ooVoo

25  live chat?

*Testimony of Roberto Oquendo*                                          *157*

1    A    I would instruct them to open, and they already know what

2    that means.

3    Q    Why would they know what "open" means?

4    A    Because, while I change their diapers, that's the way I

5    would tell them so I could clean them and take pictures.

6    Q    So when you said for them to open, what did they

7    understand?  How would they react?  What would they do?

8    A    They would spread their legs.

9    Q    And you also mentioned that the defendant sometimes would

10   instruct them.  What would she tell them to do?

11   A    To do the same.

12   Q    And what do you mean by "the same"?

13   A    To spread their legs.

14   Q    In any of those communications, did the defendant also

15   spread their legs open herself?

16   A    Yes.

17   Q    And, in addition to that, did she expose or spread their

18   vaginal labia for you to be able to see?

19   A    Yes, they were sometimes.

20   Q    So as this was happening, as you were looking at the

21   children in this manner, what were you doing on your side of

22   the video chat?

23   A    I was -- actually, I was snapping -- there's a -- there's

24   a part on the bottom of the app where you could snap stills,

25   pictures, at the same time while there was a video feed.

*Testimony of Roberto Oquendo*                                    **158**

1    That's what I would be doing, snapping pictures, saving them.

2    Q    And saving them?

3    A    Yes.

4    Q    So what would you -- what were these pictures for?

5    A    I would masturbate to them later on on my own.

6    Q    And did you -- strike that.

7         During this time, did the defendant also send you nudes

8    of the children by other means?  Text messaging?

9    A    Yes, there were times.

10   Q    For what purpose would she do that?

11   A    I would ask her sometimes.

12   Q    Based on your conversations with the defendant, did she

13   know of your sexual interest in the children?

14   A    Yes.

15   Q    While communicating with her through these ooVoo chats,

16   did you ever threaten her if she didn't expose the children in

17   this manner?

18   A    No, I never threatened her.

19   Q    Exhibit No. 15 -- actually, before we -- before we go

20   there, are you aware -- what type of phone were you using to

21   capture these ooVoo images?

22   A    I believe it was a Motorola.

23   Q    Do you -- do you know what happened with that phone

24   ultimately?

25   A    I have a tendency to drop and break screens on my cell

1  phones, but I -- I usually save them after.  I had them in my

2  bag.  I always have them in my computer bag.

3  Q    Once you relocated from Virginia, did you bring that

4  phone with you to --

5  A    Yes.

6  Q    -- the state of Florida?

7  A    Yes, I did.

8  Q    And where was the last time that you saw that phone?

9  Where was it?

10  A    It was in my computer bag at 303 Palmetto Ave, Melbourne,

11  Florida.  It's where I used to park my car.

12  Q    Is that in Brevard County?

13  A    Yes, ma'am.

14  Q    If we can go to Exhibit 15, Bates 643.  Do you recognize

15  these chats?

16  A    Yes.  The top one would be my e-mail for that app, and

17  the bottom would be Rose's e-mail for that --

18          THE COURT:  Mr. Oquendo, keep your voice up, if you

19  would, and speak into that microphone.

20          MS. RIVERA:  Okay.  Now we can go to Bates 645 --

21  actually, Bates 644 at 5:00 p.m. where it says "WTF."  Can we

22  focus there.

23  BY MS. RIVERA:

24  Q    Can you read your comment at 5:00 p.m.?

25  A    From top to bottom; correct?

1  Q    You don't have to read the entire -- I just want -- I

2  just want you to read this particular message where it starts

3  with "WTF."

4  A    Yes.  It's "WTF.  Video chat only works with Wi-Fi."

5  Q    What did you mean by that?

6  A    The chat only works when -- if you have an Internet

7  connection.  It doesn't work with your data on your cell

8  phone.

9  Q    Now, if we can go to the next message on that page, the

10  bottom -- just at the bottom right there.  What was the --

11  what was the defendant's response to that?

12  A    "Yeah."

13  Q    Now, moving on to Bates 645, top of the page.  What was

14  your response to the defendant's statement at 5:06?

15  A    Am I allowed to say that word?  "That sucks."

16  Q    And what was your next message?

17  A    "██████'s pussy got big.  Does she play with it?"  That

18  was my message.

19  Q    What did you mean by the term --

20  A    "Play?"

21  Q    "Does she play with it?"  Uh-huh.

22  A    Masturbate.  Fondle.

23         MS. RIVERA:  And if we can just keep that -- that

24  page displayed so he can continue reading this message.

25  BY MS. RIVERA:

*Testimony of Roberto Oquendo*                                          *161*

1    Q    So what was your response to that?  If you want to look

2    at Government Exhibit 15 in your binder, sir.

3    A    Here?

4    Q    Your binder.  Yes.  That may be a better way.

5    A    What was it?

6    Q    And that would be page 645.  Fifteen.

7              MS. RIVERA:  May I approach, Your Honor?

8              THE COURT:  Yes, ma'am.

9    BY MS. RIVERA:

10   Q    At 5:10 p.m., what was your message to her?

11   A    "Send a picture of it."

12   Q    What were you referring to?

13   A    █████'s in the nude.

14   Q    Of her vagina?

15   A    Yes.

16   Q    And what was the defendant's response at 5:10 p.m.?

17   A    She said no.

18   Q    And then what was your next message at 5:11 p.m.?  And

19   this is October 25, 2014.

20   A    "Let me see her."

21   Q    And what was her response to that?

22   A    She said, "Later."

23        I said, "Why?"

24   Q    And then what did she say in response at 5:22 p.m.?

25   A    "You're going to see it on video again."

*Testimony of Roberto Oquendo*                                    **162**

1   Q    What did you understand by that?

2             MS. REYES:  Objection, Your Honor, to speculation.

3             THE COURT:  Objection's overruled.

4   BY MS. RIVERA:

5   Q    What did you understand by that?

6   A    That I would see it on the ooVoo chat video.

7   Q    And turning to the next page, Bates 646, what was your

8   comment at 5:23 p.m., which is at the top of the page?

9   A    "I want a picture.  It lasts longer."

10  Q    What was her response to that?

11  A    "Okay.  When she wakes up."

12  Q    And what do you say next?

13  A    I say, "Okay, baby."

14  Q    And then at 5:25 p.m., what else did you send?

15  A    I said, "I love you."

16  Q    What did she respond to you?

17  A    "I love you so much."

18  Q    Now, how would you describe your relationship with the

19  defendant the time that you were residing in Virginia?

20  A    We were never split up.  We were just texting, contacting

21  each other.

22  Q    Was it a romantic relationship?

23  A    Yeah, yeah.

24            THE COURT:  Let's take our break here.  Good,

25  Ms. Rivera?  We'll take our afternoon break.

*Testimony of Roberto Oquendo*                                    *163*

1           Ladies and gentlemen, we'll be in recess until 3:15.

2      (Jury out at 2:59 p.m.)

3           THE COURT:  We'll be in recess until 3:15 p.m.

4      (Recess at 2:59 p.m. until 3:15 p.m.)

5           THE COURT:  Back on the record in United States

6      v. Litzky, 18-cr-223.  All counsel and the defendant are

7      present, and the witness is back in the witness box.

8           Bring our jury in, please.

9           MS. RIVERA:  Your Honor.

10          THE COURT:  Yes.

11          MS. RIVERA:  I just -- the defense again mentioned

12     that they would like to play a certain video of the defendant

13     performing sexual acts on his daughters, which I'm opposing.

14     We have all of his child pornography, but this one particular

15     video --

16          THE COURT:  Why don't we talk about this at sidebar

17     so that --

18      (Sidebar on the record.)

19          THE COURT:  Yes?

20          MS. RIVERA:  The defense has expressed that they

21     want to play for the jury -- I believe it's one of the videos

22     of production that he pled guilty to on August 9, 2016, video

23     that depicts the defendant directing the children to perform

24     sexual acts.  And we're opposing, Your Honor, based on

25     relevance, and it's unnecessary to inflame the jury in this

*Testimony of Roberto Oquendo*                                    **164**

1   manner, Your Honor.  It's, like, 403 but the other way around.

2   The focus is not him; she's the one on trial.  He's admitted

3   to his conduct, so I don't see the need for it, Your Honor.

4           THE COURT:  What's the relevance of it, Ms. Reyes?

5           MS. REYES:  I think it goes to his credibility.

6   He's testifying to things that he's never told law enforcement

7   before.  I think he has a motive to testify against her.

8           THE COURT:  I fail to see how that type of evidence

9   would show bias, prejudice, motive, interest, or otherwise

10  impair the credibility or undermine the credibility of the

11  witness, and I'm going to sustain the Government's objection

12  to it, but I will give you a chance to proffer it if you want

13  to do that.  I haven't seen it, obviously.  But if you want to

14  proffer it either -- do you have it -- I guess you have it

15  electronically?

16          MS. REYES:  Ms. Valente does.

17          THE COURT:  Okay.  At some point you can make it a

18  part of the record so that the appellate court will have an

19  opportunity to see what's been excluded.  Right now I'm going

20  on the description that was provided to me by the Government.

21  So if that description's not accurate, I want to give you a

22  chance to correct it.  I haven't actually viewed it myself.

23  So --

24          MS. REYES:  It's accurate.

25          THE COURT:  It is accurate?  Okay.

*Testimony of Roberto Oquendo*                                    *165*

1      (End of sidebar.)

2            THE COURT:  Bring the jury in.

3      (Jury in at 3:18 p.m.)

4            THE COURT:  Welcome back, ladies and gentlemen.

5            You may inquire, Ms. Rivera.

6            Everyone be seated.  Thank you.

7            MS. RIVERA:  Thank you, Your Honor.

8  BY MS. RIVERA:

9  Q    Bates 649, top of the page.  October 25, 2014, what did

10 you say to the defendant at 6:09 at the top of the page?

11 Actually, Bates 649.

12 A    It says "I miss your tight pussy."

13 Q    And what did she respond to that?

14 A    "I miss your hard dick."

15 Q    Bates 652 at -- October 26, 2014, at 2:01 p.m., what did

16 you ask the defendant?

17 A    I asked if -- I said, "Are they naked?"

18 Q    Why would you say such a thing?

19 A    I probably -- I was requesting nude photos.

20 Q    Can you speak up, please, so that we can hear you.

21 A    I was requesting nude photos.

22 Q    Okay.  Now, going to Bates 654 at 8:40 p.m.

23 A    "Kids naked."

24 Q    Who says that?

25 A    Rose.

*Testimony of Roberto Oquendo*                                    **166**

1   Q    What did you understand by that?

2   A    That they were already naked and if I wanted to see.

3   Q    I'm sorry?

4   A    If I wanted to see them naked.

5   Q    And what was your response at 9:03 p.m.?

6   A    "What?"

7   Q    And what did she respond to that at 9:03 p.m.?  And all

8   of these are UTC time.  What did she respond to that?

9   A    "Kids naked.  You want to see them?"

10  Q    And what do you respond to that?

11  A    "Pictures."

12  Q    What did that mean?

13  A    It means images of them nude.

14  Q    Were you asking for pictures?

15  A    Yes.  Yes, I was.

16  Q    And at Bates 655, what did she respond to you at

17  9:04 p.m.?

18  A    "They don't" -- "they don't sit still for pictures."

19  Q    And what was your response to that at 9:04?

20  A    "Too bad."

21  Q    And what did she respond at 9:05?

22  A    "You going to send me money to make the trip."

23          THE COURT:  Mr. Oquendo, speak up if you would.

24          THE WITNESS:  "You going to send me money to make

25  the trip."

*Testimony of Roberto Oquendo*                                    *167*

1    Q    Do you know what she was talking about here?

2    A    Yes.  She was going to come up to Virginia to see me.

3    And what was your response to that at 9:06 p.m.?

4    A    I said, "I have no money.  I'm hardly surviving because

5    of child support."

6    Q    Were you supposed to be paying child support at the time?

7    A    I was.

8    Q    Were there periods of time where you were not paying

9    child support?

10   A    In between jobs.

11   Q    And so there were periods of time when you were paying

12   child support?

13   A    Yes.

14   Q    Now, what was her response to that at 9:06 p.m.?

15   A    "How I'm going to see you?"  And there was a -- what

16   looks to me a sad face emoji.

17   Q    An emoji?

18   A    Uh-huh.

19   Q    And what else did she say at 9:07 p.m.?

20   A    "What we going to do now?"

21   Q    What do you understand by that?  What was she referring

22   to, if you know?

23   A    I believe she was referring to our relationship and being

24   so far from each other.

25   Q    What did you respond to that?

1   A    "You should have saved the 3,000 you took from your

2   mother."

3   Q    And what did she respond?

4   A    "I used that money for ███████'s party."

5   Q    Now, going to page 657 at -- on October 27, 2014, at

6   3:42 p.m., what do you say?  At the top.

7   A    The very top?

8   Q    Uh-huh.

9   A    I said, "What's" -- I said, "What's up?"

10  Q    And what did she respond at 3:43 p.m.?

11  A    "Call me."

12  Q    And what else did she respond to you at 3:43:31?

13  A    "Call me, please."

14  Q    What was your response to her at 3:43:39?

15  A    "This sucks."

16  Q    And what did she respond to that?

17  A    She said, "What sucks?"

18  Q    And what was your response to that?

19  A    "Your app."

20  Q    What were you referring to when you say, "Your app"?

21  A    I was referring to the ooVoo app.

22  Q    And why were you saying it sucks?

23  A    Because it would go in and out also.  It wasn't reliable.

24  Q    And it is your testimony she was the one who recommended

25  this application, the ooVoo application?

*Testimony of Roberto Oquendo*                                          *169*

1    A    Yes.

2              MS. REYES:  Objection to leading.

3              THE COURT:  Sustained.

4    BY MS. RIVERA:

5    Q    Now, what was her response to that at 3:44 p.m.?

6    A    She said, "Go back to Tango."

7    Q    What is Tango?

8    A    That's another app.

9    Q    Did you ever chat with her through other applications

10   like this?

11   A    I believe Tango was one of the first ones because mine

12   wasn't working that well, so we -- then we started the other

13   one.

14   Q    And what was your response to that?

15   A    "Nah," meaning no.

16   Q    Now, at Bates 658, October 28, 2014, at 7:00- --

17   7:33 p.m., what do you say?

18   A    I said -- I said, "Hey."

19   Q    What was her response to you at 7:35 p.m.?

20   A    She said, "Miss you."

21   Q    And what was your response to that at 8:55 p.m.?

22   A    "Yeah."

23   Q    And again then at 8:55:54, what did she say?

24   A    She said, "I love you."

25   Q    And what did you respond to that at 9:52 p.m.?

1   A    "Going to work."

2   Q    Were you holding a job at the time?

3   A    Yes.  I was actually -- was holding two full-time jobs --

4   one at night, one during the day -- for the first three to

5   four months of being in Virginia.  Like, right away I got a

6   job -- those two jobs.

7   Q    And when would -- when would you have time to chat with

8   the defendant like this over ooVoo?

9   A    In between jobs.  In between the jobs.  Didn't really

10  have much time.  But at this time I -- it was after the -- the

11  three-month span where I had the two jobs.  I had to quit one

12  job because my boss caught me standing up sleeping while I was

13  standing.  I was -- I believe it was an absent seizure.  She

14  said I had to quit one job or I would have to fire you.

15  Q    Now --

16  A    That's why --

17  Q    Now, on that same date at 9:52 p.m., what did the

18  defendant say?

19  A    "████  naked."

20  Q    What did you understand by that?

21  A    That she didn't have any clothes on at the moment.

22  Q    Okay.  And what was your response to that at 6:37 in the

23  morning of the next day, October 29, 2014?

24  A    I said, "Let me see."

25  Q    And what did she say to that at 8:00 in the morning?

1    A    "See whose?"

2    Q    And what was your response after that at 9:04?

3    A    "Too close."

4    Q    Why would you say that?

5    A    Because the image was fuzzy.  It was pixilating.

6    Q    And when you say "too close," do you have a sense of --

7    or do you know what you were looking at?

8    A    A vaginal area.  The focus was too close to the camera.

9    Q    The vaginal area of -- do you recall which child?

10   A    I do not recall which child, no.

11   Q    So it was one of --

12   A    Oh, it says back here ███████'s.

13             THE COURT:  Let's get back to using initials if we

14   can.  I'm going to at some point instruct the court reporter

15   to go through the transcript and redact any reference that

16   might provide identifying information for the children, and

17   while I'm on the topic, I'll also seal any of the images that

18   might depict them.

19             But, Mr. Oquendo, try to refer to the children by

20   their initials if you would, please.

21             THE WITNESS:  Yes, Your Honor.

22   BY MS. RIVERA:

23   Q    On October 29, 2014, 9:07 p.m., what did the defendant

24   say at Bates 659?

25   A    She said, "I'll call you at 8:00 a.m."

*Testimony of Roberto Oquendo*                                    172

1    Q    And what was your response to that?

2    A    I said, "Okay."

3    Q    And what was your follow-up response?

4    A    "Why?"

5    Q    And what did the defendant say in response to your

6    question at 9:13 p.m. on October 29th?

7    A    "See kids naked."

8    Q    What did you understand by that?

9    A    That the children were nude at the time and she was going

10   to take pictures.

11   Q    So was she saying she would call you later to show you

12   the kids naked?

13   A    Yes.

14   Q    So what was your response at 9:13 p.m.?

15   A    "Oh, okay."

16   Q    And then after that, at 9:14 p.m., what did the defendant

17   say?

18   A    "Why you don't see me naked?"

19   Q    And what was your response to that?

20   A    I said, "'Cause you have clothes on."

21   Q    Now, at Bates 660 at 9:19 p.m., October 29, 2014, what

22   does the defendant say?

23   A    She said, "Miss you."

24   Q    And what was your response to that?

25   A    "Miss you too."

*Testimony of Roberto Oquendo*                                    173

1   Q    Now, turning to Bates 661, that would be at the end of

2   the page, your last comment.

3   A    It says "Blue balls after seeing the girls' pussy."

4   Q    And this was, for the record, October 29, 2014, at

5   9:33 p.m.  What did you mean by that?

6   A    I was aroused probably.

7   Q    By what?

8   A    By the -- by the photographs.

9   Q    I'm sorry.  By what?

10  A    By the photos.

11  Q    What photos?  Are you referring to your Skyping live, or

12  had she -- do you think that was related to an image, if you

13  know?

14  A    I don't recall that.

15  Q    So after you said that, Bates 662, what was the

16  defendant's response to that at 9:33 p.m.?

17  A    "Aw.  I'm sorry."

18  Q    And then what else did she say at 9:34 p.m.?

19  A    She said to "Go play."

20  Q    What did you understand by the defendant saying, "Go

21  play"?

22  A    Go masturbate.

23  Q    And then after that, what did you say?

24  A    "I like seeing them naked.  I play later when you ready."

25  Q    And then what did she say after that?

1   A    "Aw.  You going to send me a picture?"

2   Q    And then after that, at 9:48, what did she say -- what

3   did you say?

4   A    It's "Video, then you send one.  Put the vibrator in your

5   pussy."

6   Q    What did she say in response to that at 9:49?

7   A    "Don't work anymore."

8   Q    At Bates 664, October 29, 2014, 10:16 p.m., what did she

9   say to you?

10          MS. REYES:  Your Honor, I object to cumulative under

11   404, 403.

12          THE COURT:  Do you want to be heard, Ms. Rivera?

13          MS. RIVERA:  Yes, Your Honor.

14          THE COURT:  Why don't you come to sidebar.

15      (Sidebar on the record.)

16          MS. RIVERA:  Your Honor, they have made a big issue

17   of this threatening environment, that the defendant was under

18   threats and in a hostile relationship with Mr. Oquendo, and I

19   am just trying to present evidence that basically shows

20   otherwise, that they were in a romantic relationship and that

21   there's -- there are several instances different dates that

22   show that the relationship was amicable, that she was not

23   under threat at the time when she was doing this, and I think

24   it goes to the crux of their defense.

25          THE COURT:  I've said multiple times that that's not

*Testimony of Roberto Oquendo*                                    **175**

1    relevant.

2            MS. RIVERA:  I understand.

3            THE COURT:  Both of you continue to go there.  The

4    Government continues to go there even though I've said over

5    and over again that it's not a defense.  But, as I said, you

6    try the case however you see fit, but I'm going to correct

7    that problem before this case goes to the jury, and I think

8    we've had enough of this, so move on.

9            MS. RIVERA:  I can move on.  Yes, Your Honor.

10        (End of sidebar.)

11           THE COURT:  Objection's sustained.  Let's move on to

12   a new area, Ms. Rivera.

13           MS. RIVERA:  Yes, Your Honor.

14   BY MS. RIVERA:

15   Q    Bates 667 at 8:58 p.m., what did the defendant say?

16   A    "Delete it and download it again.  It going to work

17   faster."

18   Q    What was she referring to here?

19   A    She was referring to the ooVoo app.  It was slowing down

20   or freezing up.

21   Q    And what was your response to that at 9:00 p.m.?

22   A    "Oh, yeah, but the pictures will be gone.  No thank you."

23   Q    And what did she say to you at 9:02 p.m. in response to

24   that?

25   A    "It's not going to lose it.  I didn't lose mine."

1    Q    So was the defendant aware that you were taking these

2    screenshots of the children as she was transmitting them naked

3    to you?

4    A    Yes.

5              MS. RIVERA:  I'd like to publish Exhibit No. 14.

6    And, Your Honor, if I may approach the defendant briefly?

7              THE COURT:  Yes.

8    BY MS. RIVERA:

9    Q    Sir, can you examine Government Exhibit 14 and flip

10   through the pages, please.  Do you recognize those?

11   A    Yes.

12   Q    What are they?

13   A    These are text messages between Rose and I.

14             MS. RIVERA:  If I may publish Government Exhibit 14?

15             Your Honor, may I retrieve the document?

16             THE COURT:  Yes.  And, yes, you may publish it.

17   It's in evidence.

18             MS. RIVERA:  If we can go to the last page in that

19   exhibit.  Zoom in starting at 1965 through 1969.

20   BY MS. RIVERA:

21   Q    Now, what is -- or what was -- what was the defendant's

22   phone number at the time, if you recall, based on this

23   exhibit?

24   A    (772) 571-3769.

25   Q    Now, at -- on October 15, 2014, what did -- what message

1    is she sending you?  Can you read that?

2    A    Are we reading top to bottom?

3    Q    No.  From bottom up because that's where it starts.

4    A    Okay.  "Laugh out loud."

5    Q    From the bottom up, from line 1969 to line 1965.  Do you

6    see that highlighted?

7    A    Yes.  I see it now.

8    Q    Okay.

9    A    It say "Download Everalbum to unlock unlimited photo

10   backups."

11   Q    What did she send that message for, if you know?

12   A    I believe it was -- is an app to store photos.  I believe

13   it's, like, a cloud.

14   Q    And what was your response to her?

15   A    "What that for?"

16   Q    And did -- what else did you respond to her?

17   A    "Don't think it's a good idea put naked photos on that.

18   I don't want to get in trouble."

19   Q    And what did she say in response?

20   A    "Oh, yeah.  I forgot."

21   Q    What were you referring -- what kind of pictures were you

22   referring to when you said you didn't think it was a good idea

23   to put naked pictures?

24   A    Nude photos of my children.

25   Q    Would you say you have hundreds of images of your

*Testimony of Roberto Oquendo*                                  **178**

1   children in the nude?

2   A    That's correct.

3   Q    Okay.  That would be Government Exhibit 17 and starting

4   at line 2324.  It would be the second to last page, line 2324.

5   Q    What did the defendant say to you?

6   A    "████    said stop painting and spend time with her."

7   Q    Would it be "skip painting"?

8   A    Yes.  It says --

9   Q    Okay.  And what did you say in response?

10  A    I said, "Not today."

11  Q    And what did the defendant say to that?

12  A    "████    said please."

13  Q    And what did you say in response to that?

14  A    I said, "Stop it."

15  Q    And what did the defendant respond to that?

16  A    "████    said please with pussy."

17  Q    What did you understand by that?

18  A    That she wanted to see me.

19  Q    Who wanted to see you?

20  A    My daughter.

21  Q    And what did you understand when it says --

22  A    That she was nude at the time.

23  Q    I'm sorry?

24  A    That she was nude.

25  Q    And then thereafter what did the defendant say to you?

*Testimony of Roberto Oquendo*                                  *179*

1   And, for the record, these are chats of August 10, 2016.  What

2   did the defendant say to you at line 2319?

3   A    She said, "Sorry."

4   Q    And what else did she say to you thereafter?  What's the

5   next line?

6   A    "████ says you mean."

7   Q    And then after that?

8   A    She said, "Love you."

9   Q    And what do you say in response?

10  A    "Send pictures."

11  Q    Turning to Exhibit 18, the last page, line 264, what did

12  the defendant say to you in this text message on August 6,

13  2016?

14  A    "Okay.  I need you here Tuesday night to babysit so I can

15  get kids' stuff for school."

16  Q    Was -- where were you residing on this time, August 6,

17  2016?

18  A    I was residing in my vehicle.  I had a friend offer me a

19  place to park my car, which was his mother's house, on -- at

20  303 Palmetto Ave.

21  Q    So did you use to babysit for the children during this

22  time sometimes?

23  A    Sometimes.

24  Q    And what did she say that was for on line 262?

25  A    She said, "Please.  I need to go shopping for school

*Testimony of Roberto Oquendo*                                    **180**

1    before Wednesday."

2    Q    And what did you respond to that?

3    A    "Just me, or is there going to be people in the house?"

4    Q    And what did she say in response?

5    A    "Just you and the kids."

6    Q    Now, going to the previous page, it would be lines 233

7    through 248.  At line 245, what does -- what did you say to

8    the defendant in this text message?  This was August 6, 2016.

9    A    "Send pictures.  I miss her too."

10   Q    At this time -- on or about this time, was the defendant

11   still sending you nude images of the children?

12   A    That's correct.

13   Q    If we can go to lines 204 through 206.  What did you say

14   to the defendant at line 206?

15   A    "I erase all naked pictures."

16   Q    What were you referring to?

17   A    The photos I had saved of my children.

18   Q    What types of photos were those?

19   A    Those were nude photos.

20   Q    And what did the defendant say to you in response?

21   A    She said, "Why" -- "why's?"

22   Q    What was your response to that?

23   A    "Oops."

24   Q    What did you mean by that?

25   A    I made a mistake.  I deleted them.

*Testimony of Roberto Oquendo*                                    **181**

1   Q    And was that -- had you deleted them from a particular

2   device?

3   A    From my cell phone images area.

4   Q    Is it fair to say that you had sexual images of your

5   children on many devices?

6   A    Yes.

7         MS. RIVERA:  And, for the record, this is August 6,

8   2016.

9   BY MS. RIVERA:

10  Q    Is it fair to say that you and the defendant exchanged

11  hundreds, possibly thousands of text messages?

12  A    Yes.

13        MS. RIVERA:  If I may have a moment, Your Honor?

14        THE COURT:  Yes.

15  BY MS. RIVERA:

16  Q    Regarding -- and this is -- I did jump around a little

17  bit.  Going back to the time that you were in -- residing in

18  Virginia during those ooVoo chats, was there anyone else

19  involved in exposing your children in the nude?

20  A    No.  It was only us.

21  Q    When you say "us," who are you referring to?

22  A    Rose and I and my children.

23        MS. RIVERA:  Your Honor, I intend to publish

24  Government Exhibit 16-A at this moment.

25        THE COURT:  Is 16-A in evidence?

1    THE COURTROOM DEPUTY:  Yes, Your Honor.

2    THE COURT:  All right.  You may proceed.

3  BY MS. RIVERA:

4  Q    Starting with the picture at the top, the one that ends

5  in 642, do you recognize this image?

6  A    Yes.

7  Q    What is depicted in this image?

8  A    KO, one of my children.

9  Q    Who else is depicted in that image?

10 A    I have -- oh, there's a picture of myself in the corner

11 there.

12 Q    And who else?

13 A    And Rose in the background.

14 Q    Who did you say was in the background?

15 A    Rose.

16 Q    And moving on to the next -- as far as what's depicted on

17 the image that we just saw, who was displaying the child in

18 this manner, KO?

19 A    Rose Litzky.

20 Q    Now, do you recognize this image?

21 A    Yes.

22 Q    Who is depicted in this image?

23 A    That's ▮▮▮▮.

24 Q    KO?

25 A    KO.

*Testimony of Roberto Oquendo*                                    **183**

1   Q    And who else is depicted in that image?

2   A    There's a picture of me in the corner.

3   Q    Were there -- in your communications with the defendant,

4   were there a lot of images like this one where the children

5   are just laying nude on a bed?

6   A    Yes.

7   Q    What was the purpose of sending you those pictures, if

8   you know?

9   A    For me to save.

10  Q    For you to save for what purpose?

11  A    To masturbate later.

12          MS. RIVERA:  The next image.

13  BY MS. RIVERA:

14  Q    What is depicted in this image?

15  A    One of my daughters.

16  Q    And is also your face at the top of that image?

17  A    Yes.

18  Q    Are these the ooVoo chat --

19  A    Yes.

20  Q    The ooVoo screenshots that you created?

21  A    Yes.  These are ooVoo -- that was a live chat, but I was

22  snapping pictures on my end.

23  Q    Okay.

24  A    Yeah.

25  Q    What is depicted in this image?

*Testimony of Roberto Oquendo*                                      **184**

1    A    One of my children.

2    Q    And who else?

3    A    And myself and Rose in the background.

4    Q    Who is displaying the child in this manner?

5    A    Rose.

6    Q    Now, what is depicted in this image?

7    A    EL in the bathtub and me in the corner there.

8    Q    Did anyone instruct her to pose in that manner?

9    A    Yes.

10   Q    Who instructed her to pose in that manner?

11   A    I believe it was me that time.

12   Q    Okay.  So were there times when the defendant instructed

13   the child to pose --

14            MS. REYES:  Objection.

15   BY MS. RIVERA:

16   Q    -- in this manner?

17            MS. REYES:  Objection to leading.

18            THE COURT:  Sustained.

19   BY MS. RIVERA:

20   Q    Who else, if anyone, would instruct the children to pose

21   in this manner?

22   A    Their mother, Rose.

23   Q    Who is depicted here?

24   A    That's EL in the bathtub and me in the corner there.

25   Q    What is -- was the child doing with her hand?

1   A    She was fondling herself.

2   Q    Do you know if anyone instructed her to act in this

3   manner?

4   A    She might have done that one by herself.

5   Q    Well, she didn't know to do this before.

6            MS. REYES:  Objection, Your Honor, to counsel

7   testifying.

8            THE COURT:  Sustained.

9            The jury will disregard the lawyer's last comment.

10  BY MS. RIVERA:

11  Q    Did you train the children to pose in this manner?

12  A    Yes, I did.

13  Q    Who is depicted in this image?

14  A    That's one of my -- one of my children and Rose there in

15  the background and myself in the corner.

16  Q    Do you recognize this image?

17  A    Yes.

18  Q    What is depicted here?

19  A    One of my children, and I'm in the background there in

20  the corner.

21  Q    Okay.  Who is -- what is depicted here?

22  A    It's one of my children and myself in the corner there

23  and Rose in the background.

24  Q    Who is exposing the child in this manner?

25  A    Rose.

*Testimony of Roberto Oquendo*                                      **186**

1    Q    What is depicted in this image?

2    A    One of my children and Rose and me in the corner there.

3    Q    Who is exposing the child in this manner?

4    A    Again, Rose in the background.

5    Q    What is depicted here?

6    A    One of my children and, again, myself in the corner

7    there.

8    Q    Who is exposing the child in this manner?

9    A    Rose.  Would it be fair to say that there were hundreds

10   of these screenshots that you created based on these chats

11   with the defendant?

12            MS. REYES:  Objection to leading.

13            THE COURT:  Sustained.

14   BY MS. RIVERA:

15   Q    If you can estimate, give us an approximate number of the

16   many -- of the quantity, number, of screenshots that you

17   created based on these communications.

18   A    Hundreds of them.  I basically was snapping pictures

19   every so often.

20   Q    How often would you chat with the defendant to have the

21   children exposed in this manner?

22   A    Almost every day.

23   Q    For how long a period of time?

24   A    I was up in Virginia for ten months, and I didn't start

25   using the app until roughly around the time I lost my first

*Testimony of Roberto Oquendo*                                      **187**

1    job, so probably four months in -- three to four months into

2    that from June.  Around September to about March.

3    Q    And when you say "to about March," March of 2015?

4    A    '15, yes.

5    Q    Okay.  During any of these ooVoo chat communications, did

6    you threaten the defendant?

7    A    No.

8    Q    Now, directing your attention to April 2016, where were

9    you residing around that time?

10   A    At that time I was also sleeping in my -- April, I was --

11   I was -- I believe I was still in their residence.

12   Q    I'm sorry?

13   A    I was still in their residence.

14   Q    What residence?

15   A    Rose's father's house.

16   Q    Would that be in Palm Bay?

17   A    Yes.

18   Q    For how -- for how long did you reside with the defendant

19   and her father in Palm Bay around that time in April of 2016?

20   A    Around three, four months.  I left the house around

21   June -- June/July-ish.

22   Q    Of 2016?

23   A    2016.  That's right.

24   Q    And what did you do after you left the house around June

25   or July of 2016?

*Testimony of Roberto Oquendo*                                    **188**

1   A    I slept in my car, and after a month I was parking at a

2   lady's house.  I was working with the son, taking him to work

3   with me.  He offered me to park my car there instead of

4   Walmart.

5   Q    Is that the residence at Palmetto Avenue?

6   A    That's correct.

7   Q    If we can go to Exhibit 1 and Bates 448.  Do you

8   recognize this?

9              MS. REYES:  Objection to relevance.

10             THE COURT:  Overruled.

11  BY MS. RIVERA:

12  Q    What is this?

13  A    This is my computer bag.

14  Q    Where did you keep this bag --

15  A    I kept --

16  Q    -- at the time back in September of 2016?

17  A    I kept it at 303 Palmetto Ave.

18  Q    And in connection with this case, what items of computer

19  media or cell phones did you store there?

20  A    I had several -- I had all my cell phones in there and

21  computer laptop.

22  Q    Is that also where you stored the phone where you kept

23  the ooVoo chats?

24  A    Yes.  They were all in there.  I did have one cell phone

25  on me.

*Testimony of Roberto Oquendo*                                    189

1    Q    Is that a different phone?

2    A    Yeah, that was a different phone.

3    Q    And when you said you had a cell phone on you, did you

4    mean the date of your arrest?

5    A    Yes, that was the day of my arrest.  That was my current

6    phone.  It was activated.

7    Q    Showing you Bates 462.  What's depicted here?

8    A    This is 303 Palmetto Ave.  This is the front porch --

9    well, side porch.

10   Q    And in connection with that computer bag, why is this

11   relevant?

12   A    Because I was storing it in -- that's where I would sleep

13   sometimes, and I'd store it when I go to work.

14   Q    Is that -- were you trying to hide that computer bag

15   there?

16   A    I didn't want it in the car --

17   Q    Why not?

18   A    -- while I'm at work.

19   Q    Why not?

20   A    Because I didn't want nobody going through it.

21   Q    Looking at Exhibit 4, Bates 464, do you recognize this?

22   A    Yes.  This is a plastic storage container that was

23   sitting out on the front porch there.

24   Q    Is that where you hid the computer bag?

25   A    That's correct.

*Testimony of Roberto Oquendo*                                           **190**

1          MS. RIVERA:  Your Honor, if I may approach the

2    witness?

3          THE COURT:  Yes.

4    BY MS. RIVERA:

5    Q    I'm showing you what has been marked as Government

6    Exhibit 2.  You can examine it.  Do you recognize it?

7    A    Yes.  That's my computer bag.

8          MS. RIVERA:  Your Honor, may I retrieve it?

9          THE COURT:  Yes.

10   BY MS. RIVERA:

11   Q    Is that the computer bag you left at 303 Palmetto Avenue?

12   A    That's correct.

13         MS. RIVERA:  I'm going to publish, Your Honor,

14   Government Exhibit 12.

15         THE COURT:  Yes.

16   BY MS. RIVERA:

17   Q    Sir, what is depicted here?

18   A    I believe that's EL, my child.

19   Q    Do you recognize this image?

20   A    Yes.

21   Q    How do you -- how do you recognize that image?

22   A    It was sent to me by Rose.

23   Q    How was it sent to you by the defendant?

24   A    Via text message, I believe.

25   Q    Do you know why the defendant sent you that -- that

**_Testimony of Roberto Oquendo_**                                    **191**

1  image?

2  A    I requested it.

3          MS. RIVERA:  If I may have a moment, Your Honor?

4          THE COURT:  Yes.

5  BY MS. RIVERA:

6  Q    Did you ever ask the defendant to delete images -- nude

7  images of the children from her phone?

8  A    Yes, I did.

9  Q    Why would you ask her to do that?

10 A    Because her father would tend to go through her phone.

11 Q    Did you ever ask her not to show images of the children

12 exposed in this manner to anyone?

13 A    Yes.

14         MS. RIVERA:  If I may have a moment?

15         THE COURT:  Yes.

16         Let's move it along, Ms. Rivera.

17         MS. RIVERA:  I have no further questions,

18 Your Honor.

19         THE COURT:  Cross-examination.

20                  CROSS-EXAMINATION

21 BY MS. REYES:

22 Q    Sir, you love abusing women; right?

23 A    That's incorrect.

24 Q    You love abusing little girls; right?

25 A    I don't love it.

*Testimony of Roberto Oquendo*                                           **192**

1   Q    You've been doing it a long time; right?  I need a yes or

2   a no.

3   A    Yes.

4   Q    And when you met Ms. Litzky, she was a child; right?

5   A    When I met her in person, she was not.

6   Q    Right.  The question is you met her online; correct?

7   A    A chat line, yes.

8   Q    Yeah.  And when you met her, she was a child?

9   A    She was 16.  Yes.

10  Q    Right.  And you were an adult?

11  A    Correct.

12  Q    Okay.  You didn't see anything wrong with that?

13  A    No.  We were only talking.

14  Q    Okay.  You told her you loved her?

15  A    When?

16  Q    During your communications online prior to meeting in

17  real life.

18  A    This was going on for years, so I don't know what time

19  you're referring to.

20  Q    During your e-mail communications with Ms. Litzky when

21  you met her when she was a child, you told her you loved her?

22  A    I don't recall that.

23  Q    You told her she was beautiful?

24  A    I don't recall that either.

25  Q    She fell in love with you?

1    Sir?

2  A    I don't recall that either.

3  Q    When she met you in real life, she was smitten; right?

4  A    There we go.  What's that mean?

5  Q    If you don't know, you can say you don't know.

6  A    I don't know what that means.

7  Q    Okay.  So you can just say you don't know.

8  A    I don't know.

9  Q    Okay.  You introduced her to your family?

10 A    I did not introduce her to my family.  I moved in with

11 her family.

12 Q    Your testimony to the members of the jury is that you

13 never introduced her to your family?

14 A    During the time that we started living together, she was

15 talking to them on Facebook, but that's it, not in person.

16 Q    Did she ever meet your sister, Ms. Nieblas?

17 A    Apparently, she -- she went down to Miami to see them at

18 one point, but I had no knowledge until she was already there.

19 Q    Okay.  And you're 37 years old?

20 A    Yes.  Now.

21 Q    And you've been in jail now since September 15th of 2016?

22 A    That's correct.

23 Q    Almost three years?

24 A    Yes.

25 Q    And this is by far the longest time you've ever been in

*Testimony of Roberto Oquendo*                                    **194**

1  jail?

2  A    This is the only time.

3  Q    Well, that's not true.

4  A    No.  I had a failure to appear, and they --

5  Q    And you served 20 days for that; correct?

6  A    I don't remember.  I think it was three days.

7  Q    Okay.

8  A    They let me go.

9  Q    Okay.

10  A    They picked me up.  Because it was a citation.

11  Q    Right.  So besides the three days that you served for a

12  failure to appear, this time in jail is the longest that

13  you've ever been in jail?

14  A    Yes.

15  Q    And you have pled guilty to two crimes?

16  A    Yes, I have.

17  Q    And those crimes carry a mandatory minimum of 15 years?

18          MS. RIVERA:  Objection, Your Honor.

19          THE COURT:  Sustained.

20          MS. REYES:  Your Honor, I'd like to proffer that as

21  well.

22          THE COURT:  Do you want to come to the sidebar and

23  talk about it?

24          MS. REYES:  Yes, Your Honor.

25      (Sidebar on the record.)

1           THE COURT:  I apologize.  I don't know what the

2    status is of Mr. Oquendo as far as his plea agreement is

3    concerned.  Does he have a plea agreement that would initiate

4    the mandatory minimum?

5           MS. RIVERA:  No, no.  He's facing a minimum of 15 to

6    30 on each count, on two counts.

7           THE COURT:  So mandatory minimum of 15 to a maximum

8    of 30 --

9           MS. RIVERA:  Yes.

10          THE COURT:  -- on two counts.

11          MS. RIVERA:  I am concerned about the spillover

12   effect in terms of them also knowing what she's exposed to,

13   the defendant.

14          THE COURT:  Well, she's entitled to inquire with

15   respect to consequences of his plea and the potential benefit

16   he hopes to obtain as a result.

17          The reason I initially sustained the objection is

18   because I, frankly, wanted to get you up here so I could find

19   out what the situation was.  So the objection's overruled.

20          MS. RIVERA:  Okay.

21          THE COURT:  If you want a limiting instruction, I'll

22   give one, but I'll let you think about it.

23          MS. RIVERA:  That would be nice.  Yes, Your Honor.

24          THE COURT:  Okay.

25          MS. REYES:  What would the limiting instruction say?

1      THE COURT:  I would instruct the jury that they

2  should consider the penalties -- they should not consider any

3  punishment or any penalties as it relates to the charges

4  against Ms. Litzky.  Consider them only as it relates to

5  Mr. Oquendo.  Would that be objectionable?

6      MS. REYES:  No, Your Honor.

7  (End of sidebar.)

8      THE COURT:  You may inquire.

9  BY MS. REYES:

10 Q   Sir, you pled guilty to two crimes, and each of those

11 crimes carry a mandatory minimum of 15 years?

12 A   That's correct.

13 Q   And the only way to get out of that mandatory minimum is

14 by cooperating with the federal government?

15 A   I was never promised anything.

16 Q   Do you understand my question?

17 A   I understand.

18 Q   Okay.  So I'm going to repeat it.  The only way for you

19 to get sentenced below the mandatory minimum of 15 years is by

20 cooperating with the federal government; correct?

21     MS. RIVERA:  Asked and answered, Your Honor.

22     THE COURT:  Objection's overruled.

23     So, ladies and gentlemen, while we have this pause,

24 let me tell you that I'm going to instruct you that you may

25 consider the question and the witness's answer with respect to

*Testimony of Roberto Oquendo*                                    **197**

1   the consequences of his plea only as it relates to him.  Under

2   no circumstances should you ever consider the issue of

3   punishment as to the defendant who is on trial.  That is in

4   the province of the judge and the judge alone.  So you may

5   consider this testimony only -- only as it relates to

6   Mr. Oquendo.

7          You may proceed, Ms. Reyes.

8   BY MS. REYES:

9   Q    Answer the question.

10  A    Can you repeat it.

11  Q    The only way that you will have a chance at getting below

12  the mandatory minimum is by cooperating with the federal

13  government?

14  A    That was not explained to me, but, yes, I would think so.

15  Q    Okay.  Well, you actually signed an agreement with the

16  prosecutor before you met with her; correct?

17  A    I did.

18  Q    Okay.  And you met with her on June 27th of this year?

19  A    Yes.

20  Q    And you were set to be sentenced by this Court on Monday,

21  July 22nd; right?

22  A    I believe so.

23  Q    You don't know when you were set to be sentenced?

24  A    No.

25  Q    Okay.  Well, you got that hearing continued -- right? --

*Testimony of Roberto Oquendo*                                    **198**

1    so that you could testify in this trial?

2    A    My attorney mentioned it.  He -- he mentioned something

3    about continuing, yes.

4    Q    Okay.  And you pled guilty on January 24th of this year;

5    correct?

6    A    Yes.

7    Q    But you decided that you were going to cooperate with the

8    federal government against Ms. Litzky in June of 2019?

9    A    Yes.

10   Q    Okay.  If we could -- if you could get the pink binder.

11   If you need assistance, let me know.  And you can turn to 9-2,

12   and go to the final page, page 4.  You're in 9-1.  If you

13   could go to 9-2.  Great.  Is that your signature on the left

14   part of the page?

15   A    Yes, that's correct.

16   Q    Okay.  So where it says "Roberto Oquendo," right above

17   that it has your signature?

18   A    Yes, that's me.

19   Q    And it has your attorney's signature?

20   A    Yes.

21   Q    And it has your -- it has the prosecutor's signature?

22   A    Yes.  On the top.

23   Q    Okay.  And this letter promises a couple of things to

24   you; correct?

25   A    Yes.

1   Q    And you just testified that no promises were made to you;
2   correct?
3   A    That's right.
4   Q    Okay.  So let's talk about the promises that were made to
5   you.  You can turn to page 2, paragraph 3.  One of the
6   promises that the federal government made to you was that,
7   whatever you told them that day, they were not going to offer
8   it in aggravation of your sentence; correct?
9   A    That's right.  It says it here.  Yes.
10  Q    And paragraph 7, they -- the federal government promised
11  you that they will consider -- you can go along to the next
12  page, top of the page.  They will consider whether your
13  cooperation qualifies for substantial assistance; correct?
14  A    Yes.  That's what it says here.
15  Q    Okay.  So those are at least two promises that the
16  federal government made to you in order for you to sit down
17  and talk to them about this case; correct?
18  A    That's right.
19  Q    Okay.  Did you approach them, or did they approach you?
20  A    My attorney approached me with this.
21  Q    Okay.  So you don't know whether the federal government
22  approached your attorney or whether your attorney approached
23  the federal government?
24  A    No, I don't know which way it went.
25  Q    Okay.  As part of your cooperation, the bottom line is

*Testimony of Roberto Oquendo*                                    **200**

1   you're trying to get a sentence reduction?

2   A    Yes, but nothing's been promised to me.

3   Q    But we just established that at least two things were

4   promised to you.

5   A    That's what I was told.

6   Q    Okay.  A part of your agreement is on paragraph 9, and it

7   states that you would submit to a polygraph examination with

8   respect to anything that you discussed with them; correct?

9   A    Yes.

10  Q    Since you sat down with them in June, have they asked you

11  to submit to a polygraph examination?

12  A    No, they haven't.

13  Q    So the truthfulness of what you said hasn't been tested

14  by anyone?

15  A    No.

16  Q    And you testified today about things that you've never

17  told anyone before; correct?

18  A    I've never told anyone before, no.

19  Q    So let's talk about those things you've never mentioned

20  before but you're mentioning today for the first time.  You

21  stated that Ms. Litzky was directing the kids on what to do?

22  A    That's correct.

23  Q    Okay.  And you said that you performed oral sex on EL --

24  A    Yes.

25  Q    I'm sorry.  EO.  I'm sorry.  EL.  You performed oral sex

*Testimony of Roberto Oquendo*                                       *201*

1   on EL in front of Ms. Litzky, and she walked away?

2   A    That's correct.

3   Q    And you've never said that to anyone before; correct?

4   A    I never told nobody that.

5   Q    Okay.  And when you got arrested on September 15, 2016,

6   you waived your right to a *Miranda*?

7   A    That's right.

8   Q    And you spoke to law enforcement; right?

9   A    Uh-huh.

10  Q    Is that a yes?

11  A    Yes.  Sorry.

12  Q    And they were asking you questions about the child sexual

13  abuse; right?

14  A    That's right.

15  Q    Okay.  And would it have been important to tell them that

16  their mother was complicit in producing all these images?

17  A    It would have, but I was -- I was -- I was afraid at the

18  time.  I just got pulled over.

19  Q    What were you afraid of?

20  A    Answering those type of questions.

21  Q    But you answered a lot of questions; right?

22  A    Eventually.

23  Q    That day you answered --

24  A    Yeah.

25  Q    -- a lot of questions; right?

*Testimony of Roberto Oquendo*                                    **202**

1    A    Yes, I did.

2    Q    Okay.  But you were scared to tell them about the mother

3    of their children?

4    A    The details, yes.

5    Q    Okay.  Have you had a chance to listen to your interview?

6    A    I listened to it once before.

7    Q    And you gave them a lot of detail that day; right?

8    A    Yes.

9    Q    Okay.  And EL -- her last name was her -- was

10   Ms. Litzky's last name; correct?

11   A    That's right.

12   Q    And that's because you didn't want to pay child support?

13   A    That was not the reason why.  The reason why was because

14   she wanted to have one in her last name and one in mine.  I

15   still ended up paying child support.  I don't see how that's

16   relevant.  And I signed the birth certificate, so it makes me

17   responsible.

18   Q    Thank you, sir.

19        You testified for the first time ever that you saw

20   Ms. Litzky taking images, you saw her taking photos?

21   A    Yes.  There were a couple times.

22   Q    And you've never told that to law enforcement before;

23   right?

24   A    I never did, no.

25   Q    Okay.  You testified that you left to Virginia and that

*Testimony of Roberto Oquendo*                                    **203**

1    Mr. Litzky begged you to come back to Florida?

2    A    This was another time when I got an apartment in Florida.

3    He actually came to my house with her, and he said that he

4    pretty much wanted me to come back, not to break up with Rose,

5    because at that time I decided to pretty much get my own

6    place.

7    Q    Do you remember the month or the year of that?

8    A    I don't remember exactly the time it was, but my oldest

9    was around -- she was just starting to walk almost.  A year --

10   a little over a year.

11   Q    Who was trying to walk?

12   A    ██████.  ██████ was just starting to walk.

13   Q    Okay.  So she was born in ████████████, and she

14   started to walk when she was one year old?

15   A    I believe it was nine months.

16   Q    Okay.

17   A    She was early.

18   Q    So we're in the latter part of 2012?

19   A    Uh-huh.

20   Q    Is that a yes?

21   A    Yes.

22   Q    Okay.  She's taking down everything you're saying.  So --

23        Okay.  So in 2012 the father goes with her to your

24   apartment and begs you to come back?

25   A    Begs me not to break up with her.  He was insinuating to

*Testimony of Roberto Oquendo*                                    **204**

1   come back.  My job was right up the street and walking

2   distance, and that was one of the reasons why I stayed.

3   Q    He actually didn't want you in the house because you were

4   abusive and you were drunk all the time; correct?

5   A    It may have been one of the reasons, but it was also

6   about money.

7   Q    Okay.  When you were in Virginia June 2014 through March

8   of 2015, there was a little girl who stayed with

9   Helen Hitchcock; correct?

10  A    Stayed?  No.

11  Q    Okay.  She would babysit a little girl?

12  A    I -- yes.

13  Q    And this little girl was how old?

14  A    I'm not exactly sure.

15  Q    Okay.  But she was your type; right?

16  A    My type?

17  Q    Yeah.  She was, like, two years old?

18  A    No.  She wasn't that young.  She was a little older.

19  Q    Okay.  How much older?

20  A    I would say maybe seven.

21  Q    Okay.  So is that too old for you?

22  A    I don't know what you mean by that.

23  Q    Okay.  While you were in Virginia, you actually

24  impregnated another woman, and you had twins with her;

25  correct?

*Testimony of Roberto Oquendo*                                                205

1    A    In Virginia?

2    Q    Yes.

3    A    No.

4            MS. RIVERA:  Objection, Your Honor.  Relevance.

5            THE COURT:  Overruled at least at this juncture.

6    I'll give you an opportunity to tie it up.

7    BY MS. REYES:

8    Q    Do you agree that you're violent?

9    A    No, I wouldn't agree with that.

10   Q    Would you agree that you have a temper?

11   A    I may have a temper.

12   Q    Would you agree that you're pretty scary?

13   A    No.

14           MS. RIVERA:  Objection, Your Honor, as to the line

15   of questioning.

16           THE COURT:  Sustained.

17   BY MS. REYES:

18   Q    You have a pending state case; correct?

19   A    I believe I don't have a pending state case.

20   Q    The State of Florida is not trying to prosecute you

21   for --

22   A    No.

23   Q    -- capital sexual battery against your children?

24   A    I was told that that was dropped --

25   Q    Okay.

*Testimony of Roberto Oquendo*                                          **206**

1   A    -- by my attorney.

2   Q    Okay.  And you -- so if it was dropped -- are you sure,

3   or you don't know?

4   A    That's what -- no, I don't know for sure.

5   Q    Okay.

6   A    My attorney said that.

7   Q    So previously that was an automatic life sentence if

8   you're convicted of that; correct?

9   A    I don't know that.

10  Q    Okay.  The plea agreement that you signed -- did you read

11  it before you signed it?

12  A    I did read it.

13  Q    Before you signed it?

14  A    Yes.

15  Q    Okay.  And you initialed every single page?

16  A    Yes.

17  Q    And did you understand all of the different promises that

18  the Government made to you in this plea agreement?

19  A    I -- I did understand them at the time.  I don't remember

20  exactly what they were, but I --

21  Q    Okay.  Well, you can turn to 9-1, page 3.  One of the

22  promises that the federal government made was that they were

23  going to drop the possession of child pornography?

24  A    That's right.

25  Q    And you had thousands of images of nude children?

1  A    That's correct.

2  Q    And on paragraph 5 they promised that they would not

3  charge you with any other offenses, any other federal criminal

4  offenses?

5  A    That's correct.

6  Q    And on page 4, paragraph 7, they promised to recommend a

7  certain sentence to the Court?

8  A    That's correct.

9  Q    But six months later, they made additional promises to

10  you once you agreed to cooperate; correct?

11  A    That's correct.

12  Q    Okay.  So you're hoping with your guilty plea and with

13  your cooperation that you might get something less than

14  15 years?

15  A    Yes, I'm hoping.

16  Q    In the factual basis of your plea agreement on page 22,

17  you admit that you took pictures of the genital area of your

18  kids for your sexual gratification?

19  A    Yes.

20  Q    And you admit that you have looked -- you have used your

21  cell phone to look for child pornography for several years?

22  A    That's correct.

23  Q    You also admit that, in some of your computer media, you

24  can be seen performing sexual acts on the two minor girls?

25  A    That's correct.

*Testimony of Roberto Oquendo*                                    **208**

1  Q    And your collection -- would you consider that you're a

2  collector of child pornography?

3  A    Yes.  Probably, if that's what you want to call it.

4  Q    Well, what do you want to call it?

5  A    I just saved -- I just saved what I see at the time.

6  Q    Okay.  So you have saved -- according to your factual

7  basis of your plea agreement, you -- on page 23 -- at the very

8  top of page 23, you have saved images of infants?

9  A    That's correct.

10  Q    And toddlers?

11  A    Yes.

12  Q    And prepubescent children engaged in sexual activity,

13  including sadistic conduct?

14  A    Yes.

15  Q    You testified that she -- Ms. Litzky knew of your sexual

16  interest in the children?

17  A    That's correct, because she's seen me taking pictures

18  with them.

19  Q    Is that what you're basing your statement on, that she

20  saw you taking pictures?

21  A    Yes.

22  Q    Okay.  Did you ever tell her that you were interested in

23  the children?

24  A    No.

25  Q    Did you ever tell anybody that you were interested in the

*Testimony of Roberto Oquendo*                                    **209**

1   children?

2   A    No.

3   Q    Did you ever confide in any family members to tell them

4   that you were interested in little kids?

5   A    No.

6   Q    You never told --

7   A    I kept that to myself.

8   Q    Because you're ashamed; right?

9   A    That's right.

10  Q    And you try to hide it?

11  A    Uh-huh.

12  Q    Is that a yes?

13  A    Yes.   Sorry.

14  Q    Your sister, Ms. Nieblas, did you confide in her about

15  your pedophilia?

16  A    No.   I never showed anybody else those pictures.

17  Q    You isolated Ms. Litzky from her friends?

18           MS. RIVERA:   Objection, Your Honor.

19           THE COURT:   Sustained.

20  BY MS. REYES:

21  Q    You isolated Ms. Litzky from her family?

22           MS. RIVERA:   Objection, Your Honor.

23           THE COURT:   Sustained.

24  BY MS. REYES:

25  Q    During the ooVoo chats, you were talking directly to your

1   daughters; correct?

2   A    Right.  At the same time.

3   Q    And you were instructing them on what to do?

4   A    Sometimes I did.

5   Q    Most of the time?

6   A    Not most of the time.  Sometimes.

7   Q    Okay.  And you were instructing them to spread their

8   legs?

9   A    Yes.

10  Q    And they -- they were trained on what you liked?

11  A    Yes.  They were -- they already know what to do pretty

12  much.

13  Q    And you trained them in front of Ms. Litzky?

14  A    I showed them how.  No, not in front of them -- not in

15  front of Litzky.  By themselves.

16  Q    Okay.  Okay.  I must have misunderstood.  I thought you

17  said that -- to the Government that you trained them in front

18  of Ms. Litzky.

19  A    Not in front, no.

20  Q    Okay.  So you would abuse the kids when she was not

21  around?

22  A    Yes.

23  Q    Except for the one time that you say you performed oral

24  sex on EL and she was there and she walked away?

25  A    Yes.

*Testimony of Roberto Oquendo*                                          **211**

1    Q    When was that?

2    A    I don't remember exactly.

3    Q    Would anything refresh your memory as to that issue?

4    A    I'm not sure.

5    Q    Did you write any statements about what you were going to

6    testify to today?

7    A    Write?

8    Q    Did you write --

9    A    Me?

10   Q    -- statements --

11   A    Me write anything down?

12   Q    Yes.

13   A    Uh-uh.  No.

14   Q    Is that a no?

15   A    No, no.

16   Q    So you never gave the Government any written statements

17   about what you were going to testify about?

18   A    No.

19   Q    Okay.  You -- you hit your daughters; correct?

20             MS. RIVERA:  Objection, Your Honor.

21             THE COURT:  Objection's overruled.

22             THE WITNESS:  I never hit my kids.  I never had to

23   slap or spank them.

24   BY MS. REYES:

25   Q    You pulled their hair?

*Testimony of Roberto Oquendo*                                                212

1    A    If there was one time, I don't remember it.

2    Q    You yelled at them?

3    A    I may have.

4    Q    You were mean to them?

5    A    I wasn't mean.  I didn't want to spank them.  If they

6    misbehave, I don't -- I didn't even spank them then.

7    Q    You also treated Ms. Litzky the same way that you treated

8    your girls?

9              MS. RIVERA:  Objection, Your Honor.

10             THE COURT:  Sustained.

11   BY MS. REYES:

12   Q    You testified that Ms. Litzky sent you the photo of EL

13   holding a set of car keys?

14   A    That's correct.

15   Q    When did she send you that photo?

16   A    I don't recall.

17   Q    Would anything refresh your memory as to that issue?

18   A    I'm sure there's a stamped date on the photo itself.

19   Q    Okay.

20   A    I'm not sure.

21   Q    What phone did you have on July 2nd of 2016?

22   A    July 2nd of 2016?  I had -- I had one of my Cricket

23   phones.  I had a broken screen on it.

24   Q    Was a Cricket phone -- was it called, like, a ZTE?

25   A    Yes.  I had a ZTE.

*Testimony of Roberto Oquendo*                                    **213**

1   Q    Okay.  So on July 2nd of 2016 you had a ZTE?

2   A    Uh-huh.

3   Q    Is that a yes?

4   A    Yes.

5   Q    Okay.  And your testimony is that she sent it to you on

6   July 2nd of 2016?

7            MS. RIVERA:  Objection, Your Honor.

8   Mischaracterization.

9            THE COURT:  Objection's overruled.

10            THE WITNESS:  Can you repeat that.

11  BY MS. REYES:

12  Q    Sure.  Let's -- let's take it back because I don't want

13  to mischaracterize anything.

14  A    Okay.

15  Q    You testified that Ms. Litzky sent you the photo that we

16  saw of EL holding a set of car keys?

17  A    That's correct, but I don't recall the date.

18  Q    Okay.  Would anything refresh your memory as to that

19  issue?

20  A    No.

21  Q    Okay.  Because that date is pretty important; correct?

22  A    Why is that?

23  Q    I'm asking you the questions.

24            MS. RIVERA:  Objection, Your Honor.

25  BY MS. REYES:

*Testimony of Roberto Oquendo*                                    **214**

1    Q    So if you don't know, you can say you don't know.

2              THE WITNESS:  Uh-huh.

3              THE COURT:  Hang on, Mr. Oquendo.

4              Let's get a new question.  Not statements,

5    questions.

6              And, Mr. Oquendo, let Ms. Reyes finish her question

7    before you answer.

8              New question.

9    BY MS. REYES:

10   Q    Have you looked at the indictment in this case that

11   charged you and Ms. Litzky with several different crimes?

12   A    Yes.

13   Q    Okay.  And you've looked at it carefully; right?

14   A    Yes.

15   Q    Because, in order for you to sign the plea agreement, you

16   had to understand the charges that were against you?

17   A    That's right.

18   Q    You had to understand the dates of when they're alleging

19   the criminal activity took place?

20   A    That's correct.

21   Q    Okay.  So for Count 1, for the conspiracy with

22   Ms. Litzky, you know that the dates are October 2014 through

23   September of 2016; right?

24   A    Oh, yes.

25   Q    Okay.  And she is charged with production from July 2nd

*Testimony of Roberto Oquendo*                                         **215**

1    of 2016; correct?

2    A    Because of a photo probably.  I don't know.

3    Q    And you were charged with production on August 9th of

4    2016?

5    A    Yes.

6    Q    And both of you were charged with possession of child

7    pornography on September 15th of 2016?

8    A    That's when I was arrested, yes.

9    Q    Okay.  So for the first time ever, you told the members

10   of the jury that Ms. Litzky sent you this photo; correct?

11   A    Yes.

12   Q    You've never told anybody that before?

13   A    I don't understand.

14   Q    You've never told law enforcement that Ms. Litzky sent

15   you --

16   A    Before, in 2016, no, I didn't say nothing about Rose.

17   Q    Okay.  Would it surprise you to learn that this image was

18   not found on any of your nine devices?

19   A    It might have been deleted.

20   Q    Okay.

21   A    Or it may have never even came through or -- I don't

22   know.

23   Q    It may not have come through?

24   A    I had a lot of images.  I can't remember all of them.

25   Q    Okay.  But you testified that she sent you this one.

1    A    It was one of the ones I recognized, yes.

2    Q    Okay.  So of the thousands that you've had in nine of

3    your devices, you specifically remember this image?

4    A    Like I said, most of them -- I had a lot of duplicates

5    too.  So, like I said, it was a lot of images.

6    Q    My question is would it surprise you to learn that the

7    image was not found on any of your nine devices?

8              MS. RIVERA:  Your Honor, asked and answered.

9              THE COURT:  Objection's overruled.  I haven't heard

10   the answer yet.

11             THE WITNESS:  It would surprise me, actually.

12   BY MS. REYES:

13   Q    Would it surprise you to know that the forensic evidence

14   reveals that she never sent that photo?

15   A    I would be surprised --

16             MS. RIVERA:  Objection, Your Honor, as to facts not

17   in evidence.

18             THE COURT:  Do you want to be heard on that,

19   Ms. Reyes?

20             MS. REYES:  Aja Stake's testimony on

21   cross-examination.

22             THE COURT:  Okay.  I'm going to overrule the

23   objection.

24             Ladies and gentlemen, you rely upon your own

25   independent recollection of the testimony.

*Testimony of Roberto Oquendo*                                    *217*

1        You can proceed.

2    BY MS. REYES:

3    Q    Would it surprise you to learn that the forensic evidence

4    in this case reveals that she never sent that photo?

5    A    That photo, I -- would be surprising, yes.

6    Q    Okay.  You were actually with her on July 2nd of 2016;

7    right?

8    A    I don't recall.

9    Q    It was a Saturday?

10   A    I really don't recall.  I was in and out of the house

11   prior to that anyway.

12   Q    Okay.  Do you remember being -- being tagged with cooking

13   duties for the 4th of July weekend?

14   A    I believe so.  I came -- I came by to do that, yes.

15   Q    Right.  You stopped at Walmart to --

16   A    Yeah.

17   Q    -- pick up some meats?

18   A    Uh-huh.

19   Q    Is that a yes?

20   A    Yes.

21   Q    Okay.  So during this time period, you were actually with

22   her; correct?

23   A    What do you mean "with her"?

24   Q    You were with Ms. Litzky, physically in front of her.

25   You were with her; correct?

*Testimony of Roberto Oquendo*                                          **218**

1    A    Yes.

2    Q    Okay.

3    A    I believe so.

4    Q    And you were still living with her at the time; correct?

5    A    Around that time, I was living in my car, I believe.

6    Soon after -- I don't remember exactly.

7    Q    Okay.  So --

8    A    But I know we did do the July 4th thing because she --

9    she invited me back -- she invited me over for that.

10   Q    Do you remember installing an above-ground pool?

11   A    Yes.  I did help with that.

12   Q    Okay.  And do you remember when that occurred?

13   A    No.

14   Q    You would use her phone all the time; correct?

15   A    For -- no, I wouldn't.  For what?

16   Q    I'm asking you.

17   A    No.

18   Q    You would use her phone all the time?  Yes or no?

19   A    No, I wouldn't.

20   Q    Did you ever use her phone?

21   A    No.

22   Q    Okay.  So your phone wouldn't be disconnected and you

23   would ask her to leave her phone so that you could use it?

24   A    I don't recall.

25   Q    Included in your Internet search history were terms such

*Testimony of Roberto Oquendo*                                         **219**

1    as "little niece"?

2    A    Okay.

3    Q    On one of your LG phones -- I'm asking the question --

4    your Internet search history of 2015 included terms such as

5    "little niece"; correct?

6    A    Correct.

7    Q    Okay.  It included "toddler"; correct?

8    A    Yes.

9    Q    It included "naked toddler"; correct?

10   A    Yes.

11   Q    Okay.  But this was all stuff that you kept secret?

12   A    Yes.  I kept that secret, yes.

13   Q    And speaking of nieces, you masturbated in front of your

14   nephew; correct?

15   A    My nephew?

16   Q    Yes.

17   A    No.

18   Q    No?  Okay.

19        Did you ever try to kiss your sister when she was a

20   little girl?

21            MS. RIVERA:  Objection, Your Honor, as to relevance.

22            THE COURT:  Sustained.

23            MS. REYES:  May I have a brief moment, Your Honor?

24            THE COURT:  You may.

25            MS. REYES:  Your Honor, based on your previous

*Testimony of Roberto Oquendo*                                    **220**

1    rulings, I don't know if this would be a good time to proffer.

2              THE COURT:  Okay.  Do you have any more questions?

3              MS. REYES:  No, Your Honor.

4              THE COURT:  Okay.  Do you have any redirect?

5              MS. RIVERA:  Yes, Your Honor.

6              THE COURT:  Okay.  We'll take the proffer up after

7    the jury departs.

8              MS. REYES:  Yes, Your Honor.

9              THE COURT:  Redirect.

10             MS. RIVERA:  If we can publish Exhibit 17,

11   lines 2114 through 2123.  2113 through 2123.  2114.

12             Your Honor, if I may have a moment?

13             THE COURT:  Yes.

14             MS. RIVERA:  It would be page 10.

15                     REDIRECT EXAMINATION

16   BY MS. RIVERA:

17   Q    August 15, 2016, if you can read there line 2122.  You

18   sent a message.  What does it state?

19   A    It says "And why's the dog with my naked kids in the

20   shower?"

21   Q    And what does she respond to you?

22   A    "Babysitting the kids, and the dog wants to take a shower

23   too."

24   Q    And this is on or about the time of August 15, 2016.  Do

25   you recall where -- where were you residing at the time?  Were

1  you residing with the defendant?

2  A    No.  I was residing in my vehicle at 303 Palmetto Ave, I

3  believe.

4  Q    And what is the approximate date that you started

5  residing in your vehicle at 303 Palmetto Avenue?

6      Sir, when did you start residing in Palmetto Avenue, to

7  your recollection?

8  A    It was more or less around that time.  I don't --

9  Q    What time?

10  A    July maybe.

11  Q    Of 2016?

12  A    Yeah, '16.  Yes.

13  Q    Okay.  And why were you making this comment here as to

14  why the dog was naked with the kids in the shower?  What were

15  you referring to?

16            MS. REYES:  Objection to beyond the scope of cross.

17            THE COURT:  Sustained.

18  BY MS. RIVERA:

19  Q    So would it be fair to say that you didn't keep every

20  single one of the images that you received from the defendant?

21            MS. REYES:  Objection to leading and improper

22  bolstering.

23            THE COURT:  Sustained.

24  BY MS. RIVERA:

25  Q    What did -- what did you do with the images that you

*Testimony of Roberto Oquendo*                                          *222*

1    received from the defendant?

2    A    I saved them.

3    Q    Did you save all of the images?

4    A    Some images, I did not.

5    Q    You mentioned that you had a Cricket phone as of July 2,

6    2016, and a ZTE.  Are those two different phones, or is that

7    the same phone?

8    A    It's -- it's the same phone.  It's a type of phone I had.

9    ZTE was the type of phone I had through Cricket.

10   Q    Okay.  Now, regarding the questions posed by -- strike

11   that.

12        You -- do you know what sentence you will receive in this

13   case?

14   A    No, I do not.

15   Q    Do you know who decides the sentence that you will

16   receive in this case?

17   A    The judge will decide that.

18   Q    Do you know if I have any say as to what sentence you

19   will receive in this case?

20   A    No.

21   Q    Do you know whether the Government will file a

22   sentence -- a motion for reduction of sentence on your behalf

23   in this case?

24   A    Nothing's been promised to me.

25   Q    And when you say nothing's been promised to you, are you

*Testimony of Roberto Oquendo*                                    **223**

1    referring that nobody has promised you a particular sentence?

2    A    That's right.

3    Q    You have no idea what your sentence will be?

4    A    Other than what I was told with the Count 1 and Count 3.

5    Q    And what do you mean by that?

6    A    I mean the minimum mandatory in the -- in the -- 15 to

7    30, each count.  That's pretty much --

8    Q    15 to 30 years as to each count?

9    A    Yes, yes.

10   Q    When you signed the plea agreement and you entered a

11   change of plea in this case, was that under oath?

12   A    Yes.

13   Q    And in that plea agreement, as to the factual basis, did

14   you tell the truth or not?

15   A    Yes.

16   Q    And when -- in the plea agreement, you mentioned that you

17   engaged in ooVoo chats with a known coconspirator through

18   ooVoo.  Were you telling the truth?

19   A    Yes.

20   Q    Who is that coconspirator?

21   A    That's Rose.

22        MS. RIVERA:  I have no further questions,

23   Your Honor.

24        THE COURT:  Thank you.

25        You may step down, Mr. Oquendo.  You can escort

*Testimony of Roberto Oquendo*                                          **224**

1  Mr. Oquendo back to the holding cell.

2          THE COURT:  We're going to break for the evening,

3  ladies and gentlemen.  I've got some things I need to take up

4  with the lawyers.  Just a reminder, this is not the time to

5  discuss the case among yourselves or with others.  Thank you

6  for your attention over the long day, and I'll see you back

7  here in the morning at 9:00.

8      (Jury out at 4:59 p.m.)

9          THE COURT:  Ms. Reyes, do you want to make your

10  proffer?

11          MS. REYES:  Yes.  Should I ask him questions or --

12          THE COURT:  I thought you wanted to proffer the

13  electronic evidence.

14          MS. REYES:  Yes.  Okay.

15          THE COURT:  Do you need Mr. Oquendo?

16          MS. REYES:  I had a couple of questions for him,

17  Your Honor --

18          THE COURT:  Okay.

19          MS. REYES:  -- based on some evidentiary rulings.

20          THE COURT:  Okay.  We can retrieve him back.  Can we

21  catch Mr. Oquendo before he goes down?  Or, if not, let's

22  bring him back up.

23          MS. REYES:  And, Your Honor --

24          THE COURT:  All right.  Let the record reflect

25  Mr. Oquendo's back on the witness stand and the jury has

*Proffered Testimony of Roberto Oquendo*                                   **225**

1    departed for the day.

2              Now, Ms. Reyes, yes?

3              MS. REYES:  Yes, Your Honor.

4                        PROFFERED DIRECT EXAMINATION

5    BY MS. REYES:

6    Q    You would force Ms. Litzky to have sex with your friends

7    in exchange for money; correct?

8    A    No.

9    Q    You would hit her?

10   A    No.

11   Q    You would cause bruising?

12   A    No.

13   Q    Through the ooVoo chats --

14   A    Uh-huh.

15   Q    -- you would threaten her; correct?

16   A    No.  I don't recall.

17   Q    You would threaten to harm the little girl that was --

18   that Ms. Hitchcock was babysitting in Virginia?

19   A    No.

20   Q    You would get home drunk a lot, and you would hit

21   Ms. Litzky when you were drunk?

22   A    No.

23   Q    You isolated her from her -- from her friends?

24   A    No.

25   Q    You isolated her from your family?

1    A    No.

2    Q    You isolated her from her family?

3    A    No.  I don't --

4    Q    You monitored her phone?

5    A    No.

6    Q    You monitored who would call her?

7    A    No.

8    Q    If your sister would call her phone, you would pick up

9    the phone and hang up?

10   A    No, I wouldn't.

11            MS. REYES:  No more proffer, Your Honor.

12            THE COURT:  Okay.  Do you need this witness to

13   introduce any electronic evidence or --

14            MS. REYES:  No, Your Honor.

15            THE COURT:  Okay.  Thank you.  Appreciate you

16   bringing him back.  You can take him back to the cell.

17            MS. REYES:  Your Honor, I recognize it's a public

18   courtroom, but it's pretty graphic what we're about to show.

19            THE COURT:  Okay.  I think the big screen is off;

20   correct?

21            THE COURTROOM DEPUTY:  Yes, Your Honor.

22            THE COURT:  So if you-all want to rotate your

23   screens, we can do it that way.

24            MS. REYES:  Yes, Your Honor.

25            THE COURT:  Unless the Government objects.  It looks

1   like the Government may have some objection.

2            MS. RIVERA:  I was thinking we could make this part

3   of the record.  Maybe we could save that onto a separate disc

4   and make it part of the record for appellate review if it

5   becomes necessary but --

6            MS. REYES:  No objection.

7            THE COURT:  Yeah.  I don't know why we're going to

8   show it because I've already excluded it.  It just needs to be

9   available in the event the Eleventh Circuit wants to look at

10  it.

11           MS. REYES:  Yes, Your Honor.

12           THE COURT:  Let's do it that way.  Why don't you

13  give me the number so I can make sure that we've got the right

14  thing.

15           MS. REYES:  Okay.

16           THE COURT:  Do you have it marked for

17  identification?

18           MS. REYES:  I don't, Your Honor.

19           MS. RIVERA:  No, Your Honor.

20           THE COURT:  Let's do this:  Let me give you an

21  opportunity over the evening to identify it in some way, mark

22  it for ID, and then if you could put it on -- you can take it

23  off whatever Ms. Valente has and put it on a separate --

24           MS. RIVERA:  Yes, Your Honor.

25           THE COURT:  -- CD or a thumb drive, and we'll give

*Proffered Testimony of Roberto Oquendo*          **228**

1    it to Mr. Countryman and make it part of the record.

2          MS. RIVERA:  We have all of the extraction reports

3    here.  We might need assistance identifying the particular

4    video and then putting it into a separate disc.

5          THE COURT:  That's fine.  You and Ms. Reyes can work

6    together.  She can tell you what it is she wants to make sure

7    is a part of the record, and we don't necessarily need to

8    worry about that immediately, but we just need to make sure

9    it's part of the record on appeal.

10          MS. RIVERA:  Yes, Your Honor.

11          THE COURT:  Let me know -- what I would like you to

12    do, though, is let me know how we're going to identify it by

13    tomorrow --

14          MS. REYES:  Yes, Your Honor.

15          THE COURT:  -- and whether or not you've actually

16    gotten it done or not because I want to make sure I

17    acknowledge in the record what it is and that it's my intent

18    that it be made a part of the record on appeal.

19          MS. RIVERA:  We might -- we might need to involve

20    Agent Dufresne in copying that.  There's only -- we can only

21    view it in our --

22          THE COURT:  I don't need to know any of that.

23          MS. RIVERA:  Fine.  I'm just saying, Your Honor, it

24    may take us some time to get that done.

25          THE COURT:  That's fine.  I don't think the

*Proffered Testimony of Roberto Oquendo*                            **229**

1    Eleventh Circuit's going to be needing it anytime soon.  May

2    not need it at all.  So we'll see.

3             MS. REYES:  Would Your Honor like to hear argument

4    today on Rule 29 or --

5             THE COURT:  Yeah.  Let's do that.

6             Is the Government going to rest?

7             MS. RIVERA:  Yes, Your Honor.

8             THE COURT:  Do you want to formally rest in front of

9    the jury in the morning when they come back?

10            MS. RIVERA:  Sure, Your Honor.

11            THE COURT:  Okay.  For purposes of the record,

12   though, the Government's announced that it's completed its

13   case in chief.  I'll give you an opportunity to formally rest

14   in front of the jury.

15            Ms. Reyes, do you have Rule 29 motions?

16            MS. REYES:  Yes, Your Honor.

17            Your Honor, our argument is that -- pursuant to

18   Rule 29, we would ask the Court for a judgment of acquittal on

19   Counts 1, 3, and 5.

20            As it relates to Count 1, there's no evidence that

21   for Element 1 that two or more persons in some way or manner

22   came to a mutual understanding but, more importantly, as to

23   Element 2, that Ms. Litzky knew about the unlawful purpose and

24   willfully joined in it.  And "willfully," which tracks the

25   language of the indictment, is what makes this count a

*Proffered Testimony of Roberto Oquendo*                    **230**

1    specific intent crime, and there's just simply no evidence of

2    that.

3           As the instruction tells us, page 38 of 60 at Docket

4    Entry 118, quote, "If the defendant played only a minor part

5    in the plan but had a general understanding of the unlawful

6    purpose of the plan and willfully joined on at least one

7    occasion, that's sufficient for you to find the defendant

8    guilty."  There's no evidence of that, that she willfully

9    joined in on any occasion.  So even in viewing the evidence in

10   the light most favorable to the Government, we believe they

11   haven't established a prima facie case.

12          Do you want me to go to the other counts or let them

13   respond?

14          THE COURT:  Why don't you go ahead and go to the

15   other counts.

16          MS. REYES:  Yes, Your Honor.

17          As it relates to Counts 3 and 5, none of the images

18   that are actually tied to Ms. Litzky that were presented to

19   the jury, especially the July 2, 2016, image forming the basis

20   for Counts -- I'm sorry -- I think it's Counts 2 and 4 are

21   child pornography as defined under 18, United States Code,

22   Section 2256.  So if we go to child pornography,

23   Subsection (8), of that statute, it tells us that "'Child

24   pornography' means any visual depiction, including photograph,

25   film, video, picture, or computer or computer-generated image

*Proffered Testimony of Roberto Oquendo*          **231**

1   or picture, where the production involves the use of a minor

2   engaging in sexually explicit conduct.  Such visual depiction

3   is a digital image, or such visual depiction has been created

4   or modified to appear that this identifiable minor is engaging

5   in sexually explicit conduct."

6          So when we go to the definition for "sexually

7   explicit conduct," I believe the Government's theory is

8   lascivious exhibition of the anus, genitals, or pubic area of

9   any person.  We know from *New York v. Ferber* at 458 U.S. 747,

10  1982, Supreme Court case, that nudity without more is

11  protected expression.  So viewing the July 2, 2016, image as a

12  neutral fact finder who are adults that are not sexually

13  attracted to children can only support a finding that the

14  images of a nude minor are nothing more.

15         Viewing the other image shown only supports a

16  finding that the image is focused on a minor's anus, which may

17  be considered child pornography after the December 7, 2018,

18  amendments to the 2256, which added anus to the lascivious

19  exhibition, but it was not CP at the time of the offense in

20  2016.

21         So based on that, Your Honor, I'm asking this Court

22  to find that the Government has not established a prima facie

23  case and grant our motion for judgment of acquittal on all

24  counts.

25         THE COURT:  All right.  Thank you.

*Proffered Testimony of Roberto Oquendo*                                232

1                  Do you want to be heard, Ms. Rivera?

2                  MS. RIVERA:  Yes, Your Honor.

3                  I think that in terms of the unlawful plan, the

4       conspiracy count, the evidence -- it is, in my -- in the

5       Government's opinion, straightforward in terms of what the

6       defendant was trying to accomplish here.  The defendant and

7       Oquendo came, obviously, to a mutual understanding through

8       years of exchanging images -- nude images of the children, and

9       the unlawful plan was to produce these types of visual

10      depictions that are lascivious in nature, specifically images

11      where the children are in the nude, laying on a bed with their

12      legs spread apart or where the focus of the image is in the

13      genital area.

14                 According to Oquendo, the defendant knew that he

15      was, in fact, while they were chatting through this ooVoo

16      application -- Defendant knew that she -- that he was creating

17      these screenshots.  Actually, some of the chats -- the ooVoo

18      chats corroborate that fact when she indicated to him,

19      "Uninstall it and reinstall the app," and she -- and he

20      indicated, "But I'm going to lose the pictures," and she said,

21      "You're not because I did it and I didn't lose mine."  So she

22      was well aware of what he was doing.

23                 She was offering for him to see the children naked.

24      She obviously, based on the communications between the two of

25      them and the text messages, knew that it was -- it was sexual

*Proffered Testimony of Roberto Oquendo*                    **233**

in nature, his attraction to the children, and she's not

exposing other areas of the children but their genital area in

most of those ooVoo chats.  It's all focused on the vaginal

area of the child and Oquendo indicating that he was sexually

aroused by these images.  Actually, the ooVoo chats showed,

when he made that vulgar expression, he was saying that he was

sexually aroused by looking at KO's vaginal area, and what she

did was to encourage him to "go play," or masturbate.

        I think, Your Honor, the circumstantial and direct

evidence in the case shows overwhelmingly that she was in it,

that she knew that what she was doing was using the children

to engage in sexually explicit conduct for the purpose of

producing these types of images.

        Of course, the children themselves were acting

innocently, and in that regard, that's why we propose

additional language, but even the jury instructions as they

are indicate that one of the factors to be considered in terms

of what is the lascivious exhibition is whether the depiction

appears to have been designed to elicit a sexual response in

the viewer.

        In addition to that, the -- some of the most recent

case law, 2016, *United States v. Holmes*, the Eleventh Circuit

indicated, basically, that the jury may also consider the

intent of the photographer or the producer to satisfy a sexual

desire in the viewer through the visual depiction.  And the

*Proffered Testimony of Roberto Oquendo*                                    **234**

1    same case, *United States v. Holmes*, emphasized the depictions

2    of otherwise innocent conduct may, in fact, constitute

3    lascivious exhibition of the genitals or pubic area of a minor

4    for purposes of the definition of sexually explicit conduct

5    based on the actions and intent of the individual creating the

6    depiction.  Therefore, this Court -- some of the cases that I

7    cited in the -- in the jury instructions that we submitted,

8    they say the minor need not be acting in a sexually explicit

9    manner, and there's no requirement that the minor exhibit

10   lust, wantonness, or sexual coyness, or other inappropriate

11   precocity.

12           So based on the definition of lascivious exhibition

13   and the evidence showing that these, in fact, are images of

14   child pornography and based on the evidence that shows the

15   defendant was complicit in participating in the creation of

16   those ooVoo chats through those live transmissions and then

17   knowing that he was creating screenshots, we believe that we

18   have, Your Honor, met our burden as to that count, Your Honor.

19           And some of these arguments also apply as to Count 2

20   when it comes to the definition of that image of EL laying on

21   a bed and her vaginal area exposed, whether that constitutes

22   lascivious exhibition of her genitalia.  That should be

23   considered in the context of this case and of years of

24   communications between the defendant and Roberto Oquendo

25   because before that, before she took that picture, she had

*Proffered Testimony of Roberto Oquendo*                                    **235**

1   already sent him many other images.  She had already engaged

2   in those ooVoo chats with him from June or July of 2014

3   through March of 2015, and when he came back, it was his

4   testimony that she continued to send him these types of

5   images.

6          Therefore, I -- I believe -- and I know there has

7   been a lot of questions about whether she sent it or not.

8   Well, she produced it, and the evidence showed that she made

9   admissions that she had sent it to him or that she took it for

10  him, and the obvious reason was knowing that it was for his

11  sexual gratification, and she admitted that much.  He

12  recognized the image.  He had thousands of images, actually,

13  many of them just like the one we saw here in court of EL in

14  that manner laying on the bed.

15         Based on that evidence, Your Honor, the totality of

16  the evidence, I believe that we have met our burden in this

17  case.

18         THE COURT:  Motion's denied.

19         Ms. Reyes, let's talk about tomorrow, and give me an

20  idea of what -- what you think the time required's going to be

21  for your witnesses, and then I want to see whether or not

22  you've had a chance to visit with Ms. Litzky as to whether or

23  not she's going to testify.

24         MS. REYES:  I'm sorry.  Can you repeat the last

25  part.

*Proffered Testimony of Roberto Oquendo*                    *236*

1        THE COURT:  Yes.  I'm sorry.  Then I want to talk

2    with you about whether you've visited with Ms. Litzky yet

3    about whether or not she's going to testify.

4        MS. REYES:  Okay.  Your Honor, I am still uncertain

5    as to what the final verdict is as to if you're going to

6    actually allow me to present a defense.  So I don't know if we

7    have time to talk about that regarding specific intent

8    versus -- and, if so, on what counts -- and versus general

9    intent on the other counts.

10       THE COURT:  Specific intent is not an element of the

11   crime charged in the indictment.  That's my ruling.

12       MS. REYES:  Except it is, Your Honor, because the

13   Government --

14       THE COURT:  I don't need an argument, Ms. Reyes.

15   I've already told you that it is not.  Now, I'll give you an

16   opportunity if you want to file some briefing overnight.

17   You've told me that you disagree with the law but that I was

18   correct that that is the state of the law.

19       MS. REYES:  Yep.

20       THE COURT:  So it may be something that you disagree

21   with, and maybe someday you'll be in a position to make a

22   change of it, but right now my job is to apply the law as it

23   exists.  I don't have the luxury to make it up myself.  So the

24   law as it presently exists in the Eleventh Circuit is that

25   specific intent is not an element of the crimes that are

*Proffered Testimony of Roberto Oquendo*                    *237*

1   charged in the indictment.

2        MS. REYES:  As stated at the -- may I respond?

3        THE COURT:  Yes, of course.

4        MS. REYES:  So as stated at the sidebar, I do agree

5   with Your Honor, but I think the Government, by adding

6   "willfully" to the conspiracy language, made the conspiracy

7   count specific intent, and I have an Eleventh Circuit case

8   that I will provide to the Court, and I will provide some

9   brief briefing on it tonight.

10       THE COURT:  Okay.  Why don't you let me have that

11  case citation now, and I'll look at it myself over the

12  evening.

13       MS. REYES:  Your Honor, may I e-mail it to

14  Mr. Countryman in about 30 minutes?

15       THE COURT:  I hope he's going to be gone in

16  30 minutes, but you can e-mail it to my chambers account.

17       MS. REYES:  Chambers account.  Okay.

18       THE COURT:  Or would you rather it come to you?

19       THE COURTROOM DEPUTY:  I'd rather it come to me.

20       THE COURT:  He'd rather it come to him.

21       THE COURTROOM DEPUTY:  I'll get it to the judge.

22       MS. REYES:  So, Your Honor, based on that, that will

23  affect the presentation of my witnesses.

24       THE COURT:  Okay.

25       MS. REYES:  So can I just tell you who my witnesses

1    are?

2              THE COURT:  Sure.  Why don't you give me best-case

3    scenario for you in light of what you'd like to do, and that

4    will help me understand at least what the maximum time

5    commitment is.

6              MS. REYES:  Yes, Your Honor.

7              THE COURT:  Part of the reason that I'm pressing you

8    on it is because, as you know, I have another case starting

9    next week, and so I need to figure that out.

10             MS. REYES:  Yes, Your Honor.  Richard Connor is

11   going to testify regarding Government Exhibit 12A, and based

12   on Dufresne being allowed to testify regarding finding images

13   of prepubescent children engaged in sexually explicit conduct,

14   I think that the door has been opened now for Mr. Connor to

15   render that same opinion as to the July 2, 2016, images.

16             THE COURT:  As to whether it's a prepubescent child?

17             MS. REYES:  Engaged in sexually explicit conduct or

18   for the purpose of lewd exhibition of the genitals.  I

19   objected to it.  The Court overruled it.  So I believe the

20   door has been opened now for Mr. Connor to opine.

21             THE COURT:  As to whether he looked for that?

22             MS. REYES:  As to whether he found it.  He

23   definitely looked for it.

24             THE COURT:  Okay.

25             MS. REYES:  Ms. Hitchcock was going to testify

1   regarding being present at the house on July 2, 2016, and on

2   ███ -- KO always having access to Ms. Litzky's phone and

3   knowing her password and using her phone to play Netflix and

4   knowing how to use the camera.

5            THE COURT:  Okay.

6            MS. REYES:  Mr. Litzky was going to testify -- the

7   Court hasn't ruled yet on the records, but he was going to --

8   I was going to lay the foundation with him for Exhibits 1,

9   2 -- 1, 2, 4, and 5.  Those were the social security records

10  which I just got this afternoon, the school records,

11  designation of health care surrogate, and durable power of

12  attorney, and this goes right into the Court's ruling on

13  specific intent.  They --

14           THE COURT:  Well, those records are a little bit

15  different because they weren't provided in a timely fashion

16  based on the scheduling order, so there's a dual problem with

17  that.

18           MS. REYES:  There is.  The school records were part

19  of the discovery provided to me by the Government, and the --

20  No. 4 and 5 were provided to me by the family on June 12th at

21  the evidentiary hearing.

22           Dana -- Dayma Nieblas is Roberto Oquendo's sister,

23  and she's going to -- she's expected to testify regarding him

24  being abusive and abusing Rose.

25           And Agent Spadafora was going to testify regarding

*Proffered Testimony of Roberto Oquendo*                    **240**

1   his interview of Ms. Litzky, and I was going to get into some

2   of the audio that I got into a little bit with Agent Stake.

3           So best-case scenario -- and 45 minutes for

4   Mr. Connor, 15 to 30 for the parents, and for the rest of the

5   factual witnesses, Agent Spadafora might be an hour.

6           THE COURT:  Okay.

7           MS. REYES:  And I expect Ms. Litzky will testify.

8           THE COURT:  Okay.  I'll revisit that with you in the

9   morning.  I just want to have a quick colloquy with Ms. Litzky

10  once she's made up her mind definitively for the record.

11          MS. REYES:  Yes, Your Honor.

12          THE COURT:  I will look at your case over the

13  evening.  You can expect that, unless I change my mind, which

14  I'll be open to do after I read your case, that the evidence

15  you have described that relates to Mr. Oquendo's treatment of

16  Mr. Litzky falls in the area of the justification defense,

17  which is not a valid defense here based on your acknowledgment

18  that you can't meet the elements of the justification defense.

19  So I would not permit that testimony unless I see something in

20  your case that persuades me that I'm wrong about that, but,

21  obviously, I'll permit you to proffer it.  So you need to have

22  those witnesses available regardless.

23          MS. REYES:  Yes, Your Honor.

24          THE COURT:  And I'll let you make your record so

25  that it'll be preserved for the Eleventh Circuit in the event

*Proffered Testimony of Roberto Oquendo*                               **241**

1   that I'm wrong.

2          And it sounds like that -- well, certainly, you'd

3   have the morning --

4          MS. REYES:  Yes, Your Honor.

5          THE COURT:  -- with testimony, but I'm trying to

6   figure out when we're going to have our charge conference.  I

7   need to look at the instructions overnight because we do have

8   some issues with respect to the instructions.

9          MS. REYES:  May I say one more thing about his

10  abuse?

11         THE COURT:  Yes.

12         MS. REYES:  Agent Stake testified that she looked at

13  all the text messages, and based on her review of her -- of

14  this case, based on her investigation of this case, that

15  they're -- they had a natural relationship and that the nature

16  of their relationship was natural, and I think the Government

17  opened the door by asking her to opine on that, and I think

18  that the evidence of past domestic abuse is necessary to show

19  the proper context of their relationship.  So even if the

20  Court finds that it's not a proper defense, I think it's

21  proper to go in front of the jury because the Government has

22  opened the door and I think it bears on the question of

23  Ms. Rose's -- Ms. Litzky's willfulness.

24         THE COURT:  Okay.

25         MS. RIVERA:  Your Honor, if I may be heard on that.

*Proffered Testimony of Roberto Oquendo*                    **242**

1          THE COURT:  What?

2          MS. RIVERA:  Well --

3          THE COURT:  I'm not entertaining additional

4    argument.  I'm giving Ms. Reyes an opportunity to make all the

5    arguments that she wants to make.  So -- but I'm happy to hear

6    from you, but what is it you want to add?

7          MS. RIVERA:  Well, at some point I would like to be

8    able to object, Your Honor.

9          THE COURT:  Object to what?

10         MS. RIVERA:  To some of the evidence that she

11   intends to present, and as -- that she's just trying to find a

12   way to backdoor the issue of mental health.  I've got the

13   records, social security records, specific documents that

14   don't address anything pertinent to the dates on the -- of the

15   offense that are irrelevant to this case.

16         And we don't believe that -- she was trying to open

17   the door, Your Honor, the defense, with Francis Dufresne's

18   testimony.  I don't believe the door was open.  He did not

19   opine that any of the images charged in this case are child

20   pornography.  I don't believe that door was opened.

21         Your Honor, and we definitely would object to any of

22   these other AT&T records, power of attorney records coming in

23   on the grounds of relevance and 403, Your Honor, as well.

24         THE COURT:  Okay.  Well, I want to make sure with

25   respect to Mr. Connor -- I'm going to permit Mr. Connor to

*Proffered Testimony of Roberto Oquendo*                                    **243**

1    answer the same question that you put to Mr. Dufresne, which

2    is whether or not he was asked to look for images of

3    children -- prepubescent children that were engaged in sexual

4    activity or that were in sexually explicit poses.  I don't

5    remember the exact phrase of the question or the answer, but

6    he'll be able to say -- he'll be able to testify exactly as

7    Mr. Dufresne.  He will not be able to offer an opinion as to

8    whether what he found was or was not child pornography.

9          The other late disclosed documents, the social

10   security records and the other records that I think you

11   indicated you got from the family on June the 12th -- I'm

12   going to exclude those because they haven't been timely

13   disclosed.  So I'll give you a chance -- you can proffer those

14   as well.  And I'm not changing my mind on my view that the law

15   is that this is a specific intent crime, and so evidence of

16   Mr. Oquendo's treatment of Ms. Litzky is not relevant, and I'm

17   not going to permit it except I'm leaving the door cracked so

18   that I can read Ms. Reyes's case and do some of my own

19   research to see whether or not I think there's any merit to

20   her argument that the willfulness aspect of the conspiracy

21   charge somehow changes the landscape.

22         So you look puzzled, so I want to address it if

23   you're puzzled, if we can -- I may not be able to solve that

24   problem, so I'm going to spend a minute or two trying to, but

25   only a minute or two.

*Proffered Testimony of Roberto Oquendo*                                    **244**

1     MS. RIVERA:  Well, for example, Your Honor,

2   Dayma Nieblas, the sister of Mr. Oquendo, coming to testify

3   about his sexual abuse of her -- how is -- I'm having trouble

4   understanding how that's pertinent --

5     THE COURT:  How much more clearly can I say that I'm

6   not going to permit that testimony?

7     MS. RIVERA:  Then I mis- --

8     THE COURT:  How much more clearly can I say it?

9     MS. RIVERA:  I misunderstood, Your Honor.  I

10  misunderstood.  I am sorry.  I apologize, then.

11    THE COURT:  Okay.  We'll be in recess.  I'll see you

12  in the morning.

13    (Proceedings concluded at 5:29 p.m.)

14

15

16                         -    -    -

17

18              CERTIFICATE OF REPORTER

19  I certify that the foregoing is a correct transcript of the
    record of proceedings in the above-entitled matter.

20

21

22

23  /s/ Heather Jewett, RPR, FCRR          04/03/2020
    Heather Jewett, RPR, FCRR              Date
24  Federal Official Court Reporter

25