1

```
 1                  UNITED STATES DISTRICT COURT
                    MIDDLE DISTRICT OF FLORIDA
 2                       ORLANDO DIVISION

 3   - - - - - - - - - - - - - - -X
                                  :
 4   UNITED STATES OF AMERICA,    :
                                  :
 5                                :  Case No.:
               Plaintiff,         :  6:18-cr-00223-RBD-EJK-2
 6                                :
     vs.                          :
 7                                :  Orlando, Florida
                                  :  July 26, 2019
 8   ROSE BETH LITZKY,            :  9:08 a.m.
                                  :
 9                                :
               Defendant.         :
10                                :
                                  :
11   - - - - - - - - - - - - - - -X

12        TRANSCRIPT OF JURY TRIAL PROCEEDINGS, VOLUME IV,
            BEFORE THE HONORABLE ROY B. DALTON, JR.
13                UNITED STATES DISTRICT JUDGE

14

15   APPEARANCES:

16    Counsel for Plaintiff:        Ilianys Rivera Miranda

17    Counsel for Defendant:        Karla Mariel Reyes

18

19

20   Proceedings recorded by mechanical stenography.
     Transcript produced by computer-aided transcription.
21

22   Court Reporter:   Heather Jewett, RPR, FCRR
                        Federal Official Court Reporter
23                      401 West Central Boulevard, Suite 4600
                        Orlando, Florida 32801
24                      e-mail: heatherjewett.focr@gmail.com

25
```

*2*

1              T A B L E   O F   C O N T E N T S

2                        July 26, 2019

3   PROCEEDINGS                                          Page

4    ARGUMENT RE: SPECIFIC INTENT                          3
     GOVERNMENT RESTS                                     12
5    JURY CHARGE CONFERENCE                              142
     RULE 29 MOTION RENEWED                              158
6    JURY CHARGE CONFERENCE (CONT'D)                     159
     CLOSING ARGUMENTS
7        Argument by Ms. Rivera                          163
         Argument by Ms. Reyes                           180
8        Rebuttal Argument by Ms. Rivera                 199
     CHARGE TO THE JURY                                  204
9    DEFENDANT'S MOTION FOR MISTRIAL                     229

10

     WITNESSES
11

     FOR THE DEFENDANT:
12

     RICHARD D. CONNOR, JR.
13       Direct Examination by Ms. Reyes                  13
         Cross-Examination by Ms. Rivera                  35
14       Redirect Examination by Ms. Reyes                41
     MICHAEL SPADAFORA
15       Direct Examination by Ms. Reyes                  43
         Cross-Examination by Ms. Rivera                  54
16       Redirect Examination by Ms. Reyes                56
     LEONARD LITZKY
17       Direct Examination by Ms. Reyes                  63
         Cross-Examination by Ms. Rivera                  70
18       Redirect Examination by Ms. Reyes                72
         Recross-Examination by Ms. Rivera                78
19   HELEN HITCHCOCK
         Direct Examination by Ms. Reyes                  80
20       Cross-Examination by Ms. Rivera                  88
     DAYMA NIEBLAS
21       Direct Examination by Ms. Reyes                  90
         Cross-Examination by Ms. Rivera                  94
22   ROSE BETH LITZKY
         Direct Examination by Ms. Reyes                 100
23       Cross-Examination by Ms. Rivera                 112
         Redirect Examination by Ms. Reyes               138

24

25

*3*

1          P R O C E E D I N G S

2      (Call to order of the court at 9:08 a.m.)

3      (The following is an excerpt of these proceedings.)

4          THE COURT:  Good morning.

5          MS. RIVERA:  Good morning.

6          MS. REYES:  Good morning, Your Honor.

7          THE COURT:  We're back on the record.  United States

8  v. Litzky, 18-cr-223.  The Court notes all counsel and the

9  defendant are present.

10          Before we bring the jury back in, I finished, to the

11  extent I can, my research on the matters we discussed

12  yesterday.

13          And, Ms. Reyes, if you want to take advantage of the

14  opportunity to add anything to your argument from last

15  evening, I'll give you a chance briefly to do that.

16          MS. REYES:  Yes, Your Honor.  I'm relying on --

17          THE COURT:  Can I ask you a quick question just to

18  make sure I'm understanding your argument?  And that is, as I

19  understand it, it's your contention that because the first

20  count in the indictment charges conspiracy, which has a

21  willful and knowing component to it, that that then allows you

22  to introduce evidence of duress or bad conduct on the part of

23  Mr. Oquendo as it relates to your client because, in your

24  view, that operates to undermine the willfulness aspect of

25  the -- the element of the conspiracy?  Is that --

*4*

1          MS. REYES:  It is.

2          THE COURT:  Am I understanding it correctly?

3          MS. REYES:  It is, Your Honor.  And in brainstorming

4    with colleagues last night, I believe that the word

5    "intentionally" in the indictment as it relates to the

6    conspiracy also makes it a specific intent.  So it's not just

7    willfully --

8          THE COURT:  I'll try to be quiet, but there's no

9    question that conspiracy is a specific intent crime.  The

10   question is whether or not that means evidence of duress comes

11   in.  But I'll be quiet and let you speak to that.

12         MS. REYES:  Okay.  Because it is a specific intent

13   crime, then I think duress absolutely is a valid defense for

14   Ms. Litzky to pursue in her trial.  I -- the case law that I

15   provided had to do with willfully being a specific intent

16   crime.  So if the Court is agreeing that conspiracy is

17   specific intent, then absolutely the prior domestic abuse, her

18   being scared of him, him threatening her, him threatening

19   family members, then, obviously, that would go to her intent

20   to willfully join into this conspiracy.

21         And I -- from my understanding from the Court,

22   you're -- you're ruling that conspiracy is specific intent, so

23   I think it absolutely is a defense that we can pursue.

24         THE COURT:  Ms. Rivera, do you want to be heard?

25         MS. RIVERA:  Yes, Your Honor.  Briefly.  I just

*5*

1    don't see, Your Honor, the correlation between the willfulness

2    element of the conspiracy count, which basically requires the

3    defendant willfully, knowingly joined a -- an unlawful plan.

4    Her intent to join was willful.  That does not correlate with

5    a duress defense akin to justification.  Duress basically is

6    saying, "I -- I did it, but I was -- I did it because I was

7    threatened because there was some immediate harm that I was

8    trying to prevent."  Willfulness -- and we submitted two cases

9    through the courtroom deputy, and we shared them to counsel

10   through e-mail yesterday.  It was late at night.

11            THE COURT:  I read them.

12            MS. RIVERA:  Your Honor, it refers to the

13   unlawfulness.  Did she know that in joining in this

14   conspiracy, in joining in this plan, that it was something

15   that was being done for bad purpose?  I just fail to see,

16   Your Honor, the correlation between the duress defense that

17   the defense is trying to raise and the willfulness aspect of

18   the conspiracy count.

19            THE COURT:  Okay.  Thank you.

20            So it's my view that while willfulness is a part of

21   the conspiracy offense, willfulness deals with the specific

22   intent to do something that is unlawful.  The pattern

23   instructions define "willfully" as that act -- that the act

24   was committed voluntarily and purposely with the specific

25   intent to do something the law forbids, that is, with bad

*6*

1   purpose either to disobey or disregard the law.

2          The record reflects that, in the defendant's final

3   interview with the law enforcement officers, there's at least

4   some evidence that she acknowledged that the taking of the

5   photographs was wrong.  As contrasted with willfulness,

6   duress, on the other hand, is an affirmative defense to a

7   crime after the Government has proven beyond a reasonable

8   doubt that the defendant committed the crime as charged.

9   Duress does not negate a defendant's state of mind or the

10  specific intent to do something willfully.  Rather, it allows

11  a defendant to avoid liability by negating a finding of guilt

12  even though the defendant had the requisite *mens rea* and

13  intent to commit the crime.

14          Specifically, the case of *Dixon v. United States*

15  found at 548 U.S. 1, pincite page 7, United States Supreme

16  Court, 2006, held that the defense of duress or necessity,

17  quote, "does not negate a defendant's state of mind when the

18  applicable offense requires the defendant to have acted

19  knowingly or willfully.  Instead, it allows the defendant to

20  avoid liability because coercive conditions or necessity

21  negates a conclusion of guilt even though the necessary

22  *mens rea* was present."  That's also consistent with and, in

23  fact, cited as authority for the Eleventh Circuit pattern Jury

24  Instruction No. 16 on duress and coercion.

25          So I interpret the defense of -- or the testimony as

7

1    it relates to duress or coercion as going to the defense of

2    justification, which the defense has already acknowledged they

3    cannot meet the elements of the defense of justification, and

4    so I'm going to adhere to my prior ruling and exclude that

5    evidence.

6              Are you ready to call your first witness?

7              MS. REYES:  Your Honor, I do intend to pursue a

8    duress defense now, and I do intend to present at least a

9    scintilla of evidence to render that jury instruction

10   available to us.

11             THE COURT:  No.  What do you mean?

12             MS. REYES:  I --

13             THE COURT:  You intend -- you intend to offer

14   evidence that you can meet the elements of the justification

15   defense?

16             MS. REYES:  Yes, Your Honor.

17             THE COURT:  After you already acknowledged to me

18   that you could not?

19             MS. REYES:  Yes, Your Honor.

20             THE COURT:  Okay.  Well, let's bring our jury in.

21   We'll see where it goes, but I'm not going to permit the

22   duress testimony until I feel that you have established the

23   elements sufficiently, specifically the third element, which

24   requires that you demonstrate that she had no opportunity to

25   contact law enforcement or failed to avail -- or did not take

*8*

1 advantage of opportunities to contact law enforcement or to
2 report the duress, and that's, I think, where you're going to
3 have an extremely big reach.
4         MS. REYES:  So that's affecting my -- the way I
5 wanted to run my case and the order of witnesses that I wanted
6 to call.
7         THE COURT:  It's an affirmative defense.  If you'll
8 give me just a minute, let me look -- let me get the case up
9 that sets out what the procedure is for that, and I'll review
10 it with you, and we'll see if we can get at least off on the
11 right foot.
12         THE COURT SECURITY OFFICER:  All rise for the jury.
13         THE COURT:  I'm sorry, Ms. Farrar.  I'm not ready
14 for them yet.  My apologies.
15     (Court at ease.)
16         THE COURT:  So let me ask you, Ms. Reyes, if you can
17 proffer for me just what you expect the evidence is going to
18 be that there was an immediate emergency that comport with the
19 requirement in the *Harmon* case that the defense of
20 justification is an extraordinary -- available only in
21 extraordinary circumstances and that the imminency prong
22 requires nothing less than an immediate emergency.  What's the
23 immediate emergency that you expect the evidence will show?
24         MS. REYES:  Her interpretation of his threats made
25 it an -- to her, it was an immediate emergency.

1      THE COURT:  Anything else?

2      MS. REYES:  Her prior experience -- her prior abuse

3  by him.  Her prior abuse by a group of males who gang-raped

4  her when she was 13.  So that came into play because

5  Mr. Oquendo also pimped her out to a couple of his friends for

6  money.  The totality of the abuse that she endured from him in

7  the form of threats, in the form of physical abuse and mental

8  and verbal, goes toward her perceiving certain things

9  differently than a normal person would.

10      And, if I may, there's a case that I provided to the

11  Government that I have a copy for the Court.  It's a Fifth

12  Circuit case from 1977.  This case stands for the proposition

13  that I don't have to pursue a duress defense in order to show

14  lack of criminal intent by a defendant who claims to have been

15  illegally coerced.

16      May I approach with that?

17      THE COURT:  Yes, please.

18   (Court at ease.)

19      THE COURT:  Anything else you want to add to your

20  proffer on the justification defense?

21      MS. REYES:  No, Your Honor, not unless the Court has

22  any additional questions.

23      THE COURT:  Okay.  I don't have any additional

24  questions.  I'm going to adhere to my prior ruling.  I'm going

25  to exclude evidence of duress, and I'll accept your proffer

1    for purposes of the record that you would have been able to

2    demonstrate the items through the presentation of witnesses

3    that you articulated into the record and note that I'm

4    excluding them for the reasons I previously indicated.  I

5    don't think that the -- primarily, that the immediacy of harm

6    element, the imminent danger component of the justification

7    defense, is established by the facts that you have recited.

8            So are you ready to proceed?

9            MS. REYES:  So, Your Honor, based on the Court's

10   ruling, do you want the proffer to occur outside of the

11   presence of the jury?

12           THE COURT:  If you think you need to add it, I'll

13   give you the opportunity to do it.  Maybe we can do it while

14   the jury is deliberating.  I think the proffer -- well, I

15   think the proffer that you've made orally is sufficient,

16   unless the Government has any issues with it.  So what I meant

17   to do when I mentioned it was to note that for purposes of the

18   record you will -- you would have been able to establish all

19   of those facts through your witnesses.  If you want to

20   actually call your witnesses, I'll give you a chance to do

21   that at some point when the jury is not here.

22           MS. REYES:  Okay.  Is the Court also ruling that I

23   cannot bring in any testimony regarding lack of criminal

24   intent based on her diminished capacity and intellectual

25   disability?

1          THE COURT:  Yes.  I'm going to exclude that evidence

2     as well.

3          MS. REYES:  Okay.  So for purposes of my defense, I

4     guess, based on your ruling, I'm only going to be allowed to

5     call Mr. Connor and Agent Spadafora.

6          THE COURT:  Yes.  I think that's right based on what

7     you told me last night.

8          MS. REYES:  Okay.

9          THE COURT:  You can bring our jury back in now.

10         MS. REYES:  Your Honor, may I retrieve an exhibit to

11    provide to Ms. Valente?

12         THE COURT:  Yes.

13       (Jury in at 9:28 a.m.)

14         THE COURT:  Welcome back, ladies and gentlemen.  I

15    hope you had a pleasant evening.  The delay this morning is my

16    fault, so I apologize for that only to the extent that, when

17    you left last evening, the Government indicated that they

18    had -- they were prepared to rest their case in chief.  I

19    think I told you when we started that there are usually some

20    procedural things I have to attend to at that point in the

21    trial, so I took care of those things this morning before you

22    arrived.

23         Am I correct, Ms. Rivera, that the Government wishes

24    to announce it's resting its case in chief?

25         MS. RIVERA:  That's correct, Your Honor.

1           THE COURT:  All right.  So, Ms. Reyes, is the

2     defense ready to proceed?

3           MS. REYES:  Yes, Your Honor.

4           THE COURT:  All right.  Call your first witness.

5           MS. REYES:  Richard Connor.

6           THE COURT:  Mr. Connor, if you'll come all the way

7     forward to the front of the courtroom, my courtroom deputy

8     will give you place you under oath and give you some seating

9     instructions.

10          THE COURTROOM DEPUTY:  Raise your right hand.  All

11    right.

12                    RICHARD D. CONNOR, JR.,

13    was called as a witness on behalf of Defendant and, having

14    been duly sworn, testified as follows:

15          THE WITNESS:  I do.

16          THE COURTROOM DEPUTY:  Thank you, sir.  If you'd

17    have a seat in the witness stand to your right.

18          THE WITNESS:  Right here?

19          THE COURTROOM DEPUTY:  Yes, sir.

20          Sir, once seated, if you'll adjust that microphone

21    in front of you so you're speaking directly into it, and state

22    your name and spell your name for the record.

23          THE WITNESS:  Richard Donald Connor, Jr.,

24    C-o-n-n-o-r.

25          THE COURTROOM DEPUTY:  Thank you.

*Testimony of Richard D. Connor, Jr.*                                    **13**

1          THE COURT:  You may inquire, Ms. Reyes.

2          MS. REYES:  Thank you, Your Honor.

3                    DIRECT EXAMINATION

4    BY MS. REYES:

5    Q    What do you do for a living?

6    A    Computer and digital forensics.

7    Q    How long have you done this?

8    A    Full time since 2006.

9    Q    Have you been retained by my office?

10   A    Yes.

11   Q    And are you working for free?

12   A    No.

13   Q    How much are you getting paid?

14   A    In this case, $150 per hour.

15   Q    And is that a discounted rate?

16   A    It is.

17   Q    In what capacity are you working on this case?

18   A    I, and generally in this case, analyze digital devices

19   and data, such as cell phones in this case.

20   Q    What is your educational background?

21   A    I graduated from Princeton University in 1982.  I

22   graduated from Stetson University College of Law in 1986.  And

23   I have a certificate in computer forensics from Oregon State

24   University in 2006.

25   Q    Are you a certified computer examiner?

*Testimony of Richard D. Connor, Jr.*                                    **14**

1   A    I have several certifications.  Yes, that's one of them.

2   Q    Okay.  And is that called a CCE?

3   A    Yes.

4   Q    What is that?

5   A    It's a certification provided -- sponsored by an

6   independent organization where you apply, you have to go

7   through a background check, you have to pass an exam, and then

8   you have to get recertified every two or three years, and I've

9   been certified as a CCE since around 2008 or '9, I think.

10  Q    And when has been your last recertification?

11  A    That one, probably about two years ago now.

12  Q    Are you a certified forensic computer examiner?

13  A    Yes.

14  Q    And what is that?

15  A    That's sponsored by IACIS, which originally was law

16  enforcement only.  Several years ago they opened it up to

17  civilian people like myself.  So I applied, got accepted, and

18  went through the program to get the certification, which is

19  the most grueling one I've been through.  It lasts six months,

20  and I completed it successfully.  I recertified that, I

21  believe, last year, and that's the one that most law

22  enforcement personnel have.

23  Q    Are you a member of professional organizations related to

24  computer forensic examinations?

25  A    Yes.

1    Q    And what are those or some of them?

2    A    The group that sponsors the CFCE is IACIS, the

3    International Association of Computer System Examiners.  I

4    forget the exact acronym.  So I'm an associate member.  I'm an

5    associate member because you have to be law enforcement to be

6    a full member.  The CCE is sponsored by -- I'm drawing a blank

7    on that now too.

8    Q    International Society of Forensic Computer Examiners?

9    A    Yes.  ISCFE.  So I'm a member of that based on my

10   certification also.  And there's a couple others.

11   Q    Okay.  A couple others.  Does that include the Digital

12   Forensics Certification Board?

13   A    Yes.  The DFCB -- they have a certification that I have,

14   which is DFCP, which is digital forensic certified

15   practitioner.

16   Q    And what about the Consortium of Digital Forensic

17   Specialists?

18   A    That's another organization that I'm a member of also.

19   Q    Have you testified previously in court regarding your

20   forensic examinations?

21   A    Yes.

22   Q    And in what kind of cases?

23   A    All kinds of cases.  I do criminal cases.  I do civil

24   cases and -- in state and federal court, and I've testified in

25   arbitrations and before various boards also.

*Testimony of Richard D. Connor, Jr.*                                 **16**

1          MS. RIVERA:  Your Honor, we don't mean to interrupt;

2    however, we will stipulate to his qualifications in the field

3    of digital forensics.

4          THE COURT:  I'll leave it to Ms. Reyes to decide

5    whether or not she wants to explore his qualifications.

6    BY MS. REYES:

7    Q    Have you been qualified as an expert in the Middle

8    District of Florida?

9    A    Yes.

10   Q    In approximately how many trials?

11   A    Not sure.  I've testified in 35 trials.  A good number of

12   them have been in federal court and in this district, but I do

13   not have the exact number.

14   Q    And has that been in your capacity as a computer forensic

15   examiner?

16   A    Yes.

17   Q    How many times have you been -- how many times have you

18   testified as an expert?

19   A    In trials, I think 35 times.  Total, about 160 cases, and

20   that's by testifying at trial, testifying in hearings,

21   testifying in depositions, or testifying by sworn affidavit.

22   Q    Do you own software to assist you in your investigation?

23   A    Yes.

24   Q    And does that software -- does that forensic software

25   make changes to what you're looking at?

*Testimony of Richard D. Connor, Jr.*                              *17*

1   A     No.

2   Q     And why not?

3   A     Part of the forensic process is that you do not alter the

4   material that you're examining.  So forensic software is read

5   only.  It accesses, analyzes, and interprets the data but in

6   a way that it does not change it.  And the way we know that

7   is we use hash values.

8        A hash value is like a digital fingerprint.  So, like, a

9   cell phone, for example, we -- we don't turn on the phone and

10  look at it and manipulate it to examine it.  We extract the

11  data from it and examine the extracted data.  And part of

12  that extraction process is that the software we use and the

13  hardware calculates the hash value of the data that it

14  extracts from the phone so we have a digital fingerprint.

15       And then it -- when we extract the data and load it into

16  our software, we -- it calculates the hash value and tells us

17  if it matches.  If it matches, that means nothing has changed,

18  and so then we can do our analysis.  We can do our exam.  And

19  at any point during that or after that, we can recalculate the

20  hash value and see that it's still the same as the original

21  extraction, and that means that the data we are examining has

22  not been altered at all.  Because if you alter one 0 to a 1 in

23  the data, the hash -- and we calculate the hash value, it'll

24  be a completely different hash value, and it'll tell you that

25  the data has changed.

*Testimony of Richard D. Connor, Jr.*                                    **18**

1    Q    How many hard drives have you examined or phones?

2    A    Thousands.

3    Q    Have you conducted computer forensic examinations in

4    cases involving allegations of sexual misconduct?

5    A    Yes.

6    Q    Allegations of possession of child pornography?

7    A    Yes.

8    Q    And approximately how many child pornography cases have

9    you examined?

10   A    Somewhere in the neighborhood of 300.

11   Q    And in those cases could you tell the members of the jury

12   how many photographs of child pornography you've seen?

13   A    No.  Thousands.

14   Q    Is a computer forensic examiner able to discover items

15   that have been deleted?

16   A    Generally, yes.

17        MS. REYES:  So, Your Honor, at this time I would

18   tender Mr. Connor as an expert in the area of digital forensic

19   examination.

20        THE COURT:  Any voir dire by the Government?

21        MS. RIVERA:  No, Your Honor.

22        THE COURT:  All right.  Ladies and gentlemen, as I

23   mentioned to you previously, the rules provide that certain

24   expert -- certain witnesses who have demonstrated expertise in

25   a particular area are permitted to offer opinion testimony.

*Testimony of Richard D. Connor, Jr.*                              **19**

1    I'm going to permit Mr. Connor to offer testimony in an

2    opinion nature in the area of digital forensic examinations.

3            You are to give that testimony the same weight that

4    you would any other and consider it in light of all of the

5    criteria that I've described for you previously and that I'll

6    repeat for you at the end of the case in terms of assessing

7    the credibility of witnesses.

8            You may proceed, and the witness will be permitted

9    to offer opinion testimony pursuant to Rule 702.

10   BY MS. REYES:

11   Q    Mr. Connor, did you examine Ms. Litzky's iPhone?

12   A    Yes.

13   Q    And what type of extraction was it?

14   A    It was a Cellebrite extraction conducted by a law

15   enforcement agent.

16   Q    Okay.  And is Cellebrite a software that you're familiar

17   with?

18   A    Yes.  I have a Cellebrite license and my own Cellebrite

19   software and hardware device, so I use that regularly.

20   Q    Okay.  And do you remember how many images or videos you

21   found on her iPhone?

22   A    No.

23   Q    Do you remember the number from July 2, 2016?

24   A    I think it was somewhere in the neighborhood of around a

25   dozen or so on that day.

1    Q    Okay.

2    A    Or maybe even more.  Maybe 12 to 20 or so, I think.

3    Q    Okay.  Did you get an opportunity to look at other

4    devices in this case?

5    A    Yes.

6    Q    And one of the devices include -- do you remember if one

7    of the devices included ooVoo messages?

8    A    Yes.

9    Q    Can those ooVoo messages match -- like, were those

10   thumbnails?

11   A    The images associated with them?  I believe they were.

12   Q    Okay.  And can you extract data from the thumbnail?

13   A    Metadata?

14   Q    Yes.

15   A    Metadata -- there's generally not metadata present in the

16   thumbnails.  It's usually in the original image.  I think that

17   was the case here.

18             MS. REYES:  Okay.  Your Honor, if we could publish

19   Government Exhibit 12-A.

20             THE COURT:  Yes.

21   BY MS. REYES:

22   Q    Mr. Connor, we're going to look at the images extracted

23   from July 2nd of 2016.

24        Do you recall --

25             MS. REYES:  If we can pause it.

*Testimony of Richard D. Connor, Jr.*                                    **21**

1   BY MS. REYES:

2   Q    Do you recall that being one of the photos from her phone

3   on July 2nd --

4   A    Yes.

5   Q    -- 2016?

6        Do you remember what time that photo was taken?

7   A    I believe that was the first one.  I think that was taken

8   around 7:20 in the morning.

9        MS. REYES:  Okay.  If we could play the next.

10  BY MS. REYES:

11  Q    We're seeing JPEGs and movies at the end of these file

12  names.

13       Are you familiar with Live Photos?

14  A    I am somewhat familiar with it, yes.

15       MS. REYES:  If we could pause it, please.

16  BY MS. REYES:

17  Q    And what is a live photo?

18  A    It's an iPhone feature that basically creates a -- when

19  you press the button to take a picture, it creates a very

20  short one- to two-second video, which Apple, I guess, refers

21  to as a "live photo."  So you get a little bit of movement in

22  your photo, essentially, and it's saved as a video, and the

23  photo JPEG is saved also.

24  Q    Okay.  Could you tell if all of her images taken that

25  day, if they were all live photos?

*Testimony of Richard D. Connor, Jr.*                                    **22**

1   A    They would appear to be.  The video files, as we'll see,

2   are one to two seconds each.  It's almost -- it would be even

3   hard to press your phone to start and stop that quickly.  So

4   it would appear to be that they were live photos, where you

5   just click the photo and it creates a short video at the

6   same time and they're saved with the same name, a Picture 3,

7   Video 3, Picture 4, Video 4.

8   Q    Okay.  In looking at this photo, what is the angle of the

9   photo?

10  A    It looks like somebody's standing or possibly sitting but

11  looking down at the floor where the dog is in some kind of bag

12  or duffel or something.

13  Q    Okay.  And this appears to be 10 seconds long.  Would

14  this be a live photo?

15  A    No, I don't believe that would be.

16          MS. REYES:  Okay.  If we could play the next one.

17          Your Honor, may I have a brief moment to confer with

18  Ms. Valente?

19          THE COURT:  Yes.

20          MS. REYES:  If you can pause it.

21  BY MS. REYES:

22  Q    Sir, this is saved as a JPEG; correct?

23  A    Yes.

24  Q    But it's ten seconds long, so how can you explain that to

25  the members of the jury?

*Testimony of Richard D. Connor, Jr.*                              **23**

1   A    You're looking at it in video software.  VLC is video

2   software, and I -- I use VLC.  I usually do not use it to look

3   at videos, but it looks like it's saying that each JPEG, which

4   does not have a length, is ten seconds.  I think if you look

5   at it in picture software, it's just a standard JPEG.  There's

6   no length to it.  It's not a video; it's a picture file.

7   Q    Okay.  If we could --

8   A    There is an associated video file with it, but this is a

9   video -- an image file.

10       MS. REYES:  If we could go to the next one, please.

11  I'm sorry.  If we could leave that one on.

12  BY MS. REYES:

13  Q    Do you recall the view or the vantage point from that

14  video?

15       MS. RIVERA:  Objection, Your Honor.  The image

16  speaks for itself.

17       THE COURT:  Objection's overruled.

18       THE WITNESS:  Yeah.  It looks like somebody is just

19  a little bit higher than the side of the pool looking at the

20  pool, so possibly standing, possibly sitting.  But, I guess,

21  about four or five feet off the ground maybe.

22       MS. RIVERA:  Objection, Your Honor, as to the nature

23  of the testimony not being an expert in that field.

24       THE COURT:  Objection's overruled.

25       MS. REYES:  We can pause this.

*Testimony of Richard D. Connor, Jr.*                              **24**

1    BY MS. REYES:

2    Q    Does this appear to be a live photo or a movie?

3    A    Well, this is a JPEG, so it's an image file, not a video

4    file.

5    Q    Okay.  So would that be a live photo?

6    A    Well, there is an associated image, 0006 movie file.  So,

7    yes, it very well may be a live photo.

8             MS. REYES:  Okay.  Next one, please.

9    BY MS. REYES:

10   Q    What is Image 7?

11   A    It's an image of a young female.

12   Q    And do you have a -- do you remember the time that this

13   one was taken?

14   A    Roughly, these were taken in the afternoon.  I think

15   either -- I think it was around 4:00, 4:30 p.m., if I remember

16   correctly.

17   Q    Okay.  Would looking at a list of the videos from that

18   day and the photos -- would that refresh your recollection?

19   A    Yes.

20            MS. REYES:  Your Honor, I'm showing --

21            MS. RIVERA:  Objection, Your Honor, as to improper

22   foundation.  He didn't say he couldn't remember.

23            THE COURT:  Do you want to ask the foundational

24   question, see if he remembers without having his recollection

25   refreshed?

1    BY MS. REYES:

2    Q    Mr. Connor, you said that you think it was around 4:30?

3    A    Correct.

4    Q    Okay.  When you do the extractions, do the exact times

5    come out?

6    A    Yes.  To the second.  And I created a list of those in

7    this case of these pictures.

8    Q    Okay.  Would looking at a list refresh your memory as to

9    the time of this video?

10   A    Yes.  I recall they were approximately -- there were some

11   taken around 4:30 in the afternoon.  If I looked at the list,

12   I could tell you exactly the hour and the minute and the

13   second it was taken.

14         MS. RIVERA:  Objection, Your Honor, as to improper

15   foundation.

16         THE COURT:  Do you recall those times without having

17   reference to the list?

18         THE WITNESS:  I recall there was some taken at 4:30.

19   I'm just assuming this was one of them.  I do not know for

20   sure.

21         THE COURT:  Objection's overruled.  You can provide

22   the list to the witness.

23         Do this for me, Mr. Connor:  When you're asked a

24   question, if you can recall the answer without looking at the

25   list, tell me and answer the question.

*Testimony of Richard D. Connor, Jr.*                              **26**

1           THE WITNESS:  Yes, sir.

2           THE COURT:  If you need to look at the list to

3    refresh your recollection, tell me that, and then I'll permit

4    you to look at the list.

5           THE WITNESS:  Yes, sir.

6    BY MS. REYES:

7    Q    So we're going to continue looking at the JPEGs, and then

8    we'll go to the movies afterwards.

9           MS. REYES:  Your Honor, may I approach Mr. Connor?

10          THE COURT:  Yes.

11   BY MS. REYES:

12   Q    What was -- if you've had a chance to look at that, let

13   us know if your memory has been refreshed.

14   A    Yes.

15   Q    What time was this photo taken?

16   A    It was taken at 4:37:05 p.m. on July 2nd of 2016.

17          MS. REYES:  And if we could go to the next image.

18   Pause it, please.

19   BY MS. REYES:

20   Q    What time was this image taken?

21   A    I believe that these -- the next several were taken at

22   about the same time, around 4:30-something in the afternoon

23   that day.

24          MS. REYES:  If we could go to the next one.  If we

25   could pause it.

*Testimony of Richard D. Connor, Jr.*                                    **27**

1    BY MS. REYES:

2    Q    What time was this photo taken?

3    A    I believe the same -- about the same time, 4:37 p.m. on

4    that day.

5    Q    Were they seconds apart?

6    A    Yes.  They were -- yes, seconds.  I believe they all say

7    4:37, and then the seconds will be different.

8    Q    Okay.

9    A    I think the one I just did was what?  Five seconds?  So

10   this is maybe at 10 or 20 seconds after 4:37.

11   Q    So do you have the exact seconds on that list?

12   A    On that list, yes.

13   Q    Okay.  Would looking at the list refresh your memory as

14   to the exact seconds --

15   A    Yes.

16   Q    -- of this photo?

17        Okay.  If you could tell us.

18   A    This is No. 9.  16:37:40.  Forty-one was when the image

19   was taken, recorded.

20   Q    So 4:37:41?

21   A    Yes.  P.m.

22        MS. REYES:  Okay.  If we could play the -- oh, I'm

23   sorry.

24   BY MS. REYES:

25   Q    What is the vantage point of this photograph?

*Testimony of Richard D. Connor, Jr.*                              28

1    A    It's basically level with the girl, so I'm guessing about

2    three feet off the ground.  It's not down as, you know, if I

3    was taking it.

4          MS. RIVERA:  Objection, Your Honor, as to the

5    testimony.

6          THE COURT:  Sustained.  I overruled the original

7    objections.  I didn't realize you were going to be doing that

8    with each photograph.  I think the Government's objection is

9    well taken with respect to this witness's expertise is not in

10   photography or angles of photography, so I'll sustain the

11   objection.

12         MS. REYES:  Yes, Your Honor.  I was seeking his

13   opinion based on a layperson just looking at photographs.

14         THE COURT:  The photograph speaks for itself.  It's

15   not helpful, so it's not 702 testimony.

16         MS. REYES:  Okay.  We can play the next one.  If we

17   can pause it.

18   BY MS. REYES:

19   Q    What time was this photo taken?

20   A    Again, I believe it was 4:37 p.m.  I do not know the

21   seconds without looking at the list.

22   Q    Okay.  Would looking at the list refresh your memory?

23   A    Yes.

24   Q    Okay.  If you could look at the list.

25   A    This is No. 10, and the JPEG was taken one second after

*Testimony of Richard D. Connor, Jr.*                              **29**

1    the previous one at 4:30- -- this one was taken at 4:37:42.

2              MS. REYES:  Okay.  If we could go to 11, please.  If

3    we could pause it.

4    BY MS. REYES:

5    Q    What time was this photo taken?

6    A    I'd have to look at the list for the exact time.

7    Q    Okay.  If you could look at the list.

8    A    Number 11, basically the same time, 4:37:42.  Down to the

9    second, the same as the last one.

10   Q    How is that possible?

11   A    Press the button twice quickly.

12             MS. REYES:  If we can go to the next one.  If we can

13   pause it, please.

14   BY MS. REYES:

15   Q    Mr. Connor, how -- what time is this photo taken?

16   A    Photo 12, a second later, 4:37:43.

17             MS. REYES:  If we could go to the next one.

18   BY MS. REYES:

19   Q    What time was this one taken?

20   A    4:37:44.

21             MS. REYES:  If we could go to the next one.  If we

22   could pause it, please.

23   BY MS. REYES:

24   Q    What time was 14 taken?

25   A    4:37:45.

*Testimony of Richard D. Connor, Jr.*                                    **30**

1           MS. REYES:  If we could play the next one.

2    BY MS. REYES:

3    Q    What time was this one taken?

4    A    Fifteen was taken at 4:37:46.

5    Q    Sixteen, please.  What time was this one taken?

6    A    4:37:47.

7    Q    How -- 47, you said?

8    A    Yes.

9           MS. REYES:  Okay.  Sorry.  Seventeen is Government

10   Exhibit 12, so we'll go back to that.

11          If we could go to 18, please.  If we could pause it.

12   BY MS. REYES:

13   Q    What time was this one taken?

14   A    This is at 8:54:58 p.m.

15   Q    Okay.  8:54?

16   A    58.

17   Q    Okay.  So with the exception of 17, if you remember, were

18   9 through 17 taken within a minute?

19   A    Yes.  Within -- they were all 4:37 and some seconds, so

20   in a minute or less.

21   Q    So after 18, are there any other images of EL in this

22   case?

23   A    Not from that day.

24   Q    Okay.

25          MS. RIVERA:  Objection, Your Honor, as to the lack

1  of foundation regarding EL.

2          THE COURT:  Objection's overruled.

3          MS. REYES:  Your Honor, may I approach the clerk to

4  retrieve an exhibit?

5          THE COURT:  Yes.

6  BY MS. REYES:

7  Q    While that's getting brought up, in your extraction of

8  Ms. Litzky's phone, did you have access to a call log?

9  A    Yes.

10  Q    And how -- do you remember how far that went back?

11  A    No, not without looking at the report.

12  Q    Okay.  In your extraction of Ms. Litzky's phone, did

13  you -- were you able to locate any deleted materials?

14  A    In general?

15  Q    Yes.

16  A    Not that I recall.

17  Q    Okay.  Is it hard to extract data from an iPhone?

18  A    Not to extract, no.

19  Q    Okay.  What is it hard to do with the iPhone if it's not

20  to extract?

21  A    Are we talking about deleted data still?  No?

22  Q    Yes.

23  A    An iPhone, as in most phones these days -- it is very

24  difficult and becoming almost impossible to recover deleted

25  data.  It used to be rather easy.  That has changed with

*Testimony of Richard D. Connor, Jr.*                    **32**

1   recent versions of the phones and the operating systems that

2   they run.  Deleted data is often gone immediately upon

3   deletion now.

4   Q    Were you able to determine if there was deleted data on

5   Ms. Litzky's iPhone?

6   A    I don't -- in general?

7   Q    Yes.

8   A    I don't recall.

9   Q    Okay.  Were you asked to look for prepubescent children

10  engaged in sexual activity or lewd exhibition of genitalia?

11  A    Yes.

12  Q    And did you find that on --

13            MS. RIVERA:  Objection, Your Honor.

14            THE COURT:  The basis of your objection?

15            MS. RIVERA:  Improper expert testimony based on the

16  Court's ruling.

17            THE COURT:  Okay.  Objection's overruled.

18            Just as I told you with respect to Mr. Dufresne,

19  Mr. -- this witness's evaluation of the photographs and what

20  they constitute is -- he's being asked the question what he

21  was asked to look for.  What these photographs constitute is

22  in your domain.  You make that determination.

23            So, with that, you may proceed.

24  BY MS. REYES:

25  Q    Did you find any images on Ms. Litzky's phone or videos

*Testimony of Richard D. Connor, Jr.*                                    33

1    of prepubescent children engaged in sexual activity or lewd

2    exhibition of genitalia?

3             MS. RIVERA:  Objection, Your Honor.  Asking for the

4    ultimate conclusion.

5             THE COURT:  Objection's overruled for the reasons

6    that I just articulated.

7             THE WITNESS:  No, I did not find any.

8             MS. REYES:  If we could play 17, please.

9             MS. VALENTE:  Do you want the picture or the video?

10            MS. REYES:  The picture for now.  If we could pause

11   it, please.

12   BY MS. REYES:

13   Q    Mr. Connor, do you remember what time this was taken?

14   A    Not exactly.  It was about the same as the other ones,

15   about 4:37 p.m.

16            MS. REYES:  Okay.  If we could play one of the first

17   videos on 12-A.

18   BY MS. REYES:

19   Q    Is this a live photo as well?

20   A    This appears to be the video associated with the picture,

21   yes, so this would be the video portion.  It's about two

22   seconds long.

23            MS. REYES:  Okay.  If we could watch the next.

24   BY MS. REYES:

25   Q    Okay.  Would you say that that's -- even though it's a

1  movie, would that be a live photo?

2  A    It appears to be.

3  Q    Okay.  So would a live photo capture audio?

4  A    I believe so.

5           MS. REYES:  Okay.  If we could play the next movie.

6           Okay.  If we could play the next one.

7           If we could play No. 7.

8           If we could please play No. 8.

9           If we could please play No. 9.

10          If we could play No. 10, please.

11          If we could play 11, please.

12          If we could play 12, please.

13  BY MS. REYES:

14  Q    11 through 15, have those been live photos?

15  A    They could be.

16          MS. REYES:  Okay.  If we could play No. 16.

17  BY MS. REYES:

18  Q    And after 16, the last one for 4:37 is No. 17?

19  A    Yes.

20          MS. REYES:  Okay.  If we could please play the movie

21  for No. 17.

22          If we could play it one more time.

23          May I have a brief moment, Your Honor?

24          THE COURT:  You may.

25  BY MS. REYES:

*Testimony of Richard D. Connor, Jr.*                    **35**

1    Q    In your examination of Ms. Litzky's phone, did you also

2    look at her SMS messages?

3    A    Yes.

4    Q    In looking at the SMS messages, are you able to look at

5    what she's received as well as what she has sent?

6    A    Yes.

7    Q    Did your investigation reveal whether Image 17 had been

8    sent by Ms. Rose?

9    A    I saw no indication that it had been sent.

10            MS. REYES:  Nothing further, Your Honor.

11            THE COURT:  Thank you, Ms. Reyes.

12            Cross-examination, Ms. Rivera.

13                      CROSS-EXAMINATION

14   BY MS. RIVERA:

15   Q    But isn't it true that you don't really know if that

16   image was sent or not?

17   A    There was no message on the phone sending that file.

18   Q    You didn't find a message on the phone sending the file?

19   A    Correct.

20   Q    And isn't it correct that messages can be deleted from a

21   phone?

22   A    Correct.

23   Q    As well as images deleted from a phone?

24   A    Correct.

25   Q    Or videos can be deleted from a phone?

*Testimony of Richard D. Connor, Jr.*                                    **36**

1    A    Correct.

2    Q    And, specifically, in terms of iPhone, you have testified

3    how these images or videos, once deleted, basically, they're

4    almost immediately gone.  It's very difficult to extract that

5    data?

6    A    To recover that data.  Correct.

7    Q    Recover that data?

8    A    Correct.

9    Q    Thank you.

10        And so you really don't know anything as to how those

11   images or videos that were just played came to be on that

12   phone, the circumstances surrounding the production of those

13   images and videos?  You don't know that?

14   A    They -- I believe they were taken with the phone that

15   they're on.

16   Q    You do know that, but you don't know the circumstances

17   surrounding how those videos came to be.  What was -- for

18   example -- let me clarify.  You don't know what the defendant

19   was thinking when she created those videos or images?

20   A    That is correct.  I do not.  That is correct.

21   Q    You don't know what was going on in the residence at the

22   time when those videos or images were taken?

23   A    Correct, other than what's in them.  Correct.

24   Q    And as to that image, No. 5 -- we just saw the video

25   clip -- there was another child in the pool; is that correct?

*Testimony of Richard D. Connor, Jr.*                          37

1  A    I believe that's correct, yes.

2  Q    So somebody else took that video?

3  A    I do not know who took the videos.

4  Q    So that is -- it's fair to say that you don't know who

5  created any of those images or videos?

6          MS. REYES:  Objection to asked and answered.

7          THE WITNESS:  That is correct.

8          THE COURT:  Sustained.

9  BY MS. RIVERA:

10 Q    And in this case you did view the ooVoo images and videos

11 that were mentioned here -- I'm sorry.  I stand corrected,

12 actually.

13     The images, the ooVoo images -- you reviewed those?

14 A    Yes.

15 Q    And you saw the defendant's face depicted in some of

16 those images?

17 A    I believe that's correct.  It's been a while.

18          MS. RIVERA:  If I may, Your Honor, retrieve

19 Government Exhibit 16?

20          THE COURT:  Yes.

21          MS. RIVERA:  Your Honor, may I consult with

22 Ms. Valente for a minute?

23          THE COURT:  Yes.

24 BY MS. RIVERA:

25 Q    Sir, we just published momentarily -- I'm not sure if --

*Testimony of Richard D. Connor, Jr.*                              **38**

1    did you have an opportunity to view it on your screen?

2    A    Yes.

3    Q    Do you recognize the defendant's face in -- does that

4    refresh your memory seeing her face in some of those images?

5    A    It's my understanding that it's supposed to be her.

6    Q    And you saw some of the actual -- you saw most of these

7    images or all of these images?

8    A    This phone that had the ooVoo on it?

9    Q    Yes.

10   A    I looked at a lot of them.  I can't tell you if I looked

11   at every single one, but I did look at a lot of them, yes.

12   Q    Would you agree that in most of those images the children

13   are exposed in a sexual manner?

14   A    The ones we looked at, yeah, could be interpreted that

15   way.

16   Q    Would you say that they're being exposed in a sexual

17   manner to the viewer?

18            MS. REYES:  Objection to asked and answered.

19            THE COURT:  Sustained.

20   BY MS. RIVERA:

21   Q    Did you perform the extractions in this case?

22   A    No.

23   Q    So what exactly did you have an opportunity to review?

24   A    Yeah.  As I said, law enforcement extracted the data from

25   the devices.  What they then do in this case and every case is

*Testimony of Richard D. Connor, Jr.*                              **39**

1    they make a copy of that extraction, put it on a hard drive,

2    and make that hard drive available to me.

3         So I bring my computer with my Cellebrite software or

4    whatever software I'm using.  I attach the hard drive that

5    they provided to my computer, and that has the extracted data

6    on it.  And so then -- and it has the same hash values that

7    are calculated and everything.  So then I examine the data --

8    a copy of the data that law enforcement extracted from the

9    device.

10   Q    And how many times did you have an opportunity to review

11   that evidence in this case?

12   A    In this case, at least three times.

13   Q    Okay.  And about -- you said you had a rate of about $150

14   an hour.  About how many hours have you worked on this case?

15   A    I could not tell you.  I think each exam was a couple

16   hours.  I do not look at that before I come over here, so I

17   cannot tell you.

18   Q    Now, as to the ooVoo images that were mentioned, you

19   indicated that you're not sure if the images were thumbnails;

20   is that correct?

21   A    Correct.

22   Q    And what are thumbnails?

23   A    On a phone, when you get a picture, the operating system

24   generally creates a thumbnail, and what that is -- so when you

25   go to the phone's gallery or picture app, you see a thumbnail

*Testimony of Richard D. Connor, Jr.*                    **40**

1    of the actual full-size photo.  So whenever a phone is taken,

2    there's usually -- or a picture is taken or put on a phone, a

3    thumbnail is usually created, which is a miniature version of

4    the original.

5         What was the question again?  Did that answer it?

6    Q    What is a thumbnail?

7    A    Yeah.  So it's a miniature version of the full-size

8    picture to pull up quickly to show in the phone photo gallery

9    app and things of that nature.

10   Q    And you mentioned that you don't believe that there was

11   metadata present in the thumbnails.  What did you -- what are

12   you referring to when you say "metadata"?

13   A    Yeah.  When you take a picture with the phone, embedded

14   within the picture file is what we call "metadata," which is

15   information, like the date and time it was taken, the make

16   and model of the device, the camera or phone, maybe the GPS

17   coordinates, and things of that nature.  That is stored in the

18   original image.  When the thumbnail is created, that metadata

19   is generally not located in the thumbnail.

20   Q    And in connection to your investigation, did you actually

21   look as to the device locations that were actually saved onto

22   the phone?

23   A    Are we talking about the ooVoo?

24   Q    Yes.  As to the Moto G XT1031?

25   A    Yeah.  I did that during my first exam.  And I looked at

*Testimony of Richard D. Connor, Jr.*                                    41

1    that.  I don't remember where it was or --

2    Q    Okay.  And you also don't remember whether there was

3    metadata present or not on those thumbnails?

4    A    In the files themselves.  Correct.

5    Q    Okay.  And as to the images and videos that were just

6    referred to in court, you really don't know how those images

7    were taken, if someone was sitting or standing.  You don't

8    know anything about that; right?

9    A    That is correct.

10          MS. RIVERA:  Okay.  I have no further questions,

11   Your Honor.

12          THE COURT:  Thank you.

13          Any redirect?

14          MS. REYES:  Briefly, Your Honor.

15                     REDIRECT EXAMINATION

16   BY MS. REYES:

17   Q    In discussing what you don't know about the Moto GT, did

18   I focus your attention on any specific device to examine?

19   A    Well, the thrust of the case, from my perspective, was

20   Ms. Litzky's iPhone.  There were numerous devices that law

21   enforcement extracted and that I did look at, but the main one

22   was the iPhone.

23   Q    Okay.  And do you remember what number the video of the

24   pool was?

25   A    No.  It was -- that was taken around 2:00 in the

*Testimony of Richard D. Connor, Jr.*                                    **42**

1    afternoon, I think, so maybe around 5:00 or 6:00.

2    Q    Okay.  Would looking at your -- the list refresh your

3    memory as to the video?

4         MS. RIVERA:  Asked and answered, Your Honor.  This

5    is cumulative.

6         THE COURT:  Objection's overruled.

7         THE WITNESS:  The pool video is taken around 2:00 in

8    the afternoon.  It would tell me which picture or pictures

9    were taken at 2:00 in the afternoon.

10   BY MS. REYES:

11   Q    Okay.  If you could please refer to it.

12   A    Yes.  Number 5 was taken at 2:41:44 p.m. on July 2, 2016.

13   That's the only one taken around that time, and I believe that

14   is the pool picture, No. 5.

15        MS. REYES:  Nothing further, Your Honor.

16        THE COURT:  Thank you.  May this witness be excused?

17        MS. REYES:  Yes, Your Honor.

18        MS. RIVERA:  Yes, Your Honor.

19        THE COURT:  Thank you, Mr. Connor.  If you're here

20   under subpoena, you're released from it.  You can go on about

21   your business.

22        Call your next witness.

23        MS. REYES:  Agent Spadafora.

24        THE COURT:  Agent Spadafora, if you'd come all the

25   way down to the front of the courtroom, please.  My courtroom

*Testimony of Michael Spadafora*                                    **43**

1    deputy will place you under oath.

2           THE COURTROOM DEPUTY:  Please raise your right hand.

3                        MICHAEL SPADAFORA

4    was called as a witness on behalf of Defendant and, having

5    been duly sworn, testified as follows:

6           THE WITNESS:  I do.

7           THE COURTROOM DEPUTY:  Thank you, sir.  You can have

8    a seat in the witness stand to your right.  And, Agent, once

9    seated, if you'd adjust that microphone in front of you so

10   you're speaking directly into it, and if you'd state your name

11   and spell your name for the record.

12          THE WITNESS:  My name is Michael Spadafora,

13   S-p-a-d-a-f-o-r-a.

14          THE COURTROOM DEPUTY:  Thank you.

15          THE COURT:  You may inquire.

16                      DIRECT EXAMINATION

17   BY MS. REYES:

18   Q    Good morning, sir.

19   A    Good morning.

20   Q    Who do you work for?

21   A    I work for the Brevard County Sheriff's Office.

22   Q    And in what capacity?

23   A    I'm an agent in the SORT unit, Sexual Offender

24   Registration and Tracking.

25   Q    And how long have you been a member -- or an agent in

1    this unit?

2    A    Since 2007.

3    Q    And what are your duties as an agent with the SORT unit?

4    A    I investigate child pornography cases and also people who

5    try to solicit children while they're online.

6    Q    How long have you worked for the Brevard County Sheriff's

7    Office?

8    A    For approximately 21 years.

9    Q    Okay.  As a member of the SORT unit, are you also

10   cross-sworn with any federal agencies?

11   A    I am.  The Department of Homeland Security

12   Investigations.

13   Q    How long have you been with them?

14   A    Approximately around 2007 also.

15   Q    What are your duties with that agency?

16   A    Basically the same: investigate child pornography cases

17   and also persons who try to solicit children while they're

18   online.

19   Q    Have you received training regarding the performance of

20   your duties?

21   A    I have.

22   Q    And what types of trainings have you received?

23   A    Numerous trainings in computer investigations, conducting

24   undercover investigations, some interview classes.

25   Q    Have you ever received training in investigating domestic

**Testimony of Michael Spadafora**                                        **45**

1    violence cases?

2    A    There might have been some in-house trainings on that.

3    Q    Did you take part in interviewing Ms. Litzky?

4    A    I did.

5    Q    And what was your role in that?

6    A    I assisted Agent Stake in the interview.

7    Q    How -- approximately how many interviews were you a part
8    of?

9    A    Two.

10   Q    Were you a part of sitting down with Ms. Litzky's prior
11   attorney and speaking to Agent Stake along with Ms. Miranda
12   Rivera?  Were you a part of that interview?

13   A    I don't believe so.

14   Q    Okay.  So in your first interview with Ms. Litzky, did
15   you notice if she had any speech impediments?

16   A    Yes.  I believe she had a speech impediment, yes.

17   Q    Did that render your interview impossible?

18   A    It did not.

19   Q    Okay.  How did it affect your interview?

20   A    Sometimes she would say things that it was hard to
21   understand, but then she would spell -- like, I think there
22   was two times we couldn't understand a street she lived on.
23   She spelled it for us.  And there was another time there was a
24   dating site that we had a hard time understanding what the
25   dating site was, and she also spelled that for us.

*Testimony of Michael Spadafora*                                    **46**

1    Q    Were there -- could you think of any other times

2    throughout your interview -- I think it was a long time ago --

3    where you had trouble understanding her?

4    A    There may have been other times.  Those are the two that

5    stick out.

6    Q    Okay.  When she was with you, do you remember how she

7    was, her demeanor for the first interview, September 15th of

8    2016?

9    A    She was cooperative.  She came in.  She was pretty

10   cooperative.

11   Q    Did she -- at the end of the interview, did she give you

12   her cell phone?

13   A    We -- we seized her cell phone.

14   Q    Okay.  Prior to you seizing it, did she consent to you

15   going through it?

16   A    Yes.  She said we could have consent to go through her

17   phone, yes.

18   Q    Okay.  But in speaking to her, did you make a

19   determination that there was contraband on her phone?

20   A    Yes.

21   Q    Okay.  So after you seized it, do you know what happened

22   next?

23   A    I believe Agent Stake wrote a search warrant for that

24   phone.

25   Q    Okay.  So was your involvement in this case limited to

**Testimony of Michael Spadafora**                                        47

1   just helping interview Ms. Litzky?

2   A    Yes.

3   Q    Okay.  Have you interviewed anybody else in this case?

4   A    Mr. Oquendo, one interview with him.

5   Q    Have you interviewed anybody else?

6   A    No, I did not.

7   Q    Okay.  And when was your interview with -- or your

8   assistance in interviewing Mr. Oquendo?

9   A    I believe it was September 15, 2016.  I'm not sure of the

10  exact date, but I believe that was the day.

11  Q    Okay.  Do you believe that was the last time you ever

12  spoke to him?

13  A    Yes.

14  Q    Okay.  Did you also interview Ms. Litzky a second time

15  with Agent Stake?

16  A    Yes, we did.

17  Q    Okay.  And can you explain to the members of the jury why

18  you went back to talk to her.

19  A    During the search of the phone, there was images of the

20  children on the phone that Agent Stake wanted to speak to her

21  about.

22  Q    And do you remember whether or not you guys specifically

23  told her that that conversation in February would be strictly

24  about the images on her phone?

25  A    I believe we said that we had questions about -- we

*Testimony of Michael Spadafora*                                    **48**

1    needed to speak with her further.  We had questions we'd like

2    to talk to her about, and I believe she was told about that

3    there was images found on the phone.

4    Q    Okay.  Would looking at a transcript of your interview

5    with her refresh your memory as to whether or not that's what

6    you told her in February 2017?

7            MS. RIVERA:  Objection, Your Honor.  He didn't say

8    he didn't remember.

9            THE COURT:  Objection's overruled.

10           THE WITNESS:  Yes.

11   BY MS. REYES:

12   Q    If you could please grab the black binder and turn to

13   Tab 8, lines -- page 2, lines 16 through 25, on 734 and then

14   the following page.

15   A    You're talking about where we talked about the door being

16   unlocked?

17   Q    Page 2 --

18   A    Oh, I'm sorry.  Page 2.  Okay.

19   Q    Lines 16 through 25.

20   A    Okay.

21        And then you said the following page also?

22   Q    Yes, sir.  Lines 1 through 8.

23   A    Okay.

24        Okay.  Yes.

25   Q    Okay.  So did you guys -- has your memory been refreshed?

*Testimony of Michael Spadafora*                                    **49**

1    A    As far as that, yes.

2    Q    Okay.  And what did you and Agent Stake tell Ms. Litzky

3    the purpose of the February 2017 interview was?

4    A    Yeah.  Once again, that there was images that was found

5    on her phone.  We wanted to talk to her about that.

6    Q    Okay.  Do you remember her denying taking the photo that

7    was on her phone?

8    A    I think, through the course of the interviews, she denied

9    it, that she did take those photographs.

10   Q    Okay.  And then eventually at the -- almost at the very

11   end of the interview, did she eventually admit to taking that

12   photo?

13   A    Yes.

14   Q    And why do you think she would go from denying it several

15   times to then admitting it?

16   A    Ms. Litzky was afraid that DCF would find out about her

17   involvement in taking those photographs and that she would

18   lose her children.  She also said she didn't want to get

19   herself in trouble or Mr. Oquendo.

20   Q    Has -- do you know or -- do you know whether she actually

21   sent that picture?

22   A    I don't.

23   Q    Okay.  And that's because after February your involvement

24   ceased?

25   A    Yes.  I had no other involvement with the case.

*Testimony of Michael Spadafora*                                          **50**

1  Q    Okay.  How would you consider your tone during this

2  February interview?

3  A    I would say it was conversational.

4  Q    Do you believe that you are somewhat intimidating?

5  A    I don't think so.

6  Q    Could you understand why someone would be intimidated by

7  you?

8  A    I don't really.

9  Q    Okay.  Do you remember asking her if she participated in

10 these -- in the sexual exploitation of her children?

11 A    Yes.

12 Q    Okay.  And do you remember what her answer was?

13 A    Are we talking about her actually being involved touching

14 her children?

15 Q    Yes.

16 A    Yeah.  She said she had never touched her children.

17 Q    Do you remember asking her if she had participated?

18 A    In?  Participated?

19 Q    In the sexual exploitation of her children.  Do you

20 remember asking her that?

21 A    Yes.

22 Q    And do you remember there being confusion as to her

23 understanding of "participating"?

24 A    Yes.

25 Q    Okay.  Do you remember if you or Agent Stake actually had

**Testimony of Michael Spadafora**                                    **51**

1    to explain the word?

2    A    I believe Agent Stake did, yes.

3    Q    And why would Agent Stake -- if you know, why would she

4    try to define the word for the suspect?

5    A    Because she said -- going back, I believe she said she

6    didn't, but then she said she did, and we were trying to

7    clarify that she knew what she was saying, that she did

8    participate in the sexual abuse of her children.

9    Q    Okay.  Do you remember you or Agent Stake putting words

10   in her mouth throughout that interview?

11   A    No, I don't.

12   Q    Okay.  Do you remember allowing Ms. Litzky to finish her

13   statements to you?

14   A    There was several -- several times where I -- we

15   interrupted her, and it was -- yeah, we did interrupt her

16   several times because it appeared she was not being truthful,

17   so we stopped her and backed up and went forward.

18   Q    Is that a common tactic in law enforcement?

19   A    Is it a common tactic?  I mean, it's done in interviews

20   all the time.

21   Q    Okay.  For what purpose?

22   A    To keep a person on track with what you're trying to talk

23   about.

24   Q    Okay.  So you believe that by the time you interviewed

25   her in February, after having interviewed her in September,

**Testimony of Michael Spadafora**                                    **52**

1  that she -- that she became a suspect in the case?

2  A    Yes.

3  Q    Okay.  Did she become a suspect in the case in September

4  of 2016 or by the time you interviewed her again in February?

5  A    I would say she began to become a suspect when she said

6  she had images of the children on her phone.

7  Q    So that was in September of 2016?

8  A    That's correct.

9  Q    Okay.  Do you remember asking her if she would be willing

10 to submit to a polygraph?

11 A    Yes.

12 Q    And do you remember the reason for that?

13 A    Yeah.  I believe it was -- it had to do with -- all the

14 while she said that Mr. Oquendo never threatened her or hit

15 her, and then she mentioned something to the effect of he was

16 going to get the -- if she didn't send him images, he was

17 going to get the boys to come to the house.  But then, when we

18 clarified that and said had he made that threat before, she

19 said he had made that threat a lot of times.

20     I told her, basically, I find that hard to believe, asked

21 her if she ever reported that to the police.  She said she

22 hadn't.  So I -- I asked her if she would like to take a

23 polygraph on that question alone.

24 Q    Do you remember if that was your September interview or

25 your February interview?

*Testimony of Michael Spadafora*                                    **53**

1    A    I want to say it might have been February.

2    Q    Okay.  In February, after your interview with her, was

3    she arrested?

4    A    No, she was not.

5    Q    Okay.  Do you remember when she got arrested in this

6    case?

7    A    I don't.

8    Q    Okay.  Between February of 2017, if that's when you

9    mentioned the polygraph, through today, do you know if -- if

10   your -- the Brevard County Sheriff's Office has asked her to

11   submit to a polygraph regarding that issue?

12   A    I don't believe so.

13   Q    Okay.  But your office -- your agency -- do they allow

14   for you to do that to suspects?

15   A    Yes.

16   Q    Besides interrupting Ms. Litzky, did you do anything else

17   to stop her from answering questions?

18   A    I don't believe so.

19   Q    In your 23 years of law enforcement --

20   A    Twenty-one.

21   Q    In your 21 years of law enforcement, do you believe that

22   false confessions exist?

23   A    Do false confessions exist?

24   Q    Yes.

25   A    Yes.

*Testimony of Michael Spadafora*                                    **54**

1    Q    Have you heard of the Central Park 5?

2    A    No.  I'm sorry.  It doesn't ring a bell.

3              MS. REYES:  May I have a brief moment, Your Honor?

4    BY MS. REYES:

5    Q    In dealing with Ms. Litzky for two separate occasions,

6    other than her speech impediment, did you identify any other

7    disability or challenge?

8              MS. RIVERA:  Objection, Your Honor.

9              THE COURT:  Objection's overruled.

10             THE WITNESS:  No, I did not.

11             MS. REYES:  Nothing further, Your Honor.

12             THE COURT:  Thank you.

13             Cross-examination.

14                      CROSS-EXAMINATION

15   BY MS. RIVERA:

16   Q    During this interview of -- during the interviews of the

17   defendant on September 5th -- September 15, 2016, did the

18   defendant appear to be of clear mind?

19   A    Yes.

20   Q    Did she appear to understand the seriousness and scope of

21   the investigation?

22   A    Yes, she did.

23   Q    Is it fair to say that, regarding Defendant's denials of

24   being involved in the sexual exploitation of her children, you

25   did not believe her?

*Testimony of Michael Spadafora*                                          **55**

1    A    That's correct.

2    Q    And is it fair to say that -- regarding the evidence that

3    you had available to you, then, on the February 3, 2017,

4    interview, specifically text messages, did they show any

5    threats from Mr. Oquendo to the Defendant?

6    A    No, they did not.

7    Q    Is it fair to say that the defendant changed her story

8    and minimized it in different ways during both interviews?

9    A    Yes.

10   Q    And, ultimately, you would agree that the defendant did

11   make admissions as to her involvement in sexually exploiting

12   the children?

13   A    Yes.

14   Q    And what did she have to say about how exactly did she

15   sexually exploit the children?

16   A    She said that she took the images, that she would

17   manipulate the child's vaginas and take pictures and send that

18   to Mr. Oquendo in order to get money and keep -- and make him

19   happy.

20   Q    Now, regarding those admissions, in this case did you

21   believe that the defendant falsely confessed to taking those

22   pictures?

23             MS. REYES:  Objection to ultimate issue.

24             THE COURT:  Sustained.

25   BY MS. RIVERA:

1    Q    Do you believe -- did you believe based on the

2    investigation at the time that her answer as to her sexual

3    exploitation of the children, that she was being truthful?

4    A    Yes.

5    Q    Is it fair to say that after your involvement in those

6    interviews of Oquendo and the defendant you didn't have

7    additional involvement in the investigation?

8    A    I did not have additional involvement, no.

9    Q    And regarding the defendant's -- strike that.

10         MS. RIVERA:  I have no further questions,

11   Your Honor.

12         THE COURT:  Any redirect?

13         MS. REYES:  Briefly, Your Honor.

14                   REDIRECT EXAMINATION

15   BY MS. REYES:

16   Q    Agent Spadafora, are you here under subpoena, under my

17   subpoena?

18   A    I am.

19         MS. REYES:  Nothing further, Your Honor.

20         THE COURT:  May this witness be excused?

21         MS. RIVERA:  Yes, Your Honor.

22         MS. REYES:  Yes, Your Honor.

23         THE COURT:  Ms. Reyes, may he be excused?

24         MS. REYES:  Yes, Your Honor.

25         THE COURT:  You're released from your subpoena.

1    Thank you, sir.  You can step down.

2              THE WITNESS:  Thank you all.

3              THE COURT:  Call your next witness.

4              MS. REYES:  Ms. Helen Hitchcock.

5              THE COURT:  Can I see the lawyers at sidebar just

6    briefly?

7         (Sidebar on the record.)

8              THE COURT:  So I just ruled that this issue with

9    respect to abuse is not coming in, and you immediately then

10   asked Mr. Spadafora whether there was any evidence of threats

11   in any of the -- you can't have it both ways, Ms. Rivera.

12             I'm going to permit you to offer testimony with

13   respect to whether or not there were threats that were made

14   because the Government continues to pursue this line even

15   though I've done everything in my power to try to point out to

16   it that it's not proper.  So --

17             MS. RIVERA:  Your Honor, the only thing I was trying

18   to do in cross was to address her questions on direct

19   regarding the polygraph as to the threatening -- the

20   threatening conduct with Oquendo and him sending the boys.

21   She pursued that, so I'm trying to address that on cross.  I'm

22   not trying to open the door.  I believe she was trying to open

23   the door by asking those questions.

24             THE COURT:  Both of you have introduced evidence on

25   this topic.  Both of you have done it in some instances

1    without objection on the other side, but I will tell you that

2    it's not fair for the Government to have it both ways.  You

3    cannot ask your agent to testify that there was no evidence of

4    any threat against Mrs. Litzky and then preclude the defense

5    from rebutting that.  And it's not fair, and I'm just not

6    going to permit it.  So I'm going to allow Ms. Reyes to

7    introduce testimony on that topic as to whether or not

8    Ms. Litzky had ever been threatened by Mr. Oquendo if she has

9    that evidence.  I don't know if she does, but if she does, I'm

10   going to permit it.

11            MS. RIVERA:  To what extent, Your Honor?

12            THE COURT:  Limited extent.

13            MS. RIVERA:  And defense brought this in opening

14   statement.  We didn't.

15            THE COURT:  You could have moved in limine to

16   exclude all of this.  You could have objected to it initially.

17   You never objected to it.  The Government has waived any

18   objection that it had to it initially.  The only time it came

19   up was when I addressed it at sidebar with my concerns about

20   it.  So -- and then even after I've addressed my concerns

21   about it, as I said, you continue to keep going back there.

22            So my -- my interest is to try and give Mrs. Litzky

23   a fair trial, and I'm not going to permit the Government to

24   create a picture from the evidence that she was never

25   subjected to any threats by Mr. Oquendo if, in fact, that's

1    not true.  I don't know whether it's true or not, but I'm

2    going to give Ms. Reyes the opportunity to introduce evidence,

3    if there is evidence, on that -- on that topic in a limited

4    way.  I'm not going to permit this -- just so you know,

5    Ms. Reyes, I'm not going to permit you to go into a lot of

6    these things that you described in your proffer about, you

7    know, her gang rape previously and that stuff.  Just as it

8    relates to Mr. Oquendo.  Okay?

9         MS. REYES:  May I step back to get a legal pad to

10   write some notes --

11        THE COURT:  Sure.

12        MS. REYES:  -- about what you're saying?

13        MS. RIVERA:  And as to Ms. Hitchcock's testimony,

14   she testified here in court previously that she did not see

15   any signs of physical abuse from Mr. Oquendo.  So as to a

16   proffer of the testimony, Your Honor, may we hear what she's

17   going to say different to what she's previously indicated?

18        MS. REYES:  All I'm going to ask of her is her

19   involvement on July 2nd and her knowledge of KL using

20   Ms. Litzky's phone.

21        THE COURT:  Okay.  So you're not going into --

22        MS. REYES:  Not with her.

23        THE COURT:  Okay.  All right.  Let's get this

24   witness done, and then we can worry about it.

25        (End of sidebar.)

1        THE COURT:  Is it Hitchcock?  Is that the right

2   name?  Ms. Reyes --

3        MS. REYES:  Yes, Your Honor.

4        THE COURT:  -- is it Hitchcock?

5        MS. REYES:  It is.  She's -- Your Honor, she'll be

6   here at 11:00 a.m.

7        THE COURT:  Okay.  What else do you have?

8        MS. REYES:  Based on the Court's ruling at sidebar,

9   I just need a little bit of guidance, and then I can call

10  another witness.

11       THE COURT:  Okay.  Why don't you-all step out for

12  just one minute, ladies and gentlemen.  Actually, I guess it's

13  about time for our break.  Why don't we do that now, and that

14  way -- let's come back at 11:00, and I'll sort this out

15  between now and then.

16       (Jury out at 10:43 a.m.)

17       THE COURT:  So if it'll be helpful to you,

18  Ms. Reyes, in the interest of fairness based on the

19  Government's examination of Mr. Spadafora and, frankly, some

20  of the other Government's witnesses, I'm going to permit you

21  to offer limited evidence on the question whether or not

22  Ms. Litzky was ever threatened by Mr. Oquendo, not any -- not

23  anybody else other than Mr. Oquendo, but I will permit you to

24  offer testimony, if you have it, that Mr. -- that Ms. Litzky

25  was threatened by Mr. Oquendo, assuming that you have

1    admissible testimony from a percipient witness on that point.

2            MS. REYES:  So by "ever threatened," Your Honor,

3    it's strictly a verbal -- a verbal assault, not a physical?

4            THE COURT:  No, no.  I'm not limiting it to physical

5    assault.  If this -- Mr. Spadafora was just asked whether or

6    not he saw any evidence in the text messages of any threats

7    made by Mr. Oquendo to Ms. Litzky.  He said that he did not.

8    I think Agent Stake said the same thing when she was on the

9    stand, although I don't have total recall of her testimony,

10   but I did make some notes.  But I am going to permit you to

11   offer testimony to address that subject of whether or not

12   Mr. Oquendo has during the course of the time of their

13   relationship subjected her to verbal or physical threats

14   because I think in fairness you should be permitted to do

15   that.

16           MS. REYES:  Okay.  And with that guidance,

17   Your Honor, I believe --

18           THE COURT:  Why don't we do this:  Let's take our

19   break.

20           MS. REYES:  Yes, Your Honor.

21           THE COURT:  You can talk -- see who your witness is,

22   review that with them, and we'll go from there.  We'll resume

23   at 11:00.

24           MS. REYES:  Yes, Your Honor.

25       (Recess at 10:45 a.m. until 11:06 a.m.)

*62*

1          THE COURT:  All right.  Back on the record.

2    United States v. Litzky, 18-cr-223.  All counsel and the

3    defendant are present.

4          Are you ready to proceed, Ms. Reyes?

5          MS. REYES:  Yes, Your Honor.

6          THE COURT:  Only other observation I wanted to make

7    on this issue of Mr. Oquendo's threats is that I also -- I

8    think it's relevant to the question of the truthfulness and

9    the voluntariness of the statements that were made by

10   Ms. Litzky to the agents during her interviews.  So for that

11   reason, in addition to what we discussed at the sidebar, I

12   think it's admissible.

13         Let's bring our jury back in, please.

14         Is the lady's name Hitchcock who's next?

15         MS. REYES:  Yes, but I'm going to call the father

16   first, Leonard Litzky.

17         THE COURT:  Okay.

18      (Jury in at 11:07 a.m.)

19         THE COURT:  Welcome back, ladies and gentlemen.

20         Call your next witness, Ms. Reyes.

21         MS. REYES:  Leonard Litzky, Your Honor.

22         THE COURT:  Mr. Litzky, make your way, if you can,

23   all the way down here to the front of the courtroom.  We're

24   going to seat you in this witness stand over here, and I'm

25   going to have my courtroom deputy place you under oath.

*Testimony of Leonard Litzky*                                    **63**

1    THE COURTROOM DEPUTY:  Mr. Litzky, that's fine right

2   there.  If you'll face me and please raise your right hand.

3                        LEONARD LITZKY

4   was called as a witness on behalf of Defendant and, having

5   been duly sworn, testified as follows:

6                   THE WITNESS:  I do.

7                   THE COURTROOM DEPUTY:  Thank you, sir.  You can have

8   a seat in the witness stand there.

9                   MS. REYES:  Your Honor, may I approach briefly to

10  move the exhibits?

11                  THE COURT:  Yes.

12                  THE COURTROOM DEPUTY:  And, Mr. Litzky, if you can

13  please adjust that microphone in front of you so you're

14  speaking directly into it, then state your name and spell your

15  name for the record.

16                  THE WITNESS:  Leonard Litzky, L-e-o-n-a-r-d.

17  Litzky, L-i-t-z-k-y.

18                  THE COURTROOM DEPUTY:  Thank you.

19                  THE COURT:  You may inquire.

20                  MS. REYES:  Thank you, Your Honor.

21                     DIRECT EXAMINATION

22  BY MS. REYES:

23  Q    Good morning, sir.

24  A    Good morning.

25  Q    How are you related to Ms. Litzky?

**_Testimony of Leonard Litzky_**                                    **64**

1   A    She's my daughter.

2   Q    Okay.  And what do you do for a living?

3   A    I'm retired now.

4   Q    What are you retired from?

5   A    New York City Parks and Recreation.

6   Q    Did you marry Ms. Litzky's mother?

7   A    Yes, I did.

8   Q    And did you guys eventually move out of New York?

9   A    Yes.

10  Q    And where did you go?

11  A    Down to Florida.

12  Q    Did you have any other children besides Ms. Litzky?

13  A    Yes.  I got two more children.

14  Q    Okay.  And when you moved to Florida, who -- who did you

15  live with?

16  A    I lived with Rose and my two children.

17  Q    Did your wife -- did you and your wife get divorced?

18  A    Yes.

19  Q    Did she stay out of state?

20  A    Yes.

21  Q    Okay.  Up until your daughter was seven years old, was

22  her mother a part of her upbringing?

23  A    No.

24  Q    Prior to seven, was her mother involved?

25  A    She was --

*Testimony of Leonard Litzky*                                    **65**

1    Q    Before your divorce, was she involved in her upbringing?

2    A    In the beginning, yes.

3    Q    Okay.  Once you moved to Florida with your daughters, was

4    the mother involved in their upbringing?

5    A    No.

6    Q    Did eventually -- did your ex-wife eventually move down

7    to Florida?

8    A    Yes.

9    Q    And did she eventually move in with you?

10   A    Yes.

11   Q    Can you explain to the members of the jury what was the

12   living situation like in October 2011 when KL was born -- KO

13   was born?

14   A    Living -- I don't remember.

15   Q    Okay.  Were you living with Ms. Litzky at the time?

16   A    No.  She moved in after her husband died because she had

17   nowhere to go.

18   Q    Okay.

19   A    So I took her in.

20   Q    Okay.  You're talking about your ex-wife?

21   A    Yes.

22   Q    Okay.  When ███████ -- when KO was born, who -- were you

23   living with your ex-wife?

24   A    When KO was born?

25   Q    Yes.

*Testimony of Leonard Litzky*                                     **66**

1   A    No.

2   Q    Okay.  So what was the living situation like in October

3   of 2011?

4   A    What?  They were living with -- real, real good.  They

5   took care of her, and I gave her a little help, and they were

6   doing good.

7   Q    Was Ms. Litzky living with you with KO?

8   A    In 2011, no.

9   Q    Okay.  Where were they living?

10  A    They were living with -- Rosie had one apartment, and I

11  had the other one with her.

12  Q    Were you guys next door to each other?

13  A    Yes.

14  Q    How often would you see Ms. Litzky?

15  A    Every day she came knocking on my door, so she'd spend

16  most of her time with me, and then she went -- she went back

17  to her house.

18  Q    Did you guys -- was your house separated by a backyard?

19  A    Yes.

20  Q    Okay.  And in this backyard did you guys have a pool?

21  A    Yes.

22  Q    Okay.  Did you ever meet Mr. Oquendo?

23  A    Yes, I met him.

24  Q    Okay.  When did you meet him?

25  A    Well, Rosie brought him home one day to me to meet him,

**_Testimony of Leonard Litzky_**                                    **67**

1   and I met him, and he said then to -- Rosie went inside the

2   house, and then he goes to me, "Mr. Litzky, I have something

3   to tell you."

4        And then I go, "What do you have to tell me?"

5        And then he goes to me, "I think Rosie's pregnant."

6   Q    So you met the codefendant, Mr. Oquendo, before KO was

7   born?

8   A    Yes.

9   Q    And were you able -- were you privy to their

10  relationship?  In other words, were you able to see them

11  interact together?

12  A    Yes.

13  Q    How would you characterize the nature of their

14  relationship?

15  A    With KO?  With K?

16  Q    Prior to KO being born, how would you characterize the

17  relationship between Ms. Litzky and Mr. Oquendo?

18  A     In the beginning it was really good and everything else,

19  and then for some reason down the line, they snapped, and he

20  wasn't really a good parent -- a good father.  I think he was

21  doing something, but I wasn't sure, could never prove it.

22  Q    Did you ever observe any physical abuse in their

23  relationship?

24            MS. RIVERA:  Objection, Your Honor.  Leading.

25            THE COURT:  Objection's overruled.

*Testimony of Leonard Litzky*                                          **68**

1   BY MS. REYES:

2   Q    Did you ever witness any physical abuse in their

3   relationship?

4   A    No.

5   Q    Did you ever suspect any physical abuse in their

6   relationship?

7          MS. RIVERA:  Objection, Your Honor.  Calling for

8   speculation.

9          THE COURT:  I'll sustain the objection absent some

10  additional foundation.

11  BY MS. REYES:

12  Q    Were there periods of time when Mr. Oquendo would live

13  with you and Ms. Litzky?

14  A    Yes.

15  Q    Okay.  And were there times where you would kick him out

16  of the residence?

17         MS. RIVERA:  Objection, Your Honor.  Leading.

18         THE COURT:  Overruled.

19         THE WITNESS:  What was the question again?

20  BY MS. REYES:

21  Q    Were there times where you had to kick him out of the

22  residence?

23  A    Yes, I had to kick him out.

24  Q    Why?

25  A    Because he was getting violent with KO and -- and E.

*Testimony of Leonard Litzky*                                              **69**

1    Q    You saw -- did you see him hit the girls?

2    A    No, I didn't see him hit them.

3    Q    Did you see him pull their hair?

4    A    Yes.

5    Q    What else did you see?

6    A    He used to drink -- drink a lot, get very -- he gets very

7    violent when he's drunk.  I seen all that.  I called the

8    police on that, and they said they can't do anything.  They

9    have to witness it.

10   Q    Based on your observations, did you suspect that there

11   was physical abuse in their relationship?

12   A    Yes.

13            MS. RIVERA:  Objection, Your Honor.

14            THE COURT:  Objection's overruled.

15   BY MS. REYES:

16   Q    And even though you never saw it, why did you suspect it?

17   A    Because he was violent 90 percent of the time.  He's

18   always been violent.

19   Q    Were you scared of Mr. Oquendo?

20   A    I wasn't.  I wasn't, no.

21   Q    Okay.  Do you believe that Ms. Litzky was scared of

22   Mr. Oquendo?

23            MS. RIVERA:  Objection, Your Honor.  Calls for

24   speculation.

25            THE COURT:  Overruled.

*Testimony of Leonard Litzky*                                    **70**

1      THE WITNESS:  Okay.  Mrs. Litzky was always afraid

2   of him.

3   BY MS. REYES:

4   Q    What are you basing that on?

5   A    Basing it on the marks on her body, on her arm, black and

6   blue.  I asked R if -- "Where did you get the marks on your

7   arm?"  And then she said, "I walked into the wall."  I didn't

8   believe that.

9           MS. REYES:  May I have a brief moment, Your Honor?

10          THE COURT:  Yes.

11          MS. REYES:  Nothing further, Your Honor.

12          THE COURT:  Cross-examination.

13                      CROSS-EXAMINATION

14   BY MS. RIVERA:

15   Q    Do you recall that you recently testified before this

16   court under oath?

17   A    Yes.

18   Q    And do you recall regarding -- do you recall regarding

19   your testimony that you testified that you only saw

20   Mr. Oquendo being violent towards the children --

21   A    Yes.

22   Q    -- once?

23       Right?

24   A    Yes.

25   Q    When you witnessed that he pulled KO's hair?

*Testimony of Leonard Litzky*                                        71

1    A    Hair.

2    Q    Okay.  So that was one time.

3    A    Yes.

4    Q    Correct?

5    A    Yes.

6    Q    And then I believe that you also testified that, as to

7    this bruising that you saw on your daughter's body at one

8    point, it was once; is that correct?

9    A    Yes.

10   Q    Okay.  And you don't really know how that happened?

11   A    No, I don't.

12   Q    So as to your testimony that he was violent when he

13   drank, was that based on things that Oquendo would say when he

14   drank?

15   A    He would say -- yes, I would call the police on that, and

16   the cops said they can't do anything unless they seen

17   him drunk.  But they did see him drunk, and they didn't do

18   anything.  That's when I decided to take him to court.

19   Q    Okay.  But other than getting drunk -- you saw him

20   getting drunk?

21   A    Yeah.  Oh, yeah.

22   Q    A few times?

23   A    A lot.  Almost every day.

24   Q    Okay.  Other than seeing him drunk, the only two

25   incidents that you -- one incident you can attest to seeing

*Testimony of Leonard Litzky*                                      72

1  him physically violent with someone in your residence, and

2  that was with KO; right?

3  A    Yes.

4  Q    And you also indicated to me that your daughter was

5  trying to make her relationship with Mr. Oquendo work?

6  A    Yeah, they tried to make it work.

7  Q    Would you say she was in love with him?

8  A    In the beginning, they were.  Toward the end, no.

9  Q    For how long would you say that the relationship was

10 actually good or working?

11 A    Two years.

12 Q    Okay.  So would that be between 2011 and 2013?

13 A    I'm not good with the years.

14 Q    Okay.

15 A    It's a long time.

16 Q    That's fine.

17       MS. RIVERA:  I have no further questions,

18 Your Honor.

19       THE COURT:  Any redirect, Ms. Reyes?

20       MS. REYES:  Yes, Your Honor.

21                    REDIRECT EXAMINATION

22 BY MS. REYES:

23 Q    When you testified previously that you only observed this

24 violent behavior one time --

25 A    Yeah.

*Testimony of Leonard Litzky*                                          73

1   Q    -- were you nervous?

2   A    Yes.  Because I didn't believe -- I didn't believe Rose

3   got --

4   Q    Can you -- can you sit up a little bit and speak into the

5   mic.

6   A    Oh, sorry.  Okay.

7        I didn't believe -- I didn't believe Rose hit a wall with

8   a -- with a bruise like that.  It looked like somebody really

9   did hit her.

10        MS. RIVERA:  Objection, Your Honor, as to

11   responsiveness.

12        THE COURT:  Objection's sustained.

13        Instruct the jury to disregard the witness's

14   response.

15        You can restate the question, if you would,

16   Ms. Reyes.

17        MS. REYES:  Yes, Your Honor.

18   BY MS. REYES:

19   Q    Mr. Litzky, the Government asked you whether or not you

20   testified previously in this case.

21   A    Yes.

22   Q    And she asked -- she confirmed with you that previously

23   you testified that you had only seen Mr. Oquendo act violently

24   once.

25        MS. RIVERA:  Objection, Your Honor, as to statement,

*Testimony of Leonard Litzky*                                    **74**

1    not a question.

2            THE COURT:  That is true, but I think it's getting

3    to a question.  I'll permit it.  Overruled.

4    BY MS. REYES:

5    Q    Okay.  When you testified that you had only seen the

6    violent behavior once, were you nervous?

7            MS. RIVERA:  Objection, Your Honor.  Leading.

8            THE COURT:  Overruled.

9    BY MS. REYES:

10   Q    When you -- do you need me to repeat the question?

11   A    Yes, please.

12   Q    Okay.

13           THE COURT:  I'm going to do it, Ms. Reyes.

14           The question for you, Mr. Litzky, is whether or

15   not -- when you testified previously, were you nervous?

16           THE WITNESS:  Yes, I was nervous.

17           THE COURT:  Thank you.

18   BY MS. REYES:

19   Q    Had you seen Mr. Oquendo be violent more than one time?

20           MS. RIVERA:  Objection, Your Honor.  Asked and

21   answered.

22           THE COURT:  Overruled.

23           THE WITNESS:  Answer it?

24   BY MS. REYES:

25   Q    (Nods head.)

*Testimony of Leonard Litzky*                                             **75**

1    A    What was the question again?

2    Q    Have you seen Mr. Oquendo be violent more than one time?

3    A    No, I haven't seen it.  No.

4    Q    Okay.  Did you write a letter to the courts regarding his

5    abuse?

6             MS. RIVERA:  Objection, Your Honor.  Improper

7    questioning.

8             THE COURT:  So you mean by that leading?  Sustained.

9    BY MS. REYES:

10   Q    Had you previously made a sworn statement regarding his

11   abuse?

12   A    Yes.

13   Q    Okay.  Did you write it for Ms. Litzky?

14   A    Yes, I did.

15   Q    Okay.  And then did Ms. Litzky sign this paper?

16            MS. RIVERA:  Objection, Your Honor.  This is well

17   beyond the scope of our cross-examination.

18            THE COURT:  It's overruled on those grounds.

19            MS. RIVERA:  And relevance, Your Honor.

20            THE COURT:  And on those grounds.

21   BY MS. REYES:

22   Q    If you could take a look at the black binder.

23   A    Black?

24            MS. REYES:  May I assist, Your Honor?

25            THE COURT:  Yes.

*Testimony of Leonard Litzky*                                    **76**

1    BY MS. REYES:

2    Q    Mr. Litzky, I'm showing you what's been marked as

3    Government Exhibit 21.  Take a look at this exhibit.  Do you

4    recognize it?

5    A    Yes.  That's my handwriting.

6    Q    Okay.  And is that Ms. Litzky's signature on the bottom?

7    A    Yes, it is.

8    Q    Okay.  Had you previously stated that Mr. Oquendo --

9              THE COURT:  Ask direct questions here, Ms. Reyes.

10   Don't lead the witness.

11   BY MS. REYES:

12   Q    Have you made statements regarding Mr. Oquendo's violent

13   behavior?

14   A    Yes.

15   Q    And what did you previously state regarding his violent

16   behavior?

17             MS. RIVERA:  Objection, Your Honor.  If it's

18   pertaining to this document, it's not in evidence.

19             THE COURT:  That objection's overruled.  613.

20             You may proceed.

21             THE WITNESS:  Okay.  What was the question again?

22   I'm sorry.

23             THE COURT:  I assume you have a copy?

24             MS. RIVERA:  Yes, Your Honor, I do.

25             THE COURT:  Okay.  Thank you.

*Testimony of Leonard Litzky*                                    77

1   BY MS. REYES:

2   Q    What previous statements did -- have you made about

3   Mr. Oquendo's violent behavior?

4        Take a look at that, read it, and once your memory has

5   been refreshed, let me know.

6   A    "He walked out" --

7   Q    Just read it to yourself.

8   A    Oh, I'm sorry.  "He walked out" --

9   Q    Okay.  Hold on.

10        MS. RIVERA:  Objection.  He was being responsive,

11   Your Honor.

12        THE COURT:  Well, I confess I've lost track of where

13   we are.

14        Take a look at the statement that's been provided

15   for you there, Mr. Litzky.  Just review it.  Don't read it out

16   loud.  And after you've read it, look up, and let me know that

17   you've finished reading it.

18        All right.  Now you may inquire.

19   BY MS. REYES:

20   Q    Have you previously made any statements regarding

21   Mr. Oquendo's violent behavior?

22   A    Yes.

23   Q    And when you wrote your prior statement, what day was

24   that?

25   A    The date?  August 29th.

*Testimony of Leonard Litzky*                                78

1   Q    What year?

2   A    '14.

3   Q    Would you say that your memory of what transpired in

4   their relationship was better in 2014 or when you testified in

5   this case a few weeks ago?

6   A    It was better in 2014.

7        MS. REYES:  Nothing further, Your Honor.

8        THE COURT:  I'll give you an opportunity to

9   cross-examine -- recross only on this new information if you

10  wish.  You're not required to.

11       MS. RIVERA:  No.  Yes, Your Honor.

12                      RECROSS-EXAMINATION

13  BY MS. RIVERA:

14  Q    Sir, do you recall in your previous testimony before this

15  Court, when I asked about this alleged document that you have

16  in front of you, you indicated that you don't -- you didn't

17  remember that?

18  A    No.

19  Q    Right?

20  A    Right.

21  Q    And your recollection of this report is that nothing came

22  out of it, if you recall anything?

23  A    No.

24  Q    Sorry?

25  A    No.

*Testimony of Leonard Litzky*                                          **79**

1    Q    You recall the outcome of having written this letter?

2    A    Yes, I do.  I wrote this letter, yes.

3    Q    Yes.  But nothing -- nothing came out of it?

4    A    No.

5    Q    Is it fair to say that these allegations were found to be

6    insufficient?

7    A    What's the meaning of that?

8    Q    That no one credited these allegations.

9               MS. REYES:  Objection, Your Honor.

10              THE COURT:  Sustained.

11   BY MS. RIVERA:

12   Q    Do you know the outcome of having written this letter, if

13   anything came out of it?

14   A    Nothing came out of it.  They declined it.

15              MS. RIVERA:  Thank you, sir.

16              THE COURT:  May this witness be excused?

17              MS. REYES:  Yes, Your Honor.

18              THE COURT:  Ms. Rivera?

19              MS. RIVERA:  Yes, Your Honor.

20              THE COURT:  All right.  Thank you, Mr. Litzky.  You

21   can step down.

22              Call your next witness.

23              MS. REYES:  Helen Hitchcock.

24              THE COURT:  Ms. Hitchcock -- Ms. Hitchcock, come all

25   the way down here to the front of the courtroom, if you would,

*Testimony of Helen Hitchcock*                                    **80**

1   please, ma'am.  If you'd just stop right there, raise your

2   right hand, my courtroom deputy will place you under oath.

3                         HELEN HITCHCOCK

4   was called as a witness on behalf of Defendant and, having

5   been duly sworn, testified as follows:

6             THE WITNESS:  Yes.

7             THE COURTROOM DEPUTY:  All right.  Thank you, ma'am.

8   If you'd have a seat in the witness stand.  And, ma'am, once

9   seated, if you'll adjust that microphone in front of you so

10  you're speaking directly into it, and then state your name and

11  spell your name for the record.

12            THE WITNESS:  I'm Helen Hitchcock, L-e-h-e-n [sic],

13  H-i-t-c-h-c-o-c-k.

14            THE COURTROOM DEPUTY:  Thank you.

15            THE COURT:  You may inquire.

16            MS. REYES:  Thank you, Your Honor.

17                      DIRECT EXAMINATION

18  BY MS. REYES:

19  Q    Good morning.

20  A    Good morning.

21  Q    How are you related to Ms. Litzky?

22  A    Ms. Litzky -- I'm her mother.

23  Q    And where were you living -- were you living out of state

24  a few years ago?

25  A    Yes, ma'am.

**Testimony of Helen Hitchcock**                                          81

1    Q     Did you move to Florida?

2    A     Yes, ma'am.

3    Q     And who did you live with when you moved to Florida?

4    A     At first I was living with my husband, but he passed

5    away, and then Mr. Litzky asked us that he needed help with

6    the girls and Rosie, and so I moved in with him.

7    Q     Do you remember the month or the year?

8    A     I would say -- I would say 2016.  I don't remember the

9    month, but it was probably, like, March, April.

10   Q     Prior to 2016, were you living in Florida?

11   A     I was living in Florida in 2000- -- I moved to Florida in

12   March 2015, yes.

13   Q     And who did you live with then?

14   A     My husband and my two boys.

15   Q     Okay.  And after your husband passed, then you moved in

16   with --

17   A     Yes.  2016, yes.

18   Q     Okay.  Did you meet Mr. Oquendo?

19   A     Yes.  I met him before then, yes.

20   Q     How long ago, if you remember?

21   A     I met him -- the first time I met him is when I came down

22   for vacation when Rosie was six months pregnant, and that's

23   when I first met him.

24   Q     Did you interact -- did you have occasion to interact

25   with them together?

*Testimony of Helen Hitchcock*                                    **82**

1    A    Yeah.  We went out for dinner and stuff like that.  Yeah,

2    I was -- I came down for vacation for two weeks.

3    Q    I'm sorry.  Was Ms. Litzky pregnant with K- --

4    A    ███, yes.

5    Q    -- KO?

6    A    Yeah, KO.  Yes.  I'm sorry.

7    Q    That's okay.

8         Did you ever notice Mr. Oquendo threatening Ms. Litzky?

9    A    No.

10   Q    Did you ever see him threatening the girls?

11   A    No.

12   Q    Okay.  When you moved in with Mr. Litzky in 2016, can

13   you describe to the members of the jury what the living

14   arrangements were.

15   A    Yes.  We lived in Palm Bay, and it was a duplex.  They

16   had -- they had an apartment with a kitchen, living room, and

17   the bedroom, and we had -- me and Mr. Litzky had a -- also a

18   living room, a bedroom, and a kitchen.

19   Q    And what separated you from -- your residence from their

20   residence?

21   A    The door in the garage.  There was two doors, one inside

22   the garage that goes to their house and one that would go into

23   our house.

24   Q    Okay.  When you moved in -- I mean, is it your testimony

25   that you and Mr. Litzky had one unit?

*Testimony of Helen Hitchcock*                                            83

1    A    Yes.

2    Q    Okay.  Do you know who lived with Ms. Litzky in the other

3    unit?

4    A    Robert and the girls.

5    Q    Was Mr. Oquendo -- was he there on a permanent basis?

6    A    He was on and off.  Like, Mr. Litzky used to kick him

7    out, and then, you know, a week later, he came back; and then,

8    you know, they argued, and then he left, and then he came

9    back, you know.

10   Q    Did you ever see Mr. Litzky actually kick Mr. Oquendo

11   out?

12   A    A couple times I -- I -- yes.  I seen him tell him to get

13   out.

14   Q    Do you remember the day of July 2, 2016?

15   A    More or less, yes.

16   Q    Okay.  And what do you mean by that?

17   A    It's -- I don't recall that much, but I think it was the

18   pool incident.  We had a pool.

19   Q    Okay.  Would looking at a photo from July 2, 2016,

20   refresh your memory?

21   A    Yes.

22        MS. REYES:  If we could please publish Government

23   Exhibit 12-A movie or JPEG 5.

24   BY MS. REYES:

25   Q    Ms. Hitchcock, do you recognize anyone in this?

*Testimony of Helen Hitchcock*                                    **84**

1    A    Yes.

2         MS. REYES:  If we could play it again.

3    BY MS. REYES:

4    Q    Who do you recognize in this photo?  And please --

5    A    ███████ and --

6    Q    Ms. Hitchcock --

7    A    ███████.

8    Q    Ms. Hitchcock, refer to the girls by their initials.

9    A    Oh, E.  EL.  I'm sorry.

10   Q    It's okay.

11        Do you recognize anyone else in that?

12   A    I think it's me in the back.

13   Q    Okay.  And what are you basing that on?

14   A    We just put the pool out, and ███████ was afraid -- I

15   mean -- I'm sorry -- EL was afraid of the water, and we told

16   her that I will always be there for -- with her, and she went

17   in, and I think that's, you know -- I think Ms. Rose took the

18   picture.

19        MS. REYES:  Okay.  If we could keep it rolling for

20   just a second.  If we could --

21   BY MS. REYES:

22   Q    Do you see anyone else in the photo?

23   A    ███████ -- I mean KO.

24   Q    And how do you know that's her?

25   A    Yes, it is her.  I recognize her hair and --

*Testimony of Helen Hitchcock*                                          **85**

1    Q    And how do you recognize her hair?

2    A    It's -- it's kind of fuzzy, you know.

3    Q    What makes you say that Ms. Litzky took that?

4    A    I'm assume that she did.  I don't recall who did it, but

5    I was assume that she did it.

6    Q    Okay.  So let's -- let's go with that you don't know.

7    A    Okay.  Yes.  I'm assume.

8    Q    Okay.  In the time that you lived together or lived close

9    to each other, did you ever see KO play with Ms. Litzky's

10   phone?

11   A    Yes.

12            MS. RIVERA:  Objection, Your Honor.  Leading.

13            THE COURT:  Overruled.

14            THE WITNESS:  Yes.

15   BY MS. REYES:

16   Q    How old was KO July 2, 2016?

17   A    She -- I would say she could have been about four, three,

18   maybe going to four.  I'm not really sure.

19   Q    Okay.  Not very good with math?

20   A    No.

21   Q    Okay.  If she was born ████████████████ --

22   A    ████, yes.

23   Q    -- would she have been turning five that year?

24   A    Yes.  Yes.

25   Q    Okay.  So for a four-, almost five-year-old, how would

*Testimony of Helen Hitchcock*                                        86

1    you characterize KO?

2    A    Very smart.

3    Q    And when you saw her playing with Ms. Litzky's phone,

4    what -- what would she do on the -- did you see what she would

5    do on the phone?

6    A    She would just watch movies.

7    Q    Okay.

8    A    You know.

9    Q    Would you ever see -- did you know if her phone had a

10   password?

11   A    Yes, it did.

12   Q    Okay.  And do you know if KO knew the password?

13   A    I -- I think she did, yes.

14   Q    Why?

15   A    She just took the phone and just pressed the numbers.

16   Q    Okay.  Would you see her actually get into the phone?

17   A    Yes.

18   Q    Would you ever see her take videos on the phone?

19   A    KO?

20   Q    Yes.

21   A    No.

22   Q    Okay.  Would you ever see her take photos with the phone?

23   A    There was one time she did took a picture of me and the

24   dog sitting on the couch.

25   Q    Would -- would you ever see KO and EL fight over the

*Testimony of Helen Hitchcock*                                    87

1    phone?

2    A    No.

3    Q    Would you ever see Ms. Litzky actually give them her

4    phone?

5    A    A couple times, yes, she would let them use the phone.

6    Yes, she gave them.

7    Q    Other than you and the girls in the pool, do you remember

8    anyone else being at the house on July 2, 2016?

9    A    I don't remember.

10          MS. REYES:  Okay.  May I have a brief moment,

11   Your Honor?

12          THE COURT:  Yes.

13   BY MS. REYES:

14   Q    Throughout the time that you lived with them, did you

15   ever see any bruising on Ms. Litzky?

16   A    Yes.

17   Q    Where?

18   A    On her arm.

19   Q    Did you ever ask her where she got those bruises?

20   A    Yes.

21   Q    And what would she tell you?

22   A    She -- she would either change the subject or she would

23   say, "Don't worry about it."

24          MS. REYES:  Nothing further, Your Honor.

25          THE COURT:  Cross-examination.

                        CROSS-EXAMINATION

BY MS. RIVERA:

Q    You said you resided in Virginia until March of 2015?

A    Yes.

Q    Who was -- was Oquendo residing with you up until that
time?

A    Yes.

Q    Would you say he helped you relocate to Florida in March
of 2015?

A    Yes.

Q    Okay.  And before, you had an opportunity to testify
under oath here in this case; right?

A    Yes.

Q    And you indicated that you got along perfectly well with
Mr. Oquendo?

A    Yes.  When he lived in Virginia, yes, there was no
problem.

Q    Is it fair to say that you don't recall much of what
happened on that date of July 2, 2016, except for looking at
the --

A    I don't recall it now, yes.

          MS. RIVERA:  No further questions.

          THE COURT:  Thank you.

          Any redirect?

          MS. REYES:  No, Your Honor.

*Testimony of Helen Hitchcock*                                                89

1           THE COURT:  Thank you.

2           May this witness be excused?

3           MS. REYES:  Yes, Your Honor.

4           THE COURT:  Ms. Rivera?

5           MS. RIVERA:  Yes, Your Honor.

6           THE COURT:  All right.  Thank you, ma'am.  If you're

7   under subpoena, you're released from it.  You can go on about

8   your business.

9           THE WITNESS:  Thank you.

10          THE COURT:  Thank you.

11          Call your next witness.

12          MS. REYES:  Dayma Nieblas.

13          MS. RIVERA:  Your Honor, we object to the testimony

14  based on the reasons that we proffered before as to this

15  particular witness.

16          THE COURT:  Okay.  I don't know who this witness is.

17  Do you want to come to sidebar and tell me what your concerns

18  are?

19          MS. RIVERA:  Yes, Your Honor.

20          THE COURT:  Come on forward, if you would, ma'am,

21  and -- come on down here.  Keep on coming.  Keep on coming.

22  There you go.

23          Now raise your right hand, if you would, please.

24          Your right -- I'm sorry -- your right hand.

25          ///

*Testimony of Dayma Nieblas*                                            **90**

1                       DAYMA NIEBLAS

2     was called as a witness on behalf of Defendant and, having

3     been duly sworn, testified as follows:

4              THE WITNESS:  Yes.

5              THE COURTROOM DEPUTY:  Thank you, ma'am.  If you'd

6     have a seat in the witness stand.

7          (Sidebar on the record.)

8              THE COURT:  I just don't know who this is.  So --

9              MS. RIVERA:  Oquendo's sister.  And I think the

10    testimony is going to be about how she was sexually involved

11    with Oquendo as a minor child.

12             MS. REYES:  Based on the Court's limited ruling on

13    whether or not Ms. Litzky was ever threatened by Mr. Oquendo,

14    I'm going to limit my examination of the witness.

15             THE COURT:  Okay.  All right.

16         (End of sidebar.)

17             THE COURTROOM DEPUTY:  And, ma'am, if you'll please

18    state your name and spell your name.

19             THE WITNESS:  My name is Dayma Nieblas, D-a-y-m-a

20    N-i-e-b-l-a-s.

21             THE COURTROOM DEPUTY:  Thank you.

22             THE COURT:  You may inquire.

23                       DIRECT EXAMINATION

24    BY MS. REYES:

25    Q    How do you know Ms. Litzky?

**Testimony of Dayma Nieblas**                                      **91**

1    A    I know her through my brother.  She was dating my

2    brother.

3    Q    And who is your brother?

4    A    Roberto Oquendo.

5    Q    What do you do for a living?

6    A    I am a bartender and a mother of six.

7    Q    And when was the last time that you spoke to your

8    brother?

9    A    In 2007.

10   Q    Through the years, would you say -- how would you

11   characterize your relationship with him?

12   A    It wasn't really too much of a talking relationship.  He

13   would call me to ask me for money, and I would not send it to

14   him due to the fact of his --

15   Q    Oh, okay.  But even though you guys are somewhat

16   estranged, do you still consider him to be family?

17   A    Of course.  Always.

18   Q    Do you -- do you wish him any ill?

19   A    No, ma'am.

20   Q    Did you have occasion to actually spend time with

21   Ms. Litzky?

22   A    Only two times.

23   Q    And other than the two times, did you ever communicate

24   with her?

25   A    Yes.  Several times we spoke.

**Testimony of Dayma Nieblas**                                           **92**

1    Q    And how often would you guys talk?

2    A    Several occasions.

3    Q    Would you guys talk on the phone, or how would you guys

4    communicate?

5    A    She would call me through the messenger on Facebook.

6    Q    Do you know why she wouldn't call you through her regular

7    phone?

8    A    Because my brother did not allow us to have a

9    relationship.

10   Q    Do you know if Ms. Litzky was ever threatened by your

11   brother?

12   A    Several times.

13   Q    How do you know that?

14   A    She told me.

15   Q    Would there be times when she would call you immediately

16   after something happened with them?

17   A    Yes, crying.

18   Q    Did you ever call her from your number?

19   A    I did, and my brother would pick up, and he would hang up.

20   Q    Would you -- did you ever see your brother act violently

21   towards Ms. Litzky?

22   A    No, ma'am.

23   Q    Did he ever act violently -- did you guys grow up

24   together?

25   A    Yes.  He was very violent towards me.

*Testimony of Dayma Nieblas*                                              **93**

1        MS. RIVERA:  Objection, Your Honor, as to --

2        THE COURT:  Sustained.  The jury will disregard the

3   witness's last response.

4   BY MS. REYES:

5   Q    When was the last time that you spoke to Ms. Litzky?

6   A    In '16, I think it was.

7   Q    Would you -- or, if you remember, did you have a

8   relationship with her from the period of October 2014 through

9   the period of September of 2016?

10  A    Yes, ma'am.

11  Q    During -- specifically during that period of time, would

12  she call you about Mr. Oquendo's abuse?

13  A    Yes, ma'am.

14       MS. RIVERA:  Objection, Your Honor.  Leading the

15  witness.

16       THE COURT:  Sustained.

17  BY MS. REYES:

18  Q    Do you remember the time period of Ms. Litzky calling you

19  regarding the abuse?

20  A    Since they started to the day that it was over.

21  Q    Do you know when the relationship started?

22  A    I can't really answer that question.

23       MS. REYES:  May I have a brief moment, Your Honor?

24       THE COURT:  Yes.

25       MS. REYES:  Your Honor, based on your prior rulings,

*Testimony of Dayma Nieblas*                                        **94**

1    may I approach very briefly with a question?

2             THE COURT:  Yes.

3        (Sidebar on the record.)

4             MS. REYES:  Am I allowed to ask regarding him

5    masturbating in front of his niece?

6             THE COURT:  No.

7             MS. REYES:  Okay.

8        (End of sidebar.)

9    BY MS. REYES:

10   Q    Would your brother drink alcohol to excess?

11   A    Yes, ma'am.

12   Q    When he did that, did he become different?

13   A    Extremely violent.

14            MS. RIVERA:  Objection, Your Honor.  Leading the

15   witness.

16            THE COURT:  Sustained.

17   BY MS. REYES:

18   Q    How would drinking alcohol in excess affect your brother?

19   A    He would get violent.

20            MS. REYES:  Nothing further, Your Honor.

21            THE COURT:  Cross-examination.

22                        CROSS-EXAMINATION

23   BY MS. RIVERA:

24   Q    So you said you don't know when the relationship with --

25   between the defendant and Mr. Oquendo started?

*Testimony of Dayma Nieblas*                                             95

1    A    No, ma'am.

2    Q    But you said that, since they started to date, it was

3    over?

4    A    I don't know exactly what year they started.

5    Q    So would you say that you'd take that statement back

6    because you really don't know how or when the relationship

7    started?  Would that be fair?

8    A    Well, he left my house in 2007, so after that he moved

9    over there to Vero Beach, and I met --

10   Q    Did you go -- I'm sorry.  It was a yes-or-no question.

11   You really don't know --

12   A    No, ma'am.

13   Q    And when were those two instances?  You said you spent

14   time with them only two times.  When did that happen?

15   A    One was in 2014.

16   Q    When in 2014?

17   A    It was probably, like, August.

18   Q    Do you recall that your brother was actually in Virginia

19   in August of 2014?

20   A    No, ma'am.

21   Q    If I -- would there be anything that can refresh your

22   recollection as to your brother being in Virginia?

23   A    He was in Virginia, but I'm not -- I don't recall what

24   year.

25   Q    So it may be wrong to say that you spent time with them

*Testimony of Dayma Nieblas* **96**

1    in August of 2014?

2    A    I didn't spend time with my brother.  I spent time with

3    Rose, the father, and the kids.

4    Q    When you say "the father," you mean the defendant's

5    father?

6    A    Yes.

7    Q    I -- I thought that in your testimony you meant to say

8    that there was two -- there were two times when you spent time

9    with Oquendo and this defendant.

10   A    Not -- not Mr. Oquendo.  He wasn't present neither time.

11   Q    Okay.  Was there any time that you spent time with the

12   two of them, the --

13   A    No, ma'am.  He didn't allow me to have a relationship

14   with them.

15   Q    And were -- were you aware the defendant could actually

16   drive?

17   A    She drove to me.

18   Q    So you did meet with the defendant?

19   A    Yes, ma'am.

20   Q    And you, in fact, did have a relationship with the

21   defendant?

22   A    With her, not with him.

23   Q    Despite Oquendo's wishes, you did have a relationship --

24   A    Yes, I did.

25   Q    -- with the defendant?

*Testimony of Dayma Nieblas*                                       **97**

1    A    Yes, I did.

2    Q    Okay.  And are you aware of the allegations in this case?

3    A    Yes, ma'am.

4    Q    And are you aware of what has been alleged with this

5    defendant in particular?

6    A    Yes, ma'am.

7    Q    Do you think that anything you've said here in your

8    testimony is an excuse for sexually exploiting a child?

9            MS. REYES:  Objection, Your Honor, as to

10   argumentative.

11           THE COURT:  Sustained.

12           MS. RIVERA:  I have no further questions.

13           THE COURT:  Any redirect?

14           MS. REYES:  No, Your Honor.

15           THE COURT:  May this witness be excused?

16           MS. REYES:  Yes, Your Honor.

17           THE COURT:  Ms. Rivera?

18           MS. RIVERA:  Yes, Your Honor.

19           THE COURT:  Thank you, ma'am.  If you're here under

20   subpoena, you're released from it.

21           Call your next witness.

22           MS. REYES:  Your Honor, I have one more witness:

23   Ms. Litzky.

24           THE COURT:  Okay.

25           MS. REYES:  It's going to take a while.

1          THE COURT:  Okay.  Why don't we take our lunch

2    break, ladies and gentlemen.  We'll come back at 1:15, and

3    we'll resume with the defense case.

4          (Jury out at 11:54 a.m.)

5          THE COURT:  We'll be in recess until 1:15.

6          (Recess at 11:54 a.m. until 1:20 p.m.)

7          THE COURT:  Back on the record, United States

8    v. Litzky, 18-cr-223.

9          All counsel and the defendant are present.  Is the

10   jury all back and ready to go?

11         THE COURT SECURITY OFFICER:  Yes, Your Honor.

12         THE COURT:  Will you bring them in, please?

13         MS. REYES:  Your Honor, I have a question.

14         THE COURT:  I'm sorry.  Hang on.

15         MS. REYES:  Very brief.  The Social Security

16   records, school records, health care surrogate, power of

17   attorney were excluded, the actual evidence of it.  May I

18   still question my client on it?

19         THE COURT:  Yes.  As long as it's not related to --

20   as long as you're not trying to introduce documentary evidence

21   that was not provided to the United States.

22         MS. REYES:  Yes, Your Honor.

23         MS. RIVERA:  Your Honor, so that basically means

24   that she can explore evidence of mental health issues with

25   this defendant?

1          THE COURT:  I don't know what's in the records.

2          MS. RIVERA:  I believe, Your Honor, that that's --

3    based on what I've seen that that's the intent of the defense

4    to --

5          THE COURT:  Well, then you can object to it at the

6    time and I'll -- I'm not going to -- I'm not going to tell her

7    in advance what questions she can ask her witness or not ask

8    her witness, but if she has something that you think is in

9    violation of one of my rulings, object to it and I'll rule

10   on it.

11         MS. RIVERA:  Thank you.

12         THE COURT:  Bring the jury in, please.

13      (Jury in at 1:22 p.m.)

14         THE COURT:  Welcome back, ladies and gentlemen.

15         Ms. Reyes, call your next witness.

16         MS. REYES:  The defense calls Ms. Rose Litzky.

17         THE COURT:  Ms. Litzky, if you'll come forward,

18   please, and be sworn.

19         THE COURTROOM DEPUTY:  That's fine right there,

20   ma'am.  If you'll please raise your right hand.

21                      ROSE BETH LITZKY

22   was called as a witness on behalf of Defendant and, having

23   been duly sworn, testified as follows:

24         THE WITNESS:  I do.

25         THE COURTROOM DEPUTY:  Thank you, ma'am.  If you'd

*Testimony of Rose Beth Litzky*                                    **100**

1   have a seat in the witness stand.

2           Ma'am, once seated, if you'll adjust that microphone

3   in front of you so you're speaking directly into it, and then

4   state your name and spell your name for the record.

5           THE WITNESS:  My name is Rose Litzky, R-o-s-e

6   L-i-t-z-k-y.

7           THE COURTROOM DEPUTY:  Thank you.

8           THE COURT:  All right.  You may inquire, Ms. Reyes.

9           MS. REYES:  Thank you, Your Honor.

10                          DIRECT EXAMINATION

11  BY MS. REYES:

12  Q    Good morning.

13  A    Good morning -- good afternoon.

14  Q    Good afternoon.  You're right.

15       When did you meet Mr. Oquendo?

16  A    When I first talk to him, I was 17.

17  Q    And did you meet him in person or online?

18  A    Only a date, and that was that.

19       (Request for clarification by the court reporter.)

20           THE WITNESS:  Only a date, and that was that.

21           THE COURT:  So, Ms. Reyes, what -- in light of the

22  communication issues, I just want to make sure that -- I'm

23  going to ask the court reporter to stop and inquire if she

24  has any concern about what she's hearing or if she's not able

25  to understand.

1        And, ladies and gentlemen of the jury, as we go

2   along, if you're not able to understand, I want you to raise

3   your hand and let me know, and we'll try to make sure you get

4   the information because that's obviously the critical thing.

5             MS. REYES:  Yes, Your Honor.

6             THE COURT:  So I apologize for the interruption.

7   BY MS. REYES:

8   Q    How long until you met in person?

9   A    I was 22.

10  Q    So for six years, you guys talked online?

11  A    Yes.

12  Q    And did you guys ever talk on the phone during that time

13  period?

14  A    No.

15  Q    When you met him in person -- actually, how much older is

16  he from you?

17  A    He's five years older than I am.

18  Q    So when you met him, you were still under 18?

19  A    Yes.

20  Q    When you first met him in person, how did you feel about

21  him?

22  A    I think he was the one.

23  Q    Did you initially or immediately become sexually intimate

24  with him?

25  A    Not at the beginning, no.

*Testimony of Rose Beth Litzky*                                      **102**

1    Q    Did you eventually become sexually intimate with him?

2    A    What do you mean?

3    Q    Did you eventually have sex with him?

4    A    Yes.

5    Q    Okay.  And did you eventually get pregnant?

6    A    Yes.

7    Q    How would you describe your relationship with him?

8    A    What do you mean?  Before the kids?

9    Q    When you first met him in person until you got pregnant.

10   A    He was sweet.

11        (Request for clarification by the court reporter.)

12            THE WITNESS:  He was a sweet, honest guy.

13   BY MS. REYES:

14   Q    And did the relationship change at some point?

15   A    Yes.

16   Q    And how did it change?

17   A    When I had KO.

18   Q    When you had KO?

19   A    Uh-huh.  Yes.

20   Q    In what way did the relationship change?

21   A    He was started being mean to me.

22   Q    Did he eventually -- did he eventually get physical

23   towards you?

24   A    Yes.

25   Q    And when -- at what point in the relationship did it get

1    physical?

2    A    When KO was five months old.

3    Q    So the verbal abuse started at the same time as the

4    physical abuse?

5    A    Yes.

6    Q    Where would he hit you?

7    A    My face sometimes.  Sometimes my arms.

8    Q    Would he ever do that in front of people?

9    A    No.

10   Q    Did you tell anyone about this?

11   A    No.

12   Q    Why not?

13   A    Because if I told anyone, he's going to hurt my family.

14   Q    Did he ever physically -- did he ever force sex on you?

15          MS. RIVERA:  Objection, Your Honor, as to all the

16   leading questions.

17          THE COURT:  I'm going to permit the lead- -- her to

18   lead to some extent in an effort to better understand the

19   witness.

20          But with some limits, Ms. Reyes.

21          So the objection is overruled.

22   BY MS. REYES:

23   Q    Did Mr. Oquendo ever force sex on you?

24   A    Yes.

25   Q    Okay.  How?

*Testimony of Rose Beth Litzky*                                    *104*

1    A    He make me sleep with three guys for money.

2    Q    When you say "three guys," was it on three separate

3    occasions?

4    A    Three different days, yes.

5    Q    When he would hit you, did he leave bruises?

6    A    Yes.

7    Q    When did he start asking for photos of the kids?

8    A    When -- when she was little.

9    Q    Who?

10   A    KO.

11   Q    And how would he ask you for the photos?

12   A    He text me and he ask.  And when I said no, he calls and

13   threats me.

14   Q    When you first met him -- at some point did you guys move

15   in together?

16   A    Yes.

17   Q    And do you remember the -- at what point in the

18   relationship you guys moved in together?

19   A    When I was pregnant with KO.

20   Q    Who were you living with now, including Mr. Oquendo?

21   A    My dad.

22   Q    Okay.  And EL wasn't born yet?

23   A    No.

24   Q    Okay.  So it was just -- so tell us who was in the house.

25   A    Me, my brother, my dad, and KO.

1    Q    Okay.  Where was your mom at this point?

2    A    She was in Virginia.

3    Q    Okay.  Did you try to get an injunction against him?

4    A    Yes.

5    Q    When?

6    A    In 2014, in August.

7    Q    Did anyone help you apply or try to get this petition?

8    A    My dad.

9    Q    Why did you need your dad's help with the petition?

10   A    To fill it out.

11   Q    Had Mr. Oquendo already moved out of state in August of

12   2014?

13   A    Yes.

14   Q    Why would you wait until he was out of state to file for

15   this petition?

16   A    So he doesn't hurt me.

17   Q    Did you also try to tell the officers in this case about

18   Mr. Oquendo's abuse?

19   A    Yes.

20   Q    And did they believe you?

21   A    No.

22   Q    Did they ask you if you were willing to be polygraphed on

23   the issue of whether or not Mr. Oquendo abused you?

24   A    Yes.

25   Q    And what did you say?

*Testimony of Rose Beth Litzky*                                        **106**

1   A    Yes.

2   Q    Did they ever follow up with you to conduct the polygraph

3   examination?

4   A    No.

5   Q    Did you continue talking to him after he moved to

6   Virginia?

7   A    Yes.

8   Q    Why?

9   A    Because he said he missed the kids and he needs to talk

10  to them.

11  Q    Would he ask you for pictures when he was out of state?

12  A    Yes.

13  Q    And what specifically would he say in his request for

14  pictures?

15  A    If I don't do it, he's going to hurt my cousin Madison.

16  Q    Who was your cousin Madison?

17  A    It's -- it's in -- she's my mom's husband's brother kid.

18  Q    Where was she at the time that Mr. Oquendo was in

19  Virginia?

20  A    My mom was babysitting her.

21  Q    Would he specifically ask you for naked photos of the

22  girls?

23  A    Yes.

24  Q    Did you believe he wanted these photos to masturbate?

25  A    No.

1   Q     Did you send him photos?

2   A     Yes.

3   Q     And approximately how many photos did you send him while

4   he was in Virginia?

5   A     Six, seven, probably.

6   Q     And how do you remember that?

7   A     Because he calls and asks for them.

8   Q     Were all the photos that you sent him, the six or

9   seven -- were they focused on her -- on the kids' vaginas?

10  A     Yes.

11  Q     And at that point how did you not know that he had a

12  sexual interest in your daughters if the photograph was

13  focused on their vagina?

14  A     I didn't know.

15  Q     Would you chat with him?  In addition to texting, would

16  you also chat with him over ooVoo?

17  A     Yes.

18  Q     And was this a video conversation?

19  A     Yes.

20  Q     What -- did he make you -- did he make requests of you

21  during these video conversations?

22  A     Yes.

23  Q     What would he ask for?

24  A     He ask for pictures of me and the kids.

25  Q     What did you say initially?

*Testimony of Rose Beth Litzky*                                    **108**

1    A    I said no.

2    Q    And what happened when you said no?

3    A    He said he's going to hurt my cousin.

4    Q    Did you ever see him lick EL's vagina?

5    A    No.

6    Q    Did you ever see him take photographs of the girls?

7    A    No.

8    Q    When was it -- going back to when ███ was -- when KO

9    was younger, when was it that he started sending you pictures

10   of cartoons having sex with children?

11   A    When ████ was 12 months old.

12   Q    Did you -- so before him moving to Virginia, did you know

13   that he was sexually interested in children?

14   A    No.

15   Q    What about some of the comments that he would make in the

16   ooVoo chats when he was in Virginia?  What about the comments

17   about blue balls?

18   A    I thought he was talking to -- about me.  I sent him a

19   picture of me too.

20   Q    Did he ever hit the girls?

21   A    Yes.

22   Q    Approximately how many times?

23   A    Three.

24   Q    Were you scared of him?

25   A    Yes.

1    Q    Why?

2    A    Because he's going to hurt me.

3    Q    Did he ever hit you with anything other than his hands?

4    A    Yes.

5    Q    What?

6    A    A baseball bat.

7    Q    Did -- when he's out of state, were you still scared of

8    him?

9    A    Yes.

10   Q    Why?

11   A    Because he was living with my mom.

12   Q    Did you agree with him to produce child pornography?

13   A    No.

14   Q    Did you take the picture on July 2, 2016, of EL naked on

15   the futon with a set of car keys?

16   A    No.

17   Q    Why do you say that?

18   A    Because ██████ had my telephone that day.

19   Q    Did you tell law enforcement that?

20   A    Yes.

21   Q    Did they believe you?

22   A    No.

23   Q    Do you remember July 2, 2016?

24   A    Yes.

25   Q    And how do you remember that day?

*Testimony of Rose Beth Litzky*                                    **110**

1   A    It's before 4th of July weekend.

2   Q    When did you move into that duplex?

3   A    We move in there on my birthday, June 17th of '16.

4   Q    When you moved in, was there a pool?

5   A    No.  My mom brought it two weeks after.

6   Q    Was July 2nd the first time that you guys had used the

7   pool?

8   A    Yes.

9   Q    And that -- do you remember what you were doing that day?

10  A    I was cooking.

11  Q    Were you cooking the entire day?

12  A    Cooking and cleaning and doing a little housework before

13  4th of July.

14  Q    Did you ever go outside to hang out at the pool?

15  A    Yes.

16  Q    And did you take any photos or videos when you were

17  outside?

18  A    Yeah.  I took a picture of ███ and my mom and KO in a

19  couple.

20  Q    If you didn't take the photo of EL, why would you tell

21  the police officers that you did?

22  A    Because they kept asking.

23  Q    Do you remember how many times you said that you didn't

24  take it before you actually told them that you took it?

25  A    Yes.  I said no five times.

*Testimony of Rose Beth Litzky*                                    *111*

1    Q    Did you feel like Roberto -- Mr. Oquendo controlled you?

2    A    Yes.

3    Q    Why do you say that?

4    A    Because he -- I have to obey him.

5    Q    Would he make you call him "sir"?

6    A    Yes.

7    Q    Did you have a relationship with his sister?

8    A    Yes.

9    Q    And would you tell her things that happened in your

10   relationship with her brother?

11   A    Yes.

12   Q    Did you ever know that Mr. Oquendo was sexually molesting

13   the kids?

14   A    No.

15   Q    Are you sexually attracted to children?

16   A    No.

17   Q    Are you sexually attracted to your children?

18   A    No.

19   Q    When you say that Mr. Oquendo was mean to you, what --

20   how was he mean to you?

21   A    He --

22             MS. RIVERA:  Asked and answered, Your Honor.

23             THE COURT:  Objection's overruled.

24   BY MS. REYES:

25   Q    You can answer.

1    A    What's the question again?

2    Q    How was he mean to you?

3    A    He screams at me, and he smacks me.

4              MS. REYES:  May I have a brief moment, Your Honor?

5              THE COURT:  Yes.

6              MS. REYES:  Nothing further, Your Honor.

7              THE COURT:  Cross-examination.

8                          CROSS-EXAMINATION

9    BY MS. RIVERA:

10   Q    So if I understand your testimony correctly today, it's

11   that you took -- you helped Oquendo take some images of your

12   children, sexual images, sometimes but not others?

13   A    What do you mean?

14   Q    So you're saying that you exposed your children in the

15   nude for him when he was in Virginia and you were in Florida;

16   right?

17   A    Yes.

18   Q    And through this ooVoo media application; right?

19   A    Yes.

20   Q    You spread their legs for him to be able to take close-up

21   pictures of their vagina; right?

22   A    Yes.

23   Q    And then you would sometimes even offer for him to take

24   nude pictures -- if you can look at me when I'm asking the

25   question as opposed to counsel.

1      You would sometimes offer him pictures of the children in

2    the nude; right?  We saw --

3    A    Yes.

4    Q    -- some of those messages.

5         And sometimes you offered those pictures to him without

6    him asking for them; right?

7    A    No.

8    Q    There were -- and we showed here messages to the jury,

9    and you had an opportunity to see them, the ooVoo messages.

10   At times you offer for him to see the children in the nude

11   without him asking for it.

12        Should I show you some of those messages?

13   A    Yes, please.

14          MS. RIVERA:  May I retrieve Government Exhibit 15?

15          THE COURT:  Yes.

16   BY MS. RIVERA:

17   Q    There's Government Exhibit 15 in your binder.

18   A    The black one?

19   Q    The black one, yes.

20        So Bates No. 659, for example, you said, "I call you at

21   8:00 a.m."; right?

22   A    Yes.

23   Q    And then he responded, "Okay"; correct?

24   A    Yes.

25   Q    And he also said, "Why?"

*Testimony of Rose Beth Litzky*                                        *114*

1    And you recognize this was October 29, 2014; right?

2  A    Yes.

3  Q    And then your response to that is "See kids naked."

4  A    Yes.

5  Q    And his response was "Oh, okay"; right?

6  A    Yes.

7  Q    So you would agree with me, for example, that in this

8  particular instance you were offering for him to see the

9  children in the nude without him asking on this occasion?

10 A    Yes.

11 Q    And is it fair to say -- right? -- that he was not with

12 you?  He was in Virginia at the time when you were offering

13 this?

14 A    Yes.

15 Q    So at the time when you were offering for him to see the

16 children in this manner, you were not under any threats from

17 him; right?

18 A    Not at the moment, no.

19 Q    Not that one time; right?

20 A    No.

21 Q    And there were other times like that -- would you say

22 that he left for Virginia around June of 2014?

23 A    Yes.

24 Q    Right?

25     In addition to that occasion, there were other times when

1  you offered for him to see the children in this manner,

2  exposing their vaginal area, without him asking?

3  A    Yes.

4  Q    And the reason why you did this is because you wanted to

5  make him happy?

6  A    Yes.

7  Q    We have presented in evidence some of the text messages

8  that you've seen; correct?

9  A    Yes.

10 Q    But there are many more text messages between you and

11 Oquendo.  Would you say there are thousands of text messages?

12 A    Yes.

13 Q    Would you agree with me that none of these text messages

14 reflect Oquendo saying, "Send me an image -- nude image of a

15 child -- of your child or otherwise I will hurt you"?

16 A    Because he called me.

17 Q    So Mr. Oquendo testified that you prefer to communicate

18 with him by text; is that right?

19 A    Yeah.

20 Q    So you would say -- you would agree with me that

21 predominantly, most of the time, you-all communicated by text

22 messaging; right?

23 A    Yes.

24 Q    And in all of these thousands of text messages between

25 you and Oquendo over several years, there's no -- there's not

*Testimony of Rose Beth Litzky*                                                    *116*

1    one threat from him to you or anyone else when asking for an

2    image of the children, a nude image of the children.  Do you

3    understand that?

4    A    Yeah.  Because he call.

5    Q    So you had -- would you agree with me that you had

6    several opportunities to talk to law enforcement through the

7    years in your relationship with Oquendo; right?

8    A    Yes.

9    Q    And on none of those occasions did you report that

10   Oquendo was making you, forcing you, to take sexual images of

11   the children?  Never?

12   A    Never.  Because I was scared of him.

13   Q    Now, even when you talk about requesting an injunction in

14   2014 -- and if you can turn to Tab No. 21 -- you reported here

15   that there was an incident when he pulled -- he pulled your

16   oldest's daughter's hair.  You were reporting that?

17   A    Yes.

18   Q    But your main concern when you -- when you filed this was

19   that he had walked out on you and the children; right?

20   A    Yes.

21   Q    You said, "He walked out on us on June 16 of 2014";

22   right?

23   A    Yes.

24   Q    And that he had walked out on you and the children for

25   the second time; right?

*Testimony of Rose Beth Litzky*                                    *117*

1    A    Yes.

2    Q    So is it fair to say that your concern at the time was to

3    try to get Oquendo back into your life?  Right?

4    A    No.

5    Q    It was -- you were concerned that -- you were in love

6    with him.  Didn't you love him?  You were in love with him?

7    A    At the beginning, yes.

8    Q    And would you say that when you were communicating with

9    him and he was in Virginia, that you sent him messages

10   indicating how much you love him?  Right?

11   A    Yeah.

12   Q    And he would tell you at times that he also -- that he

13   loved you as well?

14   A    Yes.

15   Q    So when I look at this document, Government Exhibit 21,

16   it would appear based on what you're saying here, you would

17   agree with me, that your main concern was that he had left

18   you?

19   A    Yes.

20   Q    So at the time you or your children -- let's say between

21   June of 2014 and March of 2015, there was no risk at the time

22   that he would physically harm you or the children while he was

23   in Virginia?

24   A    No.

25   Q    In fact, you would agree with me that you were the person

1   who was physically harming your children while you were

2   engaged in these ooVoo chats with Oquendo, exposing your

3   children in the nude; right?

4           MS. REYES:  Objection to argumentative.

5           THE COURT:  Overruled.

6   BY MS. RIVERA:

7   Q    You would agree with me that you were the one person

8   physically harming your children when you were exposing them

9   nude to Oquendo while in Florida?

10  A    Yes.

11  Q    Would you agree with me that what you did to KO and EL in

12  exposing them in this manner was wrong?

13  A    Yes.

14  Q    And because of this, your actions, you've lost -- you've

15  lost them?

16          MS. REYES:  Objection, Your Honor.

17          THE COURT:  Sustained.

18          MS. REYES:  403.  Move to strike.

19          THE COURT:  Sustained.  The jury will disregard the

20  question.  And I don't think the witness responded, but if

21  she did, the question and answer is stricken.  The jury is

22  instructed to disregard it.

23  BY MS. RIVERA:

24  Q    So do you understand as you sit here in court today that

25  there was a reason why the agents did not believe when you

*Testimony of Rose Beth Litzky*                              **119**

1   said that he was threatening to harm you?

2           MS. REYES:  Objection, Your Honor, to improper

3   burden shifting.

4           THE COURT:  Overruled.

5   BY MS. RIVERA:

6   Q    You can answer.  Or do you want me to repeat the

7   question?

8   A    Yes, please.

9   Q    Do you understand why the agents did not believe you when

10  you denied -- I'm sorry -- when you affirmed that Oquendo had

11  threatened you into producing those pictures?

12  A    I don't know.

13  Q    Why don't you know?

14  A    Because I just don't.

15  Q    Do you understand why they didn't believe you?

16          MS. RIVERA:  Objection to asked and answered.

17          THE COURT:  Sustained.

18  BY MS. RIVERA:

19  Q    Do you understand that none of these messages, the

20  written messages, the proof in this case, shows any

21  threatening communications between you and Oquendo?

22  A    Because he calls me.

23  Q    So you want the jury to believe that all of these threats

24  only happened in calls between you and Oquendo --

25  A    Yes.

*Testimony of Rose Beth Litzky*                          **120**

1   Q    -- over the span of years?

2        You want them to believe that?

3   A    It was.

4   Q    Yet you were the one, the only one, between you and

5   Oquendo, that took the action of deleting most of the sexual

6   images that you produced in this case for Oquendo; is that

7   right?

8   A    Yes.

9   Q    And you deleted those images from your phone because you

10  knew that what you were doing was wrong?

11  A    Yes.

12  Q    And you knew at the time that Oquendo was saving those

13  images, a lot of those images?

14  A    No.

15  Q    In fact, you recommended to him that he should get some

16  kind of an application that would allow him to back up his

17  pictures.  Do you remember that text message that we showed

18  here in court?

19  A    Which one?

20       MS. RIVERA:  Your Honor, I'm sorry.  I'm looking for

21  the particular message.

22       THE COURT:  Yes.

23  BY MS. RIVERA:

24  Q    So that would be Bates No. -- Exhibit No. 13, the very

25  last page.  Sorry.  Not 13.  Sorry.  Exhibit No. 14.

*Testimony of Rose Beth Litzky*                                                        *121*

1    Exhibit No. 14, the very last page, and starting at

2    line 1969.  Do you see that?

3    A    Yes.

4    Q    Can you -- can you read from the bottom up?  Do you see

5    that you recommended for him to download an app to back up his

6    images?

7    A    Yes.

8    Q    And he asked you what that was for; right?

9    A    Yes.

10   Q    And when -- and his response thereafter was that he

11   didn't think it was a good idea to put naked pictures on that

12   app; right?

13   A    Yes.

14   Q    And you knew he was talking about pictures of your

15   children; right?

16   A    No.

17   Q    So when he was saying "naked pictures," you didn't

18   believe that he was referring to the sexual images of KO and

19   EL?

20          MS. REYES:  Objection to asked and answered.

21          THE COURT:  Overruled.

22          THE WITNESS:  No.

23   BY MS. RIVERA:

24   Q    And your response to that was "Oh, yeah.  I forgot"?

25   A    Yeah.

*Testimony of Rose Beth Litzky*                                    **122**

1    Q    In fact, you recommended for him to use the ooVoo

2    application as well.  That was also your idea?

3    A    No.  It was his.

4    Q    Well, in the -- going back to Government Exhibit 15,

5    Bates 657 -- if you can go to Government Exhibit -- he tells

6    you, "This suck."  Do you see that?  That was October 27,

7    2014, at 3:43 p.m.

8    A    Yes.

9    Q    And you asked, "What sucks?"  Right?

10   A    Yes.

11   Q    Her [sic] response to that was "Your app"; right?

12   A    Yes.

13   Q    And you didn't correct that.  You didn't say, "No, that

14   is your app.  That was your idea."  You didn't say that.

15        Does that refresh your memory that it was you who

16   suggested this ooVoo app?

17   A    It wasn't me.

18   Q    Okay.  Didn't you help him install the ooVoo app, show

19   him how to do it?

20   A    No.

21   Q    So you tell him to go back to Tango.  Is that another

22   social media application?

23   A    Yes.

24   Q    And did you both use that social media app to chat also?

25   A    Yes.

*Testimony of Rose Beth Litzky*                                    *123*

1    Q    And then the next page, 658, for example, October 28,

2    2014, at 8:55 p.m. you tell him that you love him; right?

3    A    Yes.

4    Q    And then again at 9:52 p.m. on that same date, you're

5    offering for him to see KO naked.  Do you see that?

6    A    Yes.

7    Q    So would you agree with me that during this time --

8    right? -- of these chats that you guys were in a romantic

9    relationship, that you were friendly to each other?

10   A    Yeah.

11   Q    Then, regarding this app, this Bates 667, it appears that

12   you knew how this app worked better than Oquendo.  Would you

13   agree with me?

14   A    What's the question?

15   Q    You knew this app, this application, the ooVoo

16   application -- you knew how it worked; right?  A lot better

17   than Oquendo?

18   A    Yeah.

19   Q    So you tell him, "Delete it and download it again.  It

20   going to work."  And you're talking about him deleting and

21   downloading again the ooVoo application?

22   A    Yes.

23   Q    Apparently you were having some problems communicating

24   through the ooVoo application; right?

25   A    He did, yes.

*Testimony of Rose Beth Litzky*                                    **124**

1  Q    And then he was concerned -- right? -- that he was going

2  to lose the pictures that he had of the children in the nude.

3  If you see his next statement, it's "Oh, yeah, but the

4  pictures will be gone.  No TY," meaning no thank you; right?

5  A    Yes.

6  Q    And your response to that:  "It's not going to lose it.

7  I didn't lose mine"; right?

8  A    Yes.

9  Q    And the reason why you said that is because you had

10 uninstalled this application before and you reinstalled it,

11 and you didn't lose your pictures; right?

12 A    Pictures of him, yes.

13 Q    And is it fair to say, like, other than this iPhone, you

14 also had other devices, other cell phones?

15 A    No.

16 Q    And is it fair to say that at times you provided cell

17 phones to Oquendo --

18 A    Yes.

19 Q    -- that you had previously used?

20 A    Yes.

21 Q    So when you look at those ooVoo images, you saw your face

22 in some of those images here in court; is that right?

23 A    Yes.

24 Q    Did anyone coach you or tell you to point to KO as the

25 person who took that July 2nd image?

*Testimony of Rose Beth Litzky*                                    **125**

1    A    Which one?

2    Q    The one that -- you were referring before to an image

3    that was taken on July 2, 2016; right?

4    A    Yes.

5    Q    And you said that KO took that picture?

6    A    Yes.

7    Q    And then -- and then, if we go back to your interview of

8    September 15, 2016, first you said that KO took the picture;

9    right?

10   A    Yes.

11   Q    And then you said that Roberto Oquendo could have taken

12   that picture?

13   A    Yes.

14   Q    Right?

15        And, lastly -- right? -- you admitted that you took that

16   picture; right?

17   A    Yes.

18   Q    And isn't that picture, like many of the other pictures

19   that you sent to Mr. Oquendo in this case, like -- like the

20   children lying nude on the bed and their vaginal area

21   exposed -- we've seen some of those pictures here in court

22   today?

23        MS. REYES:  Objection, Your Honor.  It's a

24   mischaracterization of the evidence.

25        THE COURT:  Objection's overruled.

*Testimony of Rose Beth Litzky*                                    **126**

1          THE WITNESS:  No.

2    BY MS. RIVERA:

3    Q    You would agree with me that some of the pictures, like

4    the ooVoo images that you allowed Oquendo to produce, showed

5    your children just lying nude on the bed with their legs

6    spread apart; right?

7    A    Yeah.

8    Q    And those were some of the types of images that you would

9    help Oquendo take?

10   A    Yes.

11   Q    So when you told the officers at the end of that

12   interview that you had taken that picture for Oquendo, you

13   were -- you were telling the truth then?

14   A    No.

15   Q    In fact, we have messages -- and maybe you recall sending

16   him also pictures of -- some of the other pictures that we've

17   seen here of -- and videos of the children in the shower with

18   the dog; right?

19   A    Yes.

20   Q    Those pictures -- those -- and videos you shared with

21   Oquendo; right?

22   A    Yes.

23   Q    Because you knew that he liked to see the children in the

24   nude.  That's how he liked to see them: nude; right?

25   A    Yes.

*Testimony of Rose Beth Litzky*                                    *127*

1    Q    And you know -- you knew at the time, when you were

2    talking to the officers, the importance of telling the truth;

3    right?

4    A    Yes.

5    Q    And so that's why, at the end of that interview, you

6    agreed that you had taken possibly hundreds of images of your

7    children exposed in the nude for Oquendo; right?

8    A    Yes.

9    Q    And, again, February 3rd of 2017, when you're confronted

10   with that image of EL exposed like that and lying on the bed,

11   you agreed that you took that image.

12        You agreed eventually that the image where you're holding

13   EL over your shoulder, that you took that; right?

14             MS. REYES:  Objection to compound question.

15             THE COURT:  Objection's sustained.

16   BY MS. RIVERA:

17   Q    You agreed with the officers then, on February 3, 2017,

18   that you took that image of EL, just -- like, you had her over

19   your shoulder with her legs spread apart.  Do you remember

20   agreeing that you took that picture?

21   A    No.

22   Q    You don't remember -- you don't remember or you didn't

23   take the picture is what you're saying?

24   A    I didn't took the picture.

25   Q    Do you remember the picture that I'm talking about?

*Testimony of Rose Beth Litzky*                                      **128**

1    A    Yes.

2    Q    Okay.  But you recall that you admitted to taking those

3    two pictures; right?  Right?

4    A    No.

5    Q    Did you -- I'm sorry.  Let me restate that.

6         You agreed that -- you admitted, ultimately, to taking

7    both of those pictures; right?

8              MS. REYES:  Objection to asked and answered.

9              THE COURT:  Overruled.

10             THE WITNESS:  Yes.

11   BY MS. RIVERA:

12   Q    And then that you took many others for him; right?

13   A    Yes.

14   Q    And you recall that you agreed that that was for his

15   sexual gratification; right?

16   A    No.

17   Q    In addition to that, you also mentioned that you did it

18   because sometimes that was the only way to get him -- to get

19   money from him for things that -- right?

20             MS. REYES:  Objection to misstating the evidence.

21             THE COURT:  Objection's overruled.

22   BY MS. RIVERA:

23   Q    You also said to the officers that you took these types

24   of pictures for him because you needed money to buy things for

25   the kids?

1    A    I was talking about the child support money.

2    Q    Sorry?

3    A    I was talking about the child support money.

4    Q    But do you agree with me that some of those pictures that

5    you took at his request was because maybe he could provide you

6    with money if you sent him those pictures?

7              MS. REYES:  Objection to asked and answered.

8              THE COURT:  Sustained.

9    BY MS. RIVERA:

10   Q    And regarding your petition -- and I'm sorry that I'm

11   going back and forth.  Regarding your petition for an

12   injunction, looking at Tab No. 22, would you agree with me

13   that your allegations regarding Mr. Oquendo were found to be

14   insufficient?

15   A    What do you mean?

16   Q    That the Court did not believe that the request for this

17   injunction should be granted?

18             MS. REYES:  Objection, Your Honor, to misstating the

19   evidence.

20             THE COURT:  Sustained.

21   BY MS. RIVERA:

22   Q    Your request for injunction was denied; right?

23   A    Yes.

24   Q    Because you did not present enough evidence.  Would that

25   be a fair characterization?

*Testimony of Rose Beth Litzky*                                    **130**

1    A    Yes.

2    Q    And during the time -- during your interviews, you

3    mentioned that you were -- you had a DCF investigation --

4    Department of Child and Family Services investigated you at

5    least a couple times; right?

6              MS. REYES:  Objection, Your Honor, to 404(b).

7              THE COURT:  Sustained.

8    BY MS. RIVERA:

9    Q    You had opportunities on a number of encounters with law

10   enforcement officers to report any type of threats by Oquendo;

11   is that right?

12   A    Yes.

13   Q    But you didn't do it?

14   A    I did it once.

15   Q    And I am referring to the sexual abuse of your children.

16   You had a number of opportunities to report to law enforcement

17   officers -- before you were contacted in this case by the

18   agents, you had a number of opportunities to report to law

19   enforcement that Oquendo was sexually abusing the children,

20   making you take pictures, but you never did?

21   A    No.  Because I was scared.

22   Q    You were scared, but there was a period -- very long

23   periods of time when Oquendo was not around; right?

24   A    Yes.

25   Q    There were periods of time when you did not know where

*Testimony of Rose Beth Litzky*                                    **131**

1    Oquendo was?

2    A    I always know where he was.

3    Q    You always knew where he was?

4    A    Uh-huh.

5    Q    How so?

6    A    Because he moves -- he moved to Vero Beach when I kicked

7    him out the first time, and I let him babysit with the kids

8    when I was working, and he move back, and I kick him out

9    again.  He move in with my mom, and then he move back in, and

10   I -- we move to Palm Bay.  I kick him out, and he was sleeping

11   in the car in someone's driveway.

12   Q    But you didn't know where that was.  You didn't know

13   where that was located; right?

14   A    No.

15   Q    And so there were a number of times that you didn't know

16   where he was residing, where he was living physically?

17   A    No.

18   Q    And there were a number of times -- like you said here in

19   the petition for injunction, there were a number of times that

20   you had no idea where he was or what he was doing; right?

21   A    I don't know.

22        MS. RIVERA:  If I may have a moment, Your Honor?

23        THE COURT:  Yes.

24   BY MS. RIVERA:

25   Q    Did anyone coach you to come here today to blame KO for

*Testimony of Rose Beth Litzky*                                    **132**

1    that July 2, 2016, picture?

2              MS. REYES:  Objection to improper questioning.

3              THE COURT:  Sustained.

4    BY MS. RIVERA:

5    Q    So what we have established is that you know how to use

6    an iPhone; right?

7    A    What?

8    Q    You know how to use an iPhone, a cell phone?

9    A    Yes.

10   Q    Your cell phone was password protected?

11   A    Yes.

12   Q    So that not everybody could be getting into your phone;

13   right?

14   A    Yes.

15   Q    You knew how to use the camera feature of your phone;

16   right?

17   A    Yes.

18   Q    You took a number of sexual images of children -- your

19   children for Oquendo; right?

20   A    Yes.

21   Q    And that you knew that it was unlawful to take those

22   images; right?

23   A    Yes.

24   Q    And we have also established that you deleted most of

25   those images from your cell phone; right?

1   A    Yes.

2   Q    And you really didn't know maybe that law enforcement was

3   able to find those ooVoo chats; right?  At the time when you

4   were being interviewed February 3, 2017, you didn't know that

5   we had found those ooVoo chats?

6   A    They didn't find it on my telephone.

7   Q    No.  And you didn't know they had them; right?  They

8   didn't show them to you on February 3rd of 2017?

9   A    No.

10  Q    Those came out later; right?  From his phone -- from

11  Oquendo's phone?

12  A    I don't know.

13  Q    Were you surprised that the Government was able to find

14  those ooVoo images of your children?

15  A    I don't know.

16  Q    So you're saying that as to the July 2, 2016, image and

17  video that we watched here in court, that KO took that

18  picture?

19  A    Yes.

20  Q    And you saw that picture on your phone?  You saw it on

21  your phone?

22  A    No.

23  Q    How do you know -- why -- how are you saying that she

24  took that picture?  Did you direct her to take that picture?

25  A    No.

*Testimony of Rose Beth Litzky*                                    **134**

1   Q    Did you ask her to take that picture?

2   A    No.

3   Q    So when you saw that picture on your phone, did you tell

4   KO, "Hey, it was wrong to take that picture"?

5   A    I didn't saw it on my telephone.  I didn't look at the

6   pictures.

7   Q    But they were -- but you just told me that there were

8   other pictures right with that picture where EL is in the nude

9   and EL is taking a shower with the dog, and you said that you

10  sent those to Oquendo and then you shared those with Oquendo;

11  right?

12  A    Yes.

13  Q    But not the one image where EL is laying nude on the bed

14  with her legs spread apart.  Not that one; right?

15  A    No.

16  Q    But the other ones you saw; right?

17  A    Yes.

18  Q    And the other ones you sent to Oquendo?

19  A    Yes.

20  Q    You denied knowing that Oquendo was obtaining sexual

21  gratification from looking at these images; right?

22  A    What do you mean?

23  Q    Like, you denied that he was getting sexually aroused or

24  excited about looking at these pictures?

25  A    I didn't know that.

*Testimony of Rose Beth Litzky*                                    **135**

1    Q    Yet you told law enforcement, "I tell her, '▮▮▮▮, open

2    your legs.'

3         "And she, like, 'For Daddy?'

4         "I, like, 'Yes, for Daddy.'"

5         And she said, "Again?"

6         "I, like, 'Yeah.'

7         "And I'm like" -- "she, like, 'Oh, I know what Daddy

8    likes.'

9         "I'm like, 'Oh, what does Daddy like?'  And then she puts

10   her finger on her vagina."

11        Those were your words to law enforcement; right?

12   A    Yes.

13   Q    Nobody put your -- those words in your mouth; right?

14   A    No.

15   Q    And your daughter, would you agree with me, seemed to

16   understand that what her father liked was for her to fondle

17   herself for these pictures; right?

18   A    Yeah.

19   Q    And it was you -- you described yourself as the producer

20   of these types of images of your children; right?

21   A    (Nods head.)

22   Q    You say, "I tell her"; right?

23        So that was you directing your children to lay on the

24   bed, to spread their legs apart, for you to take these

25   pictures; right?

*Testimony of Rose Beth Litzky*                                    **136**

1   A    Yes.

2   Q    And in addition to asking them to spread their legs,

3   sometimes you spread the legs for them for some of these

4   pictures; right?

5   A    Yes.

6   Q    And sometimes also, in addition to that, you spread their

7   vaginal labia to expose them to the camera so that Oquendo

8   could get a better look; right?

9   A    When he asked for it, yeah.

10          MS. RIVERA:  May I have a moment, Your Honor?

11          THE COURT:  Yes.

12          MS. RIVERA:  I have no further questions,

13   Your Honor.

14          THE COURT:  Redirect, Ms. Reyes?

15          MS. REYES:  Yes, Your Honor.

16          Your Honor, I have the supplements for Government

17   Exhibits 14, 17, 18, and 19, and I've provided copies to the

18   Government.

19          THE COURT:  Okay.

20          MS. REYES:  The Government has indicated they wish

21   me to use them as defense exhibits.

22          THE COURT:  Okay.

23          MS. REYES:  So I will have them marked.

24          THE COURT:  Do you have any objection to them?

25          MS. RIVERA:  No, Your Honor.

*Testimony of Rose Beth Litzky*                                    **137**

1    THE COURT:  Okay.  This is based on your rule of

2  completeness issues with respect to 14, 17, 18, and 19?

3    MS. REYES:  Yes, Your Honor.

4    THE COURT:  So those will be marked and received as

5  defense exhibits without objection.

6    MS. REYES:  Okay.  Your Honor --

7    THE COURT:  Once you know the numbers -- do you have

8  tags on them now?

9    MS. REYES:  I don't, but I have tags with me, so I

10  can staple them right away.

11    THE COURT:  And just a reminder that you also -- you

12  also owe me an identification number for the electronic

13  proffer --

14    MS. REYES:  Yes, Your Honor.

15    THE COURT:  -- referenced during Mr. Oquendo's

16  testimony.

17    MS. REYES:  Yes, Your Honor.  It's been prepared,

18  and it's tagged, and it's 11.

19    THE COURT:  11?

20    MS. REYES:  11.

21    THE COURT:  Is it Defense 11?

22    MS. REYES:  Yes, Your Honor.

23    THE COURT:  All right.  Thank you.

24    MS. REYES:  If we could turn on the ELMO.

25    THE COURT:  Defense 11 for identification, just so

1    the record's clear.

2                          REDIRECT EXAMINATION

3    BY MS. REYES:

4    Q    Ms. Litzky, can you see that?

5    A    Yes.

6    Q    Okay.  At the time that you were taking the photographs,

7    did you consider them to be sexual?

8    A    No.

9    Q    Do you understand -- we've spoken a lot about your

10   statements to law enforcement.  Do you understand that you had

11   a right to remain silent?

12   A    No.  They never told me.

13   Q    Okay.  Did you speak -- why did you speak to law

14   enforcement?

15   A    Because I have to.

16   Q    Okay.  You spoke to them how many times?

17   A    Three.

18   Q    Okay.  You spoke to them twice on September 15th?

19   A    Yes.

20   Q    And once on February 3rd?

21   A    Yes.

22   Q    Did you speak to them a fourth time with your former

23   attorney present?

24   A    Yes.

25   Q    Okay.  And you testified that you sent Mr. Oquendo an

*Testimony of Rose Beth Litzky*                                    **139**

1    image of a dog on -- on July 2, 2016?

2    A    Not July 2nd.

3    Q    Okay.  Taking a look at your phone records from July 1st

4    through July 5th, do you see any sent messages on July 2nd?

5    A    No.

6    Q    Have you had a chance to look at the picture of the dog

7    that was taken on July 2, 2016?

8    A    Yes.

9    Q    Okay.  And how many photos of a dog were there?

10   A    Two.

11   Q    Okay.  Did you take any of those?

12   A    No.

13   Q    In regards to the money that was mentioned throughout one

14   of your interviews, did that concept of money -- did that come

15   from you or did that come from the police?

16   A    It came through me.

17   Q    Were you trying to explain that the money had to do with

18   child support?

19   A    I was, but they stop me.

20   Q    Okay.  And you denied that it was to get money; right?

21   A    Yeah.

22   Q    Okay.  And the Government asked you whether you admitted

23   to taking the photo with EL over your shoulder, and you stated

24   yes?

25   A    Yes.

*Testimony of Rose Beth Litzky*                                140

1   Q    But you -- you initially -- during the beginning of your

2   interview, you initially denied it?

3   A    Yes.

4   Q    During the screenshots -- during the ooVoo chats, did you

5   know that the codefendant, Mr. Oquendo, was taking

6   screenshots?

7   A    No.

8   Q    If he had not asked for these pictures, would you have

9   taken them?

10  A    No.

11  Q    Do you get social security?

12         MS. RIVERA:  Objection, Your Honor.  This is outside

13  the scope of cross.

14         THE COURT:  Sustained.

15  BY MS. REYES:

16  Q    Does your dad have power of attorney over you?

17         MS. RIVERA:  Objection, Your Honor.

18         THE COURT:  Scope again?

19         MS. RIVERA:  Yes, Your Honor, and relevance.

20         MS. REYES:  Nothing further, Your Honor.

21         THE COURT:  Thank you.  Ms. Litzky, you can step

22  down.

23         Call your next witness.

24         MS. REYES:  Defense rests.

25         THE COURT:  Does the Government have any rebuttal

1   evidence?

2            MS. RIVERA:  No, Your Honor.

3            THE COURT:  All right.  So, ladies and gentlemen,

4   the parties have now indicated that they've rested their cases

5   respectively.  I need to take up a couple of procedural things

6   with them.  It won't take us too long, but I'm going to ask

7   you-all to step out, stretch your legs for a minute, take this

8   opportunity to use the facility if you need to, and I'll be

9   back with you shortly.

10      (Jury out at 2:25 p.m.)

11           THE COURT:  Let me give you-all ten minutes to

12  refresh yourselves, and then let's come back and go through

13  the jury instructions.  I think my clerk left a copy of my

14  draft proposed packet of jury instructions, so we'll take that

15  ten-minute break, come back, and go through the jury

16  instructions.

17           How much time do you think you need for closing,

18  Ms. Rivera?

19           MS. RIVERA:  Forty-five minutes, Your Honor.

20           THE COURT:  Is that sufficient for you, Ms. Reyes?

21           MS. REYES:  Yes, Your Honor.

22           THE COURT:  Okay.  All right.  Let's -- anyway,

23  let's come back at 2:35.

24      (Recess at 2:26 p.m. until 2:37 p.m.)

25           THE COURT:  All right.  We're back on the record in

*142*

1   United States v. Litzky, 18-cr-223.  All counsel and the

2   defendant are present.

3           Let's go through the jury instructions.  I like to

4   go through them individually, one at a time.  You-all don't

5   need to stand up.  You can stay in your seats.  What I'll do

6   is go through each instruction that is in the Court's proposed

7   package and ask you each on the record whether you have any

8   objection to the instruction.  If you don't, I'll move on to

9   the next one.  If you do, we'll take it up.  And then after

10  I've gone through my package, I'll ask you if there are

11  additional instructions that you want that I've not included

12  that you previously submitted that you want me to -- that you

13  want to argue about, or if there are things that you have

14  submitted that I have removed that you want to argue about,

15  I'll give you a chance to do that as well.

16          This cover sheet, for your information, will be made

17  part of the record that contains my rationale for the jury

18  instructions.  So in the event the court of appeal needs to

19  know what my thought process was, this cover sheet will be a

20  part of the record as well.

21          So the Court's Proposed Instruction No. 1, the basic

22  introductory instruction, any objection from the Government?

23          MS. RIVERA:  No, Your Honor.

24          THE COURT:  From the defense?

25          MS. REYES:  No, Your Honor.

1    THE COURT:  Court's Instruction No. 2 on the

2    presumption of innocence, any objection from the Government?

3            MS. RIVERA:  No, Your Honor.

4            THE COURT:  From the defense?

5            MS. REYES:  No, Your Honor.

6            THE COURT:  Court's Instruction No. 3, definition of

7    reasonable doubt, any objection from the Government?

8            MS. RIVERA:  No, Your Honor.

9            THE COURT:  From the defense?

10           MS. REYES:  No, Your Honor.

11           THE COURT:  Court's Instruction No. 4 on the

12   consideration of the evidence as direct or circumstantial, any

13   objection from the Government?

14           MS. RIVERA:  No, Your Honor.

15           THE COURT:  From the defense?

16           MS. REYES:  No, Your Honor.

17           THE COURT:  Court's Instruction No. 5 on the

18   credibility of witnesses, any objection from the Government?

19           MS. RIVERA:  No, Your Honor.

20           THE COURT:  From the defense?

21           MS. REYES:  No, Your Honor.

22           THE COURT:  Court's Instruction No. 6, impeachment,

23   any objection from the Government?

24           MS. RIVERA:  No, Your Honor.

25           THE COURT:  From the defense?

1          MS. REYES:  No, Your Honor.

2          THE COURT:  Court's Instruction No. 7, expert

3     witnesses, any objection from the Government?

4          MS. RIVERA:  No, Your Honor.

5          THE COURT:  From the defense?

6          MS. REYES:  No, Your Honor.

7          THE COURT:  Court's Instruction No. 8, testimony of

8     a codefendant in the presence of a plea agreement, any

9     objection from the Government?

10         MS. RIVERA:  In this case, Your Honor, I just want

11    to clarify that Oquendo's plea agreement doesn't have

12    cooperation language, but he entered into a proffer agreement

13    with the Government where the Government said that it could

14    consider a motion for substantial assistance.

15         THE COURT:  Okay.  Do you object to the instruction?

16         MS. RIVERA:  The only language that may not be

17    accurate is where it states that it -- that the defendant --

18    that the codefendant entered into a plea agreement providing

19    for the possibility of a lesser sentence.

20         THE COURT:  Okay.  I don't -- I don't think

21    that's -- I don't think that warrants modification based on

22    what you've described.  It's still -- it's the same principle

23    that applies.  I don't think it matters for the jury as to

24    what the vehicle is with respect to Mr. Oquendo's situation

25    with the Government.  It's -- basically, the point of the

1   instruction is to point out that it may provide him with an

2   incentive to testify falsely.

3          How about from the defense?  Any objection to

4   Court's 8?

5          MS. REYES:  No, Your Honor.

6          THE COURT:  Court's Instruction No. 9 on

7   note-taking, any objection from the Government?

8          MS. RIVERA:  No, Your Honor.

9          THE COURT:  From the defense?

10         MS. REYES:  No, Your Honor.

11         THE COURT:  Court's Instruction No. 10, the

12   introduction to the offense instruction, conspiracy cases -- I

13   think you note from my sheet I added the word "willfully,"

14   which was not in the instruction that you submitted.

15         Any objection from the Government?

16         MS. RIVERA:  No, Your Honor.

17         THE COURT:  From the defense?

18         MS. REYES:  Your Honor, I would ask for inclusion of

19   the word "and intentionally" after "willfully" to track the

20   language of the indictment.

21         THE COURT:  I'm not going to do that.  I considered

22   it for that reason, but the word "intentional," even though it

23   is included in the indictment, it's surplusage.  It doesn't

24   add anything to "willfully and" -- "knowingly and willfully."

25   I'm going to deny your request, but I will note it, of course.

1          Otherwise, any objection, Ms. Reyes?

2          MS. REYES:  No.

3          THE COURT:  Any objection to Court's Instruction

4    No. 11, general conspiracy charge, from the Government?

5          MS. RIVERA:  No, Your Honor.

6          THE COURT:  From the defense?

7          MS. REYES:  Yes, Your Honor.  I would request the

8    word "intentionally" be included to track the language of the

9    indictment.

10          THE COURT:  Same ruling with respect to

11   Instruction No. 10.  I note your request and deny it.

12          MS. REYES:  Your Honor, I'm sorry.  For Element 2 --

13          THE COURT:  Yes.

14          MS. REYES:  -- as well, I would request the

15   inclusion of the word "knowingly" as well as "intentionally."

16   I understand the Court's ruling on "intentionally," but I

17   would also ask for Element 2 to include "knowingly."

18          THE COURT:  Okay.  Let me take a look at the pattern

19   and see whether or not "knowingly" is in the pattern.

20          Looking at Offense Instruction 13.1, I don't see it

21   in the pattern.  I think the reason it's not there is because

22   it comes after the word "knew" -- "The defendant knew about

23   the plan's unlawful purpose and willfully joined in it" --

24   which I think incorporates the knowledge aspect of it.  So I'm

25   going to stick with the pattern instruction and deny your

1    request to modify it.

2         Court's Instruction No. 12, any objection from the

3    Government?  And that's the 2251 instruction.

4         MS. RIVERA:  Yes, Your Honor.  And it was regarding

5    the definition of lascivious exhibition.  We provided the

6    *Holmes* opinion as well as the jury instructions in a recent

7    case that Judge Mendoza just recently tried, and we provided

8    copies to the defense, where I think in this case, even more

9    so after Connor -- as to Mr. Connor testified regarding

10   whether that image at issue here in Counts 2 and 4, whether

11   that is lascivious exhibition.  I think it would be helpful to

12   the jury to have the language that we've suggested in terms

13   of -- of what a lascivious exhibition may be.

14        In particular, in -- in the -- in the case that we

15   have included here, the jury instructions -- in the case of

16   United States v. Carlos Rodriguez-Fernandez, basically

17   tracking the language in the *Holmes* case --

18        THE COURT:  That's not an appellate decision.

19   That's Judge Mendoza's case.

20        MS. RIVERA:  Yes, Your Honor.  But we are referring

21   to the Eleventh Circuit decision in *United States v. Holmes* --

22        THE COURT:  Right.

23        MS. RIVERA:  -- as to the fact that depictions of

24   otherwise innocent conduct may, in fact, constitute a

25   lascivious exhibition of the genitals or pubic area of a minor

1   for purposes of the definition of sexually explicit conduct.

2          THE COURT:  Is *Holmes* a jury instruction case?

3          MS. RIVERA:  No, Your Honor.

4          THE COURT:  I didn't think it was.

5          MS. RIVERA:  No, Your Honor.  But what I'm

6   suggesting, Your Honor, is that it would be helpful to the

7   jury even more so based on the opinion that was provided here

8   by Mr. Connor, which we were not able to ask Agent Dufresne as

9   to whether or not any of these images depicted sexually

10  explicit conduct or constituted child pornography; however,

11  the defense expert opined on the image charged in Counts 2 and

12  4.  I think this would be --

13         THE COURT:  I don't recall his testimony that way.

14  The record will reflect what it was, but you and I have a

15  different recollection of his testimony.  He was asked whether

16  or not he was searched for that information --

17         MS. RIVERA:  He did.

18         THE COURT:  -- for that information, just as

19  Mr. Dufresne was.

20         MS. RIVERA:  And then a follow-up question was

21  whether he had found any images that depicted such conduct.

22  The defense then went to the next step, which was -- but I

23  believe the Court had prohibited us from doing and asked the

24  question whether any of the images on that iPhone depicted

25  a -- a prepubescent minor engaged in sexual activity or the

1   lascivious exhibition of the genitals, and he did opine on

2   that, Your Honor.

3              THE COURT:  I gave a limiting instruction.  I'm

4   quite confident about it.

5              MS. RIVERA:  Yes, Your Honor.  And so we would like

6   to state our request that at least this sentence as to the

7   depictions of otherwise innocent conduct -- because that's

8   what we have there is a child acting innocently, but it's not

9   just that that the jury should consider.  It's also the

10  purpose of the producer in creating that image.

11             THE COURT:  I'm going to decline to do that.  It

12  feels like putting a thumb on the scale in favor of the

13  Government, and I'm going to stick with the pattern language.

14  I think the factors that the jury relies upon that are

15  extensive in the jury instruction are sufficient to cover the

16  Government's concern.

17             MS. RIVERA:  In addition, Your Honor --

18             THE COURT:  Yes.

19             MS. RIVERA:  -- the Court didn't include the

20  suggested language on the live visual transmissions --

21             THE COURT:  Yes.

22             MS. RIVERA:  -- which is -- has been charged as to

23  Count 1 exclusively, and we don't see any reference to that

24  in -- in the jury instructions.

25             THE COURT:  Yes.  I'm not going to --

*150*

1           MS. RIVERA:  That is one way in which the defendant
2    may violate the statute.
3           THE COURT:  I'm not going to include that either
4    because it's duplicative of what's already in the instruction
5    with respect to visual images.
6           Anything else?
7           MS. RIVERA:  I think that was it, Your Honor.
8           THE COURT:  Okay.  How about from the defense?  Any
9    objection to the Court's Instruction No. 12?
10          MS. REYES:  No, Your Honor.
11          THE COURT:  Court's Instruction No. 13 -- that's the
12   2252A(a)(2)(A) and (5)(B) charge.  Any objection from the
13   United States?
14          MS. RIVERA:  Yes.
15          THE COURT:  That's Count 4.
16          MS. RIVERA:  Yes, Your Honor.  The same objection as
17   to clarification on the definition of lascivious exhibition.
18          THE COURT:  Same ruling.
19          Any objection from the defense?
20          MS. REYES:  No, Your Honor.
21          THE COURT:  Court's Instruction No. 4 on the various
22   types of possession, any objection from the Government?
23          MS. RIVERA:  No, Your Honor.
24          THE COURT:  From the defense?
25          MS. REYES:  No, Your Honor.

1           THE COURT:  Court's Instruction No. 15, any

2   objection from the Government?  That's the definition of

3   knowingly and willfully as it relates to Count 1.

4           MS. RIVERA:  No, Your Honor.

5           THE COURT:  From the defense?

6           MS. REYES:  No, Your Honor.

7           THE COURT:  Court's Instruction No. 16, the basic

8   conjunctive instruction, any objection from the Government?

9           MS. RIVERA:  No, Your Honor.

10          THE COURT:  From the defense?

11          MS. REYES:  No, Your Honor.

12          THE COURT:  Court's Instruction No. 17, cautionary

13  instruction regarding punishment, any objection from the

14  Government?

15          MS. RIVERA:  No, Your Honor.

16          THE COURT:  From the defense?

17          MS. REYES:  No, Your Honor.

18          THE COURT:  Court's Instruction No. 18 on avoiding

19  the use of technology, any objection from the Government?

20          MS. RIVERA:  No, Your Honor.

21          THE COURT:  From the defense?

22          MS. REYES:  No, Your Honor.

23          THE COURT:  Court's Instruction No. 19 on the duty

24  to deliberate, any objection from the Government?

25          MS. RIVERA:  No, Your Honor.

1          THE COURT:  From the defense?

2          MS. REYES:  No, Your Honor.

3          THE COURT:  Court's Instruction No. 20, introducing

4   the verdict form, any objection from the Government?

5          MS. RIVERA:  No, Your Honor.

6          THE COURT:  From the defense?

7          MS. REYES:  No, Your Honor.

8          THE COURT:  I included the forfeiture instruction.

9   I don't know whether you-all want to reach an agreement with

10  respect to forfeiture if there is a guilty verdict or if you

11  want to have this jury decide the forfeiture issue.  Have

12  you-all had a conversation about that?

13         MS. RIVERA:  We just did, Your Honor, and the

14  defense will not stipulate.

15         THE COURT:  Okay.  All right.  Well, we'll see what

16  happens if we get a guilty verdict.  If you-all don't reach an

17  agreement on the forfeiture issue, I'll send the jury back to

18  resolve the forfeiture issue.

19         Let's take a look at the verdict form.  One of

20  the --

21         MS. RIVERA:  Your Honor, if I may?

22         THE COURT:  Huh?  Pardon?

23         MS. RIVERA:  I wanted to suggest an additional

24  instruction.

25         THE COURT:  I'll get to that.

1              MS. RIVERA:  Oh, sorry.

2              THE COURT:  That's all right.

3              As to the verdict form, I just want to make sure as

4    it relates to the July 2 image -- is Exhibit 13 the right

5    number?  And is it 13 only, or is it 13 and 14?  I seem -- I

6    seem to recall there was a still and then there's a short

7    video.  I just want to make sure we don't send them off in the

8    wrong direction with the wrong exhibit number.

9              MS. REYES:  Number 12, Your Honor, is Counts 2 and

10   4, and then 13 is just her holding EL over her shoulder

11   displaying her genitalia.  But the -- the charged counts is

12   Exhibit 12.

13             THE COURT:  Exhibit 12?

14             MS. RIVERA:  That is correct, Your Honor.

15             THE COURT:  So then, in the last paragraph of the

16   verdict form, where I say, "Indicate whether the image of

17   child pornography depicted in Government Exhibits" -- that

18   should be 12?

19             MS. REYES:  Yes, Your Honor.

20             THE COURT:  Do you agree with that, Ms. Rivera?

21             MS. RIVERA:  Yes, Your Honor.

22             THE COURT:  Okay.  Thank you.

23             Now, how about the verdict form at large with that

24   change?  Any objection from the Government?

25             MS. RIVERA:  No, Your Honor.

*154*

1          THE COURT:  From the defense?

2          MS. REYES:  No, Your Honor.

3          THE COURT:  All right.  Thank you.

4          Now, Ms. Rivera, you wanted to make a request for

5    some additional instructions?

6          MS. RIVERA:  Your Honor, we would like to suggest

7    the instruction of aiding and abetting given all the evidence

8    that has been presented here.  I think, Your Honor, that

9    the -- the instruction is justified and supported by the

10   evidence.

11         THE COURT:  Okay.  Did you submit it in advance?

12         MS. RIVERA:  No, Your Honor.  And, to be honest,

13   candid with the Court, it occurred to me as -- as things were

14   happening here in court that -- and mostly to the conclusion

15   of the case -- that -- and considering that the Court excluded

16   some of our other proposed instructions, that that would be

17   warranted.

18         THE COURT:  What do you say to that, Ms. Reyes?

19         MS. REYES:  I haven't looked at the instruction,

20   Your Honor.

21         THE COURT:  I'm looking at it right now.  It's

22   Special Instruction No. -- let's see.  Let me find the right

23   one.

24         MS. RIVERA:  Special Instruction No. 7, Your Honor.

25         MS. REYES:  I'm trying to look it up so I can read

1  it.

2       THE COURT:  Is she charged in the indictment with

3  aiding and abetting?

4       MS. RIVERA:  Not -- no, Your Honor.  Not a

5  Section 2.  But the evidence showed that they did aid and abet

6  each other, and it was not required that we charge it in that

7  manner.

8       THE COURT:  You say that very authoritatively.  Do

9  you have authority for that proposition that it's not

10  necessary that she be charged?

11       MS. RIVERA:  Well, Your Honor, I could -- if we do

12  recess, I can definitely go and look up -- for that case law

13  because I believe, Your Honor, that there is case law on the

14  subject of aiding and abetting, that it can be proved and not

15  alleged in that manner in the indictment, Your Honor.

16       Your Honor, there's a case, *United States*

17  *v. Seabrooks*, 839 F.3d 1326.

18       THE COURT:  Do that one more time slowly, please.

19       MS. RIVERA:  *United States v. Seabrooks,*

20  *S-e-a-b-r-o-o-k-s*, 839 F.3d 1326, page 1333, Eleventh Circuit,

21  2016.  There's also *United States v. Broadwell*, 870 F.2d 594,

22  Eleventh Circuit, 1989; and *United States v. Howard*,

23  13 F.3d 1500, Eleventh Circuit, 1994.

24       MS. REYES:  Your Honor, if we could repeat the last

25  cite.

1       MS. RIVERA:  13 F.3d 1500, Eleventh Circuit, 1994.

2       THE COURT:  So what's the one after *Seabrooks*?

3   Because *Seabrooks* talks about the sufficiency of the evidence

4   for aiding and abetting, not whether -- I can't tell whether

5   the defendant was charged with aiding and abetting in

6   *Seabrooks* based on my quick skim of it.  What were your other

7   citations?

8       MS. RIVERA:  *United States v. Broadwell*,

9   870 F.2d 594.  And as to *Seabrooks,* it was page 1333 that was

10  cited here.

11      THE COURT:  All right.  Let me go to that pincite.

12      1331.  So at 1331 the opinion says "The indictment

13  charged Butler and Seabrooks each with committing one count of

14  being a convicted felon in possession of a firearm and

15  ammunition, in violation of" -- it doesn't say whether he

16  was -- it doesn't say that he was charged, but I guess the

17  absence of the reference would support the notion that he was

18  not charged with aiding and abetting.

19      Okay.  What I'm going to do is I'm going to -- I'm

20  going to -- my law clerk's going to continue to do some

21  research on this, but assuming that the absence of the

22  indictment -- absence of the charge in the indictment is not

23  an impediment -- I'm not asking you to agree to that, but I'm

24  going to satisfy myself one way or the other as to whether it

25  is or it isn't, but, substantively, do you have any objection

1   to the charge, Ms. Reyes?

2        MS. REYES:  Yes because I believe it changes the

3   nature of the conspiracy.

4        THE COURT:  Okay.  So I'll pass that for a moment.

5   I'm going to come back to it.

6        Any other instructions being requested from the

7   United States?

8        MS. RIVERA:  No, Your Honor.

9        THE COURT:  How about you, Ms. Reyes?  Any other

10  additional instructions?

11       MS. REYES:  No, Your Honor.

12       THE COURT:  Do you-all have any additional arguments

13  other than what you've already made as to the instructions?

14  I'm not asking you to say it over again; I just want to see if

15  there's anything new before I move on.

16       MS. RIVERA:  Your Honor, I think the instruction

17  that we're proposing could be specifically applicable to

18  Counts 2 -- Count 2 of the indictment.

19       THE COURT:  The aiding and abetting instruction?

20       MS. RIVERA:  Yes, Your Honor.

21       THE COURT:  Okay.  Do you want to add anything,

22  Ms. Reyes, to what you've argued already?

23       MS. REYES:  No, Your Honor.  I would object.

24       THE COURT:  Okay.  Understood.

25       What I'm going to do is I'm going to do some

1   research while you-all are making your closing arguments.

2   Usually, I give my instructions prior to closing arguments,

3   but in the interest of time, I'm not going to do that today.

4   I'm going to do this research, and I'll let you know before I

5   start to charge the jury whether I'm going to include aiding

6   and abetting or not.

7           And, obviously, if I do, I'll note your objection,

8   Ms. Reyes, on both grounds: that it's not charged in the

9   indictment as well as your other ground, which escapes me at

10  the moment -- oh, I think that it changes the nature of the

11  conspiracy and, consequently, would not be appropriate.

12          All right.  Are you-all ready to proceed with

13  closing?

14          MS. RIVERA:  Yes, Your Honor.

15          THE COURT:  Are you ready, Ms. Reyes?

16          MS. REYES:  Your Honor, I would like to renew my

17  Rule 29 argument and, if possible, if we could have five

18  minutes to collect our thoughts.

19          THE COURT:  Sure.  I think that's reasonable.

20          So I'm going to -- same ruling with respect to your

21  Rule 29 motion.

22          MS. REYES:  Yes, Your Honor.

23          THE COURT:  I do want to tell you-all in case I --

24  in case I forget to do it.  I don't think I will, but in case

25  I do forget to do it, again, in the event of a guilty verdict,

*159*

1   I would appreciate, Ms. Reyes -- not that you need me to tell

2   you, but I would appreciate getting some additional briefing

3   from you in your posttrial motions on the question as to

4   whether or not it was error for the Court to exclude evidence

5   of duress; secondly, whether or not it was error to exclude

6   evidence of a diminished capacity as it relates to criminal

7   intent; and, third -- this is for you, Ms. Rivera -- whether

8   or not those issues were, in essence, tried by consent between

9   the parties.  So those three things I want to make sure

10  you-all cover in your briefings in case I forget it because

11  those are the things that have been on my mind.  I'm afraid,

12  once I move on to the next project, I might forget.

13          So we'll take a five-minute recess.  We'll come

14  back.

15          And, Mr. Countryman, if you'll help rearrange the

16  furniture, we'll go to closing arguments.

17          THE COURTROOM DEPUTY:  Yes, Your Honor.

18      (Recess at 3:05 p.m. until 3:14 p.m.)

19          THE COURT:  All right.  We're back on the record.

20  United States v. Litzky, 18-cr-223.  The Court notes all

21  counsel and the defendant are present.

22          I have had a chance to read and review the cases the

23  Government provided me, Ms. Reyes, and I do agree the

24  Eleventh Circuit is clear that the failure to allege aiding

25  and abetting in the indictment does not preclude the giving of

1   the instruction.  So I am going to give the instruction, and

2   my clerk is preparing that now, and I'll include it and put it

3   in the appropriate place in the package.

4          The other thing I don't think I mentioned to you-all

5   but just so you know is it's my practice to give the jury two

6   copies of the written instructions.  They don't have any

7   headers on them.  All the information is stripped off.  So all

8   they have is a booklet form that goes from beginning to end.

9   I give them two copies of the instructions, obviously, the

10  verdict form, a redacted copy of the indictment, which I hope

11  you have for me, Ms. Rivera, and the exhibits once you-all

12  have been through the exhibits.

13         So after I'm finished with my instructions, if

14  you-all would make sure you look carefully at the exhibits.

15  If anything -- and take out anything that's not supposed to be

16  there, and if there's something missing, make sure that you

17  bring that to my attention.

18         I also think I need to -- I don't think I ever

19  formally admitted Defense Exhibits 12, 13, 14, and 15, which

20  were the -- which were the additional information that the

21  defense offered in the interest of completeness on

22  Government's 14, 17, 18, and 19.  So those -- those are

23  received without objection.

24     (Defendant's Exhibit Nos. 12 through 15 were admitted

25  into evidence.)

1          MS. REYES:  Your Honor, I made 14 copies of

2    exhibits -- of Government Exhibits 6 and 8.  Can I tell the

3    jury that they're going to have copies to take back with them

4    individually?

5          THE COURT:  Exhibits 6 and 8 -- remind me what those

6    are.

7          MS. REYES:  The transcripts.

8          THE COURT:  I thought the transcripts are already in

9    evidence.

10          MS. REYES:  They are, Your Honor, but I made hard

11    copies if they want them.  So instead of having one copy, they

12    can each have a copy of Exhibits 6 and 8.

13          THE COURT:  Okay.  I'm going to give them one copy.

14    If they ask for more, I'll give them to them.  Part of the

15    reason I do that, part of the reason I give them two sets of

16    instructions is it requires them to collaborate.  If they ask

17    for more, I'll give them to them.  I don't have any strong

18    feelings about it.  I don't have any strong objection to it

19    other than I'm worried that maybe it highlights one piece of

20    evidence over another.  So I think in the interest of avoiding

21    that potential problem, unless the Government wants to

22    acquiesce, I'll leave them with one copy and give them more if

23    they ask for it.

24          MS. RIVERA:  I think the Court's decision on that

25    matter is appropriate.  I don't have any objection.

162

1          THE COURT:  All right.  Let's bring our jury in.

2          Is that all?  I'm sorry.

3          MS. REYES:  Your Honor, since the instructions are

4    ready, would you read them first?

5          THE COURT:  They're actually not quite ready.  I

6    don't think they're quite ready.

7          Do you want to ask Meghan if they're ready?

8          You're not just trying to make me talk so you can

9    work on your notes, are you?

10          MS. REYES:  Yes, Your Honor.

11          THE COURT:  I figured as much.

12          THE COURTROOM DEPUTY:  She needs five minutes.

13          THE COURT:  We're going to do our closing arguments.

14   Let's bring our jury in, please.  If it was earlier, I'd be

15   more flexible.

16          Do you want to be warned with respect to the

17   expiration of your time?

18          MS. RIVERA:  Yes, Your Honor.  Fifteen minutes.

19          THE COURT:  So you want to get a warning at

20   30 minutes -- when 30 minutes expires?

21          MS. RIVERA:  Yes, Your Honor.

22          THE COURT:  Okay.  Mr. Countryman will do that.

23       (Jury in at 3:18 p.m.)

24          THE COURT:  All right.  Welcome back, ladies and

25   gentlemen.  The lawyers have now concluded the presentation of

*163*

1    evidence portion of the case, and we're going to go now into

2    closing arguments.  I want to ask you to give the lawyers, if

3    you would, your undivided attention.  Ms. Rivera will make the

4    original argument on behalf of the United States, after which

5    we'll hear from Ms. Reyes on behalf of the defense, and then

6    consistent with the fact that they have the burden of proof,

7    the Government has an opportunity to come back and make some

8    brief rebuttal after Ms. Reyes concludes her argument.

9          Once that has been completed, then I'm going to give

10   you -- I'm going to read to you your instructions on the law.

11   You-all will then be free to retire to deliberate.

12         We'll talk a little bit about the schedule.  I

13   suspect that we may run over -- past 5:00 a little bit.  Let

14   me just ask you-all now:  If we do go beyond 5:00 -- I know I

15   promised you'd be out at 5:00 -- would that present a hardship

16   for any of you if we go a little past 5:00 today?

17         JUROR:  No.

18         THE COURT:  No?  Okay.

19         All right.  Ms. Rivera, you may proceed.

20         MS. RIVERA:  Thank you.

21         Ladies and gentlemen of the jury, thank you for your

22   patience in listening to this case.  We're here now to do

23   these closing statements.

24         If you can present -- technology not always works.

25         That's fine.  I can read the statement, and it's

1    very short.  Actually, I can publish it on the ELMO, if we may

2    use the ELMO.

3              "I tell her, '█████, open your legs.'

4              "And she, like, 'For Daddy?'

5              "I, like, 'Yes, for Daddy.'

6              "'Again?'

7              "I, like, 'Yeah.'

8              "And, um, she, like, 'Oh, I know what Daddy likes.'

9              "I'm, like, 'Oh, what does Daddy like?  And then she

10   puts her finger on her vagina."

11             Those were the defendant's words.  Nobody put those

12   words in her mouth.  Nobody suggested to her these statements

13   that she made to law enforcement indicating what her children

14   knew to do based on the many times that this defendant and

15   Oquendo took sexually explicit images of the children.

16             And so I know this case is pretty outrageous in

17   terms of seriousness and nature of the sexual exploitation of

18   the children --

19             MS. REYES:  Objection, Your Honor, to improper

20   opinion.

21             THE COURT:  Sustained.

22             MS. RIVERA:  But --

23             THE COURT:  Please confine your remarks to the

24   evidence and reasonable inferences that can be drawn from the

25   evidence.

1          MS. RIVERA:  Yes, Your Honor.

2          However, the evidence, you have seen, is

3     straightforward.  The defendant for a number of years used and

4     manipulated her children into engaging in sexual poses for the

5     purpose of producing live transmissions or visual depictions

6     for Roberto Oquendo.

7          The motive?  To make him happy.  Obviously, based on

8     the many communications between the two of them that you'll be

9     able to read, she was in love with him.  She had, obviously, a

10    romantic interest in him, and every time that he went away, as

11    it appears from these messages and the evidence that you heard

12    here in court, she wanted him back.

13         And how would she lure him back?  How would she

14    entice him?  Well, she knew what he liked, and that was her

15    way of attracting him, of getting him back, and she knew that

16    those images were for her sexual gratification.  These words

17    she said to the agents and the context in which she said them

18    revealed to you that she knew those images were for a sexual

19    purpose, an unlawful purpose, and she knew that it was

20    wrongful.  She admitted a number of times that she knew it was

21    wrong and even here in court admitted that it was wrong.

22         We only showed you a few of those images and the

23    text messages, and the defense has marked as an exhibit

24    basically all thousands of messages between the two of them.

25    When Oquendo came here and testified that that was her

1    preferred method of communication based on her speech

2    impediment, he meant it.  These were all -- all of these were

3    communications mostly extracted from his cell phones.  The

4    only -- the only one of these groups of messages that pertains

5    to her cell phone is Defendant's Exhibit No. 15.  12, 13,

6    14 -- they're all his messages -- messages between the two of

7    them that were found on his cell phone.

8            Now, when we talk about the quality of the evidence

9    and the best evidence, usually you expect to see images,

10   videos, forensic evidence, things that you can see, read, and

11   persuade you that these are what they are or what people say

12   they are.  Well, in this case, conveniently, the defense --

13   the defendant has alleged that the threats were not

14   messages -- in text messages, in writing, not ever because she

15   knows that none of these messages are going to reveal that

16   there was that kind of relationship between the two of them.

17   You will find no messages here indicating, "Send me a picture

18   of the children in the nude; or, otherwise, I will hurt you,

19   or, otherwise, I will send the boys."  And the reason why she

20   was cut short in her explanation was obviously because the

21   agents didn't believe what she was saying, as shown by

22   hundreds, thousands of messages between the two of them.

23           And when you look -- and this is as it pertains to

24   Count 1.  The Government alleged that between October 2014 --

25   October 2014 to on or about September 15, 2016, this defendant

and Oquendo conspired knowingly, willfully, intentionally with
each other to use the children to engage in sexually explicit
conduct for the purpose of producing a visual depiction.  That
sounds very technical, but, however, it's actually very
simple, that she joined with him -- it's two or more persons,
Oquendo and her.  They joined in some way or manner -- it
doesn't have to be spelled out in writing -- into a mutual
understanding to try to accomplish a common and unlawful plan
and that she knew -- the second prong of that conspiracy is
that she knew about the plan's unlawful purpose and she
willfully joined in it, that her joining in this plan was
willing -- she was willing, and she knew of the unlawful
nature of the plan, and that we know was the evidence that was
presented here in court during the last few days.  She even
admitted to knowing of the unlawful nature of her actions.

        The motive, I already indicated, was to provide him
sexual gratification.  Their agreement was to use, entice,
induce the children to engage in these sexual poses for the
purpose of creating those visual depictions.  So it's really
very simple and straightforward in that manner.

        The conduct actually occurred between -- as to
Count 1, between June 2000- -- between June of 2014 and March
of 2015.  The indictment alleges based on the images that were
retrieved from the ooVoo application that it's from October of
2014, and you heard evidence from Agent Dufresne that gave you

1    those dates as to the location of that device, Oquendo's

2    device, where those ooVoo images were found.  That phone was

3    in Virginia, and I -- the Government submits there's

4    absolutely no doubt that Oquendo was in Virginia at the time

5    when these communications were taking place.

6            The reason why you'll see the September 15, 2016,

7    date in the indictment is because that's the date those images

8    were found -- basically, when that cell phone was found at 303

9    Palmetto Avenue in Brevard County, the Middle District of

10   Florida, that transportation element of that count is met

11   because the Government had to prove that those images traveled

12   in interstate commerce from Virginia to the Middle District of

13   Florida where they were found, and we proved that -- the

14   Government proved that beyond a reasonable doubt by showing

15   that that cell phone where those images were contained was

16   seized, was collected from that residence at 303 Palmetto

17   Avenue in Brevard County within the Middle District of

18   Florida.  And we know that from the -- from different sources:

19   Mr. Malham, who took the agents to that location to retrieve

20   the bag and confirm its location.  You also heard from

21   Agent Deavers, who identified that evidence here in court, and

22   you heard it from Oquendo, and there's actually absolutely no

23   dispute as to where those -- where those images were found and

24   where that cell phone was retrieved from.

25           And when you look at the allegations in Count 1, the

1   only issue that the defense is raising, I believe, based on

2   the defendant's admissions, is that she was under some kind of

3   threat at the time, but we never heard of any imminent threat,

4   and being generally afraid of someone is not justification.

5   It's not an excuse.  The sexual exploitation of these two

6   children cannot be justified based on some general concern

7   that the defendant -- that Mr. Oquendo had a bad temper.  You

8   even heard from their own witnesses that they didn't

9   witness -- they didn't see -- none of them saw Roberto Oquendo

10  be physically abusive with the defendant.

11          Oquendo did recognize having a bad temper.  He

12  recognized that he drank excessively.  I believe the

13  Government also believes that he recognized having pulled a

14  child's hair at one moment.  But he testified here, and he was

15  under oath, knowing that he can expose himself to a

16  prosecution for perjury, when he said that he never threatened

17  her into producing those images; and, basically, his testimony

18  was to the effect that the defendant knew that's what he

19  liked, and so she made those images for him to make him happy.

20          As much as you -- you may despise Roberto Oquendo

21  for his despicable crime, he's not the one you're called to

22  judge here, and he already pled guilty for his crimes.  You

23  may think, "Well, he has a motive to come here and testify."

24  True.  But he's bound by the oath that he took, and he was

25  well aware of the consequences that lying could entail in this

1   case.

2           Further, you don't have to take his word for

3   anything.  Independent evidence in this case showed beyond a

4   reasonable doubt that, as charged in the indictment, between

5   at least October of 2014 to March of 2015, while he was

6   residing in Virginia and the defendant resided in Florida,

7   they were engaged in these communications over this social

8   media application, and I encourage you to review Government

9   Exhibit No. 15.  It does show how the defendant at times,

10  without any prompting, without any provocation, offered

11  Oquendo to see the children in the nude, and she admitted that

12  much here in Court.

13          And that would be -- Bates 658 is one of those

14  instances.  October 28, 2014, at 9:52:44, she offers ███ --

15  I'm sorry -- KO naked.  And his response is "Let me see."  And

16  he didn't respond immediately.

17          And then the next day she asked for clarification.

18  "See whose?"

19          And his response to that is "Too close."

20          And you may recall what his answer -- what his

21  answer was to the fact as to what was the context of this

22  response, that this defendant was showing him a child's

23  vaginal area and it was just too close for him to get a good

24  visual of that image.

25          And on the next page, because apparently they were

1    having problems with the application, page 659, she says, "I

2    call you at 8:00 a.m."

3              He says, "Okay."

4              His response again is "Why?" at 9:08 p.m.

5              And she offers, "See kids naked."

6              His response to that was "Oh, okay."

7              You will see based on these text message

8    communications that a lot of their communications were very

9    casual like this about daily events, about him requesting

10   pictures of the children.  It was just casual.  It was not a

11   big deal for this defendant, but they were concerned that this

12   defendant would be caught with nude images of the children by

13   her father, who she resided with, and so she deleted -- she

14   deleted those images.  And he testified in court here today

15   that he encouraged her to delete those images because her

16   father could go through that phone and find those images.

17             You saw the screenshots.  They showed the two child

18   victims being made to spread their legs in an unnatural

19   manner, and they showed close-ups of their vaginal area.  They

20   also showed the defendant's face in those pictures while

21   manipulating her daughters as sexual objects for Oquendo's --

22   so that he could get a better look.  Those images, you will

23   find, based on the definitions provided to you in your

24   instructions -- and the Court will instruct you on the law --

25   constitute clearly sexually explicit conduct, and they are

1    lascivious exhibition of the children's genitalia.

2         In deciding whether those visual depictions

3    constitute child pornography, I would -- the Government -- you

4    should consider the defendant's -- what was the defendant's

5    intent in making and producing those depictions: to satisfy

6    the sexual desire of Oquendo.  Even these depictions, as

7    innocent as they look of their innocent conduct, constitute

8    lascivious exhibition of their genital area because of the

9    purpose for which they were produced.

10        The minors, as you will find from the jury

11   instructions -- they don't need to be acting in a sexual

12   manner or displaying lust.  In fact, you'll see that in most

13   of these images -- and we have all the ooVoo images here.  I'm

14   not encouraging you to look at those.  We showed what the

15   Government believes is sufficient evidence.  However, you will

16   see that, in most of those images, the children are just

17   acting innocently.  It is this defendant who is using them in

18   a sexual manner to expose them.

19        So the Court will give you several factors to

20   consider in determining whether those images constitute

21   lascivious exhibition, and you should consider the context in

22   which those images were made -- children lying on a bed,

23   sexually suggestive settings, the unnatural poses, how their

24   legs were spread apart by the defendant, and, most

25   importantly, as I said before, you should consider the

1    defendant's purpose to stimulate Oquendo's sexual desire for

2    the children.  And so the plan was simple and obvious: to

3    create sexual images of the children for Oquendo's enjoyment

4    as he viewed them.

5           We also showed that all of these other elements are

6    met.  As you know, these images depict a real child, two

7    different children.  The defendant used them, implored them in

8    this manner, to spread their legs apart, and that would be

9    sexually explicit conduct, and it was further purpose of

10   producing a visual depiction of the conduct and that those

11   images were transported in interstate commerce through Brevard

12   County, where they were found.

13          As to that interstate transportation nexus, you'll

14   see from the instruction that the law does not require the

15   defendant to have knowledge as to the interstate

16   transportation.

17          So the commission of this crime was accomplished

18   simply by her engaging in this implicit and sometimes sexual,

19   as you will see, messages, agreement to expose her children in

20   this manner.

21          The fact that Oquendo was in Virginia and she was in

22   Florida doing these acts to her children on her own show to

23   you that there was actually here no concern of immediate

24   threat.  She actually had many opportunities to talk to law

25   enforcement, to report any concerns of "He's making me take

1    pictures of my children in this manner," and she did not.  In

2    fact, the references to this injunction, which was found to be

3    insufficient -- her main concern appeared to be that he had

4    walked out on them.  There were no allegations of sexual abuse

5    ever raised by this defendant regarding the children.

6            And it is -- before I go there, when you look at the

7    ooVoo chats, you will see that on October 25, 2014, Oquendo

8    says about EL that "Her vagina got big.  Does she play with

9    it?"  He immediately asks for a picture of it.

10           The defendant's response is "Later," a casual

11   response.  "You're going to see it on video again."  That was

12   her follow-up response.

13           Oquendo says, "I want a picture.  It lasts longer."

14           And the defendant's response to that was "Okay.

15   When she wake up."  And then she tells him, "I love you so

16   much."

17           This is the best evidence of the nature and context

18   of these relations.  You're going to see oftentimes referrals

19   to "I love you.  I miss you.  Can you come back?  Can you come

20   to bathe the kids?"  Because that's what she wanted, and this

21   is not about "He was threatening me into doing this."  This is

22   about "I want" -- she wanted Oquendo back in her life, and

23   this is how she knew to entice him.

24           Then, on October 26, 2014, Defendant informed

25   Oquendo that the kids were naked.  She said, "Kids naked.  You

*175*

1  want to see them?"  And Oquendo then asked for pictures, to

2  which she replied, "They don't sit still for pictures."

3       Oquendo then said, "Too bad."

4       And the defendant then asked Oquendo for money to go

5  see him in Virginia.

6       So this is the man that she fears; yet she's making

7  plans -- and you will see these are chats that had been

8  deleted and were recovered by the Government during the

9  forensic examination and the best evidence that we have of

10  what was the true nature of their relationship at the time.

11  She wanted to see him, she wanted to be with him, and she was

12  making plans to go see him in Virginia.

13       There is no excuse for what she did to these

14  children in this case.  She's capable.  She's smart.  She

15  showed that she was smarter than him in many ways by deleting

16  all those images from her cell phone.

17       When Oquendo got sexually aroused by what he saw on

18  October 29, the one exhibit that I just displayed to you, she

19  just says, "Ah, I'm sorry" -- this is Bates 662 -- "Go play."

20       And Oquendo explained to you, but this is not rocket

21  science as to what "Go play" means in this context.

22       If you see the next few messages, he says, "I like

23  seeing them naked.  I play later when you ready."

24       And her response to that was "Awww.  You're going to

25  send me a picture?"

1            And then he said, "Video.  And then you send one.
2    Put the vibrator in your p-u-s-s-y."  They're obviously
3    talking in a sexual context.  She knew exactly what was going
4    on here.
5            This is not the crime of the century.  Their
6    actions --
7            MS. REYES:  Objection as to unnecessary minimizing.
8            THE COURT:  Objection's sustained.
9            MS. RIVERA:  Their actions and words -- all of it
10   was clearly sexual.  The defendant also knew that he was
11   creating these screenshots based on those live transmissions,
12   and the ooVoo chats actually show that she was well aware of
13   it because, when he became concerned that the application was
14   not working properly, she said, "Delete it and then install it
15   again."  And he was concerned that he was going to lose his
16   pictures, and she's, like, "No, you're not because I did it.
17   I uninstalled it, and I didn't lose mine."  Those were her
18   words.  She knew exactly how the application worked, and she
19   knew that he was creating these screenshots.
20           Her deliberate actions in this case of taking these
21   sexual pictures and videos, sending them to Oquendo, and later
22   deleting them showed that she knew the wrongness of her
23   actions.  Her actions were thought out, planned, and
24   deliberate.
25           And as to Counts 2 and 4, we had to show as to

1    Count 2, the production of child pornography, by creating that

2    image of EL lying in the bed with her vaginal area exposed and

3    the short video clip -- that image and video -- that's the

4    basis of Count 2 and 4.  Because in one count, Count 2, she's

5    being charged with the use of the child in producing that

6    image and creating that image; and in the other count,

7    Count 4, she's charged with the possession of that -- of that

8    image.  So these are two different crimes.

9             And, very conveniently, she came here and pretty

10   much confessed to the taking of the ooVoo chats because of the

11   obvious nature of those images, but then as to the other

12   counts, the other crimes, "Well, those, I did not -- I didn't

13   take -- I didn't take that image.  I didn't create that

14   video"; yet that video and image was found with all the other

15   images of EL that you have seen here in court where you see

16   the image with the dog and the -- all of those images and

17   videos were in the phone, and they -- that was her phone that

18   she had access to, and she's in all of those.  And she admits,

19   "Oh, I sent all of the other images of EL in the nude with the

20   dog in the bathtub, but not that one," not the one problematic

21   image, not the one that she is charged with.

22            The Government suggests to you that all of those

23   images of EL in the nude where her vaginal area is exposed --

24   all of those were sent to Oquendo.  She admitted to sending

25   the ones where EL is just in the nude.  All of those were sent

1   to Oquendo for his sexual gratification because she knew

2   that's how she -- that's how Oquendo liked to see the

3   children.

4          We also showed that -- Agent Dufresne's testimony,

5   that that image and video were produced in Brevard County in

6   her residence.  He talked to you about the geo- -- about the

7   location -- the geolocation on that image and that he traced

8   that back to that residence in particular, and that residence

9   in Palm Bay is also within the Middle District of Florida;

10  therefore, that element is met as well.

11         In addition to that, we showed that in order to

12  capture that image, she used an iPhone, which was assembled in

13  China, and that means that that interstate nexus prong is met.

14  That image was created using a facility of interstate commerce

15  that was manufactured out of state.  And, basically, that's

16  all we needed to prove to establish that interstate nexus

17  element, that she used a facility of interstate commerce and

18  that she placed it onto a piece of computer media that was

19  manufactured outside the state of Florida that traveled in

20  interstate commerce; therefore, that element was also met.  So

21  as to Count 2, all of the elements of production are met:

22  the -- a minor being involved, the use of the minor to engage

23  in sexually explicit conduct for the purpose of producing a

24  visual depiction.  That picture was created using a facility

25  of interstate commerce, and that facility of interstate

1    commerce was manufactured in China.  All these elements are

2    met.

3         The definition of lascivious exhibition, as I

4    indicated before, is going to be in your jury instructions,

5    and you should consider when looking at -- when recalling that

6    image that has been shown here multiple times what was the

7    purpose of creating that image?  She --

8         THE COURT:  Fifteen minutes, Ms. Rivera.

9         MS. RIVERA:  Thank you.

10        It does not matter that the child is acting

11   innocently in the image.  The purpose of the image was to show

12   Oquendo EL's vaginal area.  The defendant's motive, by her own

13   admission, is to make him happy.  At times she said that she

14   needed money to buy things, and she did it for that reason,

15   and that's based on her interviews with law enforcement.  She

16   sent that visual depiction to Oquendo.  He identified it here

17   in court.  That visual depiction is like many of the other

18   depictions that you see in the ooVoo images where the children

19   are just lying there in the nude, and the purpose is still the

20   same.

21        The fact that we did not find that image or that we

22   were not able -- the Government was not able to retrieve it

23   from the cell phone does not mean that she did not send it;

24   however, she's not here in court today because she distributed

25   the image to Oquendo.  The conduct that's prescribed here is

1    the using of the child for the purpose of creating that

2    lascivious exhibition.

3          Much has been said about sending.  Did she send it?

4    Did she not send it?  Was the Government able to establish

5    that Oquendo received it?  He recognized it.  He had received

6    hundreds of images like this from this defendant.

7          The defendant said she took a lot of nude pictures

8    of her kids and that she knew it was wrong, and her actions

9    meet each one of the elements of the offense, and there is no

10   excuse for the actions that she took in this case for a span

11   of years.  Therefore, the Government is asking you that you

12   let her know what it means in the context of this case to

13   employ a child in this manner and to find her guilty as

14   charged.

15         THE COURT:  Thank you, Ms. Rivera.

16         Now, ladies and gentlemen, if you'll give Ms. Reyes

17   your attention, she'll address you on behalf of the defendant,

18   Rose Litzky.

19         Ms. Reyes, you may come to the podium and proceed.

20         MS. REYES:  Good afternoon.  I want to talk first

21   about Count 2, which is for production.  You're going to be

22   instructed shortly on it.  The judge is going to instruct you

23   that in order for the Government to establish beyond a

24   reasonable doubt that the crime of production of child

25   pornography was committed, they have to prove that an actual

1    minor, a person less than 18 years old, was depicted.  2 and 3

2    are the elements that I would like to focus a little bit of

3    your attention on.

4              Element 2 for Count 2 states that the defendant,

5    meaning Ms. Litzky, employed, used, persuaded, induced,

6    enticed, or coerced the minor to engage in sexually explicit

7    conduct for the purpose of producing a visual depiction of the

8    conduct.

9              And then the Court will instruct you that

10   "producing" means producing, directing, manufacturing,

11   issuing, publishing, or advertising.

12             And you're also going to get some definitions on

13   what "sexually explicit conduct" means, and I would suggest to

14   you that the Government is proceeding under the definition

15   that sexually explicit conduct is lascivious exhibition of

16   genitals or pubic area of any person.

17             So then you're going to get instructions on what is

18   lascivious exhibition and whether or not you believe the

19   evidence shows lascivious exhibition.  You get some factors to

20   guide your analysis, and some of those factors are the overall

21   content of the material, whether the focal point is on the

22   genitalia, whether the setting appears to be sexually

23   inviting, whether the minor appears to be displayed in an

24   unnatural pose, whether the minor is partially clothed or

25   nude.

*182*

1    The Government keeps saying that, you know, the fact
2    that the minors look innocent is not something for you to
3    consider, but it is.  You're going to be instructed on it.
4    It's one of the factors.  It says, quote, "whether the
5    depiction appears to convey sexual coyness or an apparent
6    willingness to engage in sexual activity."
7    And then the last factor for you to consider is
8    whether this depiction appears to have been designed to elicit
9    a sexual response in the viewer.
10   So when I first spoke to you -- it feels like a
11   lifetime ago, but when I spoke to you a few days ago, I told
12   you that context matters and that we needed to get an actual
13   copy of what was on Ms. Litzky's phone.  The defense had to do
14   that even though we had no burden in this case.
15   MS. RIVERA:  Objection, Your Honor.
16   MS. REYES:  If I could please use the ELMO.
17   THE COURT:  Yes.
18   Objection's overruled.
19   MS. REYES:  This is not an exhibit in evidence.
20   It's just a demonstrative.
21   MS. RIVERA:  Objection, Your Honor.
22   THE COURT:  Take that down, please.  You're not free
23   to display anything that's not in evidence.  You may create
24   something, if you'd like, but --
25   MS. REYES:  I created it.

*183*

1           THE COURT:  No.  You can't use it.  Move on.

2           Let me see the lawyers at sidebar, please.

3       (Sidebar on the record.)

4           THE COURT:  You need to be a little bit careful

5   about your expressions.

6           Let me see what you have there.

7           So why would you think that you would be entitled to

8   display to the jury a document that's not in evidence?

9           MS. REYES:  It's a demonstrative, Your Honor, just

10  like she can display whatever she wants to display --

11  PowerPoint presentations, pictures, maps.

12          THE COURT:  She certainly may not, not in my

13  courtroom.  It's a demonstrative aid that's not in evidence.

14  It may not be displayed, and it certainly may not be displayed

15  without a request.

16          MS. REYES:  Okay.

17      (End of sidebar.)

18          MS. REYES:  You heard testimony from Mr. Connor,

19  unrebutted, that there were live photos that were found on

20  Ms. Litzky's phone for the period of July 2, 2016, and he

21  testified, again unrebutted, that the morning of July 2nd at

22  approximately 7:30 in the morning there was a live photo, and

23  you saw -- it's in evidence because the defense requested it.

24  It's 12A, so I would encourage you to watch it in the

25  deliberation room.  It consists of very short videos, and the

*184*

1   one that was created at 7:30 in the morning is a short video

2   of a dog, and next to the dog, you can see what appears to be

3   Ms. Hitchcock's leg.  You can see her sitting down.

4        The second photo was approximately 8:30 that

5   morning, and that was another dog photo, sleeping in the dog

6   bed.

7        Then, at approximately 2:41 p.m., you see another

8   live photo of Ms. Hitchcock in the pool with two -- the two

9   girls, KO and EL, and Ms. Hitchcock testified, unrebutted,

10  that Ms. Litzky took the photo.

11       But what is the most important evidence from

12  Ms. Litzky's phone on July 2nd starts at 4:37 p.m. at

13  4 seconds, and it ends at 4:37 at approximately 56 seconds.

14  So in less than a minute, we see a lot of photos.  One of the

15  photos during this time period, you see another dog -- it

16  looks like a different dog because it's a black-and-white

17  dog -- on the couch shortly thereafter.  40 seconds later, you

18  see EL holding the keys.  And if you hear her -- if you listen

19  carefully -- it's two seconds, but you can hear her saying

20  "cheese."  She could be saying "keys."

21       And then the next video at 4:37:41, it's, again,

22  very short, and she appears to be standing or running out of

23  the frame.  And then you see approximately four other photos

24  taken where she's holding the keys.  She's standing, and you

25  can hear the TV in the background.

1    The one right before the, quote/unquote,
2  "production" is EL standing, holding the keys, and she kind of
3  brings them to her mouth.  There appears to be nothing
4  suggestive in that.  She's just bringing them to her mouth.
5  And then there are additional videos that start at, like, 8:54
6  that night, but the crux of Count 2 is Image 17.

7    So Image 17 is not part of Government's 12A.  It's
8  Government 12.  So you're going to have that.  It's in
9  evidence.  You're going to see the JPEG, and you're also going
10  to have the movie, and I encourage you to look at it because
11  that -- even though you're going to be tasked with looking at
12  each charge individually and everyone has to agree on each
13  charge, you're going to see that Count 2 is -- is related to
14  Count 1 and 4.  The obvious connection to Count 4 is that the
15  image produced in Count 2 is the basis for Count 4.  So if you
16  find that that image is child pornography, that answers
17  Count 4, but I'm going to talk -- I'm going to keep talking
18  about this image on July 2nd because it is so related.

19    It's obviously included in the period of the
20  conspiracy.  So the question that you have to ask as you're
21  looking at these videos is looking at the angle that they're
22  taken and looking at the quality of the video, it -- I would
23  submit, respectfully, that it obviously looks like a kid took
24  these photos and --

25    MS. RIVERA:  Objection, Your Honor, as to the --

1   counsel's opinion on the matter.

2          THE COURT:  Objection's overruled.

3          MS. REYES:  It would make sense because they get the

4   phone.  It's password protected.  You heard unrebutted

5   testimony from Helen Hitchcock that KL -- KO was a very smart

6   girl.  She was almost turning five during the day of

7   July 2016.  She knew Ms. Litzky's password, and she was

8   constantly on her phone.  So the quality of the images and

9   video -- it would make sense that someone who's trying to play

10  with the video and trying to take photos, they're just going

11  to click on the -- on the home key to take the photo.  So the

12  live photo must have been a default setting because the child

13  didn't move it to video.  It kept -- it stayed in the photo

14  feature of the phone, if that makes any sense.

15          So I would submit that Ms. Litzky did not take this

16  photograph, and she told that to the law enforcement officers.

17  That was one of the first things that she told them was "I

18  leave my phone.  KO takes it all the time.  She must have

19  taken that."  That did not satisfy Agent Spadafora.  It did

20  not satisfy Agent Stake.  So they continued, continued,

21  continued asking her questions about it.

22          So if we take it to the logical conclusion -- let's

23  just suspend reality and common sense for just a moment.  If

24  the July 2, 2016, image was, in fact, taken by Ms. Litzky,

25  then why wouldn't she delete it?  Because according to the

1   Government, she deleted over 500 images.  So no other of these

2   500 or so alleged images taken on any other days were found on

3   her phone.

4           She allegedly took these images, sent them to him,

5   then deleted them, but the forensic evidence in this case does

6   not support that.  And the Government's saying, "Oh, we don't

7   have to prove that she sent it to him," but if she's

8   conspiring to produce child pornography specifically for his

9   sexual gratification, then it would make sense that she's

10  going to send it.

11          So I would like to draw your attention to

12  Agent Stake's testimony yesterday morning, and these are my

13  notes.  It's not a transcript.  The question posed to her was

14  "The forensic evidence in this case reveals that she did not

15  send a picture on July 2, 2016; correct?"  Her answer was

16  "You'd have to -- I don't have a specific sent -- data in

17  regards to that.  That would have to be addressed through

18  Agent Dufresne."

19          And the question was "Is the answer that you don't

20  know?"

21          And her response was "I don't know."

22          The question:  "Okay.  So we're here today for a

23  federal criminal jury trial, and you don't know if she sent

24  the, quote/unquote, 'pornographic production' on July 2,

25  2016?"

*188*

1        "Answer:  I know the image was produced on her

2   device, and she said she was the one that produced it."

3            "Question:  Okay.  Do you understand my question?"

4            "Answer:  I don't know the information in regards to

5   that image or that video being sent.  It was produced."

6            "Question:  You have no evidence that it was ever

7   sent; correct?"

8            "Answer:  I don't personally have evidence that it

9   was sent."

10           "Question:  Okay.  And you're the case agent in this

11  case; correct?"

12           "Answer:  Yes, ma'am."

13           "Question:  Okay.  So if anybody is going to know

14  the answer to that question, it's going to be you; correct?"

15           "Answer:  Correct."

16           So either Ms. Litzky didn't know about the image or

17  she didn't think it was child pornography if she did.  I mean,

18  what else -- what else are the odds that Ms. Litzky, who

19  apparently deleted a hundred images of these child pornography

20  photos off her phone after she took them -- she would miss an

21  entire day's worth?

22           So you're going to get an instruction on

23  Roberto Oquendo's testimony, and I am not going to offer my

24  opinion on his testimony.  I just want to point out a couple

25  of things.

1              The instruction is going to tell you that a witness

2    who hopes to gain more favorable treatment may have a reason

3    to make a false statement, and that's kind of obvious, but

4    it's an instruction that you're going to get.  So he testified

5    yesterday for the first time ever.  So he also spoke to law

6    enforcement willingly.  He waived *Miranda*.  He testified that

7    he saw this image of July 2, 2016.  He confirmed it.  The

8    Government took him through all the photos, including the --

9    including the ooVoo images that we know sexually arouse him,

10   but the Government took him and showed him the July 2, 2016,

11   image.  That's the basis for Count 2.  And he said, "Yep.

12   Yep.  She sent it to me."

13             He testified that he was -- Ms. Litzky was present

14   when he was performing oral sex on EL and that she saw it and

15   that she just simply walked away, and he testified that

16   Ms. Litzky saw him taking photos of his children.  He

17   testified about a lot of preposterous things.

18             He said that at one point in the relationship, he

19   moved out.  He got -- he got his own place and that Mr. Litzky

20   went over to his house with Ms. Litzky and begged him to come

21   back.  The evidence does not support that.  Obviously, there

22   was no love lost between Mr. Leonard Litzky and Mr. Oquendo.

23   The testimony, unrebutted, from Mr. Leonard Litzky was that he

24   constantly kicked him out of the house because he was a drunk

25   and a violent person.  So for Mr. Oquendo to testify that

1    they've begged him to come back is ridiculous, one of the many

2    ridiculous things that he said.

3              But let's -- let's take him at his word for a

4    second.  Let's suspend reality and common sense.  So what are

5    the odds that the forensic examinations of two different

6    phones with two different operating systems done by two

7    different forensic examiners, one who's employed by the

8    Brevard County Sheriff's Office and is an expert -- he has

9    been doing this for 15 years.  He's an expert -- and then

10   another forensic examiner who has almost identical

11   certifications as Agent Dufresne -- he also conducts a

12   forensic examination of these devices, and no one finds this

13   image that was sent on his phone.

14             The testimony that we heard from Agent Dufresne that

15   was kind of interesting was that, because of the proprietary

16   information that iPhone uses, it's very hard to extract

17   deleted data but that it's much easier on Androids.  So the

18   forensic examination or extraction included deleted data from

19   the Android phones and nine devices of Mr. Oquendo's, and that

20   image was not located on those devices.

21             So, apparently, he's a collector.  He admitted that

22   on cross-examination.  Agent Stake testified that, yes, she's

23   looked at all the images.  He's definitely a collector of

24   child pornography.  So if she had sent him that photo, why

25   would he delete it?  Maybe because it's not child pornography.

1           The fact is that, despite his size, Mr. Oquendo is a

2    predator, is charming.  Ms. Litzky fell in love with him.  She

3    was a child.  They communicated for a long period of time, and

4    when they met, she told you that she thought he was the one.

5           The testimony that you heard from his sister --

6    again, it was unrebutted -- was that he's violent, that he is

7    a drunk, that Ms. Litzky would call her to tell her about his

8    abuse.  You heard testimony from Leonard Litzky that he saw

9    Mr. Oquendo act violently towards the girls, especially when

10   he got drunk, but he -- he testified regarding instances where

11   he saw Mr. Oquendo pull KO's hair.  So -- so he would kick him

12   out many times.

13          One of -- another instruction you're going to get

14   momentarily has to do with the basic credibility of witnesses,

15   and I told you that this -- the evidence in this case is,

16   like, in this self-contained environment where it's there.  It

17   was just the Government's job to actually look through it to

18   find the evidence and bring it here to you.

19          So the questions you have to ask in deciding whether

20   or not to believe a witness include did the witness impress

21   you as one who was telling the truth?  Did the witness have

22   any particular reason not to tell the truth?  So, obviously,

23   that would apply with compelling urgency to Mr. Oquendo's

24   testimony.  Did the witness seem to have a good memory, and

25   did the witness appear to understand the questions clearly and

1    answer them directly?  And that's the last -- the last part of
2    that one is what I would like to talk about for just a little
3    bit.
4               Agent Stake testified that through her 18 years of
5    law enforcement experience with the Brevard County Sheriff's
6    Office, she's received a lot of training that spans a lot of
7    different types of cases, but it includes domestic violence
8    cases.  One of the last questions that the Government asked on
9    redirect was "Based on you reviewing all of the text messages
10   in this case, did they have a normal relationship?"
11              And Agent Stake said, "Yes, just a normal
12   relationship."
13              There's nothing normal about an abusive
14   relationship, so for someone to actually testify and tell you
15   that they have a normal relationship, it's one of two possible
16   reasons, in my humble opinion.  And it's, one, they have
17   actually never been trained in domestic violence
18   investigations; or, two, they will say what they need to say
19   for you to find Ms. Litzky guilty.
20              Government's Exhibit 14, 17, 18, and 19 included,
21   like, two pages of text messages from, like, one date, and
22   then it would go to, like, three weeks later.  So because
23   context is so important, I have provided a full copy of their
24   text messages, and it's not even of all their devices.  It's
25   only of four.  So I would encourage you to look at my

1   exhibits.  They're going to be 12, 13, 14, and 15, and the

2   Government's exhibit, what they have in their evidence, is

3   highlighted in my exhibits.  So you don't have to go back and

4   forth on what did they include in their exhibits and what did

5   I include in mine.

6           So, for example, Defense Exhibit 15 highlights --

7   this is when they're talking about having another baby, which

8   the Government made a big thing about.  So if you actually

9   read --

10          MS. RIVERA:  Objection, Your Honor, as to the

11  characterization.

12          THE COURT:  Objection's overruled.

13          MS. REYES:  So there were a lot of text messages on

14  August 24th of 2016.  So if you actually read it -- which

15  they're pretty easy.  They're very short -- and then you start

16  to read where it's highlighted, I think it's going to make a

17  little bit more sense.

18          And on redirect of Agent Dufresne --

19          Your Honor, may I approach to leave the exhibits on

20  the table?

21          THE COURT:  Yes.

22          MS. REYES:  The Government's redirect of

23  Agent Dufresne was, well, there are thousands and thousands

24  and thousands of text messages at, like -- making the point

25  there was no way he could have organized this.  Then I just

1    simply asked him, "Is it very easy to sort through the

2    spreadsheets?"  And he said yes.  So that's -- that's what was

3    done, and that, I encourage you to look at.

4         I want to talk a little bit about a false

5    confession.  I mentioned it during Agent Stake's testimony,

6    and I mentioned it during Agent Spadafora's testimony because,

7    again, the evidence is in a self-contained environment.  So

8    you have Ms. Litzky's statements, and then you have the

9    evidence in the case, and what the testimony and the evidence

10   shows, especially if you take Government's Exhibits 6 and 8,

11   which are the transcripts -- you can listen to the audio, but

12   the transcripts are kind of important because you can see how

13   long the questions are, and then you can see the one-word

14   answers.  And it's -- it's kind of -- it's a bit

15   disappointing, really, and the audio does give it a little bit

16   more of a context, but just looking at the transcript, if you

17   just glance at it, the questions are paragraphs long, and

18   then, when she tries to answer, they interrupt her.

19        Both Agent Spadafora and Agent Stake testified that

20   the interviews were conversational in tone, so I just want to

21   play just a little bit of the interview that took place on

22   September 15th of 2016, and it's already cued up.

23        If we could play -- Mr. Countryman, if we could

24   switch over.

25        (Exhibit published.)

1          MS. REYES:  So that clip shows that it was not
2    conversational in tone, first of all, but it goes to show that
3    Agent Stake and Agent Spadafora -- 18 years of experience,
4    21 years of experience, so what is that?  Almost 40 years of
5    experience between them.  They're -- they're putting words in
6    her mouth, and they do that throughout every single interview
7    that they conduct of my client.

8          THE COURTROOM DEPUTY:  Fifteen minutes, Ms. Reyes.

9          MS. REYES:  I'm sorry?

10         THE COURTROOM DEPUTY:  Fifteen minutes.

11         MS. REYES:  Thank you.

12         So in looking at a witness's credibility, these are
13    my notes from my cross of Agent Stake.  I asked her a
14    question.  "So would you characterize that as -- as just a
15    simple mistake on your part, to put words in her mouth?"  This
16    was when I was asking her about the dating versus talking.  It
17    was, like, one of the very first questions that she asked on
18    September 15th of my client.

19         And her answer was "She corrected me.  I misstated
20    it, and she corrected me."

21         "Question:  Would you consider that a simple mistake
22    on your part, to put words in her mouth?"

23         "Answer:  I wasn't intending to put words in her
24    mouth."

25         "Question:  Okay.  But you did; right?"

1          And answer was "No, ma'am.  She corrected me."

2          "Question:  Before she corrected you, you put words

3     in her mouth; correct?"

4          "Answer:  I said the word 'dating' as opposed to

5     'talking.'  Yes, ma'am."

6          Why are federal agents doing that to someone who

7     obviously is confused, to someone who obviously has a speech

8     impediment?  And the only possible explanation is that they

9     wanted to elicit a false confession.  They had their mind set

10    on the facts, and they ignored it, and they -- they forced

11    her -- they -- respectfully, they coerced her into making that

12    statement.

13         The abuse started when KO was approximately five

14    months old, and it's obvious that, but for his coercive

15    control, Ms. Litzky would not have complied.  Almost

16    immediately upon meeting him, you know, she testified -- which

17    she didn't have to do, but you did hear from her.  And

18    unrebutted, she testified that the abuse started -- he was

19    physically abusive to her, verbally abusive, and sexually

20    abusive to her.  She was scared for herself.  She was scared

21    for her kids.  She was scared for a cousin who was living with

22    her mom at the time that he was in Virginia.

23         So in looking at the dates of the conspiracy, it is

24    telling that he leaves in June and she petitions the court for

25    an injunction August of 2014, and they're alleging that the

1    conspiracy started October of 2014.  So the context is

2    important because everything else that surrounds these ooVoo

3    images, these ooVoo chats -- that's Government Exhibit 15.

4    That goes from October 2014 through January of 2015.

5            So those are important, but I would ask you to look

6    at all of the evidence that has been submitted before you, and

7    I would ask that you not let the image or a couple of images

8    of Ms. Litzky's face in a few of the pictures determine

9    conspiracy for you because that's not enough.  So her mere

10   presence -- the instruction for conspiracy is that it's an

11   agreement by two or more persons to commit an unlawful act, so

12   two or more persons try to accomplish a common unlawful act,

13   and then, second, that Ms. Litzky knew about the unlawful

14   purpose and that she willfully joined in it.

15           And the judge is going to instruct you that

16   "willfully" means voluntarily and purposely with the specific

17   intent to do something that the law forbids.

18           And this is not a case of child pornography

19   production or conspiracy to produce child pornography or the

20   possession of child pornography.  This is a case about

21   coercion, control, and compliance.  And the Government wants

22   you to believe that she was a member of this conspiracy, and

23   this -- this instruction is very important, and I'm going to

24   talk about it, and then I'm going to sit down because I think

25   my time is almost up.

1          It says "If the defendant played only a minor part

2     in the plan but had a general understanding of the unlawful

3     purpose of the plan and willfully joined in the plan on at

4     least one occasion, then that is sufficient for you to find

5     the defendant guilty."  So this is where Count 2 ties in here

6     because, if we follow the Government's logic and we take --

7     take it to the logical conclusion, then you must find that she

8     committed Count 2 because that would be that she willfully

9     joined in on at least one occasion of the conspiracy,

10    October 14 through September of 2016.  And the one time -- it

11    could be just one time that she joined in.  So their

12    accusation is that it was July 2, 2016, and nothing supports

13    that.  Literally nothing supports that charge.

14         I do not get a chance to get back up here.  I have a

15    lot more to say, but I hope that when the Government gets up

16    in rebuttal, that you consider how I would respond because the

17    law does not allow me to respond.  Based on all of the

18    evidence that's been presented, the lack of evidence, the

19    conflict in the evidence, I'm asking you to render the only

20    verdict that is supported by the law in this case and by the

21    oath that you took a few days ago.  You promised that emotions

22    wouldn't be part of this, so if I did anything to upset

23    anyone, I apologize.  Don't hold it against Ms. Litzky.  But

24    please hold the Government to their burden and find my client

25    not guilty.

1          THE COURT:  Thank you, Ms. Reyes.

2          Ms. Rivera.

3          MS. RIVERA:  Well, nowhere in the instructions of

4    the Court will you read that the defendant being under some

5    general fear of harm by Roberto Oquendo is an excuse to the

6    crime.  Nowhere.  That's not what you're asked to decide.

7    What you're asked to decide is whether she joined in at some

8    point, as charged in the indictment, in committing the

9    unlawful plan of taking sexually explicit images of her

10   children.

11         And the defense would have you split the case and

12   just look at July 2, 2016, and then separately look at Count 1

13   in these ooVoo chats and don't -- don't correlate the two

14   because, if you do that, that becomes problematic because, as

15   they have said, you have to look at things in context, and the

16   context of this case starts back when the children were born

17   and they started sexually abusing these children, but concrete

18   evidence of how that sexual exploitation took place is

19   presented to you starting with the ooVoo images, starting with

20   those ooVoo chats.

21         We know that Oquendo left to go to Virginia in June

22   of 2014.  He was nowhere around or near her with any type of

23   reach to harm her when she engaged in these acts voluntarily

24   on her own.  She even admitted that much, that there were a

25   couple of instances there where she said, "Yes, without

1   provocation, without him asking, I sent those to him."  She

2   acknowledged that much.

3          And when you look -- an image, a picture, speaks a

4   thousand words, and we have over 200-some pictures there, and

5   if you really wanted to not consider most of the testimony

6   provided by Oquendo or the defendant here, just look at those

7   images.  As crude as they are, they show her expressions in

8   those images where you actually see her face.  It's all fun.

9   It's all just fine.  She's smiling.  She is obviously engaged.

10  Just by looking at those images alone without words, you know

11  that she was complicit in the commission of this crime, and

12  that conduct extends over a span of time, and it continues

13  when he comes back from Virginia.

14         So when you look at Counts 2 and 4 regarding the

15  July 2, 2016, image and video, you shouldn't be looking at

16  that in isolation.  You need to look at that in the context of

17  how they were communicating for a long period of time and how

18  those communications were very sexual and obviously targeted

19  at the children.  So I'm encouraging you not to look at that

20  evidence in isolation.

21         And the reason why I mention about how the children

22  looked innocent is because you will not see the children

23  engaging in sexual activity with an adult other than the

24  images where this defendant is spreading their vaginal labia

25  apart to expose them to Oquendo.  There's sexual contact

1   there.  But in most of the images, you're not going to see

2   them.  The children are themselves acting innocently.  They're

3   not expressing coyness except for a few images, actually.

4   There are a few images there -- and I believe you saw a couple

5   of them -- where the children are made to fondle themselves,

6   and those images are obviously intended for the purpose of

7   causing sexual gratification in the viewer, Oquendo, which is

8   one of the prongs of the lascivious exhibition.

9          Those factors, not one of those factors alone,

10  dictates whether an image is lascivious in nature.  You get to

11  decide that based on the context of the evidence presented in

12  this case.

13         There is absolutely no evidence of motive presented

14  here as to why would Agent Stake try to elicit a false

15  confession from this defendant when she went to meet with the

16  defendant for the second time, February 3, 2017.  This was not

17  that they went there to try to get this defendant to admit to

18  something they had no evidence of.  They had a few images, if

19  you listen to the audio recording, and they are confronting

20  her with obvious concrete evidence of her participation in the

21  commission of the crimes, and we showed you one of the images.

22         And Francis Dufresne testified that that image was

23  created on January of 2016.  It's a selfie-style image of the

24  defendant holding EL over her shoulder with her vaginal area

25  exposed.  Well, that image was not found in her phone.  She

1    obviously took the image.  She created it, she produced it,

2    and she sent it to Oquendo.  And that image, apparently, he

3    did save, he did like enough.  And that image was found on

4    that LG cell phone, and that was January of 2016.  You can

5    link the dates.

6            And still through July of 2016, they're trading

7    messages that you can read that are sexual in nature.  They're

8    still involved in a romantic relationship.  The only person

9    that saw the defendant be sexually -- not sexually --

10   physically abusive of the defendant was this defendant.

11   Nobody else.  Including her own witnesses.  Her mother didn't

12   see it, father didn't see it.  Oquendo's sister didn't see it.

13   She's the only one.  She's the only one also of all their

14   witnesses blaming, pointing the finger, at KO for taking that

15   July 2, 2016, video and the image.

16           And out of all the people that testified here, she

17   is the one that has the biggest, most obvious motive to lie,

18   and you also saw her demeanor here when I was confronting her

19   with very crucial questions about her actions, and she kept --

20   she kept looking at defense counsel's table, constantly

21   looking at defense counsel's table to the point that I had to

22   tell her, you know, if you would look at me.  She was looking

23   for direction.  She was not sure as to how to answer that

24   question.

25           And that accusation that KO took that picture, that

1    it looked like that was taken by, you know, someone from a

2    certain height -- total speculation.

3           Ms. Hitchcock appears to have a memory problem.  She

4    did not recall -- and, well, you really cannot blame her for

5    not recalling exactly what happened on July 2nd of 2016.  She

6    had to be shown a video clip of her in the pool.  Oh, okay.

7    Yes, that happened on that date.  But as to everything else

8    that happened on that date, she didn't know.  She couldn't

9    attest to that.  So you can disregard her statements regarding

10   anything involving picture-taking on that day.

11          And as to Mr. Connor's testimony, well, he really

12   doesn't know anything about the context of how these pictures

13   were created.  He admitted that much.  Has no knowledge of

14   what was in this defendant's mind at the time when she took

15   those pictures, and he reluctantly recognized that some of

16   those ooVoo images appeared to be a lascivious exhibition.  He

17   wouldn't straight-out say it, even as obvious as they are.

18   For someone who has experience in dealing with so many cases

19   involving child pornography images, to look at something as

20   graphic as what he looked at and not be able to call it for

21   what it is?  Well, I would also disregard that testimony.

22          And I would disregard every single testimony of all

23   these individuals that came here with a motive to excuse this

24   defendant's obvious egregious conduct of sexually exploiting

25   her children because there is absolutely no justification for

*204*

1    her crimes.

2            So I would ask you to render the only verdict

3    consistent with the evidence in this case, the verdict of

4    guilty as charged.

5            THE COURT:  Thank you, Ms. Rivera.

6            Members of the jury, it's now my duty to instruct

7    you on the rules of law that you must follow and apply in

8    deciding the case.

9            Many of you, I know, have kept notes, taken notes

10   during the course of the proceeding, but I'm going to ask you

11   to put your notepads down and let me have your undivided

12   attention.  I also want to tell you that I'm going to give you

13   two copies of these written instructions to take with you back

14   to the jury room when you commence your deliberations, but

15   just let me have your undivided attention at this point.

16           It will be your duty, ladies and gentlemen, to

17   decide whether the Government has proved beyond a reasonable

18   doubt the specific facts necessary to find the defendant

19   guilty of the crime charged in the indictment.  You must make

20   your decision only on the basis on the testimony and other

21   evidence presented here during the trial, and you must not be

22   influenced in any way by either sympathy or prejudice for or

23   against the defendant or the Government.

24           You must also follow the law as I explain it to you,

25   whether you agree with that law or not, and you must follow

1  all of my instructions as a whole.  You may not single out or

2  disregard any of the Court's instructions on the law.

3        The indictment, or formal charge, against any

4  defendant is not evidence of guilt.  Indeed, every defendant

5  is presumed by the law to be innocent.

6        The law does not require a defendant to prove

7  innocence or to produce any evidence at all.  The Government

8  has the burden of proving a defendant guilty beyond a

9  reasonable doubt, and if it fails to do so, you must find that

10  defendant not guilty.  Thus, while the Government's burden of

11  proof is a strict or heavy burden, it is not necessary that a

12  defendant's guilt be proved beyond all possible doubt.  It is

13  only required that the Government's proof exclude any

14  reasonable doubt concerning the defendant's guilt.

15        A reasonable doubt is a real doubt based upon reason

16  and common sense after careful and impartial consideration of

17  all the evidence in the case.  Proof beyond a reasonable

18  doubt, therefore, is proof of such a convincing character that

19  you would be willing to rely and act upon it without

20  hesitation in the most important of your own affairs.

21        If you are convinced that the defendant has been

22  proved guilty beyond a reasonable doubt, say so.  If you are

23  not convinced, say so.

24        As I said earlier, you must consider only the

25  evidence that I have admitted in the case.  The term

1    "evidence" includes the testimony of the witnesses and the

2    exhibits admitted in the record.  Remember that anything the

3    lawyers say is not evidence in the case.  It is your own

4    recollection and interpretation of the evidence that controls.

5    What the lawyers say is not binding upon you.

6          Also, you should not assume from anything I may have

7    said that I have any opinion concerning any of the issues in

8    this case.  Except for my instructions to you on the law, you

9    should disregard anything I may have said during the trial in

10   arriving at your own decision concerning the facts.

11         In considering the evidence, you may make deductions

12   and reach conclusions which reason and common sense lead you

13   to make, and you should not be concerned about whether the

14   evidence is direct or circumstantial.

15         Direct evidence is the testimony of one who asserts

16   actual knowledge of a fact, such as an eyewitness.

17         Circumstantial evidence is proof of a chain of facts

18   and circumstances tending to prove or disprove any fact in

19   dispute.

20         The law makes no distinction between the weight you

21   may give to either direct or circumstantial evidence.

22         Now, in saying that you must consider all of the

23   evidence, I do not mean that you must accept all of the

24   evidence as true or accurate.  You should decide whether you

25   believe what each witness had to say and how important that

1    testimony was.  In making that decision, you may believe or

2    disbelieve any witness in whole or in part.  Also, the number

3    of witnesses testifying concerning any particular dispute is

4    not controlling.

5            In deciding whether you believe or do not believe

6    any witness, I suggest that you ask yourself a few questions:

7    Did the witness impress you as one who was telling the truth?

8    Did the witness have any particular reason not to tell the

9    truth?  Did the witness have a personal interest in the

10   outcome of the case?  Did the witness seem to have a good

11   memory?  Did the witness have the opportunity and ability to

12   observe accurately the things that he or she testified about?

13   Did the witness appear to understand the questions clearly and

14   answer them directly?  Did the witness's testimony differ from

15   other testimony or other evidence?

16           You should also ask yourself whether there was

17   evidence tending to prove that a witness testified falsely

18   concerning some important fact or whether there was evidence

19   that at some other time a witness said or did something or

20   failed to say or do something which was different from the

21   testimony the witness gave before you during the trial.  You

22   should keep in mind, of course, that a simple mistake by a

23   witness does not necessarily mean that the witness was not

24   telling the truth as he or she remembers it because people

25   naturally tend to forget some things or remember other things

1    inaccurately.  So if a witness has made a misstatement, you

2    need to consider whether it was simply an innocent lapse of

3    memory or an intentional falsehood, and the significance of

4    that may depend on whether it has to do with an important fact

5    or with only an unimportant detail.

6              When knowledge of a technical subject matter might

7    be helpful to a jury, a person having special training or

8    expertise in that technical field is permitted to state an

9    opinion concerning those technical matters.  Merely because a

10   witness -- merely because such a witness has expressed an

11   opinion, however, does not mean that you must accept that

12   opinion.  The same as with any other witness, it is up to you

13   to decide whether to rely upon it.

14             The testimony of some witnesses must be considered

15   with more caution than the testimony of other witnesses.

16             In this case the Government called as one of its

17   witnesses a person named as a codefendant in the indictment

18   with whom the Government has entered into a plea agreement,

19   providing for the possibility of a lesser sentence than the

20   witness would otherwise be exposed to.  Such plea bargaining,

21   as it is called, has been approved as lawful and proper and is

22   expressly provided for in the rules of this court.  However, a

23   witness who hopes to gain more favorable treatment may have

24   reason to make a false statement because the witness wants to

25   strike a good bargain with the Government.  So while a witness

1   of that kind may be entirely truthful when testifying, you

2   should consider such testimony with more caution than the

3   testimony of other witnesses.

4          And, of course, the fact that a witness has pled

5   guilty to the crime charged in the indictment is not evidence

6   in and of itself of the guilt of any other person.

7          In this case you have been permitted to take notes

8   during the course of the trial, and most of you, perhaps all

9   of you, have taken advantage of that opportunity and have made

10  notes from time to time.  You will have your notes available

11  to you during your deliberations, but you should make use of

12  them only as an aid to your memory.  In other words, you

13  should not give your notes any precedence over your

14  independent recollection of the evidence or the lack of

15  evidence, and neither should you be unduly influenced by the

16  notes of other jurors.  I emphasize that notes are not

17  entitled to any greater weight than the memory or impression

18  of each juror as to what the testimony may have been.

19         At this time I will explain the indictment, which

20  charges three separate offenses called "counts."  I will not

21  read it to you at length because you will be given a copy of

22  the indictment for reference during your deliberations.

23         In summary, Count 1 charges that the defendants

24  knowingly -- that the defendant knowingly and willfully

25  conspired to commit the offense of child pornography.

1   Counts 2 and 4, respectively, charge the commission of what
2   are referred to as "substantive offenses," namely, as to
3   Count 2, that the defendant committed the offense of
4   production of child pornography and, as to Count 4, that the
5   defendant committed the offense of possession of child
6   pornography.  I will explain the law governing those
7   substantive offenses in a moment.
8           First, however, as to Count 1, you will note that
9   the defendant is not charged in that count with committing a
10  substantive offense; rather, she is charged with having
11  conspired to do so.
12          As to Count 1, it is a federal crime to knowingly
13  and willfully conspire or agree with someone to do something
14  that, if actually carried out, would result in the crime of
15  production of child pornography, in violation of 18 U.S.C.,
16  Section 2251(a).
17          A conspiracy is an agreement by two or more persons
18  to commit an unlawful act.  In other words, it is a kind of
19  partnership for criminal purposes.  Every member of the
20  conspiracy becomes the agent or partner of every other member.
21  The Government does not have to prove that all the people
22  named in the indictment were members of the plan or that those
23  who were members made any kind of formal agreement.  The heart
24  of a conspiracy is the making of the unlawful plan itself.  So
25  the Government does not have to prove that the conspirators

1    succeeded in carrying out the plan.

2         The defendant can be found guilty of this crime only

3    if all of the following facts are proved beyond a reasonable

4    doubt:  One, two or more persons in some way or manner came to

5    a mutual understanding to try to accomplish a common and

6    unlawful plan as charged in the indictment; and, two, the

7    defendant knew about the plan's unlawful purpose and willfully

8    joined in it.

9         A person may be a conspirator even without knowing

10   all the details of the unlawful plan or the names and

11   identities of all the other alleged conspirators.  If the

12   defendant played only a minor part in the plan but had a

13   general understanding of the unlawful purpose of the plan and

14   willfully joined in the plan on at least one occasion, that is

15   sufficient for you to find the defendant guilty.  But simply

16   being present at the scene of an event or merely associating

17   with certain people and discussing common goals and interests

18   does not establish proof of a conspiracy.

19        Also, a person who does not know about a conspiracy

20   but happens to act in a way that advances some purpose of one

21   does not automatically become a conspirator.

22        As to Count 2, it is a federal crime for any person

23   to employ, use, persuade, induce, entice, or coerce a minor to

24   engage in sexually explicit conduct for the purpose of

25   producing a visual depiction of the conduct if the person

knows or has reason to know that the visual depiction will be transported in interstate or foreign commerce or mailed; the visual depiction was produced using materials that have been mailed, shipped, or transported in interstate or foreign commerce by any means, including by a computer; or the visual depiction has been transported in interstate or foreign commerce or mailed.

The defendant can be found guilty of this crime only if all of the following facts are proved beyond a reasonable doubt:  One, an actual minor, that is, a real person who is less than 18 years old, was depicted; two, the defendant employed, used, persuaded, induced, enticed, or coerced the minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of the conduct; and, three, either, A, the defendant knew or had reason to know that the visual depiction would be mailed or transported in interstate or foreign commerce, B, the visual depiction was produced using materials that had been mailed, shipped, or transported in interstate or foreign commerce by any means, including by computer, or, C, the visual depiction was mailed or actually transported in interstate or foreign commerce.

While the Government must prove that a purpose of the sexually explicit conduct was to produce a visual depiction, it need not be the defendant's only or dominant purpose.

1    The term "interstate or foreign commerce" means the

2 movement of a person or property from one state to another

3 state or from one state to another country.

4    The term "state" includes a state of the

5 United States, the District of Columbia, and any commonwealth,

6 territory, or possession of the United States.  It is not

7 necessary for the Government to prove that the defendant knew

8 that the visual depiction and/or materials used to produce the

9 visual depiction had moved in interstate or foreign commerce.

10    The term "minor" means any person who is less than

11 18 years old.  The Government does not have to prove the

12 actual identity of the identifiable minor.

13    The term "producing" means producing, directing,

14 manufacturing, issuing, publishing, or advertising.

15    The term "computer" means any electronic, magnetic,

16 optical, electrochemical, or other high-speed data processing

17 device performing logical, arithmetic, or storage functions

18 and includes any data storage facility or communications

19 facility directly related to or operated -- or operating in

20 conjunction with that device, such as a cellular phone, but

21 the term does not include an automated typewriter or

22 typesetter, a portable handheld calculator, or similar devices

23 that are limited in function to only word processing or

24 mathematical calculations.

25    A computer, telephone, cell phone -- I'm sorry.  A

1    computer, telephone, cellular phone, and the Internet are

2    instrumentalities and facilities of interstate commerce.

3            The term "visual depiction" includes undeveloped

4    film and videotape and data stored on a computer disk or by

5    any other electronic means that can be converted into a visual

6    image.

7            The term "sexually explicit conduct" means actual or

8    stimulate- -- or simulated sexual intercourse, including

9    genital to genital, oral to genital, anal to genital, or oral

10   to anal, whether between persons of the same or opposite sex,

11   bestiality, masturbation, sadistic or masochistic abuse, or

12   lascivious exhibition of the genitals or pubic area of any

13   person.

14           "Lascivious exhibition" means indecent exposure of

15   the genitals or pubic area usually to incite lust.  Not every

16   exposure is a lascivious exhibition.

17           To decide whether a visual depiction is a lascivious

18   exhibition, you must consider the context and setting in which

19   the genitalia or pubic area is being displayed.  Factors you

20   may consider include the overall content of the material,

21   whether the focal point of the visual depiction is on the

22   minor's genitalia or pubic area, whether the setting of the

23   depiction appears to be sexually inviting or suggestive, for

24   example, in a location or in a pose associated with sexual

25   activity, whether the minor appears to be displayed in an

1   unnatural pose or in an -- or in inappropriate attire, whether

2   the minor is partially clothed or nude, whether the depiction

3   appears to convey sexual coyness or an apparent willingness to

4   engage in sexual activity, and whether the depiction appears

5   to have been designed to elicit a sexual response in the

6   viewer.

7             As to Count 4, it is a federal crime to knowingly

8   possess any child pornography that has been transported,

9   shipped, or mailed in interstate or foreign commerce,

10  including by computer.  The defendant can be found guilty of

11  this crime only if all of the following facts are proved

12  beyond a reasonable doubt:  One, the defendant knowingly

13  possessed an item or items of child pornography; two, the

14  items of child pornography had been transported, shipped, or

15  mailed in interstate or foreign commerce, including by

16  computer; three, when the defendant possessed the items, the

17  defendant believed the items were or contained child

18  pornography; and, four, the visual depiction involved a

19  prepubescent minor or a minor who had not attained 12 years of

20  age.

21            The term "interstate or foreign commerce" is the

22  movement of property between states or between the

23  United States and any place outside the United States.

24            Again, the term "state" means any state of the

25  United States, District of Columbia, and any commonwealth,

1    territory, or possession of the United States.

2            It does not matter whether the defendant knew the

3    child pornography had moved in interstate or foreign commerce.

4    The Government only has to prove that the child pornography

5    actually did move in interstate or foreign commerce.

6            Again, the term "computer" means an electronic,

7    magnetic, optical, electrochemical, or other high-speed data

8    processing device performing logical, arithmetic, or storage

9    functions and includes any data storage facility or

10   communications facility directly related to or operating in

11   conjunction with that device, such as a cellular phone, but

12   the term does not include an automated typewriter or

13   typesetter, portable handheld calculator, or similar device

14   that is limited in function to only word processing or

15   mathematical calculations.

16           A computer, telephone, cellular phone, and the

17   Internet are instrumentalities and facilities of interstate

18   commerce.

19           The term "child pornography" means any visual

20   depiction, including any photograph, film, video, picture, or

21   computer or computer-generated image or picture made or

22   produced by electronic, mechanical, or other means of sexually

23   explicit conduct where the visual depiction's production

24   involves using a minor engaging in sexually explicit conduct.

25           Again, a minor is any person under 18 years old.

1   The Government does not have to prove the actual identity of

2   the identifiable minor.

3         The term "visual depiction" includes undeveloped

4   film and videotape and data stored on computer media or by

5   other electronic means that can be converted into a visual

6   image.

7         The term "sexually explicit conduct" means actual or

8   simulated sexual intercourse, including genital-genital,

9   oral-genital, anal-genital, or oral-anal contact, whether

10  between persons of the same or opposite sex, bestiality,

11  masturbation, sadistic or masochistic abuse, or lascivious

12  exhibition of the genitals or pubic area of any person.

13        "Lascivious exhibition" means indecent exposure of

14  the genitals or pubic area usually to incite lust.  Not every

15  exposure is a lascivious exhibition.  To decide whether a

16  visual depiction is a lascivious exhibition, you must consider

17  the context and setting in which the genitalia or pubic area

18  is being displayed.  Factors may -- you may consider include

19  the overall content of the material, whether the focal point

20  of the visual depiction is on the minor's genitalia or pubic

21  area, whether the setting of the depiction appears to be

22  sexually inviting or suggestive, for example, in a location or

23  pose associated with sexual activity, whether the minor

24  appears to be displayed in an unnatural pose or in

25  inappropriate attire, whether the minor is partially clothed

1  or nude, whether the depiction appears to convey sexual

2  coyness or an apparent willingness to engage in sexual

3  activity, and whether the depiction appears to have been

4  designed to elicit a sexual response in the viewer.  A visual

5  depiction need not have all these factors to be a lascivious

6  exhibition.

7       The law recognizes several kinds of possession.  A

8  person may have actual or constructive possession.  A person

9  may also have sole possession or joint possession.

10       A person who knowingly has direct physical control

11  of something is then in actual possession of it.  A person who

12  is not in actual possession but who has both the power and the

13  intention to later take control over something, either alone

14  or together with someone else, is in constructive possession

15  of it.  If one person alone has possession of something, that

16  possession is sole.  If two or more persons share possession,

17  such possession is joint.

18       Whenever the word "possession" has been used in

19  these instructions, it includes constructive as well as actual

20  possession and also joint as well as sole possession.

21       The guilt of a defendant in a criminal case may be

22  proved without evidence that the defendant personally did

23  every act involved in the commission of the crime charged.

24  The law recognizes that, ordinarily, anything a person can do

25  for oneself may also be accomplished through direction of

1    another person as an agent or by acting together with or under

2    the direction of another person or persons in a joint effort.

3    So if the acts or conduct of an agent, employee, or other

4    associate of the defendant are willfully directed or

5    authorized by the defendant or if the defendant aids and abets

6    another person by willfully joining together with that person

7    in the commission of a crime, then the law holds the defendant

8    responsible for the conduct of that other person just as

9    though the defendant had personally engaged in such conduct.

10          However, before any defendant can be held criminally

11   responsible for the conduct of others, it is necessary that

12   the defendant willfully associate in some way with the crime

13   and willfully participate in it.  Mere presence at the scene

14   of a crime and even knowledge that a crime is being committed

15   are not sufficient to establish that a defendant either

16   directed or aided and abetted the crime.  You must find beyond

17   a reasonable doubt that the defendant was a willful

18   participant and not merely a knowing spectator.

19          You will note that the indictment charges that the

20   offense was committed on or about a certain date.  The

21   Government does not have to prove with certainty the exact

22   date of the alleged offense.  It is sufficient if the

23   Government proves beyond a reasonable doubt that the offense

24   was committed on a date reasonably near the date alleged.

25          The word "knowingly," as that term has been used in

1    the indictment or in these instructions, means that the act

2    was done voluntarily and intentionally and not because of

3    mistake or accident.

4         The word "willfully," as that term is used in the

5    indictment or in these instructions, means that the act was

6    committed voluntarily and purposely with the specific intent

7    to do something the law forbids, that is, with bad purpose,

8    either to disobey or disregard the law.

9         Where our statute specifies several alternative ways

10   in which an offense may be committed, the indictment may

11   allege the several ways in the conjunctive, that is, by using

12   the word "and."  Therefore, if only one of the alternatives is

13   proved beyond a reasonable doubt, that is sufficient for

14   conviction so long as the jury agrees unanimously as to at

15   least one of the alternatives.

16        A separate crime or offense is charged in each count

17   of the indictment.  Each charge and the evidence pertaining to

18   it should be considered separately.

19        The fact that you may find the defendant guilty or

20   not guilty as to one of the offenses charged should not affect

21   your verdict as to any other offense charged.

22        I caution you, members of the jury, that you are

23   here to determine from the evidence in this case whether the

24   defendant is guilty or not guilty.  The defendant is on trial

25   only for those specific offenses alleged in the indictment.

1           Also, the question of punishment should never be

2     considered by the jury in any way in deciding the case.  If

3     the defendant is convicted, the matter of punishment is for

4     the judge alone to determine later.

5           During your deliberations, you must not communicate

6     with or provide any information to anyone by any means about

7     this case.  You may not use any electronic device or media,

8     such as the telephone, a cell phone, smartphone, iPhone,

9     Blackberry, or computer, the Internet, any Internet service,

10    any text or instant messaging service, any Internet chat room,

11    blog or website, such as Facebook, LinkedIn, Snapchat,

12    YouTube, or Twitter, or any other such device or Internet site

13    to communicate to anyone any information about this case or to

14    conduct any research about this case until I accept your

15    verdict.  In other words, you cannot talk to anyone on the

16    phone, correspond with anyone, or electronically communicate

17    with anyone about this case.  You can only discuss the case in

18    the jury room with your fellow jurors during deliberations.

19          I expect you will inform me should you become aware

20    of another juror's violation of these instructions or an

21    inadvertent violation of these instructions on your own part.

22          You may not use these electronic means to

23    investigate or communicate about the case because it is

24    important that you decide the case based solely on the

25    evidence presented in this courtroom.  Information contained

*222*

1    on the Internet or available through social media might be

2    wrong, incomplete, or inaccurate.  You are only permitted to

3    discuss the case with your fellow jurors during deliberations

4    because they have seen and heard the same evidence you have.

5          In our judicial system, it is important that you are

6    not influenced by anything or anyone outside of this

7    courtroom.  Otherwise, your decision may be based on

8    information known only by you and not your fellow jurors or

9    the parties in the case.  This would unfairly and adversely

10   impact the judicial process.

11         Any verdict you reach in the jury room, whether

12   guilty or not guilty, must be unanimous.  In other words, to

13   return a verdict, you must all agree.

14         Your deliberations will be secret.  You will never

15   have to explain your verdict to anyone.

16         It is your duty as jurors to discuss the case with

17   one another in an effort to reach an agreement if you can do

18   so.  Each of you must decide the case for yourself but only

19   after full consideration of the evidence with the other

20   members of the jury.  While you are discussing the case, do

21   not hesitate to reexamine your own opinion and change your

22   mind if you become convinced that you were wrong, but do not

23   give up your honest beliefs solely because the others think

24   differently or merely to get the case over with.  Remember

25   that in a very real way, you are judges, judges of the facts.

1   Your only interest is to seek the truth from the evidence in

2   the case.

3            When you go to the jury room, you should first

4   select one of your members to act as your foreperson.  The

5   foreperson will preside over your deliberations and speak for

6   you here in court.

7            A form of verdict has been prepared for your

8   convenience.

9            I'm going to go over the verdict form with you now.

10  The verdict form is prepared in what's called "interrogatory,"

11  or question, form.  It has the style or name of the case at

12  the top, the case number, and it has a series of questions.

13           Verdict.

14           Question 1.  Count 1 of the indictment.  As to the

15  offense of conspiracy to produce child pornography, in

16  violation of 18 U.S.C., Section 2251(a) and (e), we, the jury,

17  find the defendant, Rose Beth Litzky -- and then there's a

18  place for you to indicate your verdict, guilty or not guilty.

19           Question 2 refers to Count 2 of the indictment.  As

20  to the offense of production of child pornography, in

21  violation of 18 U.S.C., Section 2251(a) and (e), we, the jury,

22  find the defendant, Rose Beth Litzky -- and then a place for

23  you to record your verdict, either guilty or not guilty.

24           Question 3 refers to Count 4 of the indictment.  As

25  to the offense of possession of child pornography, in

*224*

1    violation of 18 U.S.C., Section 2252A(a)(5)(B) and (b)(2), we,

2    the jury, find the defendant, Rose Beth Litzky -- and then

3    there's a place for you to record your verdict, either guilty

4    or not guilty.

5           Underneath Question 3 is this following notation:

6    If you've checked guilty, you must indicate whether the image

7    of the child pornography depicted in Government's Exhibit 12

8    involved a visual depiction of a prepubescent minor or a minor

9    who had not attained 12 years of age.  And then there's a

10   place for you to indicate your finding, either yes, it did,

11   or, no, it did not.  So say we all this blank day of

12   July 2019, and then a signature line for the foreperson.

13          You'll take the verdict form with you to the jury

14   room, and when you have reached a unanimous verdict, you will

15   have your foreperson fill in the verdict form, date and sign

16   it, and return it to the courtroom.

17          If you should desire to communicate with me at any

18   time, please write down your message or question and pass the

19   note to the courtroom security officer, who will bring it to

20   my attention.  I will then respond as promptly as possible,

21   either in writing or by having you return to the courtroom so

22   that I can address you orally.

23          I caution you, however, that with regard to any

24   message or question that you might send to me, that you should

25   not tell me your numerical division at the time.

1          I'll also tell you a couple things based on my

2    experience, and that is -- first of all, this is not intended

3    to discourage you from sending me a question but to tell you

4    that most of the time the response that you will receive is to

5    refer you back to the written instructions, copies of which

6    you'll have with you back in the jury room in connection with

7    your deliberations.

8          The second thing I would mention to you about

9    sending out a question or a comment, again, not to discourage

10   you in any way from doing it, is just to remind you that I

11   need to collect all the lawyers, share the question with them,

12   tell the lawyers how I expect to respond to the question, what

13   I intend to say in response to the question, and to solicit

14   their input as to the propriety of the answer that I propose.

15   So have some patience.  It takes a while for that process to

16   be completed.

17         With that, I'm going to discharge you with the

18   exception -- or excuse you, that is, with the exception of

19   Ms. Ford, who I'm going to ask to remain behind, and to

20   commence your deliberations.

21         It's 5:15 in the evening.  I know that you-all have

22   been getting out at 5:00 based on my promise to you to do

23   that.  What I'd like for you to do initially is to retire to

24   the jury room, select a person to serve as your foreperson,

25   and then let me know by communicating to the court security

*226*

1    officer if you would like to continue to do some work tonight.

2    I can tell you we can allow you to continue to work for a

3    little while.  The -- our landlord turns the air-conditioning

4    off at about 6:00, and it becomes a bit close and

5    uncomfortable.  So I would not recommend deliberating beyond

6    6:00.

7         You let me know what you want to do.  If you want to

8    retire for the evening and come back Monday morning at 9:00,

9    that's entirely fine.  If you want to begin doing some work

10   and then see where you are and adjourn or be excused for the

11   weekend at around 6:00 -- as I said, I'm not going to keep you

12   past 6:00 because it's not -- the environment is not conducive

13   to the work that you need to do.

14        So with that, with the exception of Ms. Ford, I'm

15   going to excuse you to commence your deliberations.  In just a

16   few minutes, Mr. Countryman will deliver two sets of the jury

17   instructions, a copy of the verdict form, along with all of

18   the exhibits.

19        (Jury retired to consider their verdict at 5:14 p.m.)

20        THE COURT:  You-all can be seated.  So, Ms. Ford,

21   you are our alternate.  I know it can sometimes be frustrating

22   to have given the case your undivided attention and to have

23   served as well and faithfully as you have and then find out

24   that you are the alternate juror, but I want to tell you a

25   couple of things that are really important.

1    Oftentimes, it becomes necessary for the alternate

2    juror to be called back in to serve.  So I'm going to ask you

3    to continue to be under my instructions not to discuss the

4    case, not to do any independent research about the case.  All

5    of the instructions that I've given you previously, I want you

6    to continue to follow.

7    If you'll give Mr. Countryman some contact

8    information, what he'll do is he'll let you know one of two

9    things, either this jury was able to reach a verdict without

10   any loss of any of the members and so your services are not

11   any longer required or that something has happened that does

12   require you to come back and to be incorporated into the

13   deliberating jury, in which case he'll give you that

14   information and give you some instruction about when and where

15   to return.  So if you'll give Mr. Countryman that information,

16   he'll -- he'll arrange to deliver one of those two messages to

17   you.

18   Ms. Ford, if you will give Mr. Countryman your

19   notepad, he will keep that safe for you, and what I'm going to

20   do is ask you to go ahead and pass through the jury room on

21   your way out.  Don't interact with any of the other jurors.

22   Just collect any belongings that you might have in there.  I

23   hope you have a pleasant weekend.  I may not see you again.

24   If I don't, I want to tell you how much I appreciate your

25   attention and your service as a federal juror.  It's much

1    appreciated.

2              JUROR:  Thank you.

3              THE COURT:  All right.  Does the Government have any

4    objection to the Court's instruction as delivered other than

5    your previously noted objections?

6              MS. RIVERA:  No, Your Honor.

7              THE COURT:  Does the defense?

8              MS. REYES:  Yes, Your Honor, to the aiding and

9    abetting instruction.

10             THE COURT:  Okay.

11             MS. REYES:  Your Honor, I have a motion.  I don't

12   know if now is appropriate.

13             THE COURT:  Okay.

14             THE COURT SECURITY OFFICER:  She's ready to go down.

15             THE COURT:  Okay.  That's fine.  You can escort her

16   out this way, or she can go back out the public way, whichever

17   way she prefers.

18             Do you have all your things, Ms. Ford?

19             THE COURT SECURITY OFFICER:  Yes, Your Honor.

20             JUROR:  Yes.

21             THE COURT:  We just need to make sure we leave

22   somebody posted at the door for the jury.

23             Thanks, Ms. Ford.

24             Yes, Ms. Reyes?

25             MS. REYES:  Yes, Your Honor.

1          Your Honor, the Court's rulings, including the
2    extreme sanction of excluding evidence because the Court found
3    that it was untimely disclosed without analyzing the reasons
4    for the late disclosure or asking how the prosecutor was
5    prejudiced by the disclosure, amounted to cumulative error and
6    deprived Ms. Litzky of a fair trial.
7          Further, the addition of the aiding and abetting
8    instruction to Counts 2 and 4 adds a willfully element that,
9    in turn, turns those offenses into specific intent offenses.
10   The instruction itself should have included "intentionally."
11   I don't have a final copy of it, so I don't know if the Court
12   used the instruction as it was -- as it's patterned, but in
13   the Court ruling that production does not have a specific
14   intent element, the aiding and abetting instruction would add
15   one contrary to this Court's ruling.
16         So for the foregoing, we would move for a mistrial.
17         THE COURT:  Thank you.  Motion is denied.
18         We'll be in recess pending further word from the
19   jury.  I expect that's going to come pretty quickly, so if
20   you-all could stay close by.
21         MS. REYES:  Yes, Your Honor.
22         MS. RIVERA:  Your Honor, I need to leave for just a
23   few minutes to pick up my daughter.  She's stranded right now
24   waiting for me to pick her up from the Dr. Phillips Center.
25   If I may, Your Honor, just pick her up and come right back?

1          THE COURT:  We're going to hear from them in five

2     minutes or so.  I know you need to do something, but can you

3     dispatch someone else to pick her up or can you have someone

4     stand in for you?  Do you have somebody else from the

5     U.S. Attorney's Office --

6          MS. RIVERA:  I'll try to coordinate, Your Honor.  I

7     just need access to my cell phone, and maybe that can solve

8     it.

9          THE COURT:  I understand.  See if you can make an

10    arrangement.  I don't want her to stay over there unattended,

11    obviously, but we're going to hear back from them, I suspect,

12    in just a couple minutes.

13         (Recess at 5:20 p.m. until 5:27 p.m.)

14         THE COURT:  We're back on the record in

15    United States v. Litzky.  We don't have Mrs. Litzky.  Where is

16    the marshal?  We need Mrs. Litzky.

17         THE COURTROOM DEPUTY:  Can we radio the marshal?

18         THE COURT:  Did you make arrangements for your

19    child, or is she still waiting?

20         MS. RIVERA:  I think it's going to be taken care of,

21    Your Honor.

22         THE COURT:  Okay.  Good.

23         THE COURTROOM DEPUTY:  Can I take the exhibits back?

24    I was just going to take the exhibits back to the jury.

25         THE COURT:  Yeah.  I'm sending those back, yes.  Did

1   they take her downstairs already?  Here we go.  Thank you.

2        All right.  We're back on the record now in

3   United States v. Litzky, 18-cr-223.  The Court notes that all

4   counsel and defendant are present.

5        I got word from the jurors that they'd like to

6   adjourn for the evening and come back Monday morning and start

7   fresh, so I'm just going to bring them in, discharge them for

8   the weekend, and reinstruct them with respect to their

9   responsibilities.  So I'm going to bring them in and take care

10  of that.

11       Did you -- do we have a redacted indictment?

12       THE COURTROOM DEPUTY:  Yes.

13       MS. RIVERA:  Yes, Your Honor.

14       THE COURT:  Thank you.

15     (Jury in at 5:30 p.m.)

16       THE COURT:  You-all can go ahead and fill in all the

17  way down if you want.  Ladies and gentlemen, you-all can be

18  seated.  Thank you.

19       Ladies and gentlemen, I have received word that

20  you'd like to adjourn for the evening, for the weekend, and

21  come back Monday and commence your deliberations.  Is that

22  correct?

23       JUROR:  Yes.

24       THE COURT:  All right.  So I just want to remind you

25  of what I've already told you, but I'd be remiss if I didn't

1    do it again, especially since we've got a weekend between us

2    and the time we see each other again.  Just a reminder, it's

3    not appropriate to discuss the case amongst yourselves or with

4    anyone else.  I don't know whether the case will receive any

5    media coverage, but if it does, you should make every pain to

6    avoid it.  Turn the TV off or turn the channel, turn the

7    newspaper over or delete it from your screen, whatever you

8    have to do to avoid any exposure to any media coverage.  And,

9    obviously, just to remind you, it's -- it's wholly

10   inappropriate for you to do any kind of independent research

11   of any kind.

12          So, with that, I will excuse you with my thanks for

13   your hard work and attention over the course of the week, and

14   I look forward to seeing you back here 9:00 Monday morning.

15          What will happen on Monday when you return is you'll

16   be collected again, as you have been, in the jury room.  I'll

17   bring you in just very briefly, inquire of you as to whether

18   or not you've been able to follow my instructions, and then

19   send you back to begin your work.  So thank you very much

20   again, and I'll see you on Monday morning.

21      (Jury out at 5:32 p.m.)

22          THE COURT:  Anything further from the United States

23   this afternoon?

24          MS. RIVERA:  No, Your Honor.

25          THE COURT:  Anything further from the defense,

*233*

1    Ms. Reyes?

2          MS. REYES:  Your Honor, I have a 10:00 a.m.

3    sentencing hearing on a violation of supervised release.  I

4    don't expect it to be more than 15 or 20 minutes.  Do you

5    think I should file a motion to continue or --

6          THE COURT:  No.  I think you'll be fine.  I mean,

7    it's going to take just a minute or two, and, you know, I'd be

8    very surprised -- and even if they do come back with a

9    question or a verdict in that amount of time, I'll just hold

10   them until you're free.

11         MS. REYES:  Okay.  Thank you.

12         THE COURT:  All right.  So we'll be in recess, then,

13   until 9:00 Monday morning.

14      (Proceedings concluded at 5:33 p.m.)

15

16                    -    -    -

17

18              CERTIFICATE OF REPORTER

19   I certify that the foregoing is a correct transcript of the
     record of proceedings in the above-entitled matter.
20

21

22   /s/ Heather Jewett, RPR, FCRR        04/03/2020
     Heather Jewett, RPR, FCRR            Date
23   Federal Official Court Reporter

24

25